UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES A. MOLLET,

    Plaintiff,

v.                                                      Case No.

CITY OF GREENFIELD (Fire Department),

    Defendant.

# COMPLAINT

## I. NATURE OF ACTION

1.    This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq.*, and the Age Discrimination in Employment Act (ADEA), as amended, 29 U.S.C. §§ 621-634, to redress the injuries inflicted on the plaintiff, James A. Mollet, by the defendant when it harassed him and created a hostile work environment, retaliated against him for opposing discrimination in the workplace, and constructively discharged him from his position as a Battalion Chief for the City of Greenfield Fire Department, in violation of the rights secured by the Acts.

## II. JURISDICTION AND VENUE

2.    Jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1331, 1337, 1339, and 1343.

1

3. Venue in this Court is appropriate pursuant to 29 U.S.C. § 794A(a)(1) and 42 U.S.C. §2000E-5(f)(3) because the employment practices involved in this dispute occurred in Greenfield, Wisconsin, and thus venue is proper in the Eastern District of Wisconsin.

### III. PARTIES

4. Plaintiff James Mollet was an employee of the City of Greenfield (Fire Department), beginning in 1995, and is currently a resident of Waukesha, Wisconsin.

5. Defendant City of Greenfield is an employer within the meaning of the Age Discrimination in Employment Act (ADEA), as amended, the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1866, and has the capacity to sue and be sued in this Court.

### IV. ADMINISTRATIVE PROCEEDINGS

6. Mollet has timely and fully complied with prerequisites for administrative exhaustion required for jurisdiction in this court under the ADEA, as amended, and the Civil Rights Act of 1964, as amended, and thus all conditions precedent to this lawsuit within the meaning of Rule 9(c) of the Fed. R. Civ. Pro. have been performed or have otherwise occurred.

### V. FACTS

7. From March 6, 1995 until March 23, 2013, Mollet was employed as a firefighter/paramedic and fire lieutenant with the City of Greenfield Fire Department; his last title was Battalion Chief.

8. As one of three Battalion Chiefs, Mollet's duties were as follows: 1) he

2

was responsible for safety of all personnel during non-emergency and emergency incidents to include: fire suppression, hazardous material response, rescue operations, and emergency medical services; 2) he conducted supervision of Company Officers and shift personnel in their assigned duties as directed; 3) he performed the role of officer-in-charge of all fires, rescues and medical operations; 4) he assumed the role of incident commander and determined an overall plan to resolve the incident; 5) he supervised and developed the scheduling and coordination of shift staffing levels, changes and activities.

9. Mollet had duties in addition to the regular responsibilities of Battalion Chiefs as follows: 1) he trained firefighter recruits and acted as the department liaison for interns; 2) he developed training outlines, Department Intern Expectations and an Acting Officers Mentoring Manual; 3) he implemented and maintained community and safety programs such as, "Keep the Wreath Green" campaign as well as "Adopt a Hydrant" program; and 4) he acted as the Department's public relations officer.

10. On February 19, 2012, Mollet told his superiors, Chief Jon Cohn and Assistant Chief George Weber, that there had been an incident at the fire station during which a Latino firefighter, Cesar Hernandez, had been harassed based on his ethnic background; the incident had been brought to Mollet's attention earlier in the shift by four other personnel/subordinates.

11. Someone had put up posters on the wall near the entrances to the locker room and bunk room, one of which had a picture of the Mexican flag with "Border Patrol" across the bottom; Hernandez is Mexican-American.

12. When the matter was initially reported to Mollet, he was also told that Batallion Chief Hammernik was aware of the harassment, as Hammernik had a picture of the postings on his phone.

13. Mollet brought the matter to the attention of his superiors because the City of Greenfield had a policy prohibiting peers from performing investigations of each other, and at the time, Mollet and Hammernik held the same rank; he expected Weber or Cohn to conduct the investigation.

14. Instead, Weber instructed Mollet to investigate the matter, which he did.

15. After he began his investigation, Mollet reported to Cohn and Weber that Battalion Chief Shawn Hammernik was aware of the incident, as he had a photograph on his telephone of the postings used to harass Hernandez; Mollet also reported to Cohn and Weber when and how he came by the information.

16. After receipt of Mollet's report, Cohn and Weber told Mollet that he should have taken the matter to Hammernik rather than making a formal complaint about the harassment, prompting an investigation.

17. Cohn and Weber proceeded to harass Mollet and create a hostile work environment for him from that point on, primarily by criticizing Mollet's communication skills, especially as those skills related to texting; they also criticized Mollet's abilities as the public relations officer for the Department.

18. Cohn and Weber removed Mollet from certain roles in the Department, such as training and mentoring roles.

19. The insulting comments and actions were routine, and occurred at least weekly and sometimes daily; the harassment was pervasive.

20. Cohn and Weber repeatedly told Mollet that Mollet's job was in jeopardy.

21. Mollet complained to the City's Human Resources Director, Ben Granberg, about the harassment of Hernandez, as well as the harassment and the hostile work environment Mollet experienced at the Fire Department after he submitted his report regarding his investigation of the harassment of Hernandez.

22. Granberg recommended that Mollet talk to the Chief about Mollet's concerns.

23. In July 2012, Mollet took vacation time to go on a mission to Honduras to deliver firefighting equipment donated by Wisconsin fire department to Honduran firefighters.

24. Upon his return, he requested a meeting with Chief Cohn to discuss the Greenfield Patch newspaper reporting about his volunteer activities.

25. Instead of Mollet being able to address concerns, the meeting turned into another opportunity for Cohn and Weber to berate Mollet for his communication skills or rather what they considered his lack of skills.

26. At some point in August or September, Mollet again turned to Granberg for assistance.

27. Granberg suggested that perhaps a meeting between Granberg, Cohn and Mollet would help.

28. Mollet decided he wanted to think about the offer, and waited until October to accept.

29. In October, Mollet contacted Granberg again and said that he did want Granberg to set a meeting with the two of them and Chief Cohn.

5

30. Granberg said that Granberg was taking leave, and that he would have the Mayor Neitzke organize the meeting instead.

31. Granberg assured Mollet that the conversations between the two of them would remain confidential, as would any conversations between Mollet and Neitzke.

32. Mollet tried to contact Neitzke to set up the meeting, but both times he was told that the Mayor was out ill.

33. On November 15, 2012, Cohn told Mollet that both Neitzke and HR Director Granberg had told Cohn that Mollet had been to see them; apparently Granberg's assurances of confidentiality were unreliable.

34. Cohn also told Mollet that either Mollet could change or "get off the bus."

35. Cohn told Mollet that Mollet would either be demoted or discharged, because Cohn did not trust Mollet anymore.

36. Naturally, Mollet began to look for new employment.

37. On February 19, 2013, Mollet informed Weber that Mollet had a conditional job offer from another fire department dependent on passing physical and psychological examinations, and that if he passed the exams and was provided an unconditional offer of employment, he would be resigning from the Greenfield Fire Department; he did not resign at that time.

38. By letter dated February 22, 2013, Chief Cohn wrote Mollet "accepting" Mollet's "resignation" from the Department and informing Mollet that February 24, 2013, would be Mollet's separation date.

39. On February 25, 2013, Mollet hand-delivered a letter to Cohn and personally spoke with Weber, indicating that Mollet's conversation with Weber was not a resignation.

40. By letter dated February 28, 2013, Cohn wrote Mollet stating that "we stand by the resignation and separate date at the conclusion of payroll on Sunday, February 24, 2013," effectively discharging Mollet.

41. Cohn failed to follow any of the procedures required for discharge of an employee from a fire department under Wisconsin Statutes or the Greenfield Police and Fire Commission Rules and Regulations.

42. Cohn rescinded the discharge and placed Mollet on paid leave pending the outcome of the conditional offer of employment.

43. Cohn and Weber demanded daily updates through phone calls, texts and meetings regarding the status of Mollet's conditional offer of employment, and used these contacts to remind Mollet that he would be demoted or discharged if he decided to continue his employment with the Greenfield Fire Department.

44. Faced with the threats of either demotion or discharge, Mollet obtained a position as a Battalion Chief with a different fire department, at a considerable loss in pay and benefits.

## VI. VIOLATIONS OF LAW

45. Defendant City of Greenfield (Fire Department), and its relevant agents and supervisors, acted without regard to Mollet's rights as guaranteed under the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, as amended, and 42 U.S.C. § 1981, by, among other acts, engaging in discrimination and

7

retaliation for opposing discrimination in the workplace by harassing Mollet, creating a hostile work environment for him, and by constructively discharging him.

## VII.  DAMAGES AND EQUITY

A.  Damages

46. By virtue of Defendant's unlawful actions against the plaintiff, the plaintiff has sustained lost wages, future lost earning capacity, physical, mental and emotional distress, community humiliation and loss of reputation, for all of which he seeks compensatory damages in amounts deemed just by the Court.

B.  Equity

47. For some of his injuries, the plaintiff has no plain, adequate or speedy remedy at law and thus he invokes the Court's equitable jurisdiction to award declaratory and injunctive relief against the Defendant.  This shall include, but not be limited to, an order that plaintiff's employing unit and the Defendant City of Greenfield (Fire Department) be enjoined from applying or enforcing any practice requiring employees who report illegal harassment of others to take that issue to a harasser before making a complaint with management.

## VIII.   JURY DEMAND

48. Plaintiff hereby demands a trial by jury of all issues triable of right to a jury herein.

## IX. PRAYER FOR RELIEF

WHEREFORE, the plaintiff demands judgment awarding him back pay, compensation for lost benefits, compensatory damages in amounts deemed just by the Court, make-whole equitable relief, and the reasonable costs and expenses of this action including a reasonable attorney's fee, as well as such other and further relief as may be just. This shall include, but not be limited to, an order that that plaintiff's employing unit and the Defendant City of Greenfield (Fire Department) be enjoined from applying or enforcing any practice requiring employees who report illegal harassment of others to take that issue to a harasser before making a complaint with management.

Date:   August 25, 2016

s/ Brenda Lewison

Attorney Brenda Lewison
SBN:   1025079

Law Office of Arthur Heitzer
633 W. Wisconsin Ave., Suite 1410
Milwaukee, WI  53203-1918
(414) 273-1040 x 14
(414) 273-4859 FAX
lewisonlaw@yahoo.com

ATTORNEY FOR THE PLAINTIFF