James A. Mollet v. City of Greenfield (Fire Department)

16CV1145

Transcript of the Testimony of:

# James Mollet

February 7, 2018



800.899.7222 • www.GramannReporting.com

MILWAUKEE **414.272.7878** • FAX: **414.272.1806** • 740 North Plankinton Ave, Suite 400, Milwaukee, WI 53203

MADISON **608.268.0435** • FAX: **608.268.0437** • 14 West Mifflin Street, Suite 311, Madison, WI 53703

```
 1          IN THE UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF WISCONSIN

 3  --------------------------------------------------------

 4  JAMES A. MOLLET,

 5                    Plaintiff,

 6      -vs-                        Case No. 2:16-CV-01145-LA

 7  CITY OF GREENFIELD,

 8                    Defendant.

 9  --------------------------------------------------------

10

11

12              Deposition of JAMES MOLLET

13              Wednesday, February 7, 2018

14                    9:09 a.m.

15                       at

16              CRIVELLO CARLSON, S.C.
            710 North Plankinton Avenue, Suite 500
17                 Milwaukee, Wisconsin

18

19

20

21

22      Reported by Lindsay DeWaide, RMR, CRR

23

24

25
```

 1              Deposition of JAMES MOLLET, a witness in the

 2      above-entitled action, taken at the instance of the

 3      Defendant, pursuant to the Federal Rules of Civil

 4      Procedure, before Lindsay DeWaide, Registered Merit

 5      Reporter, Certified Realtime Reporter, and Notary

 6      Public in and for the State of Wisconsin, at CRIVELLO

 7      CARLSON, S.C., 710 North Plankinton Avenue, Suite 500,

 8      Milwaukee, Wisconsin, on the 7th day of February, 2018,

 9      commencing at 9:09 a.m. and concluding at 2:57 p.m.

10

11      A P P E A R A N C E S:

12          LAW OFFICE OF ARTHUR HEITZER, by
                Ms. Brenda Lewison
13              633 West Wisconsin Avenue, Suite 1410
                Milwaukee, Wisconsin 53203
14              Appeared on behalf of Plaintiff.

15          CRIVELLO CARLSON, S.C., by
                Mr. William W. Ehrke
16              710 North Plankinton Avenue, Suite 500
                Milwaukee, Wisconsin 53203
17              Appeared on behalf of Defendant.

18

19

20      ALSO PRESENT:  Jon Cohn

21

22

23

24

25

E X A M I N A T I O N

                                              PAGE

BY MR. EHRKE                                    4

BY MS. LEWISON                                 198

BY MR. EHRKE                                   203


E X H I B I T S

NUMBER                                PAGE IDENTIFIED

Exh. 1    Email Correspondence            99

Exh. 2    Email Correspondence           138

Exh. 3    Email Correspondence           139

Exh. 4    2/23/13 Letter                 145

Exh. 5    3/23/13 Letter                 152

Exh. 6    Settlement Numbers             159

Exh. 7    Document                       185

  (Original exhibits attached to original transcript;
   copies of exhibits attached to copies of transcript.)

1                    TRANSCRIPT OF PROCEEDINGS

2                    JAMES MOLLET, called as a witness

3        herein, having been first duly sworn on oath,

4        was examined and testified as follows:

5                    E X A M I N A T I O N

6    BY MR. EHRKE:

7    Q    Can you state your name, please.

8    A    James Allen Mollet.

9    Q    Can you spell the last name for me.

10   A    M-O-L-L-E-T.

11   Q    Mr. Mollet, have you ever been deposed before?

12   A    No.

13   Q    Okay.  And the reason I ask that is I'm going to

14       tell you a few things that we're going to be

15       doing so that you understand the process.  I'm

16       going to be asking you some questions.  They're

17       going to relate to the claims in your lawsuit

18       against the City of Greenfield.

19                    I'm going to ask you to wait until my

20       questions are done and then answer out loud so

21       the court reporter can get your answer.  Head

22       shakes and um-hums don't translate well on the

23       transcript.

24   A    Sure.

25   Q    And I want you to take your time.  A lot of

1        times people feel that there's a rush, but

2        there's no rush.  If you don't understand one of

3        my questions, feel free to tell me --

4    A   Sure.

5    Q   -- and I'll rephrase it.

6    A   Sure.

7    Q   Otherwise, when we get done today, I'll be

8        working with the understanding that you have

9        understood the questions.

10   A   Sure.

11   Q   If you want to take a break for any time -- or

12       for any reason at any time, feel free.  I just

13       ask that if you want to take a break, you not do

14       it between a question and an answer.

15   A   Okay.  You can always ask for a break otherwise

16       at any time.

17   Q   And, Mr. Mollet, what the process calls for,

18       since you haven't been through this, is when

19       we're done today, at some point, depending on

20       the court reporter's schedule, we're going to

21       get a transcript.

22   A   Okay.

23   Q   And the transcript will have what we have

24       discussed today on paper.  And the reason we do

25       that is because that will be used -- as a matter

```
 1        of fact, I will be reading parts of it to a jury
 2        in a trial in this case.  That's why I want to
 3        make sure that when we're done, you've
 4        understood my questions or I've corrected any
 5        questions you didn't understand.
 6                   Have you ever been a party to a
 7        lawsuit before?
 8  A     No.
 9  Q     Okay.  Have you ever made a claim against an
10        insurance company before?
11  A     No.
12  Q     All right.  So this is your first go-around with
13        litigation, I understand?
14  A     Correct.
15  Q     All right.  And what is your present address?
16  A     3835 Valley Creek Drive, Waukesha, Wisconsin
17        53189, ZIP code.
18  Q     And your date of birth?
19  A     December 27, 1967.
20  Q     And the last four numbers of your social
21        security number?
22  A     1675.
23  Q     All right.  Are you presently employed?
24  A     Yes.
25  Q     Where?
```

| | | |
|---|---|---|
| 1 | A | Village of Menomonee Falls Fire Department. |
| 2 | Q | And what is your title there? |
| 3 | A | Assistant fire chief. |
| 4 | Q | Okay.  And under the setup in Menomonee Falls, |
| 5 | | is that the highest ranking position in the fire |
| 6 | | department? |
| 7 | A | Correct. |
| 8 | Q | And can you tell me how that organization is set |
| 9 | | up with regard to what I understand is kind of |
| 10 | | an overview public safety deal? |
| 11 | A | Correct. |
| 12 | Q | Can you explain that to me? |
| 13 | A | In 2012, they went from a traditional fire |
| 14 | | chief, assistant chief, and then deputy chiefs |
| 15 | | to a director of protective services, who is the |
| 16 | | police chief in the village.  She's also the |
| 17 | | assistant village manager.  So she wears the |
| 18 | | assistant village manager position, police |
| 19 | | chief, and the director of protective services, |
| 20 | | and she oversees both the police and the fire |
| 21 | | department. |
| 22 | Q | Okay.  And you said that occurred in 2012.  Do |
| 23 | | you know when that occurred in 2012? |
| 24 | A | Not exactly.  It was prior to me getting to |
| 25 | | Menomonee Falls.  I don't know the exact date, |

1       but I remember it being 2012.

2    Q  So that would have occurred ostensibly when you

3       were still working with the City of Greenfield?

4    A  Correct.

5    Q  Okay.  How did you become aware that

6       Menomonee Falls had made this organizational

7       restructuring?

8    A  When I initially applied, I wasn't aware that

9       there was that type of structure.  However,

10      going through documents and looking at the

11      structure of the organization, I realized that

12      that was what the makeup was of a director of

13      protective services.

14   Q  And when you say initially applied, when did you

15      initially apply with Menomonee Falls?

16   A  That would have been December 11th, I believe,

17      is when I looked at the application.  It was

18      sent to me via email on -- I believe it was the

19      Wisconsin state fire chiefs would send job

20      announcements, and I happened to see it, and I

21      believe it was December 11, 2012.

22   Q  Okay.  And so but for the Wisconsin fire chief's

23      group sending out job available announcements,

24      would you have known that Menomonee Falls had an

25      opening or it was looking for someone?

 1   A   No.

 2   Q   Okay.  And so prior to December 11, 2012, when

 3       the Wisconsin fire chief notification came to

 4       you, prior to that, you had never sought work or

 5       employment with Menomonee Falls, had you?

 6   A   No.

 7   Q   Prior to December 11th of 2012 and while you

 8       were employed by Greenfield, did you seek

 9       employment anywhere else?

10   A   Yes.

11   Q   And can you tell me when and where that was?

12   A   That was New Berlin Fire Department.  And to the

13       best of my recollection, the date was January of

14       2003.

15   Q   And understanding that was some time ago, what

16       prompted you to look for work at New Berlin?

17   A   At the time, I was in class with an assistant

18       chief from New Berlin, Joe Dallman, who was

19       also, as I said, an assistant chief in

20       New Berlin.  We were in chemistry class, and he

21       had mentioned that they had not filled a

22       position of assistant chief of EMS.  And I

23       inquired about it, asked him some of the

24       particulars, and it intrigued me a little bit to

25       maybe seek some job or career advancement, pay

    1         advancement.

    2    Q    And so you were with Greenfield in 2003?

    3    A    Yes.

    4    Q    And what was your position with Greenfield at

    5         the time you looked into the New Berlin

    6         position?

    7    A    I was a firefighter/paramedic.

    8    Q    And so the thought of looking into New Berlin

    9         was for job advancement, primarily?

   10    A    Yes.

   11    Q    All right.  Mr. Mollet, other than Ms. Lewison,

   12         your attorney who's here with you today, have

   13         you spoken with anyone about this deposition or

   14         about this case other than perhaps your wife in

   15         the last -- well, since you became aware that

   16         you were going to be deposed today?

   17    A    The people that had referred to me or had called

   18         me to tell me that they were being deposed are

   19         the only people that I've spoken to.

   20    Q    Okay.  And let's go down to who that was.  Who

   21         have you spoken with?

   22    A    Donna Perkins and Dan Windler.  And, again, it

   23         was basically them telling me that they got a

   24         letter telling them that they were deposed.

   25    Q    Did they call you or did you call them?

1   A    They called me.

2   Q    And tell me all of your discussions that you had

3         with Donna Perkins between that first initial

4         call from her and today.

5   A    We discussed the deposition, the date, the time,

6         the place.  I'm not aware that she has ever been

7         deposed, but some of the -- what happens in a

8         deposition.  Those were some of the

9         conversations.

10            Likewise, with Dan Windler, just

11        talking about what may or may not happen,

12        questions, things like that.

13  Q    And since you've never been deposed before, how

14        did you have any knowledge as to what to discuss

15        there?

16  A    I think it was -- essentially, we were

17        bantering, you know, what do you think?  How do

18        these go?  I, quite frankly, said, I have no

19        idea.  I've never been deposed.  So it was

20        somewhat of a -- conversations of just saying,

21        you know, what types of questions do you think?

22        And I simply said, I don't know.

23  Q    Well, did you and Donna -- first of all, how

24        many times have you spoken with Donna Perkins

25        about this matter?

| 1  | A | Maybe three. |
|----|---|---|
| 2  | Q | Okay.  And tell me when each of those |
| 3  |   | discussions took place and the form. |
| 4  | A | Initially, it was when Donna Perkins had |
| 5  |   | received the first notification that she was |
| 6  |   | being deposed approximately a week and a half |
| 7  |   | ago.  And again maybe a week later.  Again, I |
| 8  |   | cannot recall the exact date.  And then |
| 9  |   | approximately another week after that.  Or, I'm |
| 10 |   | sorry, a few days after that. |
| 11 | Q | And the one and a half week ago, was that the |
| 12 |   | first contact the two of you had? |
| 13 | A | Yes.  Like I said, she was -- someone had |
| 14 |   | stopped at her home to deliver a deposition. |
| 15 |   | She wasn't home, although her partner had |
| 16 |   | mentioned that she -- someone had came for her. |
| 17 |   | So she called me to say that she had received |
| 18 |   | something or was receiving something. |
| 19 | Q | And in that first phone call, tell me everything |
| 20 |   | that she said to you and everything you said to |
| 21 |   | her. |
| 22 | A | Essentially, we talked about, you know, again, |
| 23 |   | what is a deposition, you know, what types of |
| 24 |   | questions do you believe will be asked.  And I |
| 25 |   | said, I don't -- I'm not quite sure.  I would |

1          imagine that it's -- you know, anything is fair

2          game.

3                    So there was never really any distinct

4          conversation as to what -- you know, anything in

5          particular.  It was a lot of speculation, I

6          guess you could say, as to what kind of

7          questions.

8    Q    Well, in that first call, did you and

9          Ms. Perkins talk about the facts of this case or

10         what had occurred while you were both employed

11         by the City of Greenfield or what you thought

12         about Chief Cohn or Assistant Chief Weber or

13         anything like that?

14   A    There was never discussions in particular about

15         Chief Cohn or Chief Weber.  It was probably more

16         so in the direction of incidences that had

17         happened while being employed there.

18   Q    Okay.  And these incidences that had happened

19         while being employed there, what incidences did

20         you discuss with Ms. Perkins in that first call?

21   A    Basically, it was that Cesar Hernandez incident.

22   Q    And what did you two discuss about the

23         Cesar Hernandez incident when you spoke about a

24         week and a half ago?

25   A    Essentially, the notification, when I was

```
 1          notified from her that -- a conversation that we

 2          had had at that particular time.  And then what

 3          I had done after I had a conversation with the

 4          individuals who brought it to my attention.

 5     Q    Well, you said when you were notified by her of

 6          the Hernandez incident.

 7                   Is she the first one that notified you

 8          of that -- what you call the Hernandez incident?

 9     A    No.

10     Q    Who was the first person to notify you of that

11          incident?

12     A    It was a Sunday morning.  I had just finished

13          roll call, and I was asked by Lieutenant

14          Paul Sustachek and Garret Cieczka, who was a

15          firefighter/paramedic on my shift -- they asked

16          me if they could speak to me in private in the

17          lieutenant's office.

18     Q    And before they came to speak to you, had you

19          seen anything that related to what ultimately

20          you call the Hernandez incident?  Had you seen

21          bedding strung up?  Had you seen anything else?

22     A    Yes.

23     Q    What had you seen before the lieutenants asked

24          you about that Sunday morning?

25     A    I did see that his bedding was strung up.  It
```

```
 1        was on the east wall of the fire apparatus

 2        floor.

 3   Q    Which building?

 4   A    Station 1.  Fire Station 1.  And I saw it

 5        briefly as I was leaving to go to do my rounds

 6        that morning and, at that particular time,

 7        didn't notice much else about it except that it

 8        had been strung up with what appeared to be

 9        hazard tape.  And it had a sign that I could see

10        that said "C.," his first initial, "Hernandez

11        2011..."

12                   And, again, left with my -- put my

13        gear in the battalion car, went to Station 2 to

14        do my rounds, and came back.  And by the time I

15        came back, it was down.

16   Q    And do you remember the date when you first saw

17        that?

18   A    To the best of my recollection, February 17th

19        would have been a Friday.

20   Q    Okay.  And that would have been a Friday.  So,

21        having seen this, you were a battalion chief at

22        the time; correct?

23   A    Correct.

24   Q    And at the time, the organizational structure

25        was chief, assistant chief, and then three
```

```
 1        battalion chiefs reporting to the assistant

 2        chief; correct?

 3   A    Correct.

 4   Q    And when you saw that, did you report or

 5        complain about it to anyone on that Sunday, the

 6        17th?

 7   A    Correction.  It was Friday.

 8   Q    Or Friday, the 17th -- I'm sorry -- did you

 9        report or complain about it to anyone in your

10        role as a battalion chief?

11   A    No.

12   Q    And would you -- well, prior to the 17th of

13        February of 2012, it wasn't uncommon for certain

14        firefighters' bedding to be strung up if they

15        left it at the end of their shift, was it?

16   A    I can't say that it wasn't.  It was a common

17        occurrence that it happened; however, sometimes

18        what people had done with it when it was left

19        varied in degrees of what happened to it.

20   Q    And tell me what kind of things would be done by

21        firefighters to other firefighters' gear if they

22        left it at the end of their shift.

23   A    Basically, the things that I've known is that

24        they've taken it and wrapped it up in a tight

25        ball and tied it in a knot, so when they came
```

```
 1            back, they wouldn't be able to untie it very

 2            easily.

 3    Q       Other than the Hernandez gear, had you seen it

 4            strung up somewhere prior to then?

 5    A       No.

 6    Q       Had you been aware of circumstances where a

 7            firefighter had left his or her gear and it was

 8            then balled up and put in the freezer, as an

 9            example?

10    A       Not that I'm aware of.

11    Q       Okay.  So other than tightening it up prior to

12            the Hernandez incident, were you aware of any

13            other activities by co-firefighters with their

14            brethrens' or sisters' gear?

15    A       Not that I'm aware of.

16    Q       Were you ever aware of why anyone would --

17            before Hernandez, why they would ball it up or

18            tighten it up into a tight ball if it was left

19            at the end of the shift?

20    A       I'm sorry.  Could you please repeat.

21    Q       Before Hernandez, do you know why firefighters

22            did that --

23    A       No.

24    Q       -- to other firefighters?

25    A       No.
```

1    Q    Was there a procedure by which at the end of a

2         shift a firefighter was to stow or put away gear

3         or do something with their bedding?

4    A    Yes.

5    Q    What was that procedure?

6    A    Essentially, they would -- it depended on what

7         they carried their gear in, if it was in a

8         duffel bag or a tote.  They would typically fold

9         it up, put it away, and stow it.  In Station 1,

10        they had a closet that had shelving units, and

11        they would stow it in that area.  And, again,

12        some people would put it in a duffel bag and

13        maybe slide it on the floor.

14   Q    And it was in circumstances where a firefighter

15        would either forget or neglect to do that at the

16        end of the shift when firefighters at the

17        beginning of the next shift would either ball it

18        up or do something with it; correct?

19   A    I believe that's when it would be done, yes.

20   Q    And that's what happened to Cesar Hernandez's

21        gear; correct?

22   A    I believe so.

23   Q    And do you know, as we sit here today, who took

24        the bedding and strung it up at Station 1?

25   A    I do not recall or know exactly who had done

1       that. I do know of possibly a shift that it

2       occurred on, but I don't know exactly the

3       person.

4   Q    Okay. And I'll go back into that. I got a

5       little bit offtrack there.

6          But did you discuss any of these

7       details with Donna Perkins in your first

8       discussion a week and a half ago?

9   A    No.

10   Q    So as I understand it -- well, strike that.

11          Was there anything else that you

12       discussed with Donna Perkins in that first phone

13       call? I assume it was a phone call.

14   A    Correct.

15   Q    And at any time did they call and ask, why did I

16       get subpoenaed, why am I being asked to give a

17       deposition?

18   A    No.

19   Q    Did you ever tell her that she had been named as

20       a potential witness in this suit by your

21       attorney?

22   A    Yes.

23   Q    When did you tell her that?

24   A    I don't recall exactly when. I do know that I

25       did mention it to her.

1   Q   You never told Dan Windler that he had been

2       named until he called you about the subpoena,

3       did you?

4   A   No.  I did.

5   Q   When did you tell him that?

6   A   Well, I told him that he was added to a witness

7       list.

8   Q   When did you tell him that?

9   A   I don't recall.  I believe it was when I had to

10      submit a witness list to my attorney.

11   Q   So if he says he knew nothing about this case or

12      being named as a witness until he got a

13      subpoena, you would disagree with that?

14   A   Yes.

15   Q   And so how long did that first phone call with

16      Donna Perkins last a week and a half ago?

17   A   Approximately 30 minutes.

18   Q   Okay.

19   A   Maybe longer.

20   Q   And then you said you spoke with her perhaps

21      another week later.  Was that on the phone or in

22      person?

23   A   In person.

24   Q   Okay.  And where did you meet with Ms. Perkins?

25   A   We had lunch at -- what's the name of it?  It's

```
 1        a Mexican restaurant in Milwaukee, National

 2        Avenue.  The name escapes me.  I'm sorry.  I

 3        don't remember offhand.

 4   Q    There aren't many left.  That's why I was

 5        wondering if you could recall it.

 6                 And who was -- in that first phone

 7        call, was anybody else on the line with you --

 8   A    No.

 9   Q    -- and Ms. Perkins?

10   A    No.

11   Q    So the lunch at the Mexican restaurant about a

12        week after she had been -- or she had heard that

13        a server was at her residence, in that lunch,

14        who was present?

15   A    Donna and I.

16   Q    Anyone else?

17   A    No.

18   Q    Was anyone else invited but couldn't come?

19   A    No.

20   Q    And how long did the two of you talk that day?

21   A    Probably 40 minutes or so.  Maybe a little

22        longer.  Just enough to eat lunch and go back to

23        work.

24   Q    And I understand she's retired now.

25   A    Yes.
```

1   Q   And tell me everything that the two of you

2       discussed at lunch that day.

3   A   Again, it was, you know, what may be discussed

4       during a deposition, what questions may be

5       asked, any types of information of that nature.

6               And, again, it was somewhat of

7       bantering of what do you think -- what do you

8       think the questions will be, and the same for

9       me.  Again, some conversation about the incident

10      with Cesar.

11  Q   Was it more detailed conversation about the

12      incident with Cesar than you had had on the

13      phone, or was it the same discussion?

14  A   Same discussion.

15  Q   And in that phone first call -- and I apologize,

16      but you had said the two of you discussed a

17      number of "incidents," and you said plural.  And

18      then I asked you which ones, and you referred to

19      Hernandez.

20              In that first call, what other

21      "incidents" did you discuss with Donna Perkins?

22  A   Essentially, they were things that she had

23      happen to her while she was still employed with

24      Greenfield.

25  Q   And did she work -- were you her battalion

| | | |
|---|---|---|
| 1 | | chief? |
| 2 | A | I was starting in 2009.  Prior to that, I was a |
| 3 | | lieutenant. |
| 4 | Q | And from 2009 on, when you were her battalion |
| 5 | | chief, in the context of recently you speaking |
| 6 | | with her about "what happened to her," did she |
| 7 | | ever complain to you while you were her |
| 8 | | battalion chief of what she perceived was either |
| 9 | | illegal or discriminatory treatment? |
| 10 | A | No. |
| 11 | Q | And so moving forward to the phone call, where |
| 12 | | she discussed things that had "happened to her," |
| 13 | | what did she tell you in the phone call about |
| 14 | | what had happened to her? |
| 15 | A | She didn't really tell me what had happened. |
| 16 | | She just recanted [sic] the incidents of, you |
| 17 | | know, the -- there was a -- I guess you would |
| 18 | | call a blowup doll that was noticed at the |
| 19 | | station that was affixed to the back of an |
| 20 | | engine.  She had mentioned that instance. |
| 21 | Q | When did that occur? |
| 22 | A | I don't recall offhand. |
| 23 | Q | Did she say whether she ever complained to |
| 24 | | anybody about that? |
| 25 | A | Yes. |

```
 1   Q   And what was done when she complained about it?

 2   A   I believe what she did is she went to the union

 3       president, at that time was Garret Cieczka, and

 4       brought it to his attention, and it ultimately

 5       was brought to the chief's attention.

 6   Q   Who was the chief at that time?

 7   A   Russ Spahn.

 8   Q   And what did he do about it?

 9   A   From what I recollect, he questioned everyone

10       who was working that day, performed an

11       investigation, and gave the findings back to

12       her.  I was not aware of what those were.

13   Q   And when someone makes such a complaint, from

14       your perception, the proper approach was to

15       conduct an investigation and then address it

16       with the person who had presented the complaint;

17       correct?

18   A   No.

19   Q   What was the proper process when Chief Spahn was

20       there and she made this complaint?

21   A   Proper process would have been to go to your

22       supervisor, go to that supervisor, then go to

23       their supervisor.  And then, if the case

24       warranted, it would go to the human resources

25       director and then the mayor possibly.
```

```
 1   Q   So in that case, she didn't even follow the

 2       process because she went to a coworker, who was

 3       the head of the union; correct?

 4   A   I believe that going to the union representative

 5       was her thought of going through somewhat of a

 6       chain of command.

 7   Q   But that was not the process that you just

 8       described to me, was it?

 9   A   No.

10   Q   Other than the blowup doll incident, what other

11       incidents did you discuss with Donna Perkins?

12   A   She had -- throughout her career, she had had a

13       number of incidences where she was harassed

14       with, I guess, things that were affixed to her

15       locker, messages.

16               She was a -- not admittedly at first,

17       but she was a lesbian, and she came out and

18       mentioned it to the department on her own free

19       will.  And so prior to that, there were a number

20       of messages and things that were affixed to her

21       locker, inside of her locker, stating that

22       she -- that that lifestyle wasn't correct, I

23       guess.

24   Q   Now, do you have any personal knowledge of that

25       or is this all based on what she told you
```

1       recently?

2   A   I do not have personal knowledge of that, no.

3   Q   So anything you know about that comes from her

4       telling you the story; correct?

5   A   Correct.

6   Q   So you would not have been involved in any

7       investigations of any of those incidents had she

8       complained about them, would you?

9   A   No.

10  Q   Okay.  And so from 2009 on, when you were her

11      battalion chief, she never made any such

12      complaints to you, did she?

13  A   No.

14  Q   Because if she had, you would have investigated

15      them as the battalion chief; correct?

16  A   Correct.

17  Q   And if none of these incidents occurred after

18      2009 that you're talking about with

19      Donna Perkins, then it would be fair to state

20      that during these incidents that she complained

21      about, Chief Cohn wasn't the chief, and

22      Assistant Chief Weber wasn't the assistant

23      chief; correct?

24  A   Correct.

25  Q   Did she ever have any complaints to you about

1       any treatment or incidents after Chief Cohn

2       stepped in, first as the interim chief?

3  A    Not that I recall.

4  Q    And when he became the permanent chief, did she

5       have any complaints?

6  A    Not that I recall.

7  Q    As a matter of fact, with regard to

8       Cesar Hernandez, she never complained to the

9       chief, did she, that you know of?

10 A    Not that I recall.

11 Q    What is your understanding of Cesar Hernandez's

12      feelings about the bedding and the sign that

13      were put up?  Did you ever talk to him about

14      that?

15 A    No.

16 Q    You were tasked with investigating that

17      incident, were you not?

18 A    Yes.

19 Q    And you never even talked to the subject of it?

20 A    Essentially, when the incident was noticed and

21      brought to my attention, that evening I sent an

22      email to the chief and assistant chief and the

23      next morning was told -- or, actually, that

24      evening was told to investigate and get back to

25      them.

 1              At that time, I did say that I would

 2       rather not.  However, I did not say that I would

 3       not investigate.  And, quite frankly, I had not

 4       seen Mr. Hernandez after the incident or even

 5       reporting it, so --

 6    Q   Now, my question -- let's answer the question I

 7       asked.

 8    A   Okay.

 9    Q   Did you ever speak with him in the context of

10       any investigation about that incident?  Yes or

11       no?

12    A   No.

13    Q   Okay.  Did you understand him to be the

14       "subject" of whatever had occurred?  The target,

15       the victim, whatever?

16    A   Yes.

17    Q   And why didn't you talk to him if you had to

18       conduct an investigation?

19    A   Again, at that time, when I got the email to

20       conduct the investigation, I spoke with

21       Assistant Chief Weber and asked him a few

22       questions and said, you know, how in depth can I

23       go?  When would you like the results?  And I do

24       not recall the third question, but I know there

25       was three of them.

1              At that time he said, Why don't you

2        give me what you have.  Don't do anything else.

3        Just give me what you have, and I'll take it

4        from here.

5   Q    Okay.  So when from -- well, when did

6        you -- strike that.

7              You observed this on February 17th,

8        and then you in your email reported it to

9        Assistant Chief Weber the night of the 19th;

10       correct?

11  A    Correct.

12  Q    Why did you wait two days if you observed it on

13       the 17th and thought there was something wrong

14       with it?

15  A    Initially, when I first saw it, I was not aware

16       of the Hispanic flag with "border patrol"

17       written underneath.

18  Q    And, as a matter of fact, when did you become

19       aware of the "Hispanic" flag?

20  A    On Sunday morning, the 19th.

21  Q    And by then, it wasn't even up on the wall

22       anymore, was it?

23  A    No.

24  Q    Where was it when you became aware of it?

25  A    The lieutenant that was working that day,

```
 1        Paul Sustachek, had it on his desk.  He had

 2        taken it from where it was and showed it to me.

 3   Q    And when you say "from where it was," you mean

 4        from the wall in the firehouse or from somewhere

 5        else?

 6   A    I'm not -- I don't recall where they had gotten

 7        it from.  But, nonetheless, when I was -- came

 8        into the meeting, they had asked me, Did you see

 9        Cesar Hernandez's bedding?

10                I said, I did see that.

11                They said, Did you see the sign?

12                And I said, Well, I saw the sign of

13        "C. Hernandez 2011."

14                And they said, No.  Did you see the

15        other sign?

16                And I said, No.  What do you mean?

17        And they showed me that, the picture.

18   Q    Did they tell you where they had actually gotten

19        that from?

20   A    No.

21   Q    Did Donna Perkins ever complain to you about the

22        existence of that Mexican flag and what I'll

23        call the poster?

24   A    Yes.

25   Q    And did she tell you where she first saw it and
```

| | | |
|---|---|---|
| 1 | | was offended by it? |
| 2 | A | From what I can recall, I believe it was on his |
| 3 | | locker, perhaps. |
| 4 | Q | Who put it on his locker? |
| 5 | A | I don't recall.  I don't know. |
| 6 | Q | If he will testify that he thought it was funny |
| 7 | | and he put it on his locker, would you have any |
| 8 | | way to dispute that? |
| 9 | A | No. |
| 10 | Q | Did he ever tell you he didn't see any problem |
| 11 | | with this and didn't want it investigated? |
| 12 | A | No. |
| 13 | Q | Do you know if he ever told anybody else in |
| 14 | | follow-up that he did not think this was |
| 15 | | discriminatory and was not offended by it and |
| 16 | | did not think an investigation was needed? |
| 17 | A | He may have.  I don't know. |
| 18 | Q | If he testifies to that, you can't dispute it -- |
| 19 | A | No.  I -- |
| 20 | Q | -- can you? |
| 21 | A | No. |
| 22 | Q | So you have no personal knowledge that |
| 23 | | Cesar Hernandez in the first place even |
| 24 | | complained of any discrimination or |
| 25 | | discriminatory actions, do you? |

1    A    No.

2    Q    Do you know whether or not Mr. Hernandez's

3         statements to either the chief or the assistant

4         chief that he was not bothered by this at all

5         and did not want an investigation dictated how

6         the matter was handled from that point forward?

7    A    Can you please repeat?

8              MR. EHRKE:  Can you read the question

9         back, please?

10             (Record read back as requested.)

11             THE WITNESS:  And you're asking --

12   BY MR. EHRKE:

13   Q    If you know whether that statement dictated how

14        either the chief or the assistant chief handled

15        it from that point forward.

16   A    I believe it could have.

17   Q    Had you ever had experience as a battalion chief

18        where something that you might have perceived as

19        improper was then reported to you by the

20        "subject" or victim as not offensive and you

21        were asked not to do anything about it?

22   A    No.

23   Q    Did Mr. Hernandez ever file a discrimination

24        complaint with any administrative agency or a

25        court?

1    A    Not that I'm aware of.

2    Q    When is the last time you talked to

3         Cesar Hernandez?

4    A    I don't recall.

5    Q    So you use the term "opposing discrimination" in

6         your complaint.

7              You have no personal knowledge that

8         Cesar Hernandez even opposed what was done in

9         February of 2012, do you?

10   A    No.

11   Q    We were talking about your discussion at lunch

12        with Donna Perkins.  Did you discuss any of

13        these details that we just went over with her?

14   A    I don't recall the exact content of these

15        details.  There may have been some minute

16        details of the incident and reporting and

17        essentially the -- what had happened after it

18        was reported.

19   Q    And when you say some discussion of "what had

20        happened after it was reported," what did you

21        mean by that?  What did you discuss?

22   A    Just when I found out and when I sent an email

23        and then I was told that I was to investigate,

24        and then I had my questions and then turned over

25        the findings to Assistant Chief Weber upon his

1           request.

2    Q      And you shared all that information with

3           Donna Perkins?

4    A      Yeah.  She had known of that because of being

5           one of the people who had complained about it.

6    Q      Okay.  That's not what I asked.  I asked if you

7           shared that with her, what had happened.

8    A      Yes.

9    Q      Why did you feel the need to share the results

10          of an investigation with her?

11   A      I don't feel -- did not feel that I shared

12          results.  I felt that what I had done and passed

13          it on to Assistant Chief Weber, at that point, I

14          don't believe the investigation was completed.

15   Q      All right.  So when you said that you discussed

16          what happened with Ms. Perkins, you're talking

17          about what you did and what occurred up to the

18          time that you passed it off to Assistant

19          Chief Weber?

20   A      Correct.

21   Q      Prior to that, Assistant Chief Weber had made it

22          clear to you in an email that the department

23          would not tolerate that kind of behavior;

24          correct?

25   A      Yes.

 1    Q    He opposed that kind of discriminatory behavior

 2         in an email to you before you even started the

 3         investigation; correct?

 4    A    Yes.

 5    Q    You opposed that type of behavior at the time

 6         also; correct?

 7    A    Yes.

 8    Q    You were aware that Chief Cohn was in agreement

 9         that there was no place for this kind of

10         behavior at the department; correct?

11    A    Yes.

12    Q    So at least as of February 2012, you and

13         Assistant Chief Weber and Chief Cohn were on the

14         same page with regard to knowing that you're

15         going to oppose that type of behavior because

16         there was no place for it; correct?

17    A    Yes.

18    Q    When you had lunch with Ms. Perkins, did the two

19         of you look at any kind of papers or documents

20         at all?

21    A    She had given me some documents in regards to

22         what she had passed on about Ben Granberg.

23    Q    Do you still have those documents?

24    A    Yes.

25    Q    Where are those?

```
 1   A    Actually, I had given them to my attorney,

 2        Brenda Lewison.

 3   Q    And do you know whether those were included in

 4        the initial disclosures that were required in

 5        this case, if you know?  Yes or no.

 6   A    I don't -- I believe.

 7             MS. LEWISON:  They were not.  They

 8        were provided to you last week.

 9             MR. EHRKE:  Okay.  And just so it's

10        clear on the record, I'm not sure that I was

11        provided with specific records that

12        Donna Perkins gave to Ben Granberg, but we'll

13        look into that later.

14   BY MR. EHRKE:

15   Q    Did she bring these documents to lunch?

16   A    Um-hum.

17   Q    Yes?

18   A    Yes.

19   Q    And do you know why she did that?

20   A    No, I don't.  I can honestly say that she

21        brought the one document because of what she

22        followed up with with Ben Granberg after the

23        investigation of trying to get some answers from

24        him and was not able to.

25   Q    Relating to Cesar Hernandez?
```

1    A    Correct.

2    Q    Do you know whether or not there was any need

3         for any involvement by Ben Granberg once the

4         chief and assistant chief had finished the

5         investigation and taken whatever steps they felt

6         necessary?

7    A    Could you please repeat?

8              MR. EHRKE:  Could you read that back,

9         please?

10             (Record read back as requested.)

11             THE WITNESS:  I would say yes.

12   BY MR. EHRKE:

13   Q    And who decided there was a need for that?

14        Donna Perkins?

15   A    That, I don't recall.

16   Q    Do you know what the ultimate result with regard

17        to any discipline was arising out of the

18        Cesar Hernandez incident?

19   A    I was not told directly what the end result was.

20        I had only learned through hearsay.

21   Q    Okay.  So you have no personal knowledge of what

22        was done?

23   A    No.

24   Q    What is the hearsay information you had with

25        regard to that issue, that is, discipline?

```
 1   A    The individuals that were working that day

 2        received written reprimands.  From what I

 3        understand, Shawn Hammernik was given a day off.

 4   Q    Without pay; correct?

 5   A    Yes.  I believe so.

 6   Q    And Shawn Hammernik was the battalion chief

 7        under whom this Hernandez incident occurred?

 8   A    Yes.

 9   Q    Do you know what Cesar Hernandez told

10        Shawn Hammernik about whether he thought there

11        was any problem with this or was offended by it

12        in any way?

13   A    No.  I don't know.

14   Q    Who told you about the ultimate discipline that

15        was rendered?

16   A    I don't recall exactly who told me.  Again, it

17        was -- I had heard a little of -- it may have

18        been from the assistant chief in conversation of

19        what ultimately happened.

20   Q    Would you agree with me that -- well, strike

21        that.

22               How many people were disciplined?  Do

23        you know?

24   A    I don't know.

25   Q    Well, if it was three or four people,
```

```
 1        Mr. Mollet, would you agree with me that

 2        disciplining three or four people for that

 3        activity even when the subject of the activity

 4        was not offended and did not sense it as

 5        discriminatory -- would you agree with me that

 6        the steps taken would show an indication that

 7        the department opposed that kind of behavior

 8        because discipline was meted out?

 9   A    I would say that the discipline that was given

10        to the individuals that were there working was

11        appropriate for them working; however, the

12        discipline for the person who was in charge of

13        that shift was not appropriate for what I feel

14        is the gravity of the situation.

15   Q    What would you have done disciplinewise to the

16        battalion chief?

17   A    I believe at that time that battalion chief was

18        on probation from switching from one position to

19        another.  And, again, I don't know for sure if

20        that's what happened with Shawn Hammernik when

21        he went from a deputy chief to a battalion

22        chief, if he served as a probationary status.

23        But being that he was on a probationary status,

24        I would have probably looked at the policy for

25        the City and decided what would have been
```

1              necessary punishment for him at that time.

2    Q     Would you agree with me that between the chief

3          and the assistant chief, the appropriate

4          discipline under all of the circumstances known

5          to them would have been in their discretion to

6          determine what discipline to render?

7    A     I guess I can't answer that with a "yes" or "no"

8          answer.

9    Q     Okay.  Fine.  You can't answer it.  Understood.

10                   Had you ever disciplined anybody as a

11         battalion chief?

12   A     Yes.

13   Q     How did you decide what discipline to use?

14   A     Progressive discipline.

15   Q     Okay.  So on a first offense, you had used

16         either verbal warnings or write-ups; correct?

17   A     Correct.

18   Q     Had you on a first offense ever docked somebody

19         any pay or forced them to take a day off without

20         pay on a first incident?

21   A     No.

22   Q     Based on your understanding, do you have any

23         idea as to whether Shawn Hammernik had ever had

24         any other problems in this regard where he was

25         even considered for discipline?

 1  A     Could you repeat it, please?

 2              MR. EHRKE:  You can read that back.

 3           (Record read back as requested.)

 4              THE WITNESS:  No, I would not.  Not

 5        that I was aware of.

 6  BY MR. EHRKE:

 7  Q     So you disagree with perhaps the discipline that

 8        you understand he received; correct?

 9  A     Yes.

10  Q     But you can't state that that was a violation of

11        any kind of policy or practice or procedure in

12        the discretion of the chief or the assistant

13        chief, can you?

14  A     No.

15  Q     Did you discuss that discipline with

16        Donna Perkins at lunch?

17  A     I don't recall discussing that.

18  Q     Okay.  And you had indicated -- I think you said

19        there was particularly one document that

20        Donna Perkins gave you with regard to what she

21        presented to Ben Granberg.

22              What was on that document?

23  A     It was an email from her to him requesting some

24        follow-up on the investigation and requesting

25        that he get back to her.

1   Q   When was the date of that email?

2   A   I don't recall offhand.

3   Q   How did Ben Granberg respond to that email?

4   A   I don't believe he did.

5   Q   Do you know whether or not the individuals

6       involved had already been disciplined when she

7       sent that email?

8   A   I don't know.

9   Q   As a firefighter at the time, do you think she

10      had any right to know from anyone what personal

11      and private discipline had been rendered to any

12      individuals?

13  A   Could you please repeat?

14  Q   Yes.

15          (Record read back as requested.)

16              THE WITNESS:  I believe what she was

17      understanding is that because she was a

18      complainant, that she felt as though she

19      needed -- not needed, but would like to know the

20      disposition of the -- as being part of a

21      complaint.

22  BY MR. EHRKE:

23  Q   I know what she felt.  Do you know if she had

24      any right to have that information, as a

25      battalion chief, with all of your experience?

 1   A    That, I don't know.

 2   Q    Okay.  If you had ever disciplined people in the

 3        past, did you share that discipline with anyone

 4        outside of those individuals?

 5   A    No.

 6   Q    It would be a violation of their privacy,

 7        wouldn't it?

 8   A    (Nonverbal response.)

 9   Q    That's a "yes"?

10   A    Yes.

11   Q    And did Donna Perkins ever file a formal

12        complaint with the department about what

13        happened with Cesar Hernandez alleging

14        discrimination?

15   A    I don't recall.

16   Q    When you finished lunch with her, who took those

17        documents?

18   A    I did.

19   Q    Okay.  And then you provided those to your

20        attorney?

21   A    Yes.

22   Q    After that lunch, then there was a third time

23        that you spoke with Donna Perkins.  When was

24        that in relation to today being February 7th?

25   A    Approximately a week ago.

1    Q    Okay.  So roughly --

2    A    In the evening.

3    Q    -- Thursday, February 1st or so?  Wednesday, the

4         31st?

5    A    It could have been.  Yes.

6    Q    And it was in the evening, you say?

7    A    Yes.

8    Q    What was the form of that communication?

9    A    The usual as been in the past, talking about the

10        deposition, just talking about nervousness and

11        never doing it before and unexpected and, you

12        know, what to expect.  That type of thing.

13   Q    Was it in person or on the phone?

14   A    On the phone.

15   Q    Who called who?

16   A    She called me.

17   Q    And did she say why she was calling you again

18        for the third time?

19   A    She called me actually that evening because she

20        had not received her paperwork for the

21        deposition yet.

22             In fact, while we were on the phone,

23        she told me to hold on, and the server gave her

24        the paperwork right then and there.  She thought

25        that that was ironic and weird at the same time

1           that -- I believe she was calling to tell me

2           that the server came approximately a week or

3           week and a half before, did not leave anything,

4           and she had not received them or they hadn't

5           come back yet.

6                   So I'm guessing that she may have been

7           concerned that she didn't have anything.  Maybe

8           she missed something.

9    Q     Well, there was another adult living at the same

10          residence where she lived at the time; correct?

11   A     Yes.

12   Q     Do you know whether that other adult refused to

13          receive service from that process server?

14   A     I don't know.

15   Q     Do you know whether or not Donna Perkins avoided

16          service after the first attempt?

17   A     No.  I don't know.

18   Q     Okay.  So how long was the phone call with

19          Donna Perkins last week?

20   A     Again, roughly 20, 30 minutes maybe.

21   Q     Do you have any present plans to either talk

22          with or meet with Donna Perkins?

23   A     No.

24   Q     Do you know who Kevin Wisniewski is?

25   A     Yes, I do.

```
1   Q   Do you have any plans to meet with him?

2   A   No.

3   Q   After about a week ago when you spoke with

4       Ms. Perkins, have you had any further contact

5       with her?

6   A   No.

7   Q   Okay.  Who else besides Donna Perkins have you

8       spoken to about this case other than your

9       lawyer?

10  A   Like I said, Dan Windler, to notify me that he

11      was given the -- he was served the deposition.

12  Q   He called you?

13  A   Yes.

14  Q   And he told you he had been served?

15  A   Yes.

16  Q   He wasn't happy with the process server, was he?

17  A   I'm not sure I understand the question.

18  Q   Did he express to you that he was upset with the

19      process server?

20  A   He was confused, I guess, is the word I could

21      use that he was -- he came early in the morning.

22      And he was, from what he told me, not entirely

23      sure of who it was and what it was for and

24      thought that it was some form of a scam or --

25  Q   He also asked you or -- strike that.  He also
```

**Gramann Reporting, Ltd.**                                   *(800) 899-7222*

```
 1          told you that -- strike that.

 2                    You hadn't told him prior to that

 3          service date that he had been identified as a

 4          witness in this case, had you?

 5   A      No.

 6   Q      Why not?  If you told Donna Perkins, why didn't

 7          you tell Dan Windler?

 8   A      As far as telling him that he would be served,

 9          I --

10   Q      No.  Telling him that he had been identified as

11          a potential witness.

12   A      No.  I did tell Dan, when I provided the witness

13          list, that he was on the witness list.  But as

14          far as telling him that he would be served, I

15          didn't know who would be given the depositions

16          or being deposed.

17   Q      When did you tell him he was on a potential

18          witness list?

19   A      When I created the list to give to my attorney.

20   Q      And how long ago did you create that list?

21   A      To the best of my recollection, July this last

22          year.

23   Q      Of 2017?

24   A      Without looking at anything or seeing anything,

25          I think that sounds about right.
```

 1   Q    Okay.  And so how long -- did you only have one

 2        discussion with Mr. Windler?

 3   A    No.  We talked a couple of times.  Again, it was

 4        mainly to discuss, again, the unknown sequences

 5        of a deposition.

 6   Q    And, again, you having not had any experience

 7        with depositions, do you know why he asked you

 8        about those issues?

 9   A    I don't know as if he asked me.  He asked me if

10        I had ever known anybody or had any experience

11        with it, and I told him that I hadn't.  And I

12        asked, Did you?  And he hadn't either.  And he

13        had told me that he was looking online, YouTube

14        videos, to see what kind of things he could

15        expect.

16   Q    So you say a couple of times.  When was the

17        first phone call from him to you?  Day of the

18        service?

19   A    Yes.

20   Q    Okay.  When was the second conversation you had

21        with him?

22   A    It might have been the next day.  Him and I had

23        had several conversations.  In fact, he had

24        called me last night and mentioned that -- just

25        said I understand this week are the depositions,

```
 1        and just calling to see how you're doing, and

 2        good luck.

 3   Q    So he's -- you would consider him a witness

 4        who's supporting you in this case?

 5   A    Yes.

 6   Q    He's favorable to you?

 7   A    Yes.

 8   Q    Did Mr. Windler have any opinions that were

 9        negative about Chief Cohn or Assistant

10        Chief Weber at any time while he was working?

11   A    I don't recall.

12   Q    He never expressed any of those to you?

13   A    Not that I remember.

14   Q    So the third call was last night.  How long did

15        that call last?

16   A    Maybe ten minutes.

17   Q    Did you in any of these three phone calls

18        discuss the details of either the Hernandez

19        incident or the investigation or any of the

20        facts that you have placed in your complaint in

21        this matter?

22   A    No.  Last night, absolutely not.  It was very

23        short.  I told him that -- he didn't realize

24        that today was my deposition, and I told him

25        that it was.  And he said, I better let you go,
```

1         and we concluded our conversation.

2   Q    So other than Ms. Perkins and Mr. Windler and

3         outside of your attorney, who else have you

4         spoken to about this case since you became

5         aware -- well, since you filed it?  Let me move

6         back that way.

7   A    My wife.

8   Q    Okay.

9   A    And if I could correct, go back to Dan Windler,

10        there was how many conversations?  I'd say there

11        was probably no more than, say, four or five

12        conversations.  Correct that.

13  Q    Well, the fourth and the fifth one, when did

14        those occur and how?  In phone or in person?

15  A    They were all on the phone.

16  Q    Did he tell you that he didn't have any personal

17        knowledge of what occurred with the

18        investigation of Cesar Hernandez?

19             THE WITNESS:  Could you please repeat

20        that?

21         (Record read back as requested.)

22             THE WITNESS:  I don't recall if he

23        did.

24  BY MR. EHRKE:

25  Q    In February of 2012, did he work under you?

1   A   Yes.

2   Q   He was a firefighter?

3   A   Heavy equipment operator.

4   Q   Did you ever discuss the Hernandez incident with

5       him anytime from February of 2012 forward?

6   A   Not that I recall.

7   Q   Was he involved in any way?

8   A   He was one of the people who was offended.  Not

9       directly, but felt that it was an unfortunate

10      happenstance.

11  Q   He told you that?

12  A   Yes.

13  Q   When did he tell you that?

14  A   I don't recall exactly.

15  Q   Did he know that Cesar Hernandez had no problem

16      with what had occurred?

17  A   I wouldn't -- I don't know that.

18  Q   Do you know if Dan Windler filed any complaints

19      with anyone regarding the Hernandez incident?

20  A   I don't know that.

21  Q   You had indicated that you had also spoken with

22      your wife about this case.

23              Did you do that just with the two of

24      you or was somebody else present?

25  A   With us two.

1    Q    And, generally -- well, strike that.

2                    Did your wife have any personal

3         knowledge with regard to what happened in

4         regards to the Hernandez incident?

5    A    Could you explain personal --

6    Q    Did she observe anything?  Talk to any

7         witnesses?  Talk to Cesar Hernandez?  Talk to

8         the chief or the assistant chief about it?

9    A    No.

10   Q    Okay.  Has she spoken with any other witnesses

11        that you know of, that you named as witnesses?

12   A    Not that I'm aware of.

13   Q    So the only knowledge she would have had

14        regarding the Hernandez incident would have been

15        what you told her; correct?

16   A    Correct.

17   Q    All right.  And did you ever share with her the

18        ultimate discipline that was rendered to the

19        people that were involved?

20   A    Yes.

21   Q    And did she have an opinion on whether that was

22        appropriate or not?

23   A    I don't recall what her reaction was.

24                    THE WITNESS:  After I answer the next

25        one, could I take a break?

1              MR. EHRKE:  We can take a break now.

2              THE WITNESS:  Okay.  Thank you.

3      (A recess is taken from 10:04 a.m. to 10:18 a.m.)

4   BY MR. EHRKE:

5   Q   Mr. Mollet, before we took a break for about 15

6       minutes there, we had been talking -- and I'm

7       going back on you a little bit now -- with

8       regard to "incidents" that Donna Perkins told

9       you about.  And we talked about, I think, an

10      incident with a blowup doll that occurred under

11      Chief Spahn.

12              What other incidents did you discuss

13      with her at any time that involved her?

14              I think we established that none of

15      them occurred under Chief Cohn or Assistant

16      Chief Weber; correct?

17  A   Correct.

18  Q   What other incidents were there that you can

19      remember that you discussed with her under the

20      prior chief -- or under the present chief and

21      assistant chief?

22  A   Meaning Chief Cohn and Chief Weber?

23  Q   Yeah.  Prior to them.

24  A   Prior to them?

25  Q   Yes.

```
 1   A    The instances where she had things put in her

 2        locker.

 3   Q    Oh, right.  Okay.

 4   A    Right.

 5   Q    So there were a number of those that are plural,

 6        so that's why you said instances or incidences?

 7   A    Correct.  Correct.

 8   Q    Okay.  We had covered your discussions with

 9        Mr. Windler and Ms. Perkins and your discussions

10        with your wife.

11              Have you discussed this case with any

12        of the other witnesses who have been identified

13        by you or your lawyer?

14   A    No.

15   Q    Have you talked with Kevin Wisniewski at all?  I

16        may have asked you that, and I apologize.

17   A    No.

18   Q    Do you have an understanding as to why he might

19        be a potential witness in this case?

20   A    From my understanding is I put him on my witness

21        list.

22   Q    Why?

23   A    To give some support to my leadership, my

24        character, core values, those types of things.

25   Q    And, to be clear, you were never terminated by
```

```
 1        the City of Greenfield, were you?
 2   A    Can you explain terminated?
 3   Q    Fired.  Told to leave.  You're done.
 4   A    I would disagree with that statement.
 5   Q    What documents do you have that say you were
 6        "terminated" as opposed to you leaving and
 7        taking a job at Menomonee Falls?
 8   A    Utilizing the term "terminated," no.
 9   Q    Okay.
10   A    But the essential outcome similar, in that
11        asking that I have essentially given my
12        resignation when, in fact, I did not.
13   Q    And when you explained to the chief that you
14        weren't really resigning because you had to wait
15        on the contingencies with Menomonee Falls, he
16        reinstated you, didn't he, and you were paid
17        until you left on March 23, 2013, for
18        Menomonee Falls; right?
19   A    Not immediately, no.
20   Q    You weren't paid?
21   A    No.  No.  I was paid.  Reinstatement, not
22        immediately.  It was not -- when I mentioned
23        that I did not resign, I was told that the City
24        is standing behind -- their initial intent was
25        to accept my resignation, and, therefore, my end
```

```
 1        date would have been -- again, I don't remember

 2        exactly.  March 23rd might be the date.  I'm not

 3        quite sure.  I'm sorry.  February.

 4   Q    But, in any event, although the chief took that

 5        position after you had indicated to him that

 6        there were contingencies, you remained as a paid

 7        battalion chief for the City of Greenfield until

 8        you left on March 23rd of 2013; correct?

 9   A    Yes.

10   Q    And I may have asked this before, but between

11        February 1st of 2012 and when the Wisconsin

12        Chiefs notice about Menomonee Falls came to you,

13        did you look for jobs anywhere else?

14   A    Only one time, New Berlin.

15   Q    No.  But I'm talking about between

16        Cesar Hernandez and the end of 2012, before you

17        got the notice from the chiefs about

18        Menomonee Falls, you didn't go out and actively

19        seek employment elsewhere, did you?

20   A    Uh-uh.

21   Q    No?

22   A    No.

23   Q    And in the process that we'll talk about a

24        little later with Menomonee Falls, do you

25        remember the date you first applied with
```

1        Menomonee Falls?

2   A    I submitted my application on December 27, 2012.

3   Q    And when you submitted that application, it said

4        absolutely nothing about you being either

5        unhappy or uncomfortable with the City of

6        Greenfield or having opposed discrimination, did

7        it?

8   A    No.

9   Q    Did you ever tell anybody in an interview at

10       Menomonee Falls that you wanted to leave because

11       of treatment that you attributed to the

12       Cesar Hernandez incident?

13  A    No.

14  Q    Did you ever tell them at Menomonee Falls that

15       you were asked to investigate an incident, that

16       you investigated it, and that the four

17       individuals involved were disciplined based on

18       the investigation?

19  A    No.

20  Q    So we've confirmed that the only potential

21       witnesses in the case that you've spoken with

22       about the case are Dan Windler, Donna Perkins,

23       and your wife; correct?

24  A    Correct.

25  Q    Could you give me a brief understanding of your

```
 1          educational background, starting with high
 2          school.
 3   A      Graduated from Mukwonago High School 1986.  From
 4          there, went through various technical college
 5          courses, various degrees and ranges of them.
 6                    Essentially, in 1991, settled on
 7          firefighter and EMT through WCTC, Waukesha
 8          County Technical College, and pursued my
 9          technical diplomas or technical certificates.
10                    And then eventually, after taking a
11          job in Wisconsin Rapids in 1993, I began to work
12          on my associate's degree from Fox Valley
13          Technical College.  And then eventually, after
14          moving back from central Wisconsin,
15          Wisconsin Rapids, to the Milwaukee area to take
16          a job with Greenfield, I finished my degree.  I
17          don't recall the exact date, but in 2005, 2006.
18   Q      Okay.  And the associate's degree, what was,
19          like, the subject or the focus of the
20          associate's degree?
21   A      Fire protection technician.
22   Q      Is that a required degree in order to work as a
23          firefighter at the City of Greenfield?
24   A      When I was initially hired, it was not.  It
25          is -- I don't recall if that was the requirement
```

1       at the time when I left.

2    Q  In any event, when, then -- strike that.

3                   How long did you work for

4       Wisconsin Rapids?

5    A  From January 3, 1993, until March 5, 1995.

6    Q  And, again, why did you leave the

7       Wisconsin Rapids department?

8    A  My wife and I decided that we were, for lack of

9       a better word, homesick.  We grew up in the

10      Milwaukee area, and I had an opportunity.  I had

11      taken -- or I had applied to Greenfield prior to

12      taking the job in Wisconsin Rapids.  When I was

13      working there, soon after I started, I notified

14      all departments, I thought, that I had already

15      received a job; take me off your list.

16                  I assumed that Greenfield -- they had

17      already hired, I believe, three people at that

18      time, so I figured that their list was done, so

19      I didn't call them.  Approximately a year and a

20      half, almost two years, while being in

21      Wisconsin Rapids, I was given a letter by the

22      chief at that time, Chief Poppy, asking if I

23      wanted to go onto the next list.  I eventually

24      said, yes, I wouldn't mind.  And then

25      approximately two weeks later, I was called for

```
 1        an interview.

 2   Q    And so when did you actually start with the

 3        City of Greenfield?

 4   A    March 5th, I believe, 1995, to the best of my

 5        recollection.

 6   Q    And you were employed by the City of Greenfield

 7        Fire Department until March 23rd of 2013;

 8        correct?

 9   A    Correct.

10   Q    Did you provide a formal letter of resignation

11        dated March 23, 2013?

12   A    I did provide one.  I don't know if that's the

13        correct date.

14   Q    And when did you start your employment with

15        Menomonee Falls?

16   A    That would have been Monday, March 25, 2013.

17   Q    And, again, I apologize.  I try not to repeat.

18        What was the initial position in which you were

19        hired at Menomonee Falls?

20   A    Battalion chief.

21   Q    And then it was November of 2013 that you became

22        the highest ranking official in the fire

23        department?

24   A    I believe.  Again, without looking at a

25        document, I don't -- it sounds about right.
```

1   Q   Did you receive a salary increase when you

2       became the assistant chief or head guy at the

3       Menomonee Falls department?

4   A   Yes.

5   Q   How much of a salary increase did you get?

6   A   I don't recall exact dollar amount.  I do know

7       the starting pay I believe was something in the

8       realm of 84,000.

9   Q   When you started?

10  A   Correct.

11  Q   Have you ever looked at any documents or

12      referred to any documents to try and calculate

13      the difference in pay and what you're claiming

14      is a loss in this case?

15  A   I've looked at my pay or starting pay when I

16      began in Menomonee Falls comparatively to what I

17      had when I left Greenfield to do a

18      differentiation to find out what the differences

19      were.

20              Health insurance was a little bit

21      more -- not very easily determined based on the

22      fact that it's a constant movement.  You know,

23      only going off of the numbers and what's based

24      on what I had at the time, by looking at what I

25      was -- my benefit was for insurance in

```
 1          Greenfield and what it was in Menomonee Falls
 2          and did a comparative -- cost comparative.
 3    Q     And are there documents that you used in that
 4          comparison or looked at in order to make your
 5          computation?
 6    A     Yes.
 7    Q     Where are those?
 8    A     If I would guess, they're at home in a file.
 9    Q     Do you have any understanding that you were
10          required to provide those to us back in July?
11    A     The documents themselves?
12    Q     Do you have an understanding as to whether you
13          were supposed to or not?
14    A     No.
15    Q     And you said it's hard to calculate some of
16          these things because it's kind of an
17          ever-changing thing.  Is that what you said?
18    A     (Nonverbal response.)
19    Q     Correct?  Yes?
20    A     Yes.
21    Q     That's particularly true with regard to health
22          insurance premiums; correct?
23    A     Correct.
24    Q     Sitting here today, you can't tell me whether
25          your health insurance premiums at
```

```
 1        Menomonee Falls either are or will be less than

 2        what you paid at Greenfield, can you?

 3   A    No.  But when I look at the document at the

 4        time, it was -- my premium that I was paying in

 5        Menomonee Falls was considerably more than what

 6        I was paying in Greenfield.

 7   Q    And were you provided with all of this

 8        information before you formally accepted a job

 9        at Menomonee Falls and formally resigned?

10   A    No.

11   Q    So you took the job in Menomonee Falls without

12        knowing whether or not you would pay higher

13        insurance premiums?

14   A    No.

15   Q    You did or did not take the job?

16   A    Yes.  Yes.

17   Q    And were you told what the salary of the

18        starting position at Menomonee Falls would be

19        before you left Greenfield?

20   A    Yes.

21   Q    And so you knew, according to at least your

22        understanding, that there was going to be

23        roughly $6,000 difference in the annual salary

24        at least in April of 2013 when you started with

25        Menomonee Falls; correct?
```

1   A   Could you state that again, please.

2   Q   You knew that there was going to be a $6,000

3       dropoff in salary as soon as you left Greenfield

4       and went to Menomonee Falls; right?

5   A   That's not correct.

6   Q   Did you know the salary at Menomonee Falls

7       before you accepted the job?

8   A   The wage that was quoted in the job posting, I

9       knew of.  However, I went to the director of

10      protective services and asked if there was any

11      wiggle room or any chance that I could be hired

12      at a higher rate or a higher pay rate.

13  Q   Who was that that you talked to?

14  A   Director of protective services.

15  Q   Name?

16  A   Anna Ruzinski.

17  Q   And what did Anna tell you in regard to?

18  A   She --

19  Q   -- an increase?

20  A   She said that she would have to check with the

21      village board, the village manager, and then get

22      back to me.

23  Q   Did she get back to you?

24  A   Approximately a week later.

25  Q   And this is all before you resigned from

```
 1        Greenfield?

 2   A    Yes.

 3   Q    And what did she tell you with regard to the

 4        wiggle room or the actual salary you'd be

 5        getting to start?

 6   A    She told me that there would be -- it could be

 7        an increase, however, not as much as I had

 8        initially thought or maybe considered, and told

 9        me what that amount would be.

10   Q    What had you initially thought or requested from

11        the Menomonee Falls department?

12   A    When I initially spoke to her, I was hopeful

13        that I could not have as much of a dramatic, you

14        know, drop in salary.  I don't recall the exact

15        number that I gave to her; however, she said she

16        would do what she could to get the pay raised to

17        a higher rate.  And when she finally came back,

18        that's what she told me what the pay rate was.

19   Q    So what was the initial pay rate that was posted

20        for Menomonee Falls, and what was the initial

21        pay rate that you finally agreed on?

22   A    To the best of my recollection, it was 72,000.

23        And, again, I don't recall exactly.  Roughly

24        $72,080 or -84 was the start or what was noted

25        in the job posting.
```

1    Q    For a battalion chief in Menomonee Falls?

2    A    Yes.

3    Q    In 2012, when you applied?

4    A    Yes.

5    Q    And, ultimately, in your discussions with Anna,

6         what was the salary that you were offered and

7         you agreed to take?

8    A    To the best of my recollection, it was a little

9         more than 76,000.

10   Q    And so when you started at Menomonee Falls, you

11        started at approximately $76,000.  And you knew

12        that was going to be the starting number before

13        you formally accepted at Menomonee Falls and

14        before you resigned at Greenfield; correct?

15   A    Yes.

16   Q    How long before March 23rd did you know what the

17        salary at Menomonee Falls would be?

18   A    I don't recall.  It was perhaps two to three

19        weeks, and that may be a rough estimate.

20   Q    So plenty of time for you to decide not to take

21        the Menomonee Falls job, correct, if you had

22        opted?

23   A    Yes.

24   Q    In the first four months of 2013, did you seek

25        any other employment other than Menomonee Falls?

1   A   No.

2   Q   Did your salary increase when you became the

3       assistant chief or head guy at Menomonee Falls?

4   A   Yes.

5   Q   And what did that increase to in November of

6       2013?

7   A   Approximately 84,000.

8   Q   And that was 2013.  Did your pay go up in 2014?

9   A   Yes.

10  Q   And how much were you paid salarywise in 2014?

11  A   Without looking at my past records, I wouldn't

12      recall that offhand.

13  Q   What records would you have to look at?

14  A   Pay stubs or we get -- the village manager gives

15      us a slip notifying us of our pay increases

16      incrementally.  So without looking at that, I

17      wouldn't know how much it went up exactly.

18  Q   Did you file income tax returns for 2013 through

19      2017?

20  A   Yes.

21  Q   Did you receive W-2 forms at the end of each

22      calendar year showing what your pay had been?

23  A   Yes.

24  Q   Where are those?

25  A   At home.

```
 1   Q   Did you rely on those in computing what you're

 2       claiming your loss is in this case?

 3   A   I don't recall if I did or not.  I think I was

 4       going off of the amount that was posted on my

 5       check comparatively.

 6   Q   Okay.  So you don't recall what your salary was

 7       in 2014.

 8               What is your -- what was your salary

 9       in 2015?  Did it go up?

10   A   Yes.

11   Q   And what was the salary in 2015?

12   A   I would have to look at documents.

13   Q   But as you sit here today, if you were

14       testifying to a jury today, you couldn't tell us

15       what your salary was in 2014, 2015, or 2016,

16       could you?

17   A   No.

18   Q   So you couldn't tell a jury, if they were

19       sitting here today, how that would compare to

20       what you might have made had you stayed at

21       Greenfield, can you?

22   A   Can you restate the question?

23   Q   You can't, sitting here today, if you were

24       testifying to a jury, tell us how your pay at

25       Menomonee Falls would have compared to the pay
```

**Gramann Reporting, Ltd.**                    **(800) 899-7222**

```
 1        you would have received for those years at
 2        Greenfield had you stayed, can you?
 3   A    Not without looking at a document.
 4   Q    Did your pay go up in 2017?
 5   A    Yes.
 6   Q    Do you know what your salary was in 2017?
 7   A    Again, I would be guessing.
 8   Q    I don't want you to guess.  So you can't tell
 9        us, if you were testifying to a jury today, what
10        your salary would have been in 2017, can you?
11   A    Not without seeing a document to verify.
12   Q    Have you gotten your 2017 W-2 from
13        Menomonee Falls yet?
14   A    Yes.
15   Q    When was the last time you looked at that?
16   A    Last week.
17   Q    Have you done your income taxes yet?
18   A    Yes.
19   Q    And you can't tell me what your salary was for
20        2017?
21   A    Well, my salary -- my earnings for 2017 were
22        approximately 101,000.
23   Q    And, again, you can't tell us -- or if a jury
24        was here today, you couldn't tell a jury how
25        that compares to what you might have made at
```

1          Greenfield had you stayed, can you?

2     A   Without knowing what Greenfield's battalion

3          chiefs were paid, I wouldn't know that.

4     Q   You would have to speculate, would you not,

5          Mr. Mollet, to guess whether you would have ever

6          advanced any further than battalion chief at

7          Greenfield; correct?

8     A   Could you please repeat?

9     Q   You can't say, as we sit here today, whether or

10         not you may have advanced beyond the battalion

11         chief position at Greenfield, can you?

12    A   I wouldn't say that I don't think I would have.

13         At the time when I was there, I didn't have -- I

14         had an interest to advance; however, because of

15         family and other commitments, I chose not to.

16    Q   Chose not to seek the assistant chief job;

17         correct?

18    A   Correct.

19    Q   You don't know whether you would ever been given

20         that job, do you?

21    A   No.

22    Q   You just testified that you backed off of that

23         because of family considerations; but in that

24         context, you told the people of the City of

25         Greenfield that they should have followed the

1       process that Police Chief Wentlandt followed in

2       appointing his assistant chief, didn't you, and

3       that you should have been appointed?

4  A   I don't recall that.

5  Q   Well, you don't recall it.  Is it possible that

6       you did tell them that you should have been

7       appointed, just as police Chief Wentlandt

8       appointed his assistant chief, Paul Schlecht?

9  A   Again, I don't recall saying that.

10 Q   You were unhappy when you weren't appointed

11      assistant chief at the time you told them that

12      they should have followed the same process as

13      the police department did; correct?

14 A   No.

15 Q   Did you send any emails or correspondence to

16      anybody indicate that you were unhappy in that

17      regard?

18 A   Not that I recall.  No.

19 Q   When Chief Spahn was still the head guy or the

20      chief in Greenfield, you had verbally expressed

21      an interest to him of being the assistant chief;

22      correct?

23 A   Correct.

24 Q   And then when was that?

25 A   Prior -- I believe it was prior to his

```
 1          retirement.

 2    Q     And you were disappointed when George Weber was

 3          appointed the assistant chief, were you not?

 4    A     No.

 5    Q     What was your position when Chief Cohn was

 6          appointed the interim chief position?

 7    A     Battalion chief.

 8    Q     And when did that occur?

 9    A     June of 2011, I believe.

10    Q     And then was he appointed or named permanent

11          fire chief sometime after that?

12    A     The best of my recollection, it was

13          November 2011.

14    Q     Is it possible it was October of 2011?

15    A     Could be.

16    Q     Would you agree with the statement "Since the

17          promotion of Jon Cohn to the position of chief

18          in November of 2011, Mr. Mollet's employment

19          experience with the department had been, in a

20          word, miserable"?

21    A     Would I agree with that?

22    Q     Yes.

23    A     Yes.

24    Q     So your employment with the City of Greenfield

25          became miserable in November of 2011, which was
```

**Gramann Reporting, Ltd.**                              *(800) 899-7222*

```
 1          at least three months before the Cesar Hernandez
 2          incident; correct?
 3   A      Correct.
 4   Q      Before George Weber was named the assistant
 5          chief, you and he were equals; correct?  Both
 6          battalion chiefs?
 7   A      No.
 8   Q      Okay.  Before he was named assistant chief, what
 9          were your respective positions?
10   A      I was battalion chief.  He was a lieutenant.
11   Q      And, as I understand it, lieutenant is a lower
12          rank than battalion chief; correct?
13   A      Correct.
14   Q      So when he was named as assistant chief, he kind
15          of leapfrogged over you with regard to position;
16          correct?
17   A      Correct.
18   Q      And when he was named assistant chief, he became
19          your boss, didn't he?
20   A      Correct.
21   Q      When specifically did that occur?
22   A      January 2012.
23   Q      And that decision was part of what made your
24          employment experience with the department
25          miserable, correct, the fact that he leapfrogged
```

1          over you and was named the assistant chief?

2     A    No.

3     Q    Okay.  What were the things that were making

4          your life miserable employmentwise at the

5          City of Greenfield when Chief Cohn took over?

6     A    When Chief Cohn was hired as a battalion chief,

7          he and I were on -- had our respective shifts.

8          I did not know Chief Cohn very well.  He was

9          from Greendale, came to Greendale from

10         North Shore, got to know him over a short period

11         of time and developed a friendship, if you will.

12                We had spent oftentimes texting and

13         emailing -- or not so much email, but phone

14         calls and discussions about the department,

15         about which direction the department is going

16         in, which direction the department would like to

17         see it go in.

18                And once he became the interim chief,

19         the text messages and phone calls stopped or

20         ceased immediately, and there were things that

21         were mentioned in conversations that appeared to

22         me that were not in alliance or in congruity

23         with what we talked about.  And it somewhat

24         confused me, to say the least.

25    Q    So your perception of the vision for the

| | |
|---|---|
| 1 | department that you thought you shared with at |
| 2 | the time Battalion Chief Cohn changed as soon as |
| 3 | he was appointed interim chief in June of 2011; |
| 4 | correct? |
| 5 | A | It appeared that that's what happened.  Yes. |
| 6 | Q | And it appeared to you, based on information |
| 7 | available to you, that Chief Cohn starting in |
| 8 | June of 2011 was going to take the department in |
| 9 | a different direction than what you and he had |
| 10 | discussed? |
| 11 | A | Could you repeat, please? |
| 12 | MR. EHRKE:  Can you read that back? |
| 13 | (Record read back as requested.) |
| 14 | THE WITNESS:  It appeared that it was |
| 15 | not, like, as I said, in relation to what we |
| 16 | talked about.  It seemed that it was somewhat |
| 17 | going in a different direction, yes. |
| 18 | BY MR. EHRKE: |
| 19 | Q | So your answer was, yes, it was a different |
| 20 | direction starting in June of 2011? |
| 21 | A | Yes. |
| 22 | Q | Okay.  When you investigated the Cesar Hernandez |
| 23 | incident, did you take handwritten notes? |
| 24 | A | No. |
| 25 | Q | I'm going to ask you about talking to witnesses. |

```
 1          We've talked about donna Perkins, and we've
 2          talked about Dan Windler.
 3                  Have you spoken in any regard about
 4          this case with Brent Deede, D-E-E-D-E?
 5   A   No.
 6   Q   Who's Brent Deede?
 7   A   Brent Deede is a firefighter/paramedic in
 8          Greenfield.
 9   Q   Have you spoken in any regard about this case or
10          your employment with Greenfield with
11          Reed Mattila, M-A-T-T-I-L-A?
12   A   Mattila, no.
13   Q   How about Mary Read?
14   A   No.
15   Q   Have you spoken with Chris Roehsler,
16          R-O-E-H-S-L-E-R, about your employment with
17          Greenfield or this case?
18   A   No.
19   Q   Have you spoken in that regard in any way to
20          Paul Sustachek, S-U-S-T-A-C-H-E-K?
21   A   No.
22   Q   Have you spoken about this case or any of the
23          facts involved with Doug Tew, T-E-W?
24   A   No.
25   Q   And I think you already told me you have not
```

1        discussed any of these issues with

2        Kevin Wisniewski?

3   A    No.

4   Q    Who's Nicholas Bryan, B-R-Y-A-N?

5   A    He was a firefighter/paramedic with Greenfield.

6        He's now working in the city of Racine.

7   Q    When did he leave Greenfield?

8   A    I don't know.

9   Q    Was Nicholas Bryan employed as a

10       firefighter/paramedic with Greenfield after

11       Chief Cohn became interim chief in June of 2011?

12  A    Yes.

13  Q    Mr. Mollet, to the extent you have any

14       understanding, what is your understanding as to

15       what Russell Spahn would testify to in this case

16       if you know?

17  A    Again, I believe he would look at my leadership

18       qualities, core values, personality traits,

19       things of that nature.

20  Q    And Russ Spahn was the chief just prior to June

21       of 2011 when Jon Cohn became the chief; correct?

22  A    Correct.

23  Q    And that's when the change in direction of the

24       department started, from your perception;

25       correct?

```
 1   A    Correct.

 2   Q    What is your understanding of Brent Deede's

 3        feelings of your leadership traits, work ethic,

 4        morals, standards, and personality?

 5   A    I believe he would speak favorably upon it.

 6   Q    Was he ever a chief or an assistant chief?

 7   A    No.

 8   Q    Was he ever even a lieutenant?

 9   A    No.

10   Q    With regard to Mr. Mattila, what is your

11        understanding that his testimony would be with

12        regard to your leadership traits, work ethic,

13        morals, standard, and personality?

14   A    He, too, would speak favorably.

15   Q    Has he ever been a battalion chief?

16   A    No.

17   Q    So his highest rank would have been firefighter?

18   A    Lieutenant.

19   Q    Other than Russ Spahn, have any of these

20        witnesses you named ever served in the position

21        of either the assistant chief or the chief?

22   A    No.

23   Q    So you would agree with me that none of them can

24        evaluate the aspects of a battalion chief from

25        the perspective of a chief or an assistant
```

 1          chief, who have their own direction that they

 2          want the department to go, can they?

 3     A    I think that they would have similar

 4          expectations.  I don't know as if they would see

 5          the vision as from a perspective of a higher

 6          ranking officer.

 7     Q    And my question was since none have ever been a

 8          battalion chief or an assistant chief or a

 9          chief, they don't have the perspective and can't

10          testify from that perspective as to whether you

11          were a good battalion chief, can they, from the

12          perspective of your superiors?

13     A    No.

14     Q    Same would be true with Donna Perkins and

15          Chris Roehsler; correct?

16     A    Yes.

17     Q    Same would be true with Paul Sustachek,

18          Doug Tew, and Dan Windler; correct?

19     A    Two of those three were the rank of lieutenant.

20     Q    I'm talking about battalion chief, assistant

21          chief, and chief.

22     A    Yes.

23     Q    So your answer would be the same?  They don't

24          have that perspective in order to evaluate you

25          as a battalion chief, do they?

```
 1   A     They do not.  However, they have a little

 2         closer -- work closer with myself as a

 3         lieutenant on my shift, whereas the line staff

 4         are firefighter, paramedic, and HEOs.

 5                    MR. EHRKE:  Can you read my question

 6         now back, that last one?

 7                    (Record read back as requested.)

 8   BY MR. EHRKE:

 9   Q     That perspective being from the chief or

10         assistant chief.

11   A     No.

12   Q     Same would be true with Kevin Wisniewski and

13         Nicholas Bryan?

14   A     Yes.

15   Q     Have you ever had any conversation with the

16         former Chief Spahn about how he felt about the

17         way Jon Cohn is handling things as a chief and

18         George Weber is handling things as the assistant

19         chief?

20   A     I don't recall.

21   Q     He's never criticized either Chief Cohn or

22         Assistant Chief Weber in that regard, has he?

23   A     Not that I remember.

24   Q     You had named on your initial disclosures

25         Gary Liedtke, L-I-E-D-T-K-E.  Tell me what your
```

1          interplay and involvement with Gary Liedtke is.

2     A    He's the pastor of my church -- or he's retired

3          now, but he's the pastor at my church.

4     Q    And in what period are you talking about?

5     A    During the period of 20 -- I can't remember

6          exactly the date that we joined our church, but

7          he was the pastor there at the time we joined up

8          until approximately a year, a year and a half

9          ago, when he retired.

10    Q    So when did you join the church?

11    A    I would only be guessing at a date.

12    Q    Can you give me a year?

13    A    Roughly 2003, 2004.

14    Q    And he retired roughly mid-2016?

15    A    Correct.

16    Q    Why did you name him as a potential witness?

17    A    When I was experiencing some additional stress

18         and anxiety at Greenfield, my wife thought it

19         would be best to incorporate the help of our

20         pastor to somewhat give me a little bit of

21         pastoral support.

22    Q    So tell me what occurred in that regard.

23    A    There was nothing discussed in depth.  It was

24         more just for the fact of -- like I said, my

25         wife would say that she told him that me being

1        upset, you know, a little bit depressed, so if

2        you can talk to him, give him some words of

3        encouragement and essentially pastoral support,

4        whatever that was.

5    Q   And then how many times did you talk to

6        Pastor Liedtke based on your wife's request that

7        he talk to you?

8    A   I don't recall offhand how many times.

9    Q   How long did each conversation last?

10   A   Several minutes.

11   Q   And how many of these conversations were there?

12   A   I don't recall.

13   Q   Over what period of time did they occur?

14   A   Again, I don't recall exactly.  Maybe a month to

15       maybe two months.

16   Q   Was this before or after the Cesar Hernandez

17       incident?

18   A   It was after.

19   Q   You remember that part?

20   A   (nonverbal response.)

21   Q   Yes?

22   A   Yes.

23   Q   What did Pastor Liedtke say to you in all these

24       conversations that you recall?

25   A   I don't recall exactly.

```
 1   Q    Well, you say exactly.  Can you recall
 2        generally?
 3   A    No.  I'm sorry.
 4   Q    Did you ever seek any actual care or treatment
 5        for anxiety or depression?
 6   A    No.
 7   Q    Okay.  You named Kathy Boadwine,
 8        B-O-A-D-W-I-N-E.  Did you ever tell
 9        Pastor Boadwine that she had been named as a
10        witness here?
11   A    No.
12   Q    Why not?
13   A    I'm not sure.
14   Q    Have you heard from her since the concept of
15        deposition started?
16   A    She had a service this last Sunday.  It was her
17        last one as our pastor.  She's retired.  And as
18        I said good-bye to her, she said, Do you know I
19        have a deposition on Thursday?  And I said, I
20        know.  And that was the extent of the
21        conversation.
22   Q    With regard to Pastor Boadwine, how many times
23        did you have any conversations with her about
24        Greenfield or this lawsuit?
25   A    In particular, the lawsuit, none that I can
```

1     recall.  And, again, it was essentially the

2     pastoral support of encouragement and knowing --

3     you know, a little bit of a prayer here or there

4     to, you know, know that -- I guess I could say

5     encouragement.

6  Q  What did you specifically say to Pastor Boadwine

7     that prompted that encouragement, as you used

8     the term?

9  A  Again, it was brought on by my wife, who thought

10    it would be important that the pastors could

11    help, could talk with me.

12 Q  So it wasn't even your idea; that was your

13    wife's idea?

14 A  Correct.  I was not aware of it.  However, I was

15    appreciative.

16 Q  So, again, can you tell me how many times you

17    talked about it with Pastor Boadwine?

18 A  I don't recall offhand.

19 Q  Can you tell me specifically on any occasion

20    what she specifically said to you?

21 A  Other than, you know, keep the faith, you know,

22    praying.  Those types of things.  That's what I

23    recall the most.

24 Q  Did she take over for Gary Liedtke?

25 A  She did in a full-time position or full-time

```
 1        capacity, and then they hired another minister

 2        to work in a part-time capacity.

 3   Q    And, again, can you tell me anything more than

 4        the generalities you just gave me about keep the

 5        faith and she encouraged you?

 6   A    Not that I recall other than that.

 7   Q    And you can't tell me specifically what you said

 8        to her, can you?

 9   A    To be honest, I don't recall specifically.

10   Q    Okay.  That's the same as with Pastor Liedtke --

11   A    Correct.

12   Q    -- that you don't recall what you said to him?

13   A    Correct.

14   Q    Okay.  You have not seen any healthcare

15        practitioners as a result of anything related to

16        your employment or the end of your employment

17        with Greenfield or this lawsuit, have you?

18   A    Could you explain again?

19   Q    Doctors, nurses, physician's assistants,

20        certified nurses, psychiatrists, psychologists,

21        therapists, counselors.  Have you seen any such

22        healthcare practitioner as a result of anything

23        that happened at Greenfield?

24   A    I wouldn't say -- I did see a doctor in relation

25        to having some issues with -- GI issues.
```

1   Q   Was that a GI doctor?

2   A   Yes.

3   Q   Did that GI doctor attribute them in any way to

4       anything that happened at Greenfield?

5   A   Not that he -- that I recall from the actual

6       doctor's notes.  But what prompted me to go

7       there was that I was bleeding.

8   Q   Has any medical expert told you that that

9       bleeding had anything to do with anything that

10      happened at Greenfield?

11  A   No.

12  Q   So there are no doctors that could come in and

13      testify that you had physical problems as a

14      result of anything that happened at Greenfield,

15      are there?

16  A   Correct.

17  Q   Of any of the witnesses that we just talked

18      about or any witnesses that you've named, have

19      you provided them with any documents?

20  A   No.

21  Q   And the only person on your witness list that

22      has actually handed you documents was

23      Donna Perkins; correct?

24  A   Correct.

25  Q   Did you read your complaint in this case that

```
 1        was filed with the federal court to start this

 2        lawsuit?

 3   A    Yes.

 4   Q    And did you make sure everything that was stated

 5        in there was accurate before it was filed?

 6   A    Yes.

 7   Q    Okay.  As we sit here today, is there anything

 8        in that complaint that you can think of that is

 9        not accurate?

10   A    Not that I recall.  The only thing that I know

11        that changed from that was the age

12        discrimination.

13   Q    Okay.  You and your lawyer asked to have the age

14        discrimination case dismissed; correct?

15   A    Correct.

16   Q    And it was dismissed; correct?

17   A    I believe so.

18   Q    Did you see a significant change in the

19        management style between Chief Spahn and

20        Chief Cohn?

21   A    I guess if you could explain.  What change are

22        you referring to?

23   Q    You talked about earlier what you thought was

24        Chief Cohn's vision of the future direction and

25        then how that changed, so I'm just asking you if
```

```
 1        you can tell me -- if you can differentiate

 2        between the management style of Chief Spahn and

 3        the management style of Chief Cohn.

 4   A    There was a difference.

 5   Q    Did Chief Cohn demand more communications?

 6   A    Demand.  Could you explain demand?

 7   Q    Require.  Ask his command staff for more

 8        communications.

 9   A    Not formally.

10   Q    As a battalion chief, did you know that

11        Chief Cohn expected better communications than

12        Chief Spahn had?

13   A    Not formally.

14   Q    Well, informally, did you know that?

15   A    Informally meaning via text messages, when

16        Chief Spahn was the chief, as battalion chiefs,

17        we were given smartphones as command staff

18        members.  Chief Spahn was not one who, at least

19        to my knowledge -- who at least to me personally

20        would text me or want me to text him.  So we

21        didn't share that communication venue, if you

22        will.

23   Q    When we talked about your employment experience

24        becoming miserable as soon as Chief Cohn was

25        appointed in June of 2011, was one of the things
```

 1         that occurred in that regard the fact that you

 2         allowed your EMT license to lapse and that the

 3         command staff kind of rode you about that a

 4         little bit and criticized you for that?

 5    A    Correction.  It was not that I allowed it to

 6         lapse.  It was an error on the State's part as

 7         far as having changeover in their staff, moving

 8         from a paperless system to an e-licensing

 9         system.  There was a communication gap between

10         them and taking up, I guess if you could say,

11         the documents or licensures that were at that

12         point.

13              And when it was realized that my

14         license had -- when I was notified that my

15         license was, in fact, not valid anymore, I

16         contacted then the new director of health and

17         safety at the State, Helen Pullen, and expressed

18         to her that I had attempted approximately nine

19         times to log onto the Department of Health and

20         Social Services EMS e-licensing site and do what

21         I needed to do in order to get my license or my

22         EMT certificate or EMT license.

23              My last communication was with

24         Nora Stoflett.  I don't remember the exact date,

25         but I mentioned to her that I had actually

1       completed an EMT basic refresher course in 2009,

2       I believe, and that I had met all the

3       requirements for EMT licensing; however, I could

4       not downgrade it in the system.  And she

5       explained that their system was not set up to

6       be -- that you couldn't downgrade at that

7       particular point.  They weren't -- they didn't

8       plan for that.

9                  MR. EHRKE:  Could you read back the

10      question I asked him?

11                 (Record read back as requested.)

12   BY MR. EHRKE:

13   Q    That's the question.

14   A    Aside from allowing it to lapse, yes.

15   Q    Okay.  Okay.

16   A    Yes.

17   Q    And that all took place -- well, when did your

18        EMT license lapse?

19   A    2012, I believe.

20   Q    And when did you first become aware of the fact

21        that it had lapsed?

22   A    I don't recall the exact date.  It was in the

23        summer of 2012.

24   Q    Was it possible it lapsed in August of 2011?

25   A    It could be.  Yeah.

1  Q   And when did you start taking these nine

2      attempts at getting it reinstated?

3  A   I believe in 2010.  After we completed the EMT

4      basic refresher, you were given directions to

5      log onto the e-licensing; and then complete the

6      application process; and then put your

7      information in; and then, therefore, it would

8      give you a license once that was completed.

9              So each time when I logged in -- and

10     there were a couple of times with the assistant

11     chief, at that time was Steve Bauer -- we

12     couldn't get it to accept the information, and,

13     thus -- which it made me want to go and contact

14     them verbally and by email and ask them what am

15     I doing, what am I not doing to get this to work

16     correctly.

17 Q   How were you criticized in 2011 by either

18     Chief Cohn or Assistant Chief Weber regarding

19     your EMT license lapsing?

20 A   I was told that I was negligent in following

21     through with the State and making sure that my

22     license would not lapse.

23 Q   Was there a gap in time between when you became

24     aware of the lapse and when you did anything

25     about it?

**Gramann Reporting, Ltd.**                    (800) 899-7222

```
 1   A   No.

 2   Q   Okay.  So all of that criticism, including the

 3       allegations that you were negligent, that all

 4       occurred in 2011, didn't it?

 5   A   I believe so.

 6   Q   So that would have been at least three months

 7       before the Cesar Hernandez incident; correct?

 8   A   (Nonverbal response.)

 9   Q   Yes?

10   A   Correct.  Yes.

11   Q   Do you recall being criticized in late 2011

12       regarding communications breakdowns at meetings?

13   A   I don't recall.

14   Q   And I apologize.  This might be repetitive.  Can

15       you tell me why, if you observed

16       Cesar Hernandez's bedding and the flag on

17       Friday, February 17th, you didn't do anything

18       about it until Sunday, February 19th?

19   A   As I stated earlier, I was not aware of the

20       flag, the Hispanic flag with "border patrol."

21   Q   And so you were never aware of the Hispanic flag

22       or Spanish flag on the wall.  You had to be told

23       by Donna Perkins that it was on

24       Cesar Hernandez's locker before you became aware

25       of it; correct?
```

1  A    Well, I was initially told, like I said, in a

2       meeting with Garret Cieczka and Paul Sustachek,

3       that they had asked if I witnessed a flag.  And

4       I said, Well, I saw the one denoting "C.

5       Hernandez 2011," similar to what we would put up

6       for anyone in the military.  I said, I saw that.

7                  And they said, No.  Did you see the

8       other one, the other poster?

9                  And I said, I didn't.  What are you

10      talking about?

11  Q    And this was a discussion you had with them on

12      Sunday, the 19th?

13  A    Yes.

14  Q    And that's what prompted you to contact

15      Assistant Chief Weber with that February 19th

16      email; correct?

17  A    Yes.

18  Q    When did Donna Perkins first come to you and

19      mention anything about the flag?

20  A    It may have been that day during the day.  It

21      was discussed that I was aware of the flag now,

22      or of the poster.

23  Q    Ultimately, did somebody tell you that

24      Shawn Hammernik may have had a picture of this

25      on his phone?

 1    A    Yes.

 2    Q    Who told you that?

 3    A    Garret Cieczka.

 4    Q    And how did Garret Cieczka know that?  Do you

 5         recall?

 6    A    I don't recall how he found out.  All I know is

 7         when we left the meeting or we were walking out,

 8         he said that he had personally seen a picture on

 9         his phone, and that was essentially all.

10    Q    Did Garret Cieczka get any discipline, if you

11         know, in this matter?

12    A    Not that I'm aware of.

13    Q    And do you know if Sustachek was ever

14         disciplined in any way with regard to Hernandez?

15    A    Not that I'm aware of.

16    Q    So based on your observation and your ability to

17         see what was up there, had Building 1 -- all you

18         ever saw was the bedding up there and what

19         looked like a Spanish flag or a Hispanic flag?

20    A    No.  I did not see a flag.

21    Q    Oh.  You never even saw that?

22    A    No.

23    Q    You would agree with me it's very possible

24         anybody else walking by might not have seen the

25         flag or the poster too, wouldn't?

 1    A    I would agree.

 2    Q    You would agree with me, then, that the first

 3         time the flag or poster came into issue was when

 4         it was on Cesar Hernandez's locker; correct?

 5    A    That, I couldn't say entirely for sure.  I want

 6         to say that when they were mentioning taking the

 7         bedding down, the flag was revealed under the

 8         bedding.

 9    Q    Who took the bedding down, if you know?

10    A    I don't know.

11    Q    Do you know if Cesar Hernandez did that?

12    A    I don't know.

13    Q    Who took the flag down or the poster down, if

14         you know?

15    A    I don't know.

16    Q    Did Cesar Hernandez do that?

17    A    I don't know.

18    Q    Who put it on his locker?

19    A    In conversations that I had, I thought that

20         someone had said that maybe he did it.

21    Q    Any reason to dispute that Cesar Hernandez took

22         this flag and put it on his locker?

23    A    No.

24    Q    You would agree with me that if it was offensive

25         or negative to him in any way, you wouldn't

1          expect him to put it on his locker.  Isn't that

2          fair?

3                  MS. LEWISON:  Objection.  Speculation.

4     BY MR. EHRKE:

5     Q     You can answer if you can.

6     A     I wouldn't be able to answer it with a "yes" or

7           "no."

8     Q     Had you in your investigation asked him that

9           question, you would have been able to obtain the

10          answer; right?

11    A     Correct.

12    Q     And you never bothered to ask him, did you?

13    A     The opportunity was not there to --

14    Q     That's not what I asked.  You were told the

15          night of February 19th to investigate this.  Is

16          there some reason you didn't go right to him

17          first as a potential subject or a victim to find

18          out if there was anything wrong that had been

19          done in the first place or any complaint that

20          had been filed?  Is there some reason why you

21          didn't go to him first?

22    A     From my understanding, the way I saw it, it was

23          something a little bit more than myself going to

24          that individual and asking them or doing my own

25          investigation per se.

1          I felt that it was a violation of

2     someone's rights, felt that it was a need to

3     look at a little more seriously than to have a

4     conversation.  Be a little more formal with the

5     process, I guess is what I'm trying to say.

6  Q   And that's what Assistant Chief Weber told you

7     to do that night in an email; correct?

8  A   He basically -- he made a global -- or a comment

9     to say, do the investigation.  And, again, I

10     don't remember exactly the verbiage, but to look

11     into it, I think is what he said.  If my memory

12     serves me correctly, I think he said, Look into

13     it and get back to me with the findings.

14  Q   "Could you do some investigating into this

15     incident and report any findings back to me?

16     This type of behavior should not and will not be

17     tolerated.  Please let me know what you find

18     out."

19          That's what he asked you; correct?

20  A   Correct.

21  Q   In an email that was 30 minutes after you first

22     notified him; correct?

23  A   Correct.

24  Q   You thanked him for his response, and then you

25     told him that you'd rather not conduct an

```
1          investigation; correct?

2    A    Correct.

3    Q    And how did he respond to that?

4    A    He didn't.  The next correspondence that I got

5          was the email from Chief Cohn the next morning.

6    Q    What did you get from Chief Cohn in that regard?

7    A    An email instructing me that it was my duty

8          to -- again, I'm paraphrasing -- to investigate

9          the incident, and that if I didn't want to, that

10         I should turn it back over to he and the

11         assistant chief.

12   Q    For reassignment for the investigation; correct?

13   A    Yes.

14   Q    And at that point you undertook the

15         investigation instead of telling him he should

16         reassign it; correct?

17   A    Yes.

18   Q    Did you ever interview Donna Perkins formally in

19         the investigation?

20   A    No.

21   Q    Why not?  She was the complainant, wasn't she?

22   A    I was told by Assistant Chief Weber to turn

23         everything over to him.

24   Q    That's not what I asked.

25               Why didn't you go to Donna Perkins and
```

1          in the investigation interview her?

2     A    I don't recall.

3     Q    You were instructed to do the investigation on

4          February 19th at roughly 10:00 p.m., and you

5          reported your findings to Assistant Chief Weber

6          in the afternoon of February 23rd, four days

7          later; correct?

8     A    Correct.

9     Q    And, again, you didn't do any handwritten notes

10         of the investigation, did you?

11    A    No.

12            (Exhibit No. 1 marked for identification.)

13    BY MR. EHRKE:

14    Q    Mr. Mollet, I'll show you what we've had marked

15         as Exhibit 1 and ask you if that is the email

16         dated February 23rd with the account of what you

17         "witnessed, heard, and discussed concerning

18         Firefighter Hernandez's incident."

19    A    Yes, it is.

20    Q    And, again, between Friday, February 17, 2012,

21         and February 23, 2012, you never talked to

22         Cesar Hernandez about this, did you?

23    A    No.  At that point, I believe the investigation

24         was being taken over by the assistant chief, and

25         my involvement in it may have been

1        inappropriate.

2   Q    Your answer was no, though, right, that you

3        never talked to --

4   A    Correct.

5   Q    -- the supposed subject or victim about it?

6   A    Correct.

7   Q    And then I think you agreed that after you

8        reported to Assistant Chief Weber with your

9        findings on February 23rd, you were aware that

10       ultimately a number of individuals were

11       disciplined; correct?

12  A    Not at that particular time, I wasn't.

13  Q    You did become aware that a number of

14       individuals were disciplined, did you not?

15  A    Yes.

16  Q    Now, in the normal course of a disciplinary

17       proceeding or investigation, normally those

18       outside of the individuals who are disciplined

19       would not be informed anyway, would they?

20  A    Not unless they had anything -- if they had

21       nothing to do with the investigation or the

22       complaint, they wouldn't.

23  Q    And, again, what you ultimately found out with

24       regard to discipline being rendered would be

25       consistent with Assistant Chief Weber's note to

| | | |
|---|---|---|
| 1 | | you of February 19th that this type of behavior |
| 2 | | should not and will not be tolerated; correct? |
| 3 | A | Correct. |
| 4 | Q | At any time when you were at Greenfield did you |
| 5 | | ever pull somebody's bedding who had left it |
| 6 | | from the prior shift and done anything with it? |
| 7 | A | No. |
| 8 | Q | That had occurred on your shift when you were |
| 9 | | battalion chief, though, had it not, somebody |
| 10 | | pulling a previous shift guy's bedding off and |
| 11 | | doing something with it? |
| 12 | A | Not that I would be aware of. |
| 13 | Q | Okay. |
| 14 | A | Our bunk rooms were not within the dorm. |
| 15 | Q | Paragraph 11 of your complaint says that |
| 16 | | Mr. Hernandez is "Mexican American." |
| 17 | | Where did you get that information in |
| 18 | | order to put it in your complaint? |
| 19 | A | Could you please explain? |
| 20 | Q | Paragraph 11 of your complaint you said you read |
| 21 | | and was complete and accurate, "Hernandez is |
| 22 | | Mexican American." |
| 23 | | Where did you get that information in |
| 24 | | order to put it in this complaint that you |
| 25 | | filed? |

1    A    Judging by his Hispanic heritage.

2    Q    You're judging him by his appearance, aren't

3         you?

4    A    No.

5    Q    Did he ever tell you that he was a Mexican

6         American?

7    A    No.

8    Q    Did he ever tell you where he was born?

9    A    No.

10   Q    Did he ever tell you where his parents were

11        from?

12   A    No.  He and I never had those conversations.

13   Q    I understand that.  So since there's no

14        discussion -- well, have you ever had any

15        discussion with anyone else that confirmed that

16        he was "Mexican American"?

17   A    Not that I recall.

18   Q    So you just assumed he was "Mexican American"

19        based on the way he looks; correct?

20   A    No.

21   Q    What else besides his looks lead you to think

22        that he's Mexican American?

23   A    His name.

24   Q    Do you know where he was born?

25   A    No, I don't.

1    Q    And I apologize, but who again told you that

2         Hammernik had a picture of the postings on his

3         phone?

4    A    Garret Cieczka.

5    Q    Did Cieczka complain about it in any way, or did

6         he just say, I know Shawn Hammernik has

7         pictures?

8    A    I believe that's all he said, is that he knew he

9         had it.

10   Q    When Garret Cieczka told you this, was he aware

11        that you were doing an investigation?

12   A    Yes.

13   Q    How did Chief Cohn and Assistant Chief Weber at

14        any time from you becoming miserable in June of

15        2011 -- how did either Chief Cohn or Assistant

16        Chief Weber criticize your communication skills?

17   A    Basically, there was comments of seeming

18        disconnected, distant.  Those weren't only

19        comments from Assistant Chief Weber or

20        Chief Cohn.  That was from other battalion

21        chiefs as well.

22   Q    So other battalion chiefs criticized you too?

23   A    Yes.

24   Q    So it wasn't just Chief Cohn and Assistant

25        Chief Weber.  Other battalion chiefs also

1          criticized your communication skills?

2     A    Yes.

3     Q    Well, you don't put that in your complaint.  You

4          only say that Cohn and Weber harassed you by

5          criticizing your communication skills.

6               Is there some reason you didn't

7          include the fact that battalion chiefs also

8          criticized your communication skills?

9     A    There was no reason to disclude it.  It was

10         essentially as a group, as a command staff --

11         was told as a command staff, you are not being

12         connected and being very disconnected.

13    Q    Okay.  You say that you were criticized -- well,

14         you say that you were criticized in your ability

15         as the PR, public relations, officer for the

16         department.

17              How specifically were you criticized

18         in that regard, along with the fact that you

19         didn't tell the chief that you're going to

20         Honduras for an equipment delivery until he

21         found out from the media?

22              How else were you criticized in your

23         role as a public relations officer?

24    A    I will disagree with the statement that

25         Chief Cohn did not know that I was going to

```
1        Honduras until he read it in the media.

2   Q    No.  I'm talking about the purpose of your trip

3        to Honduras, not that you were going.  The

4        purpose.

5                Are you telling me that you think

6        Chief Cohn knew that you were going down there

7        with collected fire equipment to take to

8        Honduras before he was contacted for a story by

9        the media, or did you just tell him you'd be on

10       vacation in Honduras for that time period?

11  A    I believe it did come up in that conversation,

12       what my intent was.

13  Q    Can you show me that anywhere that you informed

14       the chief that not only were you going on

15       vacation to Honduras or be there for a specific

16       time, but it was kind of a goodwill mission

17       pursuant to which you were collecting and then

18       delivering fire equipment?

19  A    Nothing to be direct, but conversations to say

20       that I would be going there for essentially a

21       mission trip with my church -- or with a church.

22  Q    Can you dispute that Chief Cohn was somewhat

23       surprised by the contact from the media in that

24       he didn't have all the details for your trip?

25  A    I don't believe I can answer that with a "yes"
```

```
 1          or "no."

 2    Q     Okay.  So how were your abilities as the public

 3          relations officer criticized?

 4    A     Up to the point when I took over as the PR

 5          officer, when I became a lieutenant, I had sent

 6          several commendations -- everything from

 7          commendations to "thank you" cards to just

 8          notices going to people for stopping at the

 9          scene of an accident and making them aware that

10          we were appreciative.

11               In that entire time, I was never told

12          that I needed to keep anyone involved.  I

13          somewhat had the ability to send those out, and

14          I did so very often.  And on one occasion, when

15          I chose to recognize four DPW employees for

16          their act on a car fire on Layton Avenue, I sent

17          them, along with their superintendent, some

18          letters of commendation.  I was not aware that

19          he would take them and put them in the paper and

20          talk about them.

21    Q     "He" being who?

22    A     Dan.  He was the superintendent of --

23    Q     Ewert, E-W-E-R-T?

24    A     Correct.

25    Q     All right.
```

```
 1   A   So I was not aware that he would go that far and

 2       put it in the paper.  And subsequently,

 3       Chief Cohn and Chief Weber were at a luncheon, I

 4       believe, and it was brought to his attention,

 5       and he became angry that I didn't tell him.

 6   Q   So this is the one incident were you were

 7       criticized with regard to your role as a PR guy;

 8       right?

 9   A   There were maybe one or two others.

10   Q   Well, on that one, when did that occur?

11   A   August of 2012.

12   Q   What were the other one or two that might have

13       occurred with regard to you being criticized

14       with regard to your PR abilities?

15   A   I do recall one.  I do not remember the exact

16       date, but it was -- we had a duck rescue,

17       something that we oftentimes had done.  We even

18       had a net and a bucket that we referred to as

19       for duck rescues.

20             And the fact of performing this, I was

21       told that I put my members in harm's way by

22       allowing them to go into a below-level grade,

23       which the entire time that they were there, at

24       best, they may have looked down or reached down

25       into it, not gone below grade entirely.  So
```

1          there was some criticism of that.

2     Q    So that wasn't criticism of PR; that was

3          criticism of the mechanism that you allowed your

4          firefighters to use to rescue some ducks;

5          correct?

6     A    Correct.

7     Q    But you can't tell me the date of that?

8     A    I don't recall offhand exactly.

9     Q    And in this context of what you call criticism,

10         regardless of the issue, when you were

11         criticized by either Chief Cohn or Chief Weber,

12         they never ever mentioned the Hernandez

13         incident, did they?

14    A    Not that I recall.

15    Q    Okay.  And these incidents took place either

16         months before or months after the Hernandez

17         incident; correct?

18    A    Correct.

19    Q    So what proof do you have, Mr. Mollet, that such

20         criticism had anything to do with the Hernandez

21         incident, excepting the fact that you agreed all

22         three of you opposed discrimination in the

23         workplace consistently?

24              What proof do you have that this

25         criticism you talk about had anything to do with

```
1          Hernandez, other than speculation?

2     A    I felt as though it was something that, again, I

3          had done for years without any sort of criticism

4          whatsoever.

5     Q    With a different chief; correct?

6     A    Well, both.

7     Q    Okay.

8     A    Both.  When Chief Cohn took over as interim and

9          then eventually chief, he was -- there were,

10         again, multiple times where I would send

11         correspondence, and not once was I told that I

12         needed to keep him informed.

13              In fact, when I told him that I would,

14         in fact, keep him informed, he said, I don't

15         want to be informed or copied on everything.

16    Q    And that's his management style that you were

17         experiencing; correct?

18    A    I guess, yes.

19    Q    Again, can you tell me what proof, if at all --

20         if any, that you have that that kind of

21         criticism or his management style that you don't

22         like had anything to do with the Hernandez

23         incident?  What proof do you have other than

24         speculation?

25    A    Essentially, it was much -- a stark difference
```

 1          from any other type of issue, if you will, that

 2          would come up or anything that would happen.  I

 3          felt as though my actions or inactions were

 4          constantly being scrutinized, whether it was

 5          because of a PR issue or if it was something

 6          that was involved with my shift in general.

 7     Q    Okay.  What proof do you have that any of that

 8          had to do with Hernandez?

 9     A    None.

10     Q    Okay.  You allege in your complaint that

11          Chief Cohn and Assistant Chief Weber told you

12          that your "job was in jeopardy."

13                    Was that in the same context of these

14          criticisms that you were experiencing?

15     A    Yes.

16     Q    And, again, is your answer the same?  Do you

17          have any proof that that was related in any way

18          to Hernandez?

19     A    No.

20     Q    And when I say "Hernandez," I'm talking about

21          the whole incident and your investigation,

22          et cetera.

23                    You understand that?

24     A    Yes.

25     Q    You at some point went to Ben Granberg about

1         Hernandez?

2    A    Not about Hernandez.  Initially, not.

3    Q    I didn't say initially.  Did you ever?

4    A    Yes, I went to Ben.

5    Q    Okay.  When?

6    A    July of 2012, maybe.  I don't recall.

7    Q    So that would have been four months after the

8         discipline had been meted out in that regard;

9         correct?

10   A    Correct.

11   Q    What did you expect Ben Granberg to do if you

12        knew already that these guys had been

13        disciplined?

14   A    My intent to go there was not in relation to the

15        Hernandez incident initially.  It was to go

16        there because I felt that because of treatments,

17        because of communications, that I was told that

18        management was watching me.  It was somewhat

19        bothersome, and I didn't know what to make of

20        it.

21   Q    With regard to this "management was watching

22        me," you never heard anybody from management say

23        that.  Some hearsay individual told you that;

24        correct?

25   A    It was my lieutenant and heavy equipment

```
 1        operator on my shift.
 2   Q    Who?  Who are they?
 3   A    Doug Tew and Chris Rottel.
 4   Q    Do you know whether those two misquoted or
 5        misstated what they had been told with regard to
 6        you?
 7   A    They could have.  However, I went back to
 8        Assistant Chief Weber and restated what they
 9        told me and asked him why he would say that.
10        And he said, I shouldn't have said that, I
11        should have refrained from saying that, and I'm
12        sorry.
13   Q    And that related to him making comments that not
14        the staff was watching Mr. Mollet, but that be
15        careful because Mr. Mollet has shown a tendency
16        to throw his people under the bus to divert
17        blame?  Isn't that what the statement was?
18   A    No.
19   Q    Well, did you ever hear what Assistant
20        Chief Weber said directly?
21   A    Not directly.
22   Q    Okay.  And he apologized to you; correct?
23   A    Yes.
24   Q    And he didn't tell you, I apologize for telling
25        these guys you were being watched, did he?  He
```

1      just apologized when you brought the subject up?

2   A   I don't recall exactly the verbiage.

3   Q   When did you first bring this to his attention?

4   A   Within a day or two after they told me.

5   Q   And when was that?

6   A   It was within the first week of him being

7       promoted, so January -- sometime in January.

8   Q   Of what year?

9   A   2012.

10  Q   Okay.  So that was over a month before the

11      Hernandez incident, wasn't it?

12  A   Um-hum.  Yes.

13  Q   So that criticism and his treatment of you

14      couldn't have had anything to do with Hernandez

15      or your handling of it, could it, because it all

16      happened before; right?

17          THE WITNESS:  Could you restate his

18      question?

19      (Record read back as requested.)

20          THE WITNESS:  Correct.

21  BY MR. EHRKE:

22  Q   Your answer is "correct"?

23  A   Correct.  Yes.

24          THE WITNESS:  After you ask the next

25      question, could we take a break?

 1                    MR. EHRKE:  Let's do that now.  Let's

 2          take a break.

 3                    (Discussion held off the record.)

 4     BY MR. EHRKE:

 5     Q    And, Mr. Mollet, I appreciate you, before going

 6          to break, for a second here while I finish up

 7          this subject.

 8                    With regard to your discussions with

 9          Ben Granberg, did he also ask you the same

10          question I asked you as to whether you had any

11          proof that what you perceived as negative

12          treatment -- if you had any proof that that was

13          related in any way to the Hernandez incident?

14          Did he ask you?

15     A    He was not aware of the Hernandez incident.

16     Q    So his treatment or mistreatment of you, as you

17          perceived it, couldn't have had anything to do

18          with Hernandez because he didn't know about it;

19          fair?

20     A    Correct.

21     Q    When you went back to Mr. Granberg in August or

22          September of 2012, the subject of the Hernandez

23          incident or investigation, again, never came up,

24          did it?

25     A    No.

 1              MR. EHRKE:  This is a good time.  We

 2         can break now.

 3      (A recess is taken from 11:42 a.m. to 12:30 p.m.)

 4  BY MR. EHRKE:

 5  Q    Mr. Mollet, we took a little bit of a break.

 6         I'd like to go back now and touch base on a

 7         couple of aspects of your complaint.  In

 8         paragraph 11 -- and if you'd like to see one, we

 9         can talk about it, because mine has got notes on

10         it.

11              But in paragraph 11, you allege that

12         someone had put "posters on the wall near the

13         entrances to the locker room and bunk room."

14              Were there more than one poster

15         involved in this case that you know of, or was

16         it just the -- kind of the flag behind the bag,

17         along with a reference to C. Hernandez?  Was

18         there just one or were there multiple?

19  A    That's the only one there was.

20  Q    Paragraph 45 of your complaint says that you

21         opposed discrimination in the workplace, and, as

22         a result, you were retaliated against.

23              What do you mean in your complaint

24         when you basically assert that you opposed

25         discrimination in the workplace?

 1   A   Referring to the Cesar Hernandez incident.

 2   Q   Okay.  And you made it clear that you didn't

 3       think it was appropriate; correct?

 4   A   Correct.

 5   Q   Both Chief Cohn and Assistant Chief Weber

 6       expressed the same feelings; correct?

 7   A   Correct.

 8   Q   And we talked about that earlier.  They headed

 9       you on the way to the investigation; correct?

10   A   Correct.

11   Q   And then they ultimately, at least from what you

12       heard, disciplined some individuals; correct?

13   A   Correct.

14   Q   So the only opposition to workplace

15       discrimination was made up of your expression

16       that you didn't think this behavior was

17       appropriate?

18   A   Correct.

19   Q   Okay.  Did you express that feeling to anyone

20       other than Chief Cohn and Assistant Chief Weber?

21   A   Not that I recall.

22   Q   To your knowledge, was there -- from February of

23       2012 to the time you left, was there ever any

24       more such behavior in the fire department at

25       Greenfield, that you know of?

 1                     MS. LEWISON:  By such behavior, you

 2         mean?

 3    BY MR. EHRKE:

 4    Q    Discriminatory behavior.

 5    A    There were instances where -- not so much

 6         discrimination, but posters that were found

 7         around the station that were directly intended

 8         for my shift.  Two of them were a clown face.

 9         It was actually a -- it was either that one or

10         the other one that said -- it was the two babies

11         sitting on a couch.  And it said, "Dude, you're

12         not going to B shift."  One of them was put in a

13         frame and hung at Station 2.

14    Q    Okay.  But those didn't have any racial,

15         national origin, or nationality --

16    A    No.

17    Q    -- intimation or indication on them, did they?

18    A    No.

19    Q    Did you take those -- as opposed to the

20         discrimination then, did you just take those as

21         somebody putting them up to pick on your shift?

22         Because one has the babies crying and says

23         something about not going to B shift?

24    A    Not going to B shift.

25                     The other one is a clown saying that

```
 1          "We put the fun in dysfunction," referring to

 2          B shift.

 3     Q    Okay.  And from a layperson's standpoint, B

 4          shift starts at what time in the morning?

 5     A    8:00 a.m.

 6     Q    And B shift, when we talk about it, is the group

 7          of firefighters or paramedics over whom you

 8          served as battalion chief; correct?

 9     A    Yes.

10     Q    And that's 8:00 until --

11     A    8:00 until 8:00.

12     Q    8:00 until 8:00.  Okay.

13     A    24 hours.

14     Q    All right.  And you certainly don't have any

15          indication that those posters that we talked

16          about had anything to do with Cesar Hernandez,

17          do you?  You have no proof of that?

18     A    No.

19     Q    You were not criticized in any way on the manner

20          in which you handled the Hernandez investigation

21          once you were instructed by Chief Cohn to

22          proceed with that, were you?

23     A    Could you repeat that?

24     Q    You weren't ever criticized for the way you

25          handled the Hernandez investigation, were you?
```

 1    A    Not criticized in the sense of any handling of

 2         it, but criticized or told that it was my duty

 3         to do that.

 4    Q    Okay.  So I'm talking about it was your duty to

 5         do that as an instruction, as I understand it.

 6         What I'm saying is after it's all said and done,

 7         you turned the documents and information that we

 8         talked about, Exhibit 1 --

 9    A    Yes.

10    Q    -- over to Assistant Chief Cohn.  You weren't

11         criticized after that for the manner or the

12         information you provided; correct?

13    A    I was told that I did not follow through with an

14         investigation, which at the point when I turned

15         it over to Assistant Chief Weber, that's how I

16         interpreted it as my follow-through, was to hand

17         it off to Assistant Chief Weber.

18    Q    All right.  Were you disciplined or called on

19         the carpet at all for "not following through"?

20    A    I was not disciplined in relation to this, but

21         felt that some of the actions and inactions of

22         command staff following this was somewhat of a

23         direct relation to not following through with

24         the investigation as put forward to me on

25         Monday, following the -- following reporting the

1          incident.

2     Q    But, as I understand it, you did the

3          investigation.  You turned it over.  Individuals

4          were disciplined.  And so other than this vague

5          feeling, did anyone say to you, you didn't do it

6          right or you should have done it differently or

7          something like that?

8     A    Not to those words exactly.  However, it was

9          that I was -- I said, no, that I didn't want to

10         do it when -- it wasn't, in fact, a no.  It was

11         a -- I felt like -- as I said before, I felt

12         that the gravity of this meant more than just me

13         looking into it.  This was much more of a

14         professional investigation which had serious

15         consequences of becoming much larger.

16    Q    And so you expressed that hesitation.  You were

17         directed from your commanding officer to do the

18         investigation.  You did what you could.  You

19         handed that off to the assistant chief.

20         Discipline was rendered.

21                And you've already told me that there

22         was nothing afterwards that occurred with regard

23         to national origin or racial or nationality

24         discrimination; correct?

25    A    Not in relation to the Hernandez incident.

```
 1   Q    Right.  Right.  Okay.  While you may disagree

 2        with the type of discipline, the investigation

 3        was completed and individuals were disciplined;

 4        correct?

 5   A    Yes.

 6   Q    And, again, there were no incidents of any

 7        further type discrimination related to the

 8        Hernandez incident after the discipline was

 9        rendered; correct?

10   A    Not that I'm aware of.

11   Q    Okay.  So you'd agree that the discipline as

12        handed out had the effect of quelling this and

13        not allowing it to become a bigger thing,

14        correct, because it never happened again while

15        you were there?

16   A    I would disagree with that statement.  I would

17        say that the discipline that was handed out for

18        the Cesar Hernandez incident quelled that

19        incident.  However, there was still a large

20        majority or a large amount of posters, verbiage,

21        and whatnot carried on throughout the firehouse

22        that -- I guess, in my belief, I'm looking at it

23        as that if something this significant happens

24        within an organization, it should somewhat

25        rattle you to the core.  And anything and
```

```
 1         everything after that, it just shouldn't happen.
 2                   Posting pictures of not wanting to go
 3         to B shift or, you know, things of that nature,
 4         it didn't seem to quell that.
 5                   MR. EHRKE:  Could you read my question
 6         back, please?
 7                   (Record read back as requested.)
 8    BY MR. EHRKE:
 9    Q    And, Mr. Mollet, by that, I mean the racial or
10         national origin or nationality discrimination
11         never happened again while you were there;
12         correct?
13    A    Again, I'll say incorrect.  I did --
14    Q    Wait a minute, then.  What is it about the
15         babies and "I don't want to go to B shift," one,
16         that is directed at you; and, two, has anything
17         to do with anybody's national origin, race,
18         gender, or anything?
19    A    Speaking aside from that --
20    Q    We're not speaking aside from that.  This is all
21         about discrimination based on national origin.
22         That's why we're here.
23    A    Correct.
24    Q    That's the question that the jury is going to
25         consider.  What in the picture of the baby or
```

1    the clowns says anything about race, national

2    origin, nationality, or anything like that?  Is

3    there anything on those?

4  A    No.

5  Q    Okay.

6  A    No.  However --

7  Q    Who put those up?

8  A    I don't know.

9  Q    What was done when they were put up?

10  A    I took them down.

11  Q    Okay.  And what type of complaint did you make

12    when you took them down?

13  A    When I was meeting with Chief Cohn and Assistant

14    Chief Weber, I made reference to the fact that

15    these pictures are being put up and that I don't

16    find it being appropriate.

17  Q    Because someone was criticizing B shift as a

18    group; right?

19  A    Yes.

20  Q    And once you took those down and told the chief

21    and assistant chief about this, did any of those

22    posters go back up?

23  A    No.

24  Q    Okay.  Did you ever do anything to determine who

25    put those posters up?

```
 1   A    No.  I did, however, instruct my shift that that

 2        was -- we are not to engage in any of this

 3        behavior.

 4   Q    Okay.  And do you know whether or not, after you

 5        took those down, the other two shifts were

 6        instructed not to follow through on this

 7        behavior?

 8   A    No, I don't.

 9   Q    After you took them down again, did any more

10        posters go up?

11   A    Not that I was aware of.

12   Q    Okay.

13   A    Can I go back to the instance of asking about

14        any racial or any --

15   Q    No.  You answered the question.

16             And I apologize if I asked this

17        earlier, but at any time after February 19th of

18        2012, with regard to any circumstance that you

19        did not like or were unhappy with, where there

20        was criticism -- and we talked about specific

21        instances.  But in any of those, was the

22        Hernandez incident ever even mentioned?

23   A    Yes.

24   Q    Okay.  When?

25   A    I believe it was during the November 15, 2012,
```

1          conversation.  I don't recall the exact, but I

2          know that it was brought up during that meeting,

3          and I believe again in August of 2012.

4     Q    Who was at the -- what was the meeting for on

5          November 15th of 2012?

6     A    That was the meeting with Chief Cohn and

7          Assistant Chief Weber.

8     Q    And who else?

9     A    Myself.

10                  MS. LEWISON:  I'm sorry.  Was it the

11         13th or the 15th?  I thought he said the 13th

12         and you said the 15th.

13                  MR. EHRKE:  I wrote down 15th.

14                  THE WITNESS:  November 15th.

15                  MR. EHRKE:  It is November 15th?

16    BY MR. EHRKE:

17    Q    There's a meeting between the three of you in

18         November of 2012.  What was mentioned about

19         Hernandez, knowing that you testified earlier

20         that it never came up again after the

21         discipline?

22    A    And, again, I don't recall the exact.  I think

23         there was only a reference to the incident, the

24         investigation, and the subsequent discipline of

25         Battalion Chief Hammernik.

```
 1   Q   And what was that discussion?

 2   A   It wasn't much of a discussion.  It was just a

 3       remark that was made.

 4   Q   Who made the remark?

 5   A   I did.

 6   Q   And what did you say?

 7   A   I don't recall without --

 8   Q   But certainly the chief or the assistant chief

 9       didn't make any comments about Hernandez.  You

10       did; correct?

11   A   Yes.

12   Q   And then you said something about an August

13       meeting of 2012 --

14   A   Yes.

15   Q   -- that you think Hernandez was mentioned.

16               I need to know the details of who

17       mentioned it and what was mentioned, if you can

18       tell me.

19   A   You know, I was mistaken with that as far as the

20       August 10th.  That was in regards to a different

21       matter.  That was when I asked George again

22       about the statement that he had made about me

23       being watched.

24   Q   The July 18th issue of 2012 and the Honduras

25       trip that we talked about earlier -- strike
```

 1       that.  We already talked about that.

 2             Do you remember, when you got back I

 3       believe from Honduras on August 1st of 2012,

 4       instead of coming in for your shift at 8:00, you

 5       advised certain people on your shift that you

 6       weren't coming in?

 7   A    Yes.

 8   Q    And then at that point you didn't tell the chief

 9       or the assistant chief that you weren't coming

10       in?

11   A    Not until later.

12   Q    You reference something in your paperwork to I

13       think the GIU or the GUI system.  Is there some

14       kind of reporting or --

15   A    It's scheduling.

16   Q    Do I have it right?  GUI or GIU?

17   A    GUI.

18   Q    What does that stand for?

19   A    I don't recall offhand.

20   Q    Is that a system that allows for someone to in

21       advance put in when they're going to be either

22       out or on vacation, or is it only about clocking

23       in when you get to work?

24   A    No.  It can allow you to put it in in advance.

25   Q    All right.  And your August 1st date of 2012 was

| 1 | | never entered before you didn't show up at |
|---|---|---|
| 2 | | 8:00 that morning, was it? |
| 3 | A | No. |
| 4 | Q | Who was Fire Marshal Nehm, N-E-H-M? |
| 5 | A | Again, he was the fire marshal for the fire |
| 6 | | department.  He was a part-time employee who |
| 7 | | retired from the department and came back to |
| 8 | | work part-time. |
| 9 | Q | Was he working in February of 2013, the year |
| 10 | | after the Hernandez incident? |
| 11 | A | Yes. |
| 12 | Q | Did you ever make any comments that would be |
| 13 | | negative and reflective of his age at any time |
| 14 | | in February of 2013? |
| 15 | A | Yes, I did. |
| 16 | Q | And when we were talking about Garret, his last |
| 17 | | name is spelled C-I-E-C-Z-K-A? |
| 18 | A | Yes.  I believe so. |
| 19 | Q | When you refer to BA, is that one of the trucks? |
| 20 | A | It's our command car. |
| 21 | Q | Oh, command car.  Okay.  In your investigation, |
| 22 | | Exhibit 1, particularly the entries on |
| 23 | | February 19th, you indicate that you asked |
| 24 | | Lieutenant Sustachek how he got the sign that we |
| 25 | | were talking about. |

```
 1              And he told you that Firefighter

 2      Perkins noticed it on Cesar Hernandez's locker;

 3      correct?  Last entry on the first page of

 4      Exhibit 1.

 5  A   Yes.

 6  Q   So Lieutenant Sustachek didn't say anything

 7      about the sign to you until Firefighter Perkins

 8      took it off Hernandez's locker and took it to

 9      him; correct?

10  A   I believe that's what happened, yes.

11  Q   There's a reference in Exhibit 1 to you telling

12      Firefighter Cieczka that "I can't tell you what

13      to do as a union officer."

14              What do you mean by that?  It's on the

15      second page of Exhibit 1.

16  A   I believe what I meant at that time is that, you

17      know, if he had the ability as a union officer

18      to make it known to union members that there is

19      no -- that we can't tolerate any type of

20      behavior like this, that somewhat of a -- again,

21      not knowing if anything else is going on or if

22      something else is, you know, being done in the

23      department as we spoke, that just know that it

24      won't be tolerated.

25  Q   Same thing that Assistant Chief Weber told you
```

1        on February 19 in his email; correct?

2   A    Yes.

3   Q    You reference Battalion Chief Hohensee,

4        H-O-H-E-N-S-E-E, who you spoke with on Monday,

5        February 20; is that correct?

6   A    Yes.

7   Q    Did Battalion Chief Shawn Hammernik come forward

8        and basically take responsibility for the

9        Hernandez incident on February 20th?

10  A    I believe he did.  That's what I was told by

11       Assistant Chief Weber.

12  Q    Hammernik didn't come to you with that, did he?

13  A    No.

14  Q    He went to the assistant chief; right?

15  A    I'm not sure how that information was gathered,

16       if he went to him or if Assistant Chief Weber

17       called him.

18  Q    Someone before that time told you

19       Shawn Hammernik had the picture on his phone of

20       what I'll call the posters?

21  A    Yes.

22  Q    Did you instruct anyone else in your part of the

23       investigation to interview Cesar Hernandez?

24  A    No.

25  Q    When Chief Cohn responded to your indication

```
 1        that you were uncomfortable potentially doing an
 2        investigation, he also specifically invited you
 3        to let him or Assistant Chief Weber know if you
 4        needed either assistance or guidance; correct?
 5   A    Yes.
 6   Q    Did you ever go back to them then after that
 7        during the course of the investigation and ask
 8        them for assistance or guidance?
 9   A    No.
10   Q    Was there a meeting in 2011 that included
11        Assistant Chief Bauer at the time that kind of
12        disintegrated with arguments among those of you
13        at the meeting?
14   A    2011, can you be more specific?
15   Q    Late 2011, a meeting to attempt to resolve
16        communications and distance problems between the
17        shifts.
18   A    Yes.
19   Q    And that meeting broke down and created tension
20        among members and communications as shift
21        changes ended; correct?
22   A    Restate that again.
23   Q    The meeting breakdown created tension amongst
24        the members and communications between the
25        shifts eroded?
```

1   A   Between battalion chiefs.  I would agree with

2       that.

3   Q   And you were one of those battalion chiefs;

4       correct?

5   A   Yes.

6   Q   And that was at least three months before the

7       Hernandez incident; correct?

8   A   Approximately, yes.

9   Q   Mr. Mollet, if you had a firefighter on your

10      shift, B shift, that was supposed to be in and

11      ready to go at 8:00 a.m. and he didn't show up

12      until -- he didn't show up at all and then

13      sometime closer to noon advised command staff

14      that he wasn't coming in, would he have been

15      disciplined?

16  A   May have been given counseling.

17  Q   Okay.  Is counseling part of the discipline

18      process?

19  A   Yes.

20  Q   Does that same process apply to battalion

21      chiefs?

22  A   I would imagine it would, following the

23      disciplinary process of the City, progressive

24      steps.

25  Q   Were you ever disciplined on August 1st for not

1       advising anybody that you weren't coming in

2       until 11:51 a.m.?

3   A   Not that I was aware of.

4   Q   Well, if you'd been disciplined, you would have

5       been aware of it, wouldn't you?

6   A   Yes.

7   Q   And under such circumstances, such discipline

8       would have to come from your higher-ups being

9       either the assistant chief or the chief; right?

10  A   Yes.

11  Q   Did you ever walk out of rapid intervention

12      training when you had disagreements with another

13      battalion chief?

14  A   Not that I recall.

15  Q   Did you ever get frustrated in rapid

16      intervention training that would cause you to

17      walk out when you had disagreements with

18      Shawn Hammernik?

19  A   Not that I recall.

20  Q   You had on -- strike that.

21          Do you recall what day you wrote a

22      letter to the chief indicating that you had

23      received a conditional offer with

24      Menomonee Falls?

25  A   I don't recall the exact date.

 1   Q   Did you on February 20, 2013, address B shift

 2       and tell them that you were going to be taking a

 3       Menomonee Falls battalion chief position?

 4   A   No.

 5   Q   Did you tell B shift anything on February 20th

 6       about Menomonee Falls?

 7   A   Told them that I had a conditional offer and

 8       that I had to meet certain requirements before I

 9       would be able to take the job and that I would

10       let them know at a further time if and when that

11       came about.

12   Q   And what were the additional, like,

13       contingencies or requirements?

14   A   I had to pass a psychological exam, a medical

15       physical, and those had not been taken yet.

16   Q   Would you agree that the B shift guys had a

17       pretty good understanding of your psychological

18       well-being and your physical well-being, having

19       worked with you every day?

20   A   I don't know if I could answer that.

21   Q   Do you know whether there were any B shift guys

22       that assumed that there would be no problem with

23       you passing a psychological test or a physical?

24   A   Again, I wouldn't know to answer that.

25   Q   On February 22nd of 2013, you got a letter from

```
 1        Chief Cohn indicating that he was taking your

 2        steps as a resignation and accepting the

 3        resignation as of February 22nd; correct?

 4   A    Yes.

 5   Q    And, subsequently, you sent him a letter saying,

 6        basically, wait a minute; I haven't resigned yet

 7        because of these contingencies?

 8   A    Yes.

 9   Q    Okay.

10   A    Yes.

11   Q    And do you remember when you delivered that

12        follow-up letter to the chief, knowing that the

13        acceptance letter from the chief came on

14        February 22nd, which was a Friday?

15   A    That would have been the following Monday.

16        Monday morning.

17   Q    So you would have come to the station on Monday,

18        February 25th, to bring that other letter

19        saying, wait a minute, I haven't resigned?

20   A    Yes.

21   Q    Were you scheduled to work on the 24th?

22   A    I don't recall.

23   Q    Did you work on Sunday, the 24th?

24   A    No.

25   Q    Did you tell anybody why you didn't come to work
```

**Gramann Reporting, Ltd.**                              **(800) 899-7222**

1          on Sunday, February 24th, when you were

2          scheduled to otherwise work?

3     A    No.

4     Q    Why didn't you go to work when you were

5          scheduled on the 24th?

6     A    Again, without seeing the letter, I was under

7          the understanding that I was not to report to

8          work.

9     Q    Okay.  That letter didn't say anything about

10         Hernandez or the incident or the investigation,

11         did it?

12    A    No.

13    Q    When you went to the Station 2 on the 25th, who

14         did you give that letter to?

15    A    Assistant Chief Weber.

16    Q    Okay.  Before you went to Honduras in August of

17         2012, you sent an email out -- a widespread

18         email indicating you were beginning to collect

19         gear, but you did not include the battalion

20         chiefs, the assistant chief, or the chief on

21         that email, did you?

22    A    No.  I had forgotten.

23    Q    And that failure raised an issue that Chief Cohn

24         was not happy with; correct?

25    A    Yes.

1    Q    And, in response, you basically said --

2                   MS. LEWISON:  In response to what?

3    BY MR. EHRKE:

4    Q    In response to the chief's unhappiness with your

5         failure to advise him in that email, you said,

6         once I sent the second email, I realized I

7         didn't carbon copy command staff on the first

8         message.  And you said, you are all more than

9         welcome to volunteer again.  Sorry.

10                  That was the email you sent to the

11        chief on August 14th of 2012; correct?

12   A    Yes.

13   Q    And that didn't have anything to do with

14        Cesar Hernandez and didn't mention it at all;

15        correct?

16   A    Correct.

17   Q    And the chief responded by saying he didn't take

18        it personally.  It was about the organization,

19        and he hoped you could see that this type of a

20        mission could cause dissent among certain

21        individuals, including battalion chiefs.

22                  That's what he said to you; right?

23   A    Yes.

24   Q    And he suggested a different form of

25        communication so as to avoid that; right?

1    A    As I recall, yes.

2            MR. EHRKE: Let's take a couple-minute

3     break. I want to make a copy here.

4            (A brief recess is taken.)

5      (Exhibit No. 2 marked for identification.)

6   BY MR. EHRKE:

7    Q    Mr. Mollet, we talked about this to some extent

8      earlier, but I didn't mark it. I'm showing you

9      what's been marked as Exhibit 2 with today's

10     date and ask you -- it's two pages. Ask you

11     if -- looking at the back page of that first

12     that starts with the February 19, 9:32 p.m.

13     email that you sent to -- who you call Jon and

14     George, chief Cohn and Assistant Chief Weber.

15     That very back page.

16            Is that the first email?

17   A    Yes.

18   Q    Raising the Hernandez incident for the first

19     time; correct?

20   A    Yes.

21   Q    Okay. And then on the front page of Exhibit 2,

22     that's the -- at the bottom, that's the same

23     day, 10:02 p.m. response from Assistant

24     Chief Weber on which he copies Chief Cohn;

25     correct?

1    A    Yes.

2    Q    And that's the quote I read to you earlier,

3         "This type of behavior should not and will not

4         be tolerated.  Please let me know what you find

5         out"; correct?

6    A    Correct.

7    Q    And then up at the top of Exhibit 2 is a

8         response from you 42 minutes later on

9         February 19th that say "Thanks for the quick

10        response.  I'm glad you share the sentiments in

11        the seriousness of this incident."

12                  And that's where you express that you

13        would rather not conduct the investigation;

14        correct?

15   A    Yes.

16        (Exhibit No. 3 marked for identification.)

17   BY MR. EHRKE:

18   Q    Mr. Mollet, I'll show you what's been marked as

19        Exhibit 3 with a sticker in the lower right-hand

20        corner and ask if that is an email you received

21        from Chief Cohn on February 20th at 9:37 a.m. in

22        response to your indication that you were

23        hesitant to do the investigation.

24                  And as we look at that, that's the one

25        that ends with the sentence "However, if you

1          need assistance or guidance, please advise AC or

2          me."

3                    I read that correctly; right?

4     A    Yes.

5     Q    And there's an opening paragraph there that

6          talks about "by the seat of our pants."

7                    Do you remember some kind of

8          discussion that was brought to your attention

9          from rank and file or even other battalion

10         chiefs about how somebody had the perception

11         that things were done by the seat of the pants

12         or something like that?

13    A    It was a comment that I had heard from an

14         oncoming shift.  As I was cleaning out my

15         office, the battalion chief office, I had heard

16         Mark Dallman, who was the lieutenant on C shift,

17         make the remark in the kitchen.  And I walked

18         out of my office, and I told him -- you know,

19         supported the mission of the command staff,

20         telling him that that's really not the kind of

21         conversation you should be having, and I know

22         that we make these decisions for -- or we make

23         decisions based on what we feel is the best for

24         the organization.

25    Q    Right.  And so you two disagreed with the

1     perception or characterization that the fire

2     department operated by the seat of its pants;

3     correct?

4  A  He had his interpretation, if that's what it

5     was.  And I tried to tell him, as a command

6     staff member, that that's not how it was or

7     should be.

8  Q  And "he" being Dallman?

9  A  Mark Dallman, yes.

10 Q  Okay.  Was there a time when Mark Dallman was

11    the lieutenant in 2011 where you on a fairly

12    consistent basis would complain to him about the

13    command staff, other battalion chiefs and/or the

14    chief or assistant chief?

15 A  Not that I recall offhand.

16 Q  Well, when you say not that you recall, if

17    Mr. Dallman indicates that you complained and

18    "bitched" about the command staff regularly in

19    2011, would you disagree with that?

20 A  I wouldn't say that I bitched about them.  I may

21    have had a conversation to talk about some

22    different theories or management ideals.

23 Q  And you had a number of discussions in 2011 with

24    Mark Dallman in which you expressed either

25    dissatisfaction or disagreement with the

```
 1        approach or the concept or the direction of the

 2        department; correct?

 3   A    Again, not that I recall specifically.

 4   Q    Okay.  Well, how did you classify those things

 5        that you talked to Mr. Dallman about in 2011?

 6        You said we may have had some conversations

 7        about -- what were the subjects again?

 8   A    Just leadership qualities, demeanor, basically.

 9        Those types of things.

10   Q    Would you disagree if he indicates he perceived

11        those as complaints from you about how command

12        staff was operating?

13   A    I would not disagree; however, I would say that

14        it was not meant as, as you had mentioned

15        before, a bitch session to him.

16   Q    So he may have perceived it that way, but it

17        wasn't intended that way by you?

18   A    Correct.

19   Q    Okay.  When you had come back to the fire

20        department on February 25, 2013, to drop off the

21        letter that basically said, I haven't resigned

22        yet because we have these contingencies, it's

23        conditional, you got a letter back from

24        Chief Cohn dated February 28th of 2013; correct?

25   A    Yes.
```

1   Q   And at the end of that, he was referencing those

2       contingencies.  And he says "Should one of the

3       contingencies mentioned above preclude you from

4       taking the battalion chief position with the

5       Menomonee Falls Fire Department, please contact

6       us, and we will discuss the matter and available

7       options"; correct?

8   A   Yes.

9   Q   Did you ever talk to him about that afterwards?

10   A   No.

11   Q   Okay.  You never asked him what he was talking

12       about when he said "we'll discuss the matter and

13       available options"?

14   A   After I received this letter, I didn't come back

15       to work in the capacity to have the conversation

16       with him.

17   Q   In the context of your February 25th letter that

18       says we have these contingencies, when did you

19       actually pass the physical and pass the site

20       test and have those contingencies removed?

21   A   Without looking at a document, I wouldn't be

22       able to tell you exactly the date.

23   Q   Was it early March or do you know?

24   A   No.  I wasn't -- there was some rescheduling due

25       to -- I had a concern that I had a torn ligament

1        in my hip.  And prior to going to the physical,

2        I made sure from my orthopaedic doctor that it

3        wasn't something that was a little more severe

4        that would preclude me from passing a physical.

5        I wanted to take care of that first.

6   Q    And just so that I understand it, you hadn't

7        done the physical or the psych test with

8        Menomonee Falls as of Chief Cohn's February 28,

9        2013, letter, had you?

10  A    Right.

11  Q    And he said if one of those contingencies

12       precluded you from taking the job in

13       Menomonee Falls, you should contact him to

14       discuss other available options; correct?

15  A    Yes.

16  Q    And you never did follow up after that with him,

17       did you?

18  A    No.

19  Q    Did you then at some point send a letter --

20       another letter to the department officially

21       resigning?

22  A    March -- at some point.  March 23rd, I believe

23       it was.  I hand-delivered it Assistant

24       Chief Weber the night that I came to clean out

25       my locker.

1 Q  What day did you clean out your locker?

2 A  The 23rd, I believe it was.  March 23rd.  It was

3    a Saturday evening.

4     (Exhibit No. 4 marked for identification.)

5 BY MR. EHRKE:

6 Q  Mr. Mollet, I haven't made a copy yet, so I'll

7    give your counsel a chance to look at this.  But

8    I'm going to show you what's been marked as

9    Exhibit 4 and ask if that is a letter from you

10    dated February 23rd to Chief Cohn, effectively

11    saying I'm not resigning and referencing

12    contingencies.  And don't answer that until your

13    counsel has had a chance to look at it.

14      And my question was, is that the

15    letter that you delivered on February 25th when

16    you walked to the --

17 A  Yes.

18 Q  Okay.  Can you explain to me why it's dated

19    February 23rd, but you didn't bother to either

20    email it or deliver it to the department that

21    same day?

22 A  I guess my intent was to deliver it Monday, as

23    far as the business day on Monday.  I didn't

24    know if I could or should have done something

25    like this via email.  I would have rather

 1        hand-delivered it.

 2   Q    You were scheduled to work on Sunday, the 24th,

 3        though, weren't you?

 4   A    Again, as I interpreted the letter that I was

 5        given from Chief Cohn that I was not working on

 6        Sunday, that that was considered to be my

 7        last -- or my shift would have ended -- or the

 8        pay schedule or pay cycle would have ended as of

 9        that Sunday.

10   Q    Sunday, the 24th?

11   A    Correct.

12   Q    Inclusive or exclusive of your shift that day?

13   A    I couldn't answer either way if it was inclusive

14        or exclusive.

15   Q    You were scheduled to work on the 24th, though,

16        weren't you, originally?

17   A    On the schedule, I believe I was.  I don't know

18        if they removed me from the schedule.

19   Q    That's not what I asked.  I asked if you were

20        scheduled, because my follow-up question is did

21        anything physically preclude you from going to

22        Station 2 on the 24th, when you were scheduled,

23        with that letter to give it to the command

24        staff?

25   A    I believe it was a Sunday.

1    Q    Is the fire department not open on Sundays?

2    A    The command staff is not there.

3    Q    Okay.  Who was in charge at the time your shift

4         was supposed to start at 8:00 on Sunday?

5    A    I don't know.

6    Q    Nothing stopped you from emailing that, just as

7         you had emailed the chief and assistant chief

8         prior to this, did it?

9    A    No.

10   Q    Especially since you knew they wouldn't be at

11        the station on the 24th when you were scheduled?

12        Nothing stopped you from doing that, did it?

13   A    No.

14   Q    Did Chief Cohn explain to you on February 22nd

15        that there was some language in the ordinance

16        about notice when you were leaving and the

17        chief's ability to waive such notice?

18   A    Could you repeat the question?

19   Q    Were you aware of any requirement in a local

20        ordinance about providing some kind of notice

21        before someone would resign and the chief's

22        ability to waive such requirement?

23   A    I had knowledge of a notice -- that it was a

24        requirement, but I was not aware that it was the

25        discretion of the chief to waive it.

```
 1   Q    Okay.  Today, are you aware that it is in the

 2        discretion of the chief to waive such notice?

 3   A    Yes.

 4   Q    Do you understand what the term "flexed off"

 5        meant when he was talking about February 24,

 6        2013?

 7   A    How I interpret flex off is that we were allowed

 8        to take off without -- with short notice,

 9        without prior notice.  It was an ability that we

10        had as command staff that we shared.

11   Q    Do you remember, Mr. Mollet, a situation

12        involving Firefighter Patrick Chenery,

13        C-H-E-N-E-R-Y, in October of 2012?

14   A    I don't recall anything in October.  May have

15        been November.

16   Q    Do you remember an October 5, 2012, email to

17        Assistant Chief Weber about Patrick Chenery,

18        where you provided details of events dating back

19        to October 3rd with Firefighter Chenery?  I know

20        there was some issue with regard to privacy you

21        were a little concerned with.

22   A    I don't recall that.

23   Q    Was there an issue in November of 2012 involving

24        an injury on Southridge Drive when the

25        Greenfield Police Department had been called?
```

1        Do you remember any issues with that and

2        communications about what had occurred?

3    A   I do.

4    Q   And what do you recall about that generally?

5    A   I received a text message from Chief Cohn asking

6        if anyone knew what had happened when the police

7        officer -- again, paraphrasing, not exactly

8        knowing what the message was or content.  But I

9        remember something to the effect that it was

10       asking if anyone knew about an incident on

11       Southridge Drive and if -- why the police

12       department was at the station.

13   Q   Was there at some point a visitation at the

14       station by Greenfield police officers to

15       interview people from the fire department?

16   A   There was on the afternoon of the incident.

17   Q   Do you recall whether the chief or assistant

18       chief took issue with the way that was handled?

19   A   Yes.

20   Q   What was the chief or the assistant chief's

21       issue with the way it was handled?

22   A   That it was not appropriately recorded to the

23       police department how the incident was handled

24       by the individuals that were on the call.

25   Q   Was that because there were signs of potential

```
 1        domestic abuse?

 2   A    Yes.

 3   Q    And at that time was it proper policy, if fire

 4        department members or EMTs noticed signs of

 5        domestic abuse, to advise the Greenfield Police

 6        Department?

 7   A    It was proper policy.

 8   Q    And so the fact that the firefighters on scene

 9        didn't originally contact Greenfield PD, it

10        would have been a problem with regard to that

11        policy?

12   A    Yes.

13   Q    And the chief and assistant chief became aware

14        of that when they noticed Greenfield police

15        officers at the station actually talking to the

16        firefighters?  Is that what happened?

17   A    No.

18   Q    What developed there, then, with regard to their

19        failure to notify police originally when they

20        noticed the domestic abuse signs on the call?

21   A    When they were on the call -- when I interviewed

22        them, when they were on the call, they said that

23        they had noticed the call was for a hand injury.

24             They said that the husband was acting

25        a little different, and so they felt that if
```

1      they called for the police department, that it

2      may -- they may not have gotten her out of the

3      house, is what I was told.

4             So they packaged her, took her to

5      St. Luke's, and told staff at St. Luke's that

6      they believed that this was a domestic issue.

7      Therefore, they contacted the police.  The

8      police came to the hospital and then

9      subsequently came back to the fire station.

10            In the meantime of this happening, I

11     was not aware that -- of the details of the

12     call.

13  Q   Well, when you were asked to look into it,

14     then -- you were asked to review the conduct of

15     the two firefighters; correct?

16  A   Yes.

17  Q   And you investigated that, and then you reported

18     that back to Assistant Chief Weber?

19  A   Yes.

20  Q   And that was the end of it once he got those

21     answers from you?

22  A   From the investigation standpoint.  However, we

23     moved forward with some remedial training

24     policies and protocols with those two

25     individuals and the shift likewise.

1    Q    Relating to these domestic abuse potential

2         issues?

3    A    Yes.

4    Q    And that was the end of it, then?

5    A    I believe so.

6              MR. EHRKE:  Off the record.

7              (Discussion held off the record.)

8    BY MR. EHRKE:

9    Q    Mr. Mollet, going back to March of 2013, when

10        you accepted the offer in Menomonee Falls, you

11        specifically yourself said that you were at a

12        point in your career where you needed something

13        new and that you saw the combination department

14        in Menomonee Falls as both a challenge and an

15        opportunity; correct?

16   A    Yes.

17   Q    The combination department in Menomonee Falls

18        was different than the structure in Greenfield;

19        correct?

20   A    Yes.

21   Q    And you saw working as a battalion chief there

22        as both a challenge and an opportunity; correct?

23   A    Yes.

24         (Exhibit No. 5 marked for identification.)

25

1    BY MR. EHRKE:

2    Q    Mr. Mollet, I put in front of you Exhibit 5 with

3         today's date.  Is that your March 23, 2013,

4         resignation letter to Chief Cohn?

5    A    Yes.

6    Q    There's no complaint of discrimination or

7         retaliation or even mention of the Hernandez

8         incident in that letter of resignation, is

9         there?

10   A    No.

11              MR. EHRKE:  Let's take a five-minute

12        break.  I'm getting close.

13        (A recess is taken from 1:40 p.m. to 1:46 p.m.)

14   BY MR. EHRKE:

15   Q    By way of a little more background, Mr. Mollet,

16        would you agree with the statement that during

17        the time George Weber was being considered for

18        the assistant chief position, he started

19        treating you differently than he had treated you

20        previously?

21   A    Yes.

22   Q    That included short and disinterested

23        conversations?

24   A    Yes.

25   Q    When Chief Cohn became the interim chief in June

```
 1          of 2011, that's when what you had testified to

 2          earlier as texts and phone calls based on

 3          friendship between the two of you just ceased;

 4          right?

 5    A     Right.

 6    Q     And Chief Cohn distanced himself from you at

 7          that point; correct?

 8    A     Correct.

 9    Q     And that was eight months before the Hernandez

10          incident; right?

11    A     Yes.

12    Q     Did you tell someone that Kevin Wisniewski

13          retired two months early because he disliked

14          what was happening with the department right

15          when Chief Cohn took over in June of 2011?

16    A     I don't recall telling someone that.  I believe

17          I may have heard that.

18    Q     Okay.  Have you talked to Kevin Wisniewski to

19          have him specifically contradict that assertion?

20    A     No.

21    Q     When you first started this litigation with a

22          complaint to the Wisconsin Equal Rights

23          Division, Mr. Mollet, that complaint said that

24          Kevin Wisniewski retired two months early

25          because he disliked what was happening with the
```

```
 1          department.
 2                  Does that refresh your recollection as
 3          to whether you personally, through your lawyer,
 4          have asserted that Wisniewski retired early
 5          because he didn't like what was happening?
 6   A      Again, I believe I heard that.
 7   Q      He'd be the best one to address when and why he
 8          retired, wouldn't he?
 9   A      Yes.
10   Q      In December, did Chief Cohn retain the services
11          of an outside contractor to work further on
12          leadership within the department?
13   A      I do recall it was an outside contractor, was
14          James Rowan.
15   Q      You spoke with him, didn't you?
16   A      I believe as command staff we all did.  Yes.
17   Q      Right.  All battalion chiefs spoke with him;
18          correct?
19   A      Yes.
20   Q      And Chief Cohn and Assistant Chief Weber spoke
21          with him?
22   A      I believe so.
23   Q      Okay.  And that was all to basically evaluate
24          how things were going at the department and how
25          we could get better; correct?
```

| 1 | A | I believe that was the basis. |
|---|---|---|

1  A  I believe that was the basis.

2  Q  From a leadership standpoint?

3  A  Correct.

4  Q  You never said anything to that consultant about

5      Hernandez or the incident or anything related

6      thereto, did you?

7  A  No.

8  Q  We had talked earlier, Mr. Mollet, about some of

9      your -- before you -- strike that.

10     During the process of your application

11    and ultimate employment with Menomonee Falls,

12    you specifically spoke with an investigator from

13    Menomonee Falls; correct?

14  A  Yes.

15  Q  And that investigator asked you repeatedly why

16    you were interested in leaving the City of

17    Greenfield; correct?

18  A  Yes.

19  Q  And you never told him that there was any

20    problem with retaliation or discrimination

21    relating in any way to Hernandez, did you?

22  A  No.

23  Q  And he told you at the outset of that interview

24    that the interview was private and personal;

25    right?

```
 1   A   That, I don't recall.

 2   Q   Okay.  In the context of recent requests for

 3       records and documents from the City of -- or

 4       from the Village of Menomonee Falls, have you

 5       played any part in responding to any such

 6       requests?

 7   A   Yes.

 8   Q   What have you done in that regard?

 9   A   Asked for the background investigation.

10   Q   Okay.  You are aware that there is an open

11       records request for your entire personnel file;

12       correct?

13   A   Yes.

14   Q   So why did you only put together the background

15       investigation?

16   A   I wasn't allowed to get to that part of my

17       background.  It was -- I don't understand what

18       our village attorney -- what the rationale was,

19       but that was a separate entity of my personnel

20       file.

21   Q   Again, you are aware that the open records

22       request is for your entire personnel file;

23       correct?

24   A   Yes.

25   Q   Do you know what the Village of Menomonee Falls
```

1        is going to provide in that regard?

2   A    No.

3   Q    Were you aware that the custodian of the

4        background check documents has been subpoenaed

5        to appear for deposition next week?

6   A    Yes.

7   Q    Were you aware that that subpoena was issued by

8        your own attorney?

9   A    Yes.

10  Q    Without breaching any discussion you had with

11       your attorney, do you know why the subpoena only

12       asked for background check information and not

13       your entire personnel file?

14  A    I'm not sure.

15  Q    Have you had any role in the decision on what

16       documents are produced with regard to the

17       background check and your personnel file?

18  A    No.

19  Q    Have you had any input by suggesting to anyone

20       what should or should not be produced?

21  A    No.

22  Q    Who at the Village of Menomonee Falls is

23       actually handling that if you're not?

24  A    The request came, and the village attorney had

25       advised what would be admissible.  And I believe

```
 1        it would be the HR coordinator, human resources

 2        coordinator.

 3   Q    Did you at some point, Mr. Mollet, put together

 4        a one-page document that has at the top of it

 5        "Settlement Numbers"?

 6   A    Yes.

 7   Q    And we had talked about that earlier in terms of

 8        what documents you had relied upon; correct?

 9   A    Yes.

10   Q    And you've testified that you had those

11        documents when you put that together last July?

12   A    Yes.

13   Q    Okay.

14   A    Again, they were check stubs and tax returns.

15   Q    And W-2 forms; right?

16   A    Yes.  Tax return, W-2 forms, things of that

17        nature.

18   Q    Where are those now?

19   A    At home.

20        (Exhibit No. 6 marked for identification.)

21   BY MR. EHRKE:

22   Q    Mr. Mollet, I want to put something on the

23        record.  I'm about to show you a document we've

24        had marked as Exhibit 6, which is a one-page

25        document, at the top of which it says "Below is
```

1    a breakdown of the numbers.  Settlement

2    numbers."

3              I'm stating on the record that I first

4    received this from your attorney last week, and

5    so I have not had a chance to explore or get

6    into any detail the legitimacy or the validity

7    of these numbers, particularly since you have

8    testified now that you have the supporting

9    documentation upon which they were based, but

10   those documents have not been produced in your

11   initial disclosures.

12             So I'm not waiving any right to

13   continue this deposition with regard to damages,

14   and I'm not waiving any right to move to

15   preclude such evidence; but in order to at least

16   determine what we're dealing with, I'm showing

17   you what's been marked as Exhibit 6 and ask you

18   to identify that for me.

19             Can you tell me what that is?

20 A   Yes.  It is a breakdown, as it states, of

21   numbers that I did through wage differentiation

22   between Greenfield and Menomonee Falls, retiree

23   health insurance, sick bank, longevity, and then

24   a penalty for early withdrawal of deferred

25   compensation.

1    Q    And it was in that context that you told me

2         that, at least with regard to health insurance,

3         that was kind of an ever-changing thing, so you

4         weren't really sure how that would apply to this

5         case; right?

6    A    The best -- the information gathered at the time

7         was the information that I had in relation to

8         Greenfield and Menomonee Falls.

9    Q    Right.  But you don't know whether that was as

10        of July of 2017, correct, when you put this

11        together?

12   A    Correct.  I don't recall exactly the time it was

13        put together.

14   Q    Did you sit down at a keyboard and type this in?

15   A    Yes.

16   Q    Okay.  And did you do that at your home

17        computer?

18   A    Yes.

19   Q    Did you save the document and any drafts of the

20        document?

21   A    That, I'm not sure.  I believe I did.

22   Q    Were there other pages that were part of this

23        calculation that are not presented here with

24        Exhibit 6?

25   A    No.

```
 1   Q    If we look at Exhibit 6, it appears across the

 2        top to have headers of the "Wages," and then it

 3        says "GFD," and then it says "MFFD."

 4                   Do you see that column?

 5   A    Yes.

 6   Q    And then there's a column that says

 7        "Difference"; correct?

 8   A    Yes.

 9   Q    So if you go back to the MM -- strike that.

10                   If you go back to the "MFFD" column,

11        partway down there there's a GF $30,000 figure

12        and down below that an MF $52,000 figure.

13   A    Yes.

14   Q    Where do those come from?

15   A    That is what I was paid from Greenfield in 2013

16        and Menomonee Falls in 2013.  That was the

17        breakdown.

18   Q    And was your official start date at

19        Menomonee Falls April 1st of 2013?

20   A    No.  It was March 25th.

21   Q    Oh, okay.  As you look under "Wages," you only

22        go to 2015, correct, in that column?

23   A    Yes.

24   Q    And if you look at 2014 under "GFD," it says, if

25        I read it correctly, 95,528.
```

1                    Did I read that correctly?

2    A    Yes.

3    Q    Where did that number come from?

4    A    That would have been based on what my salary

5         would have been at the time.

6    Q    Where?

7    A    Had I stayed in Greenfield.

8    Q    How do you know that?

9    A    We have a resolution that was given to us

10        from -- the City gives a resolution of a

11        breakdown of what salaries are and then what

12        they are for subsequent years.

13   Q    So you somewhere have a resolution from the City

14        that sets forth the pay for battalion chief with

15        your specific experience and tenure for 2014 and

16        2015?

17   A    Yes.

18   Q    So are you aware whether the salary for the

19        battalion chiefs at Greenfield in the years you

20        reference here could be changed or altered based

21        on experience or any other factors that can

22        typically affect a salary?

23   A    None that I'm aware of.

24   Q    Would you agree with me that with regard to the

25        resolution and the documents, that the numbers

```
 1        you may have taken from such a resolution are

 2        maximums?

 3   A    That, I'm not aware of whether they were

 4        maximums.  They were basically broken down into

 5        yearly salaries, wages.  I believe that how they

 6        stated it was a monthly wage and then it

 7        computed into a yearly salary.

 8   Q    Is there anything, based on what you recall from

 9        the resolution, that would indicate that a

10        battalion chief in 2014 in Greenfield after you

11        left could be paid less than the number that you

12        took off the resolution?

13   A    Nothing indicating that.

14   Q    You haven't seen that?

15   A    No.

16   Q    Okay.  Are you aware of any practice that allows

17        a municipality to hire someone in a position at

18        less than the resolve number, as reached by the

19        common council or a board or a commission?

20   A    Not that I'm aware of.

21   Q    As an example, the people in Menomonee Falls

22        originally quoted you a number and obviously

23        were able after the fact to raise that number by

24        at least $8,000 a year, correct, from 74 to 84?

25        Something like that?  Did I get that wrong?
```

Gramann Reporting, Ltd.                    (800) 899-7222

1  A   76.

2  Q   Okay.  So there was an $8,000 difference; right?

3  A   That wasn't due to -- that was due to a

4       promotion, moving from battalion chief to

5       assistant chief.

6  Q   And did you have any say in the increase?

7  A   No.

8  Q   When you said you had negotiated with someone at

9       Menomonee Falls, was that before you even

10      started?

11  A   Yes.

12  Q   And after you got -- again, tell me what the

13      number was on the posting for the job.

14  A   Roughly 72,000.

15  Q   Okay.  And, ultimately, what did you start at?

16  A   76.

17  Q   Okay.  So would you agree that a municipality

18      can post a number but then can move up or down

19      from that number depending on how much they want

20      a candidate?

21  A   I would agree that it could move, but I would

22      disagree that it would move down.

23  Q   Okay.  Have you ever seen a situation where --

24      with a municipal employer where the resolution

25      is $84,000, but they offer somebody 78- and they

```
 1        take it?

 2   A    No.

 3   Q    Your figure of 97,439 for 2015, did that come

 4        from a similar resolution?

 5   A    Yes.

 6   Q    And within a year at Menomonee Falls -- strike

 7        that.

 8                 A little over a year and a half at

 9        Menomonee Falls, you went from 84,000 to 93,183;

10        correct?

11   A    84,000 was a combination of Menomonee Falls and

12        Greenfield numbers.  That's what that wage was,

13        the 84,000.  And then the bump from 2014 -- in

14        2013 November, I believe 2013 I was promoted to

15        assistant chief.

16   Q    And you got a bump then; correct?

17   A    Correct.

18   Q    How much was that bump again?

19   A    It was to -- I want to say the posted amount was

20        84,000 starting salary.  A little over 84-.

21   Q    For the assistant chief?

22   A    Yes.

23   Q    Again, where did you get -- moving down, where

24        did you get the retiree health insurance

25        information?
```

```
 1   A    I had asked our HR department.  We were actually

 2        working on a project for some salary comps with

 3        negotiations, so I was able to get that from

 4        Menomonee Falls, and then the retiree health

 5        insurance was something that was in the

 6        resolution as well from Greenfield.

 7   Q    What year are you applying when you say

 8        Greenfield was $223 a month?

 9   A    I would have to look at the document.  I don't

10        remember offhand.

11   Q    And what year are you using when you refer to

12        MFFD at 1882 a month?

13   A    Again, I'd have to look at it to refresh my

14        memory.

15   Q    How much are you paying for health insurance

16        now?

17   A    I would have to take a look at my paycheck, my

18        pay stub.

19   Q    What kind of plan do you have with

20        Menomonee Falls?  Who's the carrier?

21   A    Rural Health Care.  It's a WCA.  We just changed

22        to it in January.  We used to have

23        UnitedHealthcare.

24   Q    So you would agree with me that the amount that

25        might be paid for premiums every year can vary
```

**Gramann Reporting, Ltd.**                    **(800) 899-7222**

1          significantly based on who the carrier is;

2          right?

3    A     Correct.

4    Q     And that's one of the reasons you're not sure

5          about how accurate these estimates can be;

6          right?

7    A     Correct.

8    Q     Do you have a single plan or a family plan?

9    A     Family.

10   Q     Okay.  And does that include kids?

11   A     Yes.

12   Q     How many kids do you guys have?

13   A     We have three dependents.  Two are in college,

14         and one is 15.

15   Q     Are the two in college still on your health

16         plan?

17   A     Yes, they are.

18   Q     I understand that feeling.  Did you have all

19         three kids on the health insurance plan when you

20         were in Greenfield?

21   A     Yes.

22   Q     You use a -- or you put a slash in here on the

23         health insurance and then refer to "nine years."

24              What does that mean?

25   A     That would have been the amount of years until I

```
 1        reach retirement -- or, I'm sorry, Medicare.
 2   Q    If you had retired at age -- strike that.
 3                How old are you now?
 4   A    50.
 5   Q    You're eligible to retire as a firefighter in
 6        Wisconsin at what age?
 7   A    53.
 8   Q    If you were to retire at 53, what would your
 9        health insurance premiums be, if you know?
10   A    I don't know offhand.
11   Q    The nine years takes you out to what age?
12   A    62.
13   Q    You do have the option of retiring as a
14        firefighter in the state of Wisconsin under the
15        retirement system any time after you turn 53;
16        correct?
17   A    Yes.
18   Q    You don't know, do you, Mr. Mollet, what the
19        difference between any earnings you may have at
20        Menomonee Falls and any earnings you might have
21        earned between Greenfield -- or at Greenfield
22        will be subsequent to the calendar year 2015, do
23        you?
24   A    No.
25   Q    And the same would be true for any healthcare
```

 1        benefit payments; correct?  You don't know what

 2        the difference would be, do you?

 3   A    No.

 4   Q    You'd have to speculate to try and guess at

 5        those numbers, wouldn't you?

 6   A    Yes.

 7   Q    Below this, you talk about MF at retirement, I

 8        would get 100 days -- 110 days at eight hours.

 9             What benefit is that?

10   A    That would be your sick days, paid out of your

11        sick time.

12   Q    And then it says multiplied by current salary.

13        Basically, you come up with an hourly rate at

14        Menomonee Falls; correct?

15   A    Correct.

16   Q    How many hours a year do you work?

17   A    Full-time employee, about 40 hours a week.  288,

18        I'm guessing.  No.  That can't be right.

19   Q    Let me ask it this way, Mr. Mollet.  How did you

20        get the 48.02 per hour?

21   A    Breakdown of my yearly salary by amount of

22        hours.  Took the yearly salary, divided it by

23        the amount of hours worked.

24   Q    And then you say, I then subtracted the

25        42,257.60 from the 179,172.00.

1                      Where do those numbers come from?

2    A    Those may have been my calculations from the

3         retiree health insurance up above, to the best

4         of my recollection.

5    Q    Can you tell me anywhere above that line that

6         says I subtracted the 42,257.60, where that

7         42,257.60 comes from?  I don't see it anywhere

8         on this document.

9    A    I don't recall offhand.

10   Q    Would your answer be the same to the 179,172.00

11        number?  That is, I don't see the 179- figure

12        anywhere on this document.  Can you tell me

13        where that comes from as we sit here today?

14   A    Without actually going back and working the

15        numbers, no.

16   Q    Then there's a lower there of sick bank and

17        time -- at time of dismissal.

18                      What are you talking about when you

19        say at time of dismissal?

20   A    When I left Greenfield.

21   Q    And how did sick bank pay or money work?

22   A    When you retired, you were to get 35 percent of

23        your total hours.

24   Q    Total hours for a year or total hours --

25   A    Total in your bank.  Some individuals have more

1          than that, but that's what I had as of 2013.

2     Q    And the hours that you would have had varied

3          year to year depending on how much sick time you

4          actually took; correct?

5     A    Correct.

6     Q    And for anyone that left the employment of

7          Greenfield for any reason as a battalion chief,

8          they would be able to be paid out for unused

9          sick time; correct?

10    A    Basically, anyone and everyone.  Not just

11         battalion chiefs.

12    Q    Was there a cap on how much bank time you could

13         have?

14    A    There was; however, I don't recall the number

15         for that.  Some individuals had two sick time

16         banks.  They would reach a maximum and then move

17         into a second account.

18    Q    Did you?

19    A    No.

20    Q    Okay.  Where do you get the 1,606 hours, then,

21         that you use here?

22    A    That's what I was given or knew of per my

23         paycheck, my pay stub.

24    Q    The pay stub says how many hours of sick bank

25         time you have?

```
 1    A    I believe they do, if my memory serves me

 2         correctly.

 3    Q    So your last paycheck would say Mr. Mollet has

 4         1,606 sick time hours banked?

 5    A    It was either the paycheck or I was able to get

 6         that through payroll.  Nonetheless, we are

 7         aware -- we can be made aware of what our sick

 8         time hours are.  They showed us on our checks

 9         when they would accrue.

10    Q    Would you agree that that would only be due to

11         you when you retired and not when you resigned?

12    A    That -- I'm unaware of whether there was an

13         actual dissertation, whether it was retire or

14         resign.

15    Q    So you don't know whether you would have been

16         entitled to that because you resigned or even if

17         you had been terminated?  You don't know if you

18         would have been entitled to this, do you?

19    A    When I was meeting with the mayor, he had made

20         mention that when I left, that they could see if

21         I could get my sick time bank payout.

22    Q    That was in terms of a settlement discussion,

23         was it not?

24    A    Yes.

25    Q    You met with the mayor to try and settle before
```

1       you filed any kind of claim or suit against the

2       City; correct?

3  A    No.

4  Q    When did you meet with the mayor to discuss

5       settlement, then?

6  A    We did not discuss settlement.  We met on an

7       off-chance where he had stopped in the fire

8       station as I was leaving, and my wife and I

9       requested to meet with him.

10      And in the conversation of meeting

11     with him, he asked me what -- you know, why I

12     wasn't or wouldn't take the job in

13     Menomonee Falls, and I said that the pay scale

14     or the pay was far too less than what I was

15     making, and I didn't want to put my family in

16     that position.

17  Q    So there was a time -- when did you have this

18     meeting with the mayor?

19  A    February 14, 2013.

20  Q    Okay.  And as of February 14th of 2013, then the

21     mayor asked you why you weren't taking the job

22     in Menomonee Falls?

23  A    No.  He said what -- I don't believe he knew

24     that there was a big disparity in wages.  And I

25     think he put that out there as, you know, why

```
 1        wouldn't you.  And I said that the pay was far
 2        less than what I was being paid now, and I
 3        couldn't put my family in that position.
 4     Q  So did you tell him you were going to stay at
 5        Greenfield, then?
 6     A  I told him I wanted to.
 7     Q  And that was on February 14th; correct?
 8     A  Yes.
 9     Q  And on February 28th, you delivered a letter
10        that said you were resigning; correct?
11     A  Not on February 28th.
12     Q  What was the date of that letter?  I'm sorry.
13     A  March 23rd.
14     Q  Oh, okay.  What happened between your indication
15        to the mayor on February 13th that you weren't
16        leaving -- what happened between that day and
17        March 23rd, when you did leave?
18     A  I had had several meetings with command staff,
19        being Chief Cohn and Assistant Chief Weber, in
20        regards to my employment there, and that if I
21        stayed, that I would either be demoted or
22        possibly terminated.
23     Q  And in those discussions, again, not one word
24        was said about Cesar Hernandez or that incident
25        or any opposition to discrimination or
```

1      discrimination; correct?  Not a word?

2   A   Again, I wouldn't say not a word.  It was

3      brought up on one occasion.

4   Q   What was said specifically if it was brought up

5      in that conversation?

6   A   There were several conversations that were had

7      between myself and the --

8   Q   I'm talking about the one you just talked about.

9   A   That would have been in November of 2012,

10     November 15th, referencing the Cesar Hernandez

11     incident, just as how it was handled and dealt

12     with.

13   Q   Oh, we talked about that.  I'm talking about --

14   A   Correct.

15   Q   -- your discussion -- many discussions between

16     February 14, 2013, and March 23rd where you said

17     there was a discussion of a demotion or

18     termination.

19         What in those meetings was said, if

20     anything, about Hernandez?

21   A   Nothing.

22   Q   Okay.  Other issues outside of Hernandez, not

23     relating in any way to Hernandez, were discussed

24     with you in those discussions relating to

25     potential demotion; correct?

```
 1   A    Yes.

 2   Q    So when you talked to the mayor on your way out

 3        that day, he was basically -- was he trying to

 4        find out what you would accept from the City in

 5        order to go to Menomonee Falls?

 6   A    I'm not quite sure what the crux of the meeting

 7        was.

 8   Q    Okay.  Well, it was a happenstance meeting;

 9        correct?

10   A    Correct.

11   Q    Okay.  You on Exhibit 6 reference 1,606 hours at

12        31.21.

13                Do you see that?

14   A    Yes.

15   Q    What does that represent?

16   A    Sick time hours, sick bank hours, and then my

17        hourly wage.

18   Q    As of what date?

19   A    My leaving in 2013.  March 23rd.

20   Q    And what's the 35 percent designation?

21   A    That's what you're paid out.  That's what the

22        individual is paid out at, 35 percent.

23   Q    Again, is that on retirements, or is it on any

24        departure, if you know?

25   A    I don't know.
```

**Gramann Reporting, Ltd.**                    **(800) 899-7222**

1 Q And up above, there's a reference to salary

2  three lines up.  It says salary, and then it

3  says 48.02.

4     Do you see that?

5 A Yes.

6 Q What's that based on?

7 A Again, I don't recall offhand without going back

8  and looking at the mathematical -- or where I

9  gathered the information from.

10 Q Well, was your salary 48.02 an hour, or was it

11  31.21 an hour, if you know?

12 A I don't know.

13 Q Okay.

14 A I do know that at the time in Greenfield, my

15  salary was 31.21.  I don't recall what the 48.02

16  was.

17 Q I mean, the difference between those is, like,

18  55 percent, isn't it, between 31.21 and 48.02,

19  roughly?

20 A Roughly.

21 Q So your calculations here, depending on what

22  your salary is, at least for one of these

23  numbers, could be off by at least 50 percent,

24  couldn't it?

25 A Again, I'm not sure.

1   Q   But it could be because you don't know; correct?

2   A   Right.

3   Q   Longevity at time of dismissal says $15 a month,

4       times 8 years.  What is that?

5   A   Longevity was a benefit that was afforded to

6       employees for additional pay.  I don't recall

7       the exact definition of it but, it was something

8       that was added to your paycheck, afforded a

9       benefit by the City.

10  Q   At Greenfield?

11  A   Yes.

12  Q   Was there any such longevity for

13      Menomonee Falls?

14  A   No.

15  Q   None at all?

16  A   None.

17  Q   Did the City of Greenfield reserve the right to

18      remove that benefit at any time, if you know?

19  A   I don't know.

20  Q   You would have to speculate to know whether or

21      not you would have worked another eight years

22      and gotten that longevity payment had you

23      stayed; correct?

24  A   Yes.

25  Q   There's a reference here to 2014 penalty for

1              early withdrawal of deferred compensation.

2                     What's that all about?

3    A    With the severe drop in pay, I stopped putting

4         into my deferred comp and had to withdraw to

5         offset some of the bills and payments that we

6         had encountered.  Basically, a change of

7         lifestyle.

8    Q    When did you make the withdrawal?

9    A    2014.

10   Q    And how much did you withdraw?

11   A    Again, I'd have to look at the total amount.

12   Q    Was the "2014 penalty" a percentage?

13   A    I don't recall.

14   Q    Were you fully vested in deferred compensation

15        at that point?

16   A    Yes.

17   Q    And what do you mean by deferred compensation?

18        Is that a 401(k) or something like --

19   A    Similar.  However, in the protective services,

20        it's referred to as deferred compensation.

21   Q    Doesn't that carry over without penalty to a new

22        employer?

23   A    Unless you state otherwise.  But, as I said,

24        with the tremendous drop in salary, I could

25        not -- like I said, I stopped putting into

```
1        the -- what's the word I'm looking for?  My

2        contribution.  I stopped doing that.

3   Q    I'm talking about the withdrawal penalty here.

4        Once you changed from Greenfield to

5        Menomonee Falls, you can roll that deferred

6        payment thing over to Menomonee Falls, start a

7        new one with Menomonee Falls, and then withdraw

8        the Greenfield one without penalty, can't you?

9   A    No.  I don't believe I could have done that.

10  Q    When in 2014 did you actually withdraw that

11       money?

12  A    I would have to look at my paperwork.

13  Q    And, again, you have support paperwork for that

14       that you haven't provided; right?

15  A    I do have paperwork.  Yes.

16  Q    You understand that the discovery in this case

17       ends on February 28th, and the trial is set in

18       April?

19            MS. LEWISON:  There's no trial date.

20  BY MR. EHRKE:

21  Q    Okay.  You understand that the discovery in this

22       case ends at the end of February; right?  Or do

23       you, if you know?

24  A    No.

25  Q    I apologize.  That was paranoia about stating
```

```
 1          the trial date.

 2                   So, as we sit here today, you are not

 3          able to tell me generally the bases of these

 4          numbers on Exhibit 6 without going back and

 5          looking at some kind of support documentation?

 6    A     Correct.

 7    Q     There's a reference here on Exhibit 6, "plus

 8          attorney fees."

 9                   Have you paid any attorneys' fees yet

10          in this case?

11    A     Yes.

12    Q     How much?

13    A     I'd have to look at the amount.

14    Q     And, again, you can't give me that number as of

15          today without looking at some kind of support

16          documentation; correct?

17    A     Correct.

18    Q     Who was Cesar Hernandez's immediate supervisor

19          on February 17th of 2012?

20    A     Battalion Chief Jeff Hohensee.

21    Q     You would agree with me that with regard to the

22          two lieutenants who raised the Hernandez issue

23          with you on February 19th, that that was taken

24          seriously and was investigated promptly by you;

25          correct.
```

```
 1   A    I'm sorry?
 2   Q    You would agree with me that to the extent there
 3        were complaints from the two gentlemen that
 4        talked to you on February 19, 2012 -- to the
 5        extent those were complaints, they were taken
 6        seriously, and they were investigated promptly;
 7        correct?
 8   A    From myself?
 9   Q    Yes.
10   A    Yes.
11   Q    Okay.
12   A    And correction.  They were not both lieutenants.
13   Q    Oh, okay.  But the two guys you identified --
14   A    Yes.
15   Q    -- on that Sunday; right?
16   A    Yes.
17   Q    Okay.  I apologize for that.
18             And action was taken against those who
19        were found to have violated any harassment
20        policy; correct?  To your understanding, knowing
21        that you don't have personal knowledge.
22   A    That's my understanding.
23   Q    Were you asked -- when you started your efforts
24        to join Menomonee Falls, were you asked what
25        inspired you to become a battalion chief or
```

```
 1          shift commander for Menomonee Falls?

 2   A      I believe I recall that.

 3   Q      And did you provide a written response to that?

 4   A      Yes.

 5   Q      And you would agree with me that in your written

 6          response, again, you said nothing about being

 7          unhappy with the command staff at Greenfield or

 8          any type of discrimination or retaliation for

 9          opposing discrimination?

10              You would agree that you didn't

11          mention any of that; correct?

12   A      Correct.

13   Q      You wanted the opportunity to face unique

14          challenges of a combination department such as

15          that at Menomonee Falls; correct?

16   A      Yes.

17   Q      You also were interested in the Menomonee Falls

18          position because they were considering upgrading

19          their emergency medical service from an EMT 4

20          technician to the paramedic level; correct?

21   A      Correct.  EMT IV technician.

22   Q      Sorry.  Roman numeral IV, I'll call it.  But

23          that is IV, as in intravenous --

24   A      Yes.

25   Q      -- not Roman numeral IV?
```

1    A    Yes.

2         (Exhibit No. 7 marked for identification.)

3    BY MR. EHRKE:

4    Q    Mr. Mollet, I'll show you what's been marked as

5         Exhibit 7 and ask if that is the document

6         explaining what inspired you to apply for the

7         Menomonee Falls job, if that's the written

8         response you personally put together.

9    A    Yes.

10   Q    Did you receive any type of payout of any funds

11        when you left Greenfield?

12   A    My vacation.

13   Q    How much was that?

14   A    Without knowing the exact amount, approximately

15        $9,000.

16   Q    Have you accrued any vacation time at

17        Menomonee Falls yet?

18   A    Yes.

19   Q    How much do you have that, if you left tomorrow,

20        you would get paid out?

21   A    We are -- we don't accrue per se over time.  We

22        have to use it within the year, otherwise we

23        lose it.

24   Q    So that's a benefit that you had at Greenfield,

25        but you don't have Menomonee Falls; correct?

1    A    Correct.

2    Q    When you interviewed with Menomonee Falls, did

3         they discuss with you the departmental structure

4         change that could lead to you being an assistant

5         chief, i.e., the head guy?

6    A    No.

7    Q    Was Menomonee Falls the only entity with which

8         you sought employment between February 17th of

9         2012 and when you left Greenfield?

10   A    Yes.

11   Q    Were there other battalion chief jobs available

12        between February 17th of 2012 and when you left

13        Greenfield?

14   A    In --

15   Q    In the southeastern Wisconsin regional area?

16   A    Not that I was aware of.

17   Q    What type of jobs did this Wisconsin Fire Chiefs

18        notification talk about when you would get it?

19   A    They ranged anywhere from firefighters.  Some

20        departments would put that they're hiring

21        part-time, full-time, you know, classifications,

22        EMT, paramedic, firefighters.  So it was a wide

23        array of jobs.  Whoever -- whatever you were

24        hiring and needed, they would post it.

25   Q    And how often would you, as a battalion chief,

```
 1        receive such notifications from February 17,

 2        2012, forward?

 3   A    Not many, that I remember.  All I remember is

 4        the one being in Menomonee Falls being the one

 5        that I had looked at --

 6   Q    Go ahead.  I'm sorry.

 7   A    -- or that I saw.

 8   Q    Now, mechanically did those find their way to

 9        you?  Did they come via email, or did you have

10        to go search somewhere?

11   A    Via email.

12   Q    Okay.

13   A    You were on an email blast site that it went to

14        everyone who was listed on the Wisconsin State

15        Fire Chiefs Association site.

16   Q    And those would come out at least on a monthly

17        basis, wouldn't they?

18   A    No.  No.  Not on a monthly.  Very sporadic.

19   Q    Okay.

20   A    Again, it depended on the needs.

21   Q    Before you got that email with the

22        Menomonee Falls job, you hadn't looked anywhere

23        else for any employment, had you?

24   A    No.

25   Q    And had you not gotten that email and been
```

 1          interested in the Menomonee Falls job based on

 2          the grounds set forth in Exhibit 7, you would

 3          have stayed at Greenfield, wouldn't you?

 4     A    Yes.

 5     Q    Mr. Mollet, did you read the December 18, 2015,

 6          finding from the Wisconsin Department of Equal

 7          Rights that indicated there was no probable

 8          cause to determine that you had been retaliated

 9          against for opposition to a discriminatory

10          behavior?

11     A    Yes.

12     Q    You were at least at one point, Mr. Mollet, kind

13          of in charge of an intern program at Greenfield?

14     A    Yes.

15     Q    Was there a time when an individual listed

16          Greenfield as a former employer, as an intern,

17          when he hadn't been?

18     A    No.

19     Q    Was there an issue that came up and was

20          mentioned to you by either the chief or the

21          assistant chief with regard to an intern?

22     A    Can you be a little more specific?

23     Q    Well, do you remember any issues where you were

24          either criticized or asked to explain something

25          relating to an intern who wasn't really an

1          intern?

2     A    Yes.  The intern in question did apply for a

3          position, however, did mention himself as an

4          unpaid intern on his application.  And when the

5          business -- again, it escapes me as who it

6          was -- called to determine whether or not he was

7          an unpaid intern, the conversation was that he

8          put -- not the conversation, but the message was

9          that he put he was an employee of the

10         organization, which he was not.

11               When I learned of this, I found that

12         there was a question as to does anyone know who

13         this individual is.  I did because I was the

14         liaison for the interns.

15               And when I found out what had

16         happened, I contacted the company -- again, I

17         don't have the name -- inquired what did he put

18         on his application, and I was told that he

19         was -- he put down that he was an unpaid intern

20         in Greenfield.

21    Q    Okay.  And so what was the interplay between you

22         and the chief and the assistant chief on this,

23         to the extent you perceived it as negative?

24    A    When I realized what had happened, the woman

25         from the company had called the administrative

1    assistant at Greenfield, Mary Read.  Mary Read

2    then in turn called Joanne Wate [ph] from HR.

3         The question was brought up as to, you

4    know, who is this guy without really my

5    knowledge of it to even step forward and say,

6    whoa, wait a minute, this is who this is.  And

7    then, again, as before I realized what was going

8    on or it was brought to my attention, the

9    village attorney was brought into it, along with

10    HR director Ben Granberg.

11         And it was decided that we needed to

12    pull everything back from all interns, get all

13    gear and equipment, and essentially Assistant

14    Chief Weber would take over as the liaison for

15    the interns.

16  Q   All right.  There was, again, no relationship or

17      mention of the Hernandez incident or anything

18      like that in this process, was there?

19  A   No.

20  Q   I'm not going to mark it yet because I can't

21      read it, but to the extent you know, this came

22      with your initial disclosures, Mr. Mollet.  Can

23      you tell me what that document is or purports to

24      be, if you can?

25  A   That's a letter that my daughter wrote to my

 1        wife and I.

 2   Q    What's the date on that, if any?

 3   A    I don't see a date.

 4   Q    Which daughter?

 5   A    Jayden.

 6   Q    How old is Jayden?

 7   A    She's now 18.

 8   Q    She's not on your list of witnesses in this

 9        case, is she?

10   A    No.

11   Q    When you met with Ben Granberg, was your first

12        meeting in July of 2013?  Strike that.

13                  Was it in July of 2012?

14   A    That sounds about right.

15   Q    Did you take handwritten notes at that meeting?

16   A    No.

17   Q    Did you at some point type up notes?

18   A    Yes.

19   Q    And how long between the actual meeting with

20        Ben Granberg and your typing up the notes?  How

21        much time passed?

22   A    I don't recall how much time.

23   Q    Were you asked to type up those notes by anyone?

24   A    No.

25   Q    Were you able to write down everything verbatim

```
1         that was discussed with Mr. Granberg, or did you

2         just write down concepts and generalities?

3    A    Some concepts, some generalities, and some the

4         best of my recollection.

5    Q    Would you agree with me that in your notes from

6         your July 2012 meeting with Mr. Granberg, you

7         didn't even mention the Hernandez name or that

8         incident or the investigation?

9    A    Yes.

10   Q    Did you have a meeting with Chief Cohn and

11        Assistant Chief Weber in August of 2012 where

12        you discussed a number of issues?

13   A    Yes.

14   Q    And in that meeting, was there a discussion of

15        where they thought your performance and

16        communications could improve?

17   A    I don't recall the exact content of it.  It may

18        have been.

19   Q    You did type up notes afterwards; correct?

20   A    Yes.

21   Q    Would you agree with me that your notes from

22        that meeting don't say anything about Hernandez

23        or the investigation?

24   A    Yes.

25   Q    How long after that meeting did you type those
```

```
 1        notes up?
 2   A    I don't recall.
 3   Q    When you in your complaint allege that you had
 4        certain duties removed or withdrawn from you,
 5        you did not sustain any kind of reduction in
 6        pay, did you?
 7   A    No.
 8   Q    You have referenced in your complaint something
 9        along the lines of community humiliation.
10             Who from the community has indicated
11        to you anything that would indicate that it
12        could humiliate you?
13   A    Family, friends.  The day that I came back to
14        the station to clean out my locker, I was to
15        meet the assistant chief there and have him
16        observe my action or my conduct of emptying out
17        my office and my locker.
18   Q    That's standard operating procedure for somebody
19        that's leaving the department, isn't it?  At
20        least for a command staff member?
21   A    Not that I'm aware of.  I don't recall.
22   Q    Well, you're not aware of it.  Do you know
23        whether it's standard operating procedure for
24        someone to observe outgoing employees' removal
25        of equipment and personal things from a locker?
```

```
 1   A     I don't know.

 2   Q     What is it about that -- who observed that?

 3   A     My shift.

 4   Q     Okay.  And at that point everybody on the shift

 5         knew you had accepted a new job at

 6         Menomonee Falls, didn't they?

 7   A     I don't believe that they all knew.  I think

 8         that they -- because I had been gone for

 9         approximately a month before coming back to

10         empty my locker.

11   Q     Well, they all certainly knew that you hadn't

12         been terminated; right?

13   A     Was that a question?

14   Q     It was a question.

15               THE WITNESS:  Could you repeat,

16         please.

17            (Record read back as requested.)

18               THE WITNESS:  Yes.

19   BY MR. EHRKE:

20   Q     So what, again, are you talking about when you

21         talk about "community humiliation"?

22               Is it just based on the fact that

23         members of your shift who knew you were leaving

24         to go to Menomonee Falls were there when you

25         cleaned out your locker and left?
```

```
 1   A     No.

 2   Q     What else --

 3   A     I was sharing that information with family,

 4         friends, telling them that I no longer worked

 5         there.  And when I started in Menomonee Falls, I

 6         was approached by a gentleman who happens to be

 7         a friend of Chris Rottel from Greenfield, asked

 8         me in the battalion chief office -- or made a

 9         comment that, what's this I hear that there's a

10         lawsuit with you and Greenfield?

11              And I looked at him and said, Jesse,

12         those are bad things to say.  You know, you

13         shouldn't spread rumors like that.  Those things

14         can hurt a person and their career, and left it

15         at that.  I did not say, yes, that's true.  No,

16         that's not.  But I do know that his confidant in

17         Greenfield was Chris Rottel.

18   Q     Who is this guy that asks you about the lawsuit

19         against Greenfield?

20   A     He was an employee of Menomonee Falls.  He has

21         since left and sought employment elsewhere.

22   Q     What's his name?

23   A     Jesse Hull.  He was a full-time employee with

24         the Menomonee Falls Fire Department.

25   Q     He's not an your witness least either, is he?
```

1    A    No.

2    Q    Did he ask you about the "lawsuit" with the

3         City of Greenfield after you had filed your

4         discrimination complaint with the Equal Rights

5         Division?

6    A    I don't recall if that was -- when that came

7         into play as far as timewise.

8    Q    Well, you had started legal proceedings with the

9         City of Greenfield before Jesse Hull came up to

10        you and asked you that question, hadn't you?

11   A    I don't recall offhand.  I can't dispute it, but

12        I don't know exactly timeframe-wise.  But being

13        that he knew, he did, in turn, share that with

14        the union president at that time, which, again,

15        is something that I would have rather have not

16        had in my new position, new department, that

17        knowledge.

18   Q    And that wouldn't have happened had you not

19        filed your litigation and commenced claims

20        against the City of Greenfield; correct?

21   A    No.

22   Q    So he would have come and asked you about your

23        lawsuit against the City of Greenfield even if a

24        lawsuit against the City of Greenfield didn't

25        exist?

1  A   Correction.  Yes; however, the request was made

2      when I left Greenfield that there would be no

3      conversations between Menomonee Falls and

4      Greenfield personnel, knowing -- I knew at the

5      time that Chris Rottel knew this gentleman; and

6      so, therefore, I requested there not be any type

7      of communication between the two.

8  Q   Did you ask Jesse where the information came

9      from?

10 A   No, I didn't.

11 Q   So you don't know where the information came

12     from as we sit here today, do you?

13 A   No.  But I do know that he and Chris -- Chris

14     knew that I applied to Menomonee Falls through

15     Jesse.  Jesse told Chris when I was applying,

16     which I did not make it aware to anyone in

17     Greenfield.  I had not announced it.

18     Chris Rottel approached me and said, hey, I

19     heard you applied to Menomonee Falls.  And I

20     looked at him and said, How do you know that?

21     He says, I have a friend there.

22 Q   So that's a Menomonee Falls communication issue;

23     right?  Right?  Not a Greenfield issue?

24 A   In that instance, yes.

25 Q   So the lawsuit, going back to this humiliation,

1       had you not filed claims and started litigation

2       against Greenfield, there would not have been a

3       lawsuit upon which you now base a claim of

4       embarrassment and humiliation; correct?

5   A   Yes.

6   Q   So it wasn't what happened at Greenfield that

7       embarrasses you.  It was the fact that you filed

8       a lawsuit and litigation against Greenfield and

9       that was mentioned to you by someone in

10      Greenfield; correct?  Or in Menomonee Falls;

11      correct?

12  A   Yes.

13  Q   And your litigation and claims against the

14      City of Greenfield are a matter of public

15      record, aren't they?

16  A   I believe so, yes.

17          MR. EHRKE:  Well, subject to reserving

18      rights on precluding damage information and a

19      lack of those documents, I'm done for today,

20      Mr. Mollet.  I think your attorney may have some

21      follow-up.

22          MS. LEWISON:  I do.

23             E X A M I N A T I O N

24  BY MS. LEWISON:

25  Q   I'm going back to some questions that you --

1     answers that you provided early on where you

2     talked about how you had become friendly with

3     Jon Cohn, and you had discussions about the

4     direction of the department, and then you said

5     things were not congruent with what you had

6     discussed.

7                 So what did you mean by "congruent"?

8                 MR. EHRKE:  I'm going to object.  I

9     think that mischaracterizes the testimony.  I

10    don't think the term "congruent" was used.

11                But go ahead.

12                THE WITNESS:  I did say congruent.

13    And what I meant was that -- from what we

14    discussed and what was actually happening, that

15    the two were not -- they were starkly different

16    than what we talked about.

17    BY MS. LEWISON:

18    Q    And in terms of the direction of the department,

19         was it also quite different from the way

20         Chief Spahn had run the department?

21    A    Yes.

22    Q    And how was Mr. Cohn's leadership or the

23         direction which he was taking the department,

24         rather, different from what you and he had

25         discussed prior to when he became the interim

```
 1        chief?

 2   A    It was different in the sense that some of the

 3        comments that he had made to me while we were

 4        both battalion chiefs in an individual that was

 5        somewhat of a catalyst in the command staff, it

 6        was discussed between the both of us that this

 7        individual -- we didn't understand how our

 8        previous leader, Chief Spahn, would allow him to

 9        be so cavalier and be somewhat damaging to the

10        organization.  And we discussed --

11   Q    Who is it that you're talking about?

12   A    Shawn Hammernik.

13   Q    Okay.  Go ahead.

14   A    And we discussed in great detail about how when

15        we became -- looked at becoming somewhat the

16        leadership of the organization, that we didn't

17        want this to be that way anymore, that being

18        that, you know, some of the actions or inactions

19        of Battalion -- or at that time Deputy Chief

20        Hammernik we felt were damaging to the

21        organization.

22              MS. LEWISON:  All right.  So, for the

23        record, I did not realize until I was informed

24        by opposing counsel that he had not received

25        what has now been marked as Exhibit 6 with the
```

1  initial disclosures until he informed me of that

2  last Friday, I believe it was.  And I also did

3  not know that he was interested in receiving the

4  underlying documents.

5     As I recall from Mr. Mollet's

6  testimony, that would include the resolution of

7  the City of Greenfield regarding wages, the W-2

8  forms from both employers, tax returns from 2013

9  to '17, check stubs from both employers,

10  documents regarding health insurance from both

11  employers, and deferred compensation withdrawal

12  penalty records and attorney fee records.

13     We will try to get those to counsel

14  next week and would offer that if there needs to

15  be a continuing deposition of Mr. Mollet, that

16  we would not be opposed to another deposition

17  should that have to happen outside of the

18  regular discovery period.

19     And we'll pay for it if we have to

20  have a court reporter.  I'm going to assume

21  we're going to want to be on the record and have

22  a court reporter.

23     MR. EHRKE:  Are you all set with

24  everything?  Because I have to respond.  Are you

25  done?

1                MS. LEWISON:  I'm done.

2                MR. EHRKE:  Okay.  Just in response to

3        what counsel just said, she said she didn't know

4        we were interested in receiving those documents.

5                Federal Rule 26(a)(1)(A)(iii) requires

6        a party to not only provide a computation of

7        their damages, but also "documents or other

8        evidentiary material on which each computation

9        is based."

10                So whether or not plaintiff or his

11        attorney knew I was interested in that,

12        plaintiff had a legal obligation as of the

13        deadline for initial disclosures I believe in

14        July of 2017 to provide me with all of that

15        documentation.  I do not have to ask for it.

16        The federal rules require that it be produced at

17        that time.

18                We're now finding out in February of

19        2018, roughly seven months after the

20        disclosures, that some documents may or may not

21        exist, and Mr. Mollet has admitted that he

22        cannot tell us today what the computations were

23        based on or whether or not those are speculative

24        or not.  So that's my response to counsel's

25        statement.

```
 1                   E X A M I N A T I O N

 2    BY MR. EHRKE:

 3    Q    Mr. Mollet, in response to just the questions

 4         that your attorney just asked you, the

 5         discussions that you had with Mr. Cohn about the

 6         direction of the department occurred when you

 7         were both battalion chiefs; correct?

 8    A    Yes.

 9    Q    And the change you noted was after Chief Cohn

10         became the chief; correct?

11    A    No.

12    Q    You noted changes in his approach as a chief

13         before he became chief?

14    A    When he was the interim.

15    Q    That's what I'm saying.  He became the chief,

16         interim or otherwise, in June of 2011; correct?

17    A    Correct.

18    Q    You noted the changes already as of then

19         vis-à-vis what you and he had discussed when you

20         were both battalion chiefs; correct?

21    A    Yes.

22    Q    You would agree with me that a new chief for a

23         fire department has the right to manage pursuant

24         to his own style and doesn't have to follow the

25         style of the previous chief; correct?
```

1    A    Correct.

2    Q    You have managed differently in Menomonee Falls

3         than your predecessor has; correct?

4    A    Yes.

5    Q    Your discussions with Chief Cohn about Hammernik

6         and what you talked about I believe as

7         destructive behavior all occurred way before he

8         became even interim chief; correct?

9    A    Then and then continued after.

10   Q    What specific destructive behavior on the part

11        of Shawn Hammernik did you discuss with

12        Chief Cohn after he became chief?

13   A    Oh.  In that sense, no.  I was misunderstanding

14        your question.

15   Q    So your discussions in that regard with Jon Cohn

16        about Shawn Hammernik all occurred way before

17        Jon Cohn became chief, didn't they?  That is,

18        "destructive behavior of Shawn Hammernik"?

19   A    Before and up until becoming interim or chief.

20   Q    So, again, all of those discussions about

21        Shawn Hammernik and his "destructive behavior"

22        occurred before June of 2011, didn't they?

23   A    Yes.

24             MR. EHRKE:  That is all I have,

25        pending our other discussion.  Thanks.

1          (Deposition concluded at 2:57 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF WISCONSIN    )
                           )  SS:
 2   COUNTY OF MILWAUKEE   )

 3             I, Lindsay DeWaide, a Registered Merit

 4   Reporter, Certified Realtime Reporter, and Notary

 5   Public in and for the State of Wisconsin, do hereby

 6   certify that the preceding deposition was reported by

 7   me and reduced to writing under my personal direction.

 8             I further certify that said deposition was

 9   taken at CRIVELLO CARLSON, S.C., 710 North Plankinton

10   Avenue, Suite 500, Milwaukee, Wisconsin, on the 7th day

11   of February, 2018, commencing at 9:09 a.m.

12             I further certify that I am not a relative or

13   employee or attorney or counsel of any of the parties,

14   or a relative or employee of such attorney or counsel,

15   or financially interested directly or indirectly in

16   this action.

17             In witness whereof, I have hereunto set my

18   hand and affixed my seal of office at Milwaukee,

19   Wisconsin, this 16th day of February, 2018.

20

21

22                    _____
                          LINDSAY DEWAIDE, RMR, CRR
23                      Notary Public, State of Wisconsin

     My Commission Expires: January 22, 2021.
24

25
```

## WORD INDEX

**< $ >**
**$15** 179:3
**$223** 167:8
**$30,000** 162:11
**$52,000** 162:12
**$6,000** 63:23 64:2
**$72,080** 65:24
**$76,000** 66:11
**$8,000** 164:24 165:2
**$84,000** 165:25
**$9,000** 185:15

**< 1 >**
**1** 3:9 15:4, 4 18:9, 24
94:17 99:12, 15 119:8
128:22 129:4, 11, 15
202:5
**1,606** 172:20 173:4
177:11
**1:40** 153:13
**1:46** 153:13
**10:00** 99:4
**10:02** 138:23
**10:04** 53:3
**10:18** 53:3
**100** 170:8
**101,000** 69:22
**10th** 126:20
**11** 8:21 9:2 101:15, 20
115:8, 11
**11:42** 115:3
**11:51** 133:2
**110** 170:8
**11th** 8:16 9:7
**12:30** 115:3
**13** 3:12, 13
**138** 3:10
**139** 3:11
**13th** 125:11, 11 175:15
**14** 174:19 176:16
**1410** 2:13
**145** 3:12
**14th** 137:11 174:20
175:7
**15** 53:5 124:25 168:14
**152** 3:13
**159** 3:14
**15th** 125:5, 11, 12, 13, 14,
15 176:10
**1675** 6:22
**16th** 206:19
**17** 99:20 187:1 201:9
**179** 171:11
**179,172.00** 170:25
171:10
**17th** 15:18 16:6, 8, 12
29:7, 13 92:17 182:19
186:8, 12
**18** 188:5 191:7
**185** 3:15

**1882** 167:12
**18th** 126:24
**19** 130:1 138:12 183:4
**1967** 6:19
**198** 3:4
**1986** 58:3
**1991** 58:6
**1993** 58:11 59:5
**1995** 59:5 60:4
**19th** 29:9, 20 92:18
93:12, 15 96:15 99:4
101:1 124:17 128:23
139:9 182:23
**1st** 44:3 56:11 127:3,
25 132:25 162:19

**< 2 >**
**2** 3:10, 12 15:13
117:13 136:13 138:5, 9,
21 139:7 146:22
**2:16-CV-01145-LA** 1:6
**2:57** 2:9 205:1
**20** 45:20 81:5 130:5
134:1
**2003** 9:14 10:2 81:13
**2004** 81:13
**2005** 58:17
**2006** 58:17
**2009** 23:2, 4 26:10, 18
90:1
**2010** 91:3
**2011** 15:11 30:13 72:9,
13, 14, 18, 25 75:3, 8, 20
77:11, 21 88:25 90:24
91:17 92:4, 11 103:15
131:10, 14, 15 141:11,
19, 23 142:5 154:1, 15
203:16 204:22
**2011,** 93:5
**2012** 7:13, 22, 23 8:1,
21 9:2, 7 16:13 33:9
35:12 50:25 51:5
56:11, 16 57:2 66:3
73:22 90:19, 23 99:20,
21 107:11 111:6 113:9
114:22 116:23 124:18,
25 125:3, 5, 18 126:13,
24 127:3, 25 136:17
137:11 148:13, 16, 23
176:9 182:19 183:4
186:9, 12 187:2 191:13
192:6, 11
**2013** 55:17 56:8 60:7,
11, 16, 21 63:24 66:24
67:6, 8, 18 128:9, 14
134:1, 25 142:20, 24
144:9 148:6 152:9
153:3 162:15, 16, 19
166:14, 14 172:1
174:19, 20 176:16
177:19 191:12 201:8
**2014** 67:8, 10 68:7, 15
162:24 163:15 164:10

**166:13** 179:25 180:9,
12 181:10
**2015** 68:9, 11, 15
162:22 163:16 166:3
169:22 188:5
**2016** 66:17
**2017** 47:23 67:19 69:4,
6, 10, 12, 20, 21 161:10
202:14
**2018** 1:13 2:8 202:19
206:11, 19
**2021** 206:22
**203** 3:5
**20th** 130:9 134:5
139:21
**22** 206:22
**22nd** 134:25 135:3, 14
147:14
**23** 3:12, 13 55:17
60:11 99:21 153:3
**23rd** 56:2, 8 60:7
66:16 99:6, 16 100:9
144:22 145:2, 2, 10, 19
175:13, 17 176:16
177:19
**24** 118:13 148:5
**24th** 135:21, 23 136:1, 5
146:2, 10, 15, 22 147:11
**25** 60:16 142:20
**25th** 135:18 136:13
143:17 145:15 162:20
**26** 202:5
**27** 6:19 57:2
**28** 144:8
**288** 170:17
**28th** 142:24 175:9, 11
181:17

**< 3 >**
**3** 3:11, 13 59:5 139:16,
19
**30** 20:17 45:20 97:21
**31.21** 177:12 178:11, 15,
18
**31st** 44:4
**35** 171:22 177:20, 22
**3835** 6:16
**3rd** 148:19

**< 4 >**
**4** 3:3, 12 145:4, 9
184:19
**40** 21:21 170:17
**401** 180:18
**42** 139:8
**42,257.60** 170:25 171:6,
7
**45** 115:20
**48.02** 170:20 178:3, 10,
15, 18

**< 5 >**

**166:13** — *(see col 4)*

**5** 3:13 59:5 148:16
152:24 153:2
**50** 169:4 178:23
**500** 1:16 2:7, 16 206:10
**53** 169:7, 8, 15
**53189** 6:17
**53203** 2:13, 16
**55** 178:18
**5th** 60:4

**< 6 >**
**6** 3:14 159:20, 24
160:17 161:24 162:1
177:11 182:4, 7 200:25
**62** 169:12
**633** 2:13

**< 7 >**
**7** 1:13 3:15 185:2, 5
188:2
**710** 1:16 2:7, 16 206:9
**72,000** 65:22 165:14
**74** 164:24
**76** 165:1, 16
**76,000** 66:9
**78** 165:25
**7th** 2:8 43:24 206:10

**< 8 >**
**8** 179:4
**8:00** 118:5, 10, 11, 11, 12,
12 127:4 128:2 132:11
147:4
**84** 65:24 164:24
**84-** 166:20
**84,000** 61:8 67:7 166:9,
11, 13, 20

**< 9 >**
**9:09** 1:14 2:9 206:11
**9:32** 138:12
**9:37** 139:21
**93,183** 166:9
**95,528** 162:25
**97,439** 166:3
**99** 3:9

**< A >**
**a.m** 1:14 2:9 53:3, 3
115:3 118:5 132:11
139:21 206:11
**a.m.** 133:2
**abilities** 106:2 107:14
**ability** 94:16 104:14
106:13 129:17 147:17,
22 148:9
**able** 17:1 36:24 96:6, 9
134:9 143:22 164:23
167:3 172:8 173:5
182:3 191:25
**above-entitled** 2:2
**absolutely** 49:22 57:4

**abuse** 150:*1, 5, 20* 152:*1*
**AC** 140:*1*
**accept** 55:*25* 91:*12*
177:*4*
**acceptance** 135:*13*
**accepted** 63:*8* 64:*7*
66:*13* 152:*10* 194:*5*
**accepting** 135:*2*
**accident** 106:*9*
**account** 99:*16* 172:*17*
**accrue** 173:*9* 185:*21*
**accrued** 185:*16*
**accurate** 87:*5, 9* 101:*21*
168:*5*
**act** 106:*16*
**acting** 150:*24*
**action** 2:*2* 183:*18*
193:*16* 206:*16*
**actions** 31:*25* 110:*3*
119:*21* 200:*18*
**actively** 56:*18*
**activities** 17:*13*
**activity** 39:*3, 3*
**actual** 65:*4* 83:*4* 86:*5*
173:*13* 191:*19*
**added** 20:*6* 179:*8*
**additional** 81:*17* 134:*12*
179:*6*
**address** 6:*15* 24:*15*
134:*1* 155:*7*
**administrative** 32:*24*
189:*25*
**admissible** 158:*25*
**admitted** 202:*21*
**admittedly** 25:*16*
**adult** 45:*9, 12*
**advance** 70:*14* 127:*21,
24*
**advanced** 70:*6, 10*
**advancement** 9:*25* 10:*1,
9*
**advise** 137:*5* 140:*1*
150:*5*
**advised** 127:*5* 132:*13*
158:*25*
**advising** 133:*1*
**affect** 163:*22*
**affixed** 23:*19* 25:*14, 20*
206:*18*
**afforded** 179:*5, 8*
**afternoon** 99:*6* 149:*16*
**age** 87:*11, 13* 128:*13*
169:*2, 6, 11*
**agency** 32:*24*
**ago** 9:*15* 12:*7, 11*
13:*24* 19:*8* 20:*16*
43:*25* 46:*3* 47:*20* 81:*9*
**agree** 38:*20* 39:*1, 5*
40:*2* 72:*16, 21* 78:*23*
94:*23* 95:*1, 2, 24*
121:*11* 132:*1* 134:*16*
153:*16* 163:*24* 165:*17,
21* 167:*24* 173:*10*

**182**:*21* 183:*2* 184:*5, 10*
192:*5, 21* 203:*22*
**agreed** 65:*21* 66:*7*
100:*7* 108:*21*
**agreement** 35:*8*
**ahead** 187:*6* 199:*11*
200:*13*
**allegations** 92:*3*
**allege** 110:*10* 115:*11*
193:*3*
**alleging** 43:*13*
**Allen** 4:*8*
**alliance** 74:*22*
**allow** 127:*24* 200:*8*
**allowed** 89:*2, 5* 108:*3*
148:*7* 157:*16*
**allowing** 90:*14* 107:*22*
121:*13*
**allows** 127:*20* 164:*16*
**altered** 163:*20*
**American** 101:*16, 22*
102:*6, 16, 18, 22*
**amount** 61:*6* 65:*9* 68:*4*
121:*20* 166:*19* 167:*24*
168:*25* 170:*21, 23*
180:*11* 182:*13* 185:*14*
**angry** 107:*5*
**Anna** 64:*16, 17* 66:*5*
**announced** 197:*17*
**announcements** 8:*20, 23*
**annual** 63:*23*
**answer** 4:*20, 21* 5:*14*
28:*6* 40:*7, 8, 9* 52:*24*
75:*19* 79:*23* 96:*5, 6, 10*
100:*2* 105:*25* 110:*16*
113:*22* 134:*20, 24*
145:*12* 146:*13* 171:*10*
**answered** 124:*15*
**answers** 36:*23* 151:*21*
199:*1*
**anxiety** 81:*18* 83:*5*
**anybody** 21:*7* 23:*24*
31:*13* 40:*10* 48:*10*
57:*9* 71:*16* 94:*24*
111:*22* 133:*1* 135:*25*
**anybody's** 122:*17*
**anymore** 29:*22* 89:*15*
200:*17*
**anytime** 51:*5*
**anyway** 100:*19*
**apologize** 22:*15* 54:*16*
60:*17* 92:*14* 103:*1*
112:*24* 124:*16* 181:*25*
183:*17*
**apologized** 112:*22* 113:*1*
**apparatus** 15:*1*
**appear** 158:*5*
**appearance** 102:*2*
**Appeared** 2:*14, 17* 15:*8*
74:*21* 75:*5, 6, 14*
**appears** 162:*1*
**application** 8:*17* 57:*2, 3*
91:*6* 156:*10* 189:*4, 18*

**applied** 8:*8, 14* 56:*25*
59:*11* 66:*3* 197:*14, 19*
**apply** 8:*15* 132:*20*
161:*4* 185:*6* 189:*2*
**applying** 167:*7* 197:*15*
**appointed** 71:*3, 7, 8, 10*
72:*3, 6, 10* 75:*3* 88:*25*
**appointing** 71:*2*
**appreciate** 114:*5*
**appreciative** 84:*15*
106:*10*
**approach** 24:*14* 142:*1*
203:*12*
**approached** 195:*6*
197:*18*
**appropriate** 39:*11, 13*
40:*3* 52:*22* 116:*3, 17*
123:*16*
**appropriately** 149:*22*
**approximately** 12:*6, 9*
20:*17* 43:*25* 45:*2*
59:*19, 25* 64:*24* 66:*11*
67:*7* 69:*22* 81:*8* 89:*18*
132:*8* 185:*14* 194:*9*
**April** 63:*24* 162:*19*
181:*18*
**area** 18:*11* 58:*15* 59:*10*
186:*15*
**arguments** 131:*12*
**arising** 37:*17*
**array** 186:*23*
**ARTHUR** 2:*12*
**Aside** 90:*14* 122:*19, 20*
**asked** 9:*23* 12:*24* 14:*13,
15, 23* 19:*16* 22:*5, 18*
28:*7, 21* 30:*8* 32:*21*
34:*6, 6* 46:*25* 48:*7, 9, 9,
12* 54:*16* 56:*10* 57:*15*
64:*10* 87:*13* 90:*10*
93:*3* 96:*8, 14* 97:*19*
98:*24* 112:*9* 114:*10*
124:*16* 126:*21* 128:*23*
143:*11* 146:*19, 19*
151:*13, 14* 156:*15*
157:*9* 158:*12* 167:*1*
174:*11, 21* 183:*23, 24*
188:*24* 191:*23* 195:*7*
196:*10, 22* 203:*4*
**asking** 4:*16* 32:*11*
55:*11* 59:*22* 87:*25*
96:*24* 124:*13* 149:*5, 10*
**asks** 195:*18*
**aspects** 78:*24* 115:*7*
**assert** 115:*24*
**asserted** 155:*4*
**assertion** 154:*19*
**assistance** 131:*4, 8* 140:*1*
**Assistant** 7:*3, 14, 17, 18*
9:*17, 19, 22* 13:*12*
15:*25* 16:*1* 26:*22, 22*
27:*22* 28:*21* 29:*9* 32:*3,
14* 33:*25* 34:*13, 18, 21*
35:*13* 37:*4* 38:*18* 40:*3*

**41**:*12* 49:*9* 52:*8* 53:*15,
21* 61:*2* 67:*3* 70:*16*
71:*2, 8, 11, 21* 72:*3*
73:*4, 8, 14, 18* 74:*1*
78:*6, 21, 25* 79:*8, 20*
80:*10, 18, 22* 91:*10, 18*
93:*15* 97:*6* 98:*11, 22*
99:*5, 24* 100:*8, 25*
103:*13, 15, 19, 24*
110:*11* 112:*8, 19* 116:*5,
20* 119:*10, 15, 17*
120:*19* 123:*13, 21*
125:*7* 126:*8* 127:*9*
129:*25* 130:*11, 14, 16*
131:*3, 11* 133:*9* 136:*15,
20* 138:*14, 23* 141:*14*
144:*23* 147:*7* 148:*17*
149:*17, 20* 150:*13*
151:*18* 153:*18* 155:*20*
165:*5* 166:*15, 21*
175:*19* 186:*4* 188:*21*
189:*22* 190:*1, 13*
192:*11* 193:*15*
**assistants** 85:*19*
**associate's** 58:*12, 18, 20*
**Association** 187:*15*
**assume** 19:*13* 201:*20*
**assumed** 59:*16* 102:*18*
134:*22*
**attached** 3:*16, 16*
**attempt** 45:*16* 131:*15*
**attempted** 89:*18*
**attempts** 91:*2*
**attention** 14:*4* 24:*4, 5*
27:*21* 107:*4* 113:*3*
140:*8* 190:*8*
**attorney** 10:*12* 19:*21*
20:*10* 36:*1* 43:*20*
47:*19* 50:*13* 157:*18*
158:*8, 11, 24* 160:*4*
182:*8* 190:*9* 198:*20*
201:*12* 202:*11* 203:*4*
206:*13, 14*
**attorneys** 182:*9*
**attribute** 86:*3*
**attributed** 57:*11*
**August** 90:*24* 107:*11*
114:*21* 125:*3* 126:*12,
20* 127:*3, 25* 132:*25*
136:*16* 137:*11* 192:*11*
**available** 8:*23* 75:*7*
143:*6, 13* 144:*14* 186:*11*
**Avenue** 1:*16* 2:*7, 13, 16*
21:*2* 106:*16* 206:*10*
**avoid** 137:*25*
**avoided** 45:*15*
**aware** 8:*5, 8* 10:*15*
11:*6* 17:*6, 10, 12, 15, 16*
24:*12* 29:*15, 19, 24*
33:*1* 35:*8* 41:*5* 50:*5*
52:*12* 84:*14* 90:*20*
91:*24* 92:*19, 21, 24*
93:*21* 94:*12, 15* 100:*9,*

**Gramann Reporting, Ltd.**      **(800) 899-7222**

*13* 101:*12* 103:*10*
106:*9, 18* 107:*1* 114:*15*
121:*10* 124:*11* 133:*3, 5*
147:*19, 24* 148:*1*
150:*13* 151:*11* 157:*10,
21* 158:*3, 7* 163:*18, 23*
164:*3, 16, 20* 173:*7, 7*
186:*16* 193:*21, 22*
197:*16*

< B >
**BA** 128:*19*
**babies** 117:*10, 22* 122:*15*
**baby** 122:*25*
**back** 15:*14, 15* 17:*1*
19:*4* 21:*22* 23:*19*
24:*11* 27:*24* 32:*9, 10*
37:*8, 10* 41:*2, 3, 25*
42:*15* 45:*5* 50:*6, 9, 21*
53:*7* 58:*14* 62:*10*
64:*22, 23* 65:*17* 75:*12,
13* 80:*6, 7* 90:*9, 11*
97:*13, 15* 98:*10* 112:*7*
113:*19* 114:*21* 115:*6*
122:*6, 7* 123:*22* 124:*13*
127:*2* 128:*7* 131:*6*
138:*11, 15* 142:*19, 23*
143:*14* 148:*18* 151:*9,
18* 152:*9* 162:*9, 10*
171:*14* 178:*7* 182:*4*
190:*12* 193:*13* 194:*9,
17* 197:*25* 198:*25*
**backed** 70:*22*
**background** 58:*1*
153:*15* 157:*9, 14, 17*
158:*4, 12, 17*
**bad** 195:*12*
**bag** 18:*8, 12* 115:*16*
**ball** 16:*25* 17:*17, 18*
18:*17*
**balled** 17:*8*
**bank** 160:*23* 171:*16, 21,
25* 172:*12, 24* 173:*21*
177:*16*
**banked** 173:*4*
**banks** 172:*16*
**bantering** 11:*17* 22:*7*
**base** 115:*6* 198:*3*
**based** 25:*25* 40:*22*
57:*17* 61:*21, 23* 75:*6*
82:*6* 94:*16* 102:*19*
122:*21* 140:*23* 154:*2*
160:*9* 163:*4, 20* 164:*8*
168:*1* 178:*6* 188:*1*
194:*22* 202:*9, 23*
**bases** 182:*3*
**basic** 90:*1* 91:*4*
**basically** 10:*23* 13:*21*
16:*23* 97:*8* 103:*17*
115:*24* 130:*8* 135:*6*
137:*1* 142:*8, 21* 155:*23*
164:*4* 170:*13* 172:*10*
177:*3* 180:*6*

**basis** 141:*12* 156:*1*
187:*17*
**battalion** 15:*13, 21* 16:*1,
10* 22:*25* 23:*4, 8* 26:*11,
15* 32:*17* 38:*6* 39:*16,
17, 21* 40:*11* 42:*25*
56:*7* 60:*20* 66:*1* 70:*2,
6, 10* 72:*7* 73:*6, 10, 12*
74:*6* 75:*2* 78:*15, 24*
79:*8, 11, 20, 25* 88:*10,
16* 101:*9* 103:*20, 22, 25*
104:*7* 118:*8* 125:*25*
130:*3, 7* 132:*1, 3, 20*
133:*13* 134:*3* 136:*19*
137:*21* 140:*9, 15*
141:*13* 143:*4* 152:*21*
155:*17* 163:*14, 19*
164:*10* 165:*4* 172:*7, 11*
182:*20* 183:*25* 186:*11,
25* 195:*8* 200:*4, 19*
203:*7, 20*
**Bauer** 91:*11* 131:*11*
**becoming** 88:*24* 103:*14*
120:*15* 200:*15* 204:*19*
**bedding** 14:*21, 25* 16:*14*
18:*3, 24* 27:*12* 30:*9*
92:*16* 94:*18* 95:*7, 8, 9*
101:*5, 10*
**began** 58:*11* 61:*16*
**beginning** 18:*17* 136:*18*
**behalf** 2:*14, 17*
**behavior** 34:*23* 35:*1, 5,
10, 15* 39:*7* 97:*16*
101:*1* 116:*16, 24* 117:*1,
4* 124:*3, 7* 129:*20*
139:*3* 188:*10* 204:*7, 10,
18, 21*
**belief** 121:*22*
**believe** 8:*16, 18, 21*
12:*24* 18:*19, 22* 20:*9*
24:*2* 25:*4* 31:*2* 32:*16*
34:*14* 36:*6* 38:*5* 39:*17*
42:*4, 16* 45:*1* 59:*17*
60:*4, 24* 61:*7* 71:*25*
72:*9* 77:*17* 78:*5* 87:*17*
90:*2, 19* 91:*3* 92:*5*
99:*23* 103:*8* 105:*11, 25*
107:*4* 124:*25* 125:*3*
127:*3* 128:*18* 129:*10,
16* 130:*10* 144:*22*
145:*2* 146:*17, 25* 152:*5*
154:*16* 155:*6, 16, 22*
156:*1* 158:*25* 161:*21*
164:*5* 166:*14* 173:*1*
174:*23* 181:*9* 184:*2*
194:*7* 198:*16* 201:*2*
202:*13* 204:*6*
**believed** 151:*6*
**below-level** 107:*22*
**Ben** 35:*22* 36:*12, 22*
37:*3* 41:*21* 42:*3*
110:*25* 111:*4, 11* 114:*9*
190:*10* 191:*11, 20*

**benefit** 61:*25* 170:*1, 9*
179:*5, 9, 18* 185:*24*
**Berlin** 9:*12, 16, 18, 20*
10:*5, 8* 56:*14*
**best** 9:*13* 15:*18* 47:*21*
60:*4* 65:*22* 66:*8* 72:*12*
81:*19* 107:*24* 140:*23*
155:*7* 161:*6* 171:*3*
192:*4*
**better** 49:*25* 59:*9*
88:*11* 155:*25*
**beyond** 70:*10*
**big** 174:*24*
**bigger** 121:*13*
**bills** 180:*5*
**birth** 6:*18*
**bit** 9:*24* 19:*5* 53:*7*
61:*20* 81:*20* 82:*1* 84:*3*
89:*4* 96:*23* 115:*5*
**bitch** 142:*15*
**bitched** 141:*18, 20*
**blame** 112:*17*
**blast** 187:*13*
**bleeding** 86:*7, 9*
**blowup** 23:*18* 25:*10*
53:*10*
**Boadwine** 83:*7, 9, 22*
84:*6, 17*
**B-O-A-D-W-I-N-E** 83:*8*
**board** 64:*21* 164:*19*
**border** 29:*16* 92:*20*
**born** 102:*8, 24*
**boss** 73:*19*
**bother** 145:*19*
**bothered** 32:*4* 96:*12*
**bothersome** 111:*19*
**bottom** 138:*22*
**breaching** 158:*10*
**break** 5:*11, 13, 15*
52:*25* 53:*1, 5* 113:*25*
114:*2, 6* 115:*2, 5* 138:*3*
153:*12*
**breakdown** 131:*23*
160:*1, 20* 162:*17*
163:*11* 170:*21*
**breakdowns** 92:*12*
**Brenda** 2:*12* 36:*2*
**Brent** 76:*4, 6, 7* 78:*2*
**brethrens** 17:*14*
**brief** 57:*25* 138:*4*
**briefly** 15:*5*
**bring** 36:*15* 113:*3*
135:*18*
**broke** 131:*19*
**broken** 164:*4*
**brought** 14:*4* 24:*4, 5*
27:*21* 36:*21* 84:*9*
107:*4* 113:*1* 125:*2*
140:*8* 176:*3, 4* 190:*3, 8,
9*
**Bryan** 77:*4, 9* 80:*13*
**B-R-Y-A-N** 77:*4*

**bucket** 107:*18*
**building** 15:*3* 94:*17*
**bump** 166:*13, 16, 18*
**bunk** 101:*14* 115:*13*
**bus** 112:*16*
**business** 145:*23* 189:*5*

< C >
**C.,** 15:*10*
**calculate** 61:*12* 62:*15*
**calculation** 161:*23*
**calculations** 171:*2*
178:*21*
**calendar** 67:*22* 169:*22*
**call** 10:*25, 25* 11:*4*
12:*19* 13:*8, 20* 14:*8, 13,
20* 19:*13, 13, 15* 20:*15*
21:*7* 22:*15, 20* 23:*11,
13, 18* 30:*23* 45:*18*
48:*17* 49:*14, 15* 59:*19*
108:*9* 130:*20* 138:*13*
149:*24* 150:*20, 21, 22,
23* 151:*12* 184:*22*
**called** 4:*2* 10:*17* 11:*1*
12:*17* 20:*2* 44:*15, 16,
19* 46:*12* 48:*24* 59:*25*
119:*18* 130:*17* 148:*25*
151:*1* 189:*6, 25* 190:*2*
**calling** 44:*17* 45:*1* 49:*1*
**calls** 5:*17* 49:*17* 74:*14,
19* 154:*2*
**candidate** 165:*20*
**cap** 172:*12*
**capacity** 85:*1, 2* 143:*15*
**car** 15:*13* 106:*16*
128:*20, 21*
**carbon** 137:*7*
**cards** 106:*7*
**care** 83:*4* 144:*5* 167:*21*
**career** 9:*25* 25:*12*
152:*12* 195:*14*
**careful** 112:*15*
**CARLSON** 1:*16* 2:*7, 15*
206:*9*
**carpet** 119:*19*
**carried** 18:*7* 121:*21*
**carrier** 167:*20* 168:*1*
**carry** 180:*21*
**Case** 1:*6* 6:*2* 10:*14*
13:*9* 20:*11* 24:*23* 25:*1*
36:*5* 46:*8* 47:*4* 49:*4*
50:*4* 51:*22* 54:*11, 19*
57:*21, 22* 61:*14* 68:*2*
76:*4, 9, 17, 22* 77:*15*
86:*25* 87:*14* 115:*15*
161:*5* 181:*16, 22*
182:*10* 191:*9*
**catalyst** 200:*5*
**cause** 133:*16* 137:*20*
188:*8*
**cavalier** 37:*4*
**ceased** 74:*20* 154:*3*
**central** 58:*14*

**certain** 16:13 127:5 134:8 137:20 193:4
**certainly** 118:14 126:8 194:11
**certificate** 89:22
**certificates** 58:9
**Certified** 2:5 85:20 206:4
**certify** 206:6, 8, 12
**Cesar** 13:21, 23 18:20 22:10, 12 27:8, 11 30:9 31:23 33:3, 8 36:25 37:18 38:9 43:13 50:18 51:15 52:7 56:16 57:12 73:1 75:22 82:16 92:7, 16, 24 95:4, 11, 16, 21 99:22 116:1 118:16 121:18 129:2 130:23 137:14 175:24 176:10 182:18
**cetera** 110:22
**chain** 25:6
**challenge** 152:14, 22
**challenges** 184:14
**chance** 64:11 145:7, 13 160:5
**change** 77:23 87:18, 21 180:6 186:4 203:9
**changed** 75:2 87:11, 25 163:20 167:21 181:4
**changeover** 89:7
**changes** 131:21 203:12, 18
**character** 54:24
**characterization** 141:1
**charge** 39:12 147:3 188:13
**check** 64:20 68:5 158:4, 12, 17 159:14 201:9
**checks** 173:8
**chemistry** 9:20
**Chenery** 148:12, 17, 19
**C-H-E-N-E-R-Y** 148:13
**chief** 7:3, 14, 14, 16, 19 9:3, 18, 19, 22 13:12, 12, 15, 15 15:21, 25, 25 16:2, 10 23:1, 5, 8 24:6, 19 26:11, 15, 21, 21, 22, 23 27:1, 2, 4, 9, 22, 22 28:21 29:9 32:3, 4, 14, 14, 17 33:25 34:13, 19, 21 35:8, 13, 13 37:4, 4 38:6, 18 39:16, 17, 21, 22 40:2, 3, 11 41:12, 13 42:25 49:9, 10 52:8, 8 53:11, 15, 16, 20, 20, 21, 22, 22 55:13 56:4, 7 59:22, 22 60:20 61:2 66:1 67:3 70:6, 11, 16 71:1, 2, 7, 8, 11, 19, 20, 21 72:3, 5, 6, 7, 11, 17 73:5, 8, 10, 12, 14, 18 74:1, 5, 6,

6, 8, 18 75:2, 3, 7 77:11, 11, 20, 21 78:6, 6, 15, 21, 21, 24, 25 79:1, 8, 8, 9, 11, 20, 21, 21, 25 80:9, 10, 16, 17, 19, 21, 22 87:19, 20, 24 88:2, 3, 5, 10, 11, 12, 16, 16, 18, 24 91:11, 18, 18 93:15 97:6 98:5, 6, 11, 22 99:5, 24 100:8, 25 101:9 103:13, 13, 15, 16, 19, 20, 24, 25 104:19, 25 105:6, 14, 22 107:3, 3 108:11, 11 109:5, 8, 9 110:11, 11 112:8, 20 116:5, 5, 20, 20 118:8, 21 119:10, 15, 17 120:19 123:13, 14, 20, 21 125:6, 7, 25 126:8, 8 127:8, 9 129:25 130:3, 7, 11, 14, 16, 25 131:3, 11 133:9, 9, 13, 22 134:3 135:1, 12, 13 136:15, 20, 20, 23 137:11, 17 138:14, 14, 24, 24 139:21 140:15 141:14, 14 142:24 143:4 144:8, 24 145:10 146:5 147:5, 7, 14, 25 148:2, 17 149:5, 17, 18, 20 150:13, 13 151:18 152:21 153:4, 18, 25, 25 154:6, 15 155:10, 20, 20 163:14 164:10 165:4, 5 166:15, 21 172:7 175:19, 19 182:20 183:25 186:5, 11, 25 188:20, 21 189:22, 22 190:14 192:10, 11 193:15 195:8 199:20 200:1, 8, 19 203:9, 10, 12, 13, 15, 22, 25 204:5, 8, 12, 12, 17, 19
**chiefs** 7:14 8:19 16:1 56:12, 17 70:3 73:6 88:16 103:21, 22, 25 104:7 132:1, 3, 21 136:20 137:21 140:10 141:13 155:17 163:19 172:11 186:17 187:15 200:4 203:7, 20
**chief's** 8:22 24:5 137:4 147:17, 21 149:20
**chose** 70:15, 16 106:15
**Chris** 76:15 79:15 112:3 195:7, 17 197:5, 13, 13, 15, 18
**church** 81:2, 3, 6, 10 105:21, 21
**Cieczka** 14:14 24:3 93:2 94:3, 4, 10 103:4, 5, 10 129:12
**C-I-E-C-Z-K-A** 128:17
**circumstance** 124:18

**circumstances** 17:6 18:14 40:4 133:7
**CITY** 1:7 4:18 8:3 13:11 39:25 55:1, 23 56:7 57:5 58:23 60:3, 6 70:24 72:24 74:5 77:6 132:23 156:16 157:3 163:10, 13 174:2 177:4 179:9, 17 196:3, 9, 20, 23, 24 198:14 201:7
**Civil** 2:3
**claim** 6:9 174:1 198:3
**claiming** 61:13 68:2
**claims** 4:17 196:19 198:1, 13
**class** 9:17, 20
**classifications** 186:21
**classify** 142:4
**clean** 144:24 145:1 193:14
**cleaned** 194:25
**cleaning** 140:14
**clear** 34:22 36:10 54:25 116:2
**clocking** 127:22
**close** 153:12
**closer** 80:2, 2 132:13
**closet** 18:10
**clown** 117:8, 25
**clowns** 123:1
**code** 6:17
**co-firefighters** 17:13
**Cohn** 2:20 13:12, 15 26:21 27:1 35:8, 13 49:9 53:15, 22 72:5, 17 74:5, 6, 8 75:2, 7 77:11, 21 80:17, 21 87:20 88:3, 5, 11, 24 91:18 98:5, 6 103:13, 15, 20, 24 104:4, 25 105:6, 22 107:3 108:11 109:8 110:11 116:5, 20 118:21 119:10 123:13 125:6 130:25 135:1 136:23 138:14, 24 139:21 142:24 145:10 146:5 147:14 149:5 153:4, 25 154:6, 15 155:10, 20 175:19 192:10 199:3 203:5, 9 204:5, 12, 15, 17
**Cohn's** 87:24 144:8 199:22
**collect** 136:18
**collected** 105:7
**collecting** 105:17
**college** 58:4, 8, 13 168:13, 15
**column** 162:4, 6, 10, 22
**combination** 152:13, 17 166:11 184:14

**come** 21:18 45:5 86:12 93:18 105:11 110:2 130:7, 12 133:8 135:17, 25 142:19 143:14 162:14 163:3 166:3 170:13 171:1 187:9, 16 196:22
**comes** 26:3 171:7, 13
**coming** 127:4, 6, 9 132:14 133:1 194:9
**command** 25:6 88:7, 17 89:3 104:10, 11 119:22 128:20, 21 132:13 137:7 140:19 141:5, 13, 18 142:11 146:23 147:2 148:10 155:16 175:18 184:7 193:20 200:5
**commander** 184:1
**commanding** 120:17
**commenced** 196:19
**commencing** 2:9 206:11
**commendation** 106:18
**commendations** 106:6, 7
**comment** 97:8 140:13 195:9
**comments** 103:17, 19 112:13 126:9 128:12 200:3
**commission** 164:19 206:22
**commitments** 70:15
**common** 16:16 164:19
**communication** 44:8 88:21 89:9, 23 103:16 104:1, 5, 8 137:25 197:7, 22
**communications** 88:5, 8, 11 92:12 111:17 131:16, 20, 24 149:2 192:16
**community** 193:9, 10 194:21
**comp** 180:4
**company** 6:10 189:16, 25
**comparative** 62:2, 2
**comparatively** 61:16 68:5
**compare** 68:19
**compared** 68:25
**compares** 69:25
**comparison** 62:4
**compensation** 160:25 180:1, 14, 17, 20 201:11
**complain** 16:5, 9 23:7 30:21 103:5 141:12
**complainant** 42:18 98:21
**complained** 23:23 24:1 26:8, 20 27:8 31:24 34:5 141:17

**complaint** 24:*13, 16, 20*
32:*24* 33:*6* 42:*21*
43:*12* 49:*20* 86:*25*
87:*8* 96:*19* 100:*22*
101:*15, 18, 20, 24* 104:*3*
110:*10* 115:*7, 20, 23*
123:*11* 153:*6* 154:*22,
23* 193:*3, 8* 196:*4*
**complaints** 26:*12, 25*
27:*5* 51:*18* 142:*11*
183:*3, 5*
**complete** 91:*5* 101:*21*
**completed** 34:*14* 90:*1*
91:*3, 8* 121:*3*
**comps** 167:*2*
**computated** 164:*7*
**computation** 62:*5* 202:*6,
8*
**computations** 202:*22*
**computer** 161:*17*
**computing** 68:*1*
**concept** 83:*14* 142:*1*
**concepts** 192:*2, 3*
**concern** 143:*25*
**concerned** 45:*7* 148:*21*
**concerning** 99:*17*
**concluded** 50:*1* 205:*1*
**concluding** 2:*9*
**conditional** 133:*23*
134:*7* 142:*23*
**conduct** 24:*15* 28:*18, 20*
97:*25* 139:*13* 151:*14*
193:*16*
**confidant** 195:*16*
**confirmed** 57:*20* 102:*15*
**confused** 46:*20* 74:*24*
**congruent** 199:*5, 7, 10,
12*
**congruity** 74:*22*
**connected** 104:*12*
**consequences** 120:*15*
**consider** 49:*3* 122:*25*
**considerably** 63:*5*
**considerations** 70:*23*
**considered** 40:*25* 65:*8*
146:*6* 153:*17*
**considering** 184:*18*
**consistent** 100:*25* 141:*12*
**consistently** 108:*23*
**constant** 61:*22*
**constantly** 110:*4*
**consultant** 156:*4*
**contact** 12:*12* 46:*4*
91:*13* 93:*14* 105:*23*
143:*5* 144:*13* 150:*9*
**contacted** 89:*16* 105:*8*
151:*7* 189:*16*
**content** 33:*14* 149:*8*
192:*17*
**context** 23:*5* 28:*9*
70:*24* 108:*9* 110:*13*
143:*17* 157:*2* 161:*1*

**contingencies** 55:*15*
56:*6* 134:*13* 135:*7*
142:*22* 143:*2, 3, 18, 20*
144:*11* 145:*12*
**continue** 160:*13*
**continued** 204:*9*
**continuing** 201:*15*
**contractor** 155:*11, 13*
**contradict** 154:*19*
**contribution** 181:*2*
**conversation** 13:*4* 14:*1,
3* 22:*9, 11* 38:*18* 48:*20*
50:*1* 80:*15* 82:*9* 83:*21*
97:*4* 105:*11* 125:*1*
140:*21* 141:*21* 143:*15*
174:*10* 176:*5* 189:*7, 8*
**conversations** 11:*9, 20*
48:*23* 50:*10, 12* 74:*21*
82:*11, 24* 83:*23* 95:*19*
102:*12* 105:*19* 142:*6*
153:*23* 176:*6* 197:*3*
**coordinator** 159:*1, 2*
**copied** 109:*15*
**copies** 3:*16, 16* 138:*24*
**copy** 137:*7* 138:*3* 145:*6*
**core** 54:*24* 77:*18*
121:*25*
**corner** 109:*15*
**Correct** 6:*14* 7:*7, 11*
8:*4* 15:*22, 23* 16:*2, 3*
18:*18, 21* 19:*14* 24:*17*
25:*3, 22* 26:*4, 5, 15, 16,
23, 24* 29:*10, 11* 34:*20,
24* 35:*3, 6, 10, 16* 37:*1*
38:*4* 40:*16, 17* 41:*8*
45:*10* 50:*9, 12* 52:*15,
16* 53:*16, 17* 54:*7, 7*
56:*8* 57:*23, 24* 60:*8, 9,
13* 61:*10* 62:*19, 22, 23*
63:*25* 64:*5* 66:*14, 21*
70:*7, 17, 18* 71:*13, 22,
23* 73:*2, 3, 5, 12, 13, 16,
17, 20, 25* 75:*4* 77:*21,
22, 25* 78:*1* 79:*15, 18*
81:*15* 84:*14* 85:*11, 13*
86:*16, 23, 24* 87:*14, 15,
16* 92:*7, 10, 25* 93:*16*
95:*4* 96:*11* 97:*7, 19, 20,
22, 23* 98:*1, 2, 12, 16*
99:*7, 8* 100:*4, 6, 11*
101:*2, 3* 102:*19* 106:*24*
108:*5, 6, 17, 18* 109:*5,
17* 111:*9, 10, 24* 112:*22*
113:*20, 22, 23* 114:*20*
116:*3, 4, 6, 7, 9, 10, 12, 13,
18* 118:*8* 119:*12*
120:*24* 121:*4, 9, 14*
122:*12, 23* 126:*10*
129:*3, 9* 130:*1, 5* 131:*4,
21* 132:*4, 7* 135:*3*
136:*24* 137:*11, 15, 16*
138:*19, 25* 139:*5, 6, 14*
141:*3* 142:*2, 18, 24*

143:*7* 144:*14* 146:*11*
151:*15* 152:*15, 19, 22*
154:*7, 8* 155:*18, 25*
156:*3, 13, 17* 157:*12, 23*
159:*8* 161:*10, 12* 162:*7,
22* 164:*24* 166:*10, 16,
17* 168:*3, 7* 169:*16*
170:*1, 14, 15* 172:*4, 5, 9*
174:*2* 175:*7, 10* 176:*1,
14, 25* 177:*9, 10* 179:*1,
23* 182:*6, 16, 17, 25*
183:*7, 20* 184:*11, 12, 15,
20, 21* 185:*25* 186:*1*
192:*19* 196:*20* 198:*4,
10, 11* 203:*7, 10, 16, 17,
20, 25* 204:*1, 3, 8*
**corrected** 6:*4*
**Correction** 16:*7* 89:*5*
183:*12* 197:*1*
**correctly** 91:*16* 97:*12*
140:*3* 162:*25* 163:*1*
173:*2*
**Correspondence** 3:*9, 10,
11* 71:*15* 98:*4* 109:*11*
**cost** 62:*2*
**couch** 117:*11*
**council** 164:*19*
**counsel** 145:*7, 13*
200:*24* 201:*13* 202:*3*
206:*13, 14*
**counseling** 132:*16, 17*
**counselors** 85:*21*
**counsel's** 202:*24*
**County** 58:*8* 206:*2*
**couple** 48:*3, 16* 91:*10*
115:*7*
**couple-minute** 138:*2*
**course** 90:*1* 100:*16*
131:*7*
**courses** 58:*5*
**COURT** 1:*1* 4:*21* 5:*20*
32:*25* 87:*1* 201:*20, 22*
**covered** 54:*8*
**coworker** 25:*2*
**create** 47:*20*
**created** 47:*19* 131:*19, 23*
**Creek** 6:*16*
**criticism** 92:*2* 108:*1, 2,
3, 9, 20, 25* 109:*3, 21*
113:*13* 124:*20*
**criticisms** 110:*14*
**criticize** 103:*16*
**criticized** 80:*21* 89:*4*
91:*17* 92:*11* 103:*22*
104:*1, 8, 13, 14, 17, 22*
106:*3* 107:*7, 13* 108:*11*
118:*19, 24* 119:*1, 2, 11*
188:*24*
**criticizing** 104:*5* 123:*17*
**CRIVELLO** 1:*16* 2:*6,
15* 206:*9*
**CRR** 1:*22* 206:*22*

**crux** 177:*6*
**crying** 117:*22*
**current** 170:*12*
**custodian** 158:*3*
**cycle** 146:*8*

**< D >**
**Dallman** 9:*18* 140:*16*
141:*8, 9, 10, 17, 24* 142:*5*
**damage** 198:*18*
**damages** 160:*13* 202:*7*
**damaging** 200:*9, 20*
**Dan** 10:*22* 11:*10* 20:*1*
46:*10* 47:*7, 12* 50:*9*
51:*18* 57:*22* 76:*2*
79:*18* 106:*22*
**date** 6:*18* 7:*25* 9:*13*
11:*5* 12:*8* 15:*16* 42:*1*
47:*3* 56:*1, 2, 25* 58:*17*
60:*13* 81:*6, 11* 89:*24*
90:*22* 107:*16* 108:*7*
127:*25* 133:*25* 138:*10*
143:*22* 153:*3* 162:*18*
175:*12* 177:*18* 181:*19*
182:*1* 191:*2, 3*
**dated** 60:*11* 99:*16*
142:*24* 145:*10, 18*
**dating** 148:*18*
**daughter** 190:*25* 191:*4*
**day** 2:*8* 21:*20* 22:*2*
24:*10* 29:*25* 38:*1, 3*
40:*19* 48:*17, 22* 93:*20,
20* 113:*4* 133:*21*
134:*19* 138:*23* 145:*1,
21, 23* 146:*12* 175:*16*
177:*3* 193:*13* 206:*10, 19*
**days** 12:*10* 29:*12* 99:*6*
170:*8, 8, 10*
**deadline** 202:*13*
**deal** 7:*10*
**dealing** 160:*16*
**dealt** 176:*11*
**December** 6:*19* 8:*16, 21*
9:*2, 7* 57:*2* 155:*10*
188:*5*
**decide** 40:*13* 66:*20*
**decided** 37:*13* 39:*25*
59:*8* 190:*11*
**decision** 73:*23* 158:*15*
**decisions** 140:*22, 23*
**Deede** 76:*4, 6, 7*
**D-E-E-D-E** 76:*4*
**Deede's** 78:*2*
**Defendant** 1:*8* 2:*3, 17*
**deferred** 160:*24* 180:*1,
4, 14, 17, 20* 181:*5*
201:*11*
**definition** 179:*7*
**degree** 58:*12, 16, 18, 20,
22*
**degrees** 16:*19* 58:*5*
**deliver** 12:*14* 145:*20, 22*

**delivered** 135:*11* 145:*15* 175:*9*

**delivering** 105:*18*

**delivery** 104:*20*

**demand** 88:5, *6, 6*

**demeanor** 142:*8*

**demoted** 175:*21*

**demotion** 176:*17, 25*

**denoting** 93:*4*

**Department** 7:*1, 6, 21* 9:*12* 25:*18* 34:*22* 35:*10* 39:*7* 43:*12* 59:*7* 60:*7, 23* 61:*3* 65:*11* 71:*13* 72:*19* 73:*24* 74:*14, 15, 16* 75:*1, 8* 77:*24* 79:*2* 89:*19* 104:*16* 116:*24* 128:*6, 7* 129:*23* 141:*2* 142:*2, 20* 143:*5* 144:*20* 145:*20* 147:*1* 148:*25* 149:*12, 15, 23* 150:*4, 6* 151:*1* 152:*13, 17* 154:*14* 155:*1, 12, 24* 167:*1* 184:*14* 188:*6* 193:*19* 195:*24* 196:*16* 199:*4, 18, 20, 23* 203:*6, 23*

**departmental** 186:*3*

**departments** 59:*14* 186:*20*

**departure** 177:*24*

**depended** 18:*6* 187:*20*

**dependents** 168:*13*

**depending** 5:*19* 165:*19* 172:*3* 178:*21*

**deposed** 4:*11* 10:*16, 18, 24* 11:*7, 13, 19* 12:*6* 47:*16*

**Deposition** 1:*12* 2:*1* 10:*13* 11:*5, 8* 12:*14, 23* 19:*17* 22:*4* 44:*10, 21* 46:*11* 48:*5* 49:*24* 83:*15, 19* 158:*5* 160:*13* 201:*15, 16* 205:*1* 206:*6, 8*

**depositions** 47:*15* 48:*7, 25*

**depressed** 82:*1*

**depression** 83:*5*

**depth** 28:*22* 81:*23*

**deputy** 7:*14* 39:*21* 200:*19*

**described** 25:*8*

**designation** 177:*20*

**desk** 30:*1*

**destructive** 204:*7, 10, 18, 21*

**detail** 160:*6* 200:*14*

**detailed** 22:*11*

**details** 19:*7* 33:*13, 15, 16* 49:*18* 105:*24* 126:*16* 148:*18* 151:*11*

**determine** 40:*6* 123:*24*

**160**:*16* 188:*8* 189:*6*

**determined** 61:*21*

**developed** 74:*11* 150:*18*

**DeWaide** 1:*22* 2:*4* 206:*3, 22*

**dictated** 32:*5, 13*

**difference** 61:*13* 63:*23* 88:*4* 109:*25* 162:*7* 165:*2* 169:*19* 170:*2* 178:*17*

**differences** 61:*18*

**different** 75:*9, 17, 19* 109:*5* 126:*20* 137:*24* 141:*22* 150:*25* 152:*18* 199:*15, 19, 24* 200:*2*

**differentiate** 88:*1*

**differentiation** 61:*18* 160:*21*

**differently** 120:*6* 153:*19* 204:*2*

**diplomas** 58:*9*

**direct** 105:*19* 119:*23*

**directed** 120:*17* 122:*16*

**direction** 13:*16* 74:*15, 16* 75:*9, 17, 20* 77:*23* 79:*1* 87:*24* 142:*1* 199:*4, 18, 23* 203:*6* 206:*7*

**directions** 91:*4*

**directly** 37:*19* 51:*9* 112:*20, 21* 117:*7* 206:*15*

**director** 7:*15, 19* 8:*12* 24:*25* 64:*9, 14* 89:*16* 190:*10*

**disagree** 20:*13* 41:*7* 55:*4* 104:*24* 121:*1, 16* 141:*19* 142:*10, 13* 165:*22*

**disagreed** 140:*25*

**disagreement** 141:*25*

**disagreements** 133:*12, 17*

**disappointed** 72:*2*

**disciplinary** 100:*16* 132:*23*

**discipline** 37:*17, 25* 38:*14* 39:*8, 9, 12* 40:*4, 6, 13, 14, 25* 41:*7, 15* 42:*11* 43:*3* 52:*18* 94:*10* 100:*24* 111:*8* 120:*20* 121:*2, 8, 11, 17* 125:*21, 24* 132:*17* 133:*7*

**disciplined** 38:*22* 40:*10* 42:*6* 43:*2* 57:*17* 94:*14* 100:*11, 14, 18* 111:*13* 116:*12* 119:*18, 20* 120:*4* 121:*3* 132:*15, 25* 133:*4*

**disciplinewise** 39:*15*

**disciplining** 39:*12*

**disclosures** 36:*4* 80:*24* 160:*11* 190:*22* 201:*1* 202:*13, 20*

**disclude** 104:*9*

**disconnected** 103:*18* 104:*12*

**discovery** 181:*16, 21* 201:*18*

**discretion** 40:*5* 41:*12* 147:*25* 148:*2*

**discrimination** 31:*24* 32:*23* 33:*5* 43:*14* 57:*6* 87:*12, 14* 108:*22* 115:*21, 25* 116:*15* 117:*6, 20* 120:*24* 121:*7* 122:*10, 21* 153:*6* 156:*20* 175:*25* 176:*1* 184:*8, 9* 196:*4*

**discriminatory** 23:*9* 31:*15, 25* 35:*1* 39:*5* 117:*4* 188:*9*

**discuss** 11:*14* 13:*20, 22* 19:*6* 22:*21* 25:*11* 33:*12, 21* 41:*15* 48:*4* 49:*18* 51:*4* 53:*12* 143:*6, 12* 144:*14* 174:*4, 6* 186:*3* 204:*11*

**discussed** 5:*24* 11:*5* 19:*12* 22:*2, 3, 16* 23:*12* 34:*15* 53:*19* 54:*11* 75:*10* 77:*1* 81:*23* 93:*21* 99:*17* 176:*23* 192:*1, 12* 199:*6, 14, 25* 200:*6, 10, 14* 203:*19*

**discussing** 41:*17*

**discussion** 19:*8* 22:*13, 14* 33:*11, 19* 48:*2* 93:*11* 102:*14, 15* 114:*3* 126:*1, 2* 140:*8* 152:*7* 158:*10* 173:*22* 176:*15, 17* 192:*14* 204:*25*

**discussions** 11:*2* 12:*3* 13:*14* 54:*8, 9* 66:*5* 74:*14* 114:*8* 141:*23* 175:*23* 176:*15, 24* 199:*3* 203:*5* 204:*5, 15, 20*

**disintegrated** 131:*12*

**disinterested** 153:*22*

**disliked** 154:*13, 25*

**dismissal** 171:*17, 19* 179:*3*

**dismissed** 87:*14, 16*

**disparity** 174:*24*

**disposition** 42:*20*

**dispute** 31:*8, 18* 95:*21* 105:*22* 196:*11*

**dissatisfaction** 141:*25*

**dissent** 137:*20*

**dissertation** 173:*13*

**distance** 131:*16*

**distanced** 154:*6*

**distant** 103:*18*

**distinct** 13:*3*

**DISTRICT** 1:*1, 2*

**divert** 112:*16*

**divided** 170:*22*

**Division** 154:*23* 196:*5*

**docked** 40:*18*

**doctor** 85:*24* 86:*1, 3* 144:*2*

**Doctors** 85:*19* 86:*12*

**doctor's** 86:*6*

**Document** 3:*15* 36:*21* 41:*19, 22* 60:*25* 63:*3* 69:*3, 11* 143:*21* 159:*4, 23, 25* 161:*19, 20* 167:*9* 171:*8, 12* 185:*5* 190:*23*

**documentation** 160:*9* 182:*5, 16* 202:*15*

**documents** 8:*10* 35:*19, 21, 23* 36:*15* 43:*17* 55:*5* 61:*11, 12* 62:*3, 11* 68:*12* 86:*19, 22* 89:*11* 119:*7* 157:*3* 158:*4, 16* 159:*8, 11* 160:*10* 163:*25* 198:*19* 201:*4, 10* 202:*4, 7, 20*

**doing** 4:*15* 44:*11* 49:*1* 91:*15, 15* 96:*24* 101:*11* 103:*11* 131:*1* 147:*12* 181:*2*

**doll** 23:*18* 25:*10* 53:*10*

**dollar** 61:*6*

**domestic** 150:*1, 5, 20* 151:*6* 152:*1*

**Donna** 10:*22* 11:*3, 23, 24* 12:*4* 19:*7, 12* 20:*16* 21:*15* 22:*21* 25:*11* 26:*19* 30:*21* 33:*12* 34:*3* 36:*12* 37:*14* 41:*16, 20* 43:*11, 23* 45:*15, 19, 22* 46:*7* 47:*6* 53:*8* 57:*22* 76:*1* 79:*14* 86:*23* 92:*23* 93:*18* 98:*18, 25*

**dorm** 101:*14*

**Doug** 76:*23* 79:*18* 112:*3*

**downgrade** 90:*4, 6*

**DPW** 106:*15*

**drafts** 161:*19*

**dramatic** 65:*13*

**Drive** 6:*16* 148:*24* 149:*11*

**drop** 65:*14* 142:*20* 180:*3, 24*

**dropoff** 64:*3*

**duck** 107:*16, 19*

**ducks** 108:*4*

**Dude** 117:*11*

**due** 143:*24* 165:*3, 3* 173:*10*

**duffel** 18:*8, 12*

**duly** 4:*3*

**duties** 193:*4*

**duty** 98:*7* 119:*2, 4*

**dysfunction,** 118:*1*

< E >

earlier 87:23 92:19 116:8 124:17 125:19 126:25 138:8 139:2 154:2 156:8 159:7
early 46:21 143:23 154:13, 24 155:4 160:24 180:1 199:1
earned 169:21
earnings 69:21 169:19, 20
easily 17:2 61:21
east 15:1
EASTERN 1:2
eat 21:22
educational 58:1
effect 121:12 149:9
effectively 145:10
efforts 183:23
Ehrke 2:15 3:3, 5 4:6 32:8, 12 36:9, 14 37:8, 12 41:2, 6 42:22 50:24 53:1, 4 75:12, 18 80:5, 8 90:9, 12 96:4 99:13 113:21 114:1, 4 115:1, 4 117:3 122:5, 8 125:13, 15, 16 137:3 138:2, 6 139:17 145:5 152:6, 8 153:1, 11, 14 159:21 181:20 185:3 194:19 198:17 199:8 201:23 202:2 203:2 204:24
eight 154:9 170:8 179:21
either 18:15, 17 23:8 32:3, 14 40:16 45:21 48:12 49:18 57:4 63:1 78:21 80:21 91:17 103:15 108:11, 15 117:9 127:21 131:4 133:9 141:24 145:19 146:13 173:5 175:21 188:20, 24 195:25
e-licensing 89:8, 20 91:5
eligible 169:5
Email 3:9, 10, 11 8:18 27:22 28:19 29:8 33:22 34:22 35:2 41:23 42:1, 3, 7 74:13 91:14 93:16 97:7, 21 98:5, 7 99:15 130:1 136:17, 18, 21 137:5, 6, 10 138:13, 16 139:20 145:20, 25 148:16 187:9, 11, 13, 21, 25
emailed 147:7
emailing 74:13 147:6
emails 71:15
embarrasses 198:7
embarrassment 198:4
emergency 184:19

employed 6:23 9:8 13:10, 17, 19 22:23 60:6 77:9
employee 128:6 170:17 189:9 195:20, 23 206:13, 14
employees 106:15 179:6 193:24
employer 165:24 180:22 188:16
employers 201:8, 9, 11
employment 9:5, 9 56:19 60:14 66:25 72:18, 24 73:24 76:10, 16 85:16, 16 88:23 156:11 172:6 175:20 186:8 187:23 195:21
employmentwise 74:4
empty 194:10
emptying 193:16
EMS 9:22 89:20
EMT 58:7 89:2, 22, 22 90:1, 3, 18 91:3, 19 184:19, 21 186:22
EMTs 150:4
encountered 180:6
encouraged 85:5
encouragement 82:3 84:2, 5, 7
ended 131:21 146:7, 8
ends 139:25 181:17, 22
engage 124:2
engine 23:20
entered 128:1
entire 106:11 107:23 157:11, 22 158:13
entirely 46:22 95:5 107:25
entitled 173:16, 18
entity 157:19 186:7
entrances 115:13
entries 128:22
entry 129:3
Equal 154:22 188:6 196:4
equals 73:5
equipment 51:3 104:20 105:7, 18 111:25 190:13 193:25
eroded 131:25
error 89:6
escapes 21:2 189:5
Especially 147:10
essential 55:10
essentially 11:16 12:22 13:25 18:6 22:22 27:20 33:17 55:11 58:6 82:3 84:1 94:9 104:10 105:20 109:25 190:13
established 53:14
estimate 66:19

estimates 168:5
et 110:22
ethic 78:3, 12
evaluate 78:24 79:24 155:23
evening 27:21, 24 44:2, 6, 19 145:3
event 56:4 59:2
events 148:18
eventually 58:10, 13 59:23 109:9
ever-changing 62:17 161:3
everybody 194:4
evidence 160:15
evidentiary 202:8
Ewert 106:23
E-W-E-R-T 106:23
exact 7:25 12:8 33:14 58:17 61:6 65:14 89:24 90:22 107:15 125:1, 22 133:25 179:7 185:14 192:17
exactly 7:24 18:25 19:2, 24 38:16 51:14 56:2 65:23 67:17 81:6 82:14, 25 83:1 97:10 108:8 113:2 120:8 143:22 149:7 161:12 196:12
exam 134:14
examined 4:4
example 17:9 164:21
excepting 108:21
exclusive 146:12, 14
Exh 3:9, 10, 11, 12, 13, 14, 15
Exhibit 99:12, 15 119:8 128:22 129:4, 11, 15 138:5, 9, 21 139:7, 16, 19 145:4, 9 152:24 153:2 159:20, 24 160:17 161:24 162:1 177:11 182:4, 7 185:2, 5 188:2 200:25
exhibits 3:16, 16
exist 196:25 202:21
existence 30:22
expect 44:12 48:15 96:1 111:11
expectations 79:4
expected 88:11
experience 32:17 42:25 48:6, 10 72:19 73:24 88:23 163:15, 21
experiencing 81:17 109:17 110:14
expert 86:8
Expires 206:22
explain 7:12 52:5 55:2 85:18 87:21 88:6 101:19 145:18 147:14

188:24
explained 55:13 90:5
explaining 185:6
explore 160:5
express 46:18 116:19 139:12
expressed 49:12 71:20 89:17 116:6 120:16 141:24
expression 116:15
extent 77:13 83:20 138:7 183:2, 5 189:23 190:21

< F >

face 117:8 184:13
fact 6:1 27:7 29:18 44:22 48:23 55:12 61:22 73:25 81:24 89:1, 15 90:20 104:7, 18 107:20 108:21 109:13, 14 120:10 123:14 150:8 164:23 194:22 198:7
factors 163:21
facts 13:9 49:20 76:23
failure 136:23 137:5 150:19
fair 13:1 26:19 96:2 114:19
fairly 141:11
faith 84:21 85:5
Falls 7:1, 4, 25 8:6, 15, 24 9:5 55:7, 15, 18 56:12, 18, 24 57:1, 10, 14 60:15, 19 61:3, 16 62:1 63:1, 5, 9, 11, 18, 25 64:4, 6 65:11, 20 66:1, 10, 13, 17, 21, 25 67:3 68:25 69:13 133:24 134:3, 6 143:5 144:8, 13 152:10, 14, 17 156:11, 13 157:4, 25 158:22 160:22 161:8 162:16, 19 164:21 165:9 166:6, 9, 11 167:4, 20 169:20 170:14 174:13, 22 177:5 179:13 181:5, 6, 7 183:24 184:1, 15, 17 185:7, 17, 25 186:2, 7 187:4, 22 188:1 194:6, 24 195:5, 20, 24 197:3, 14, 19, 22 198:10 204:2
family 70:15, 23 168:8, 9 174:15 175:3 193:13 195:3
far 47:8, 14 89:7 107:1 126:19 145:23 174:14 175:1 196:7
favorable 49:6
favorably 78:5, 14

**February** 1:*13* 2:*8*
15:*18* 16:*13* 29:7 33:9
35:*12* 43:*24* 44:*3*
50:*25* 51:*5* 56:*3, 11*
92:*17, 18* 93:*15* 96:*15*
99:*4, 6, 16, 20, 21* 100:9
101:*1* 116:*22* 124:*17*
128:9, *14, 23* 130:*1, 5, 9*
134:*1, 5, 25* 135:*3, 14,
18* 136:*1* 138:*12* 139:9,
21* 142:*20, 24* 143:*17*
144:*8* 145:*10, 15, 19*
147:*14* 148:*5* 174:*19,
20* 175:7, 9, *11, 15*
176:*16* 181:*17, 22*
182:*19, 23* 183:*4* 186:*8,
12* 187:*1* 202:*18*
206:*11, 19*
**Federal** 2:*3* 87:*1* 202:*5,
16*
**fee** 201:*12*
**feel** 5:*1, 3, 12* 34:9, *11,
11* 39:*13* 140:*23*
**feeling** 116:*19* 120:*5*
168:*18*
**feelings** 27:*12* 78:*3*
116:*6*
**fees** 182:*8, 9*
**felt** 34:*12* 37:*5* 42:*18,
23* 51:9 80:*16* 97:*1, 2*
109:*2* 110:*3* 111:*16*
119:*21* 120:*11, 11*
150:*25* 200:*20*
**fifth** 50:*13*
**figure** 162:*11, 12* 166:*3*
171:*11*
**figured** 59:*18*
**file** 32:*23* 43:*11* 62:*8*
67:*18* 140:9 157:*11, 20,
22* 158:*13, 17*
**filed** 50:*5* 51:*18* 87:*1, 5*
96:*20* 101:*25* 174:*1*
196:*3, 19* 198:*1, 7*
**filled** 9:*21*
**finally** 65:*17, 21*
**financially** 206:*15*
**find** 61:*18* 96:*17* 97:*17*
123:*16* 139:*4* 177:*4*
187:*8*
**finding** 188:*6* 202:*18*
**findings** 24:*11* 33:*25*
97:*13, 15* 99:*5* 100:9
**Fine** 40:9
**finish** 114:*6*
**finished** 14:*12* 37:*4*
43:*16* 58:*16*
**Fire** 7:*1, 3, 5, 13, 20*
8:*19, 22* 9:*3, 12* 15:*1, 4*
58:*21* 60:*7, 22* 72:*11*
105:*7, 18* 106:*16*
116:*24* 128:*4, 5, 5*
141:*1* 142:*19* 143:*5*
147:*1* 149:*15* 150:*3*

151:9 174:*7* 186:*17*
187:*15* 195:*24* 203:*23*
**Fired** 55:*3*
**firefighter** 10:*7* 14:*15*
17:*7* 18:*2, 14* 42:9
51:*2* 58:*7, 23* 76:*7*
77:*5, 10* 78:*17* 80:*4*
99:*18* 129:*1, 7, 12*
132:9 148:*12, 19* 169:*5,
14*
**firefighters** 16:*14, 21, 21*
17:*21, 24* 18:*16* 108:*4*
118:*7* 150:*8, 16* 151:*15*
186:*19, 22*
**firehouse** 30:*4* 121:*21*
**first** 4:*3* 6:*12* 11:*3, 23*
12:*5, 12, 19* 13:*8, 20*
14:*7, 10* 15:*10, 16* 19:*7,
12* 20:*15* 21:*6* 22:*15,
20* 25:*16* 27:*2* 29:*15*
30:*25* 31:*23* 40:*15, 18,
20* 45:*16* 48:*17* 56:*25*
66:*24* 90:*20* 93:*18*
95:*2* 96:*17, 19, 21*
97:*21* 113:*3, 6* 129:*3*
137:*7* 138:*11, 16, 18*
144:*5* 154:*21* 160:*3*
191:*11*
**five** 50:*11*
**five-minute** 153:*11*
**flag** 29:*16, 19* 30:*22*
92:*16, 20, 20, 21, 22*
93:*3, 19, 21* 94:*19, 19,
20, 25* 95:*3, 7, 13, 22*
115:*16*
**flex** 148:*7*
**flexed** 148:*4*
**floor** 15:*2* 18:*13*
**focus** 58:*19*
**fold** 18:*8*
**follow** 25:*1* 119:*13*
124:*6* 144:*16* 203:*24*
**followed** 36:*22* 70:*25*
71:*1, 12*
**following** 91:*20* 119:*19,
22, 23, 25, 25* 132:*22*
135:*15*
**follows** 4:*4*
**follow-through** 119:*16*
**follow-up** 31:*14* 41:*24*
135:*12* 146:*20* 198:*21*
**forced** 40:*19*
**forget** 18:*15*
**forgotten** 136:*22*
**form** 12:*3* 44:*8* 46:*24*
137:*24*
**formal** 43:*11* 60:*10*
97:*4*
**formally** 63:*8, 9* 66:*13*
88:*9, 13* 98:*18*
**former** 80:*16* 188:*16*
**forms** 67:*21* 159:*15, 16*

201:*8*
**forth** 163:*14* 188:*2*
**forward** 23:*11* 32:*6, 15*
51:*5* 119:*24* 130:*7*
151:*23* 187:*2* 190:*5*
**found** 33:*22* 94:*6*
100:*23* 104:*21* 117:*6*
183:*19* 189:*11, 15*
**four** 6:*20* 38:*25* 39:*2*
50:*11* 57:*16* 66:*24*
99:*6* 106:*15* 111:*7*
**fourth** 50:*13*
**Fox** 58:*12*
**frame** 117:*13*
**frankly** 11:*18* 28:*3*
**free** 5:*3, 12* 25:*18*
**freezer** 17:*8*
**Friday** 15:*19, 20* 16:*7, 8*
92:*17* 99:*20* 135:*14*
201:*2*
**friend** 195:*7* 197:*21*
**friendly** 199:*2*
**friends** 193:*13* 195:*4*
**friendship** 74:*11* 154:*3*
**front** 138:*21* 153:*2*
**frustrated** 133:*15*
**full-time** 84:*25, 25*
170:*17* 186:*21* 195:*23*
**fully** 180:*14*
**fun** 118:*1*
**funds** 185:*10*
**funny** 31:*6*
**further** 46:*4* 70:*6*
121:*7* 134:*10* 155:*11*
206:*8, 12*
**future** 87:*24*

**< G >**
**game** 13:*2*
**gap** 89:9 91:*23*
**Garret** 14:*14* 24:*3* 93:*2*
94:*3, 4, 10* 103:*4, 10*
128:*16*
**Gary** 80:*25* 81:*1* 84:*24*
**gathered** 130:*15* 161:*6*
178:9
**gear** 15:*13* 16:*21* 17:*3,
7, 14* 18:*2, 7, 21* 136:*19*
190:*13*
**gender** 122:*18*
**general** 110:*6*
**generalities** 85:*4* 192:*2,
3*
**generally** 52:*1* 83:*2*
149:*4* 182:*3*
**gentleman** 195:*6* 197:*5*
**gentlemen** 183:*3*
**George** 72:*2* 73:*4*
80:*18* 126:*21* 138:*14*
153:*17*
**getting** 7:*24* 65:*5* 91:*2*
153:*12*

**GF** 162:*11*
**GFD,** 162:*3, 24*
**GI** 85:*25* 86:*1, 3*
**GIU** 127:*13, 16*
**give** 19:*16* 29:*2, 3*
47:*19* 54:*23* 57:*25*
81:*12, 20* 82:*2* 91:*8*
136:*14* 145:*7* 146:*23*
182:*14*
**given** 35:*21* 36:*1* 38:*3*
39:9 46:*11* 47:*15*
55:*11* 59:*21* 70:*19*
88:*17* 91:*4* 132:*16*
146:*5* 163:9 172:*22*
**gives** 67:*14* 163:*10*
**glad** 139:*10*
**global** 97:*8*
**go** 10:*20* 11:*18* 15:*5*
19:*4* 21:*22* 24:*21, 22,
22, 24* 28:*23* 49:*25*
50:9 56:*18* 59:*23* 67:*8*
68:9 69:*4* 74:*17* 79:*2*
86:9 91:*13* 96:*16, 21*
98:*25* 107:*1, 22* 111:*14,
15* 115:*6* 122:*2, 15*
123:*22* 124:*10, 13*
131:*6* 132:*11* 136:*4*
162:9, *10, 22* 177:*5*
187:*6, 10* 194:*24*
199:*11* 200:*13*
**go-around** 6:*12*
**going** 4:*13, 14, 16, 17, 19*
5:*20* 8:*10* 10:*16* 25:*4,
5* 35:*15* 53:*7* 61:*23*
63:*22* 64:*2* 66:*12* 68:*4*
74:*15* 75:*8, 17, 25*
96:*23* 104:*19, 25* 105:*3,
6, 14, 20* 106:*8* 114:*5*
117:*12, 23, 24* 122:*24*
127:*21* 129:*21* 134:*2*
144:*1* 145:*8* 146:*21*
152:9 155:*24* 158:*1*
171:*14* 175:*4* 178:*7*
182:*4* 190:*7, 20* 197:*25*
198:*25* 199:*8* 201:*20, 21*
**good** 49:*2* 79:*11* 115:*1*
134:*17*
**good-bye** 83:*18*
**goodwill** 105:*16*
**gotten** 30:*6, 18* 69:*12*
151:*2* 179:*22* 187:*25*
**grade** 107:*22, 25*
**Graduated** 58:*3*
**Granberg** 35:*22* 36:*12,
22* 37:*3* 41:*21* 42:*3*
110:*25* 111:*11* 114:9,
21* 190:*10* 191:*11, 20*
192:*1, 6*
**gravity** 39:*14* 120:*12*
**great** 200:*14*
**Greendale** 74:9, 9
**GREENFIELD** 1:*7*
4:*18* 8:*3* 9:*8* 10:*2, 4*

**Gramann Reporting, Ltd.** (800) 899-7222

13:*11* 22:*24* 55:*1* 56:*7*
57:*6* 58:*16, 23* 59:*11,*
*16* 60:*3, 6* 61:*17* 62:*1*
63:*2, 6, 19* 64:*3* 65:*1*
66:*14* 68:*21* 69:*2* 70:*1,*
*7, 11, 25* 71:*20* 72:*24*
74:*5* 76:*8, 10, 17* 77:*5,*
*7, 10* 81:*18* 83:*24*
85:*17, 23* 86:*4, 10, 14*
101:*4* 116:*25* 148:*25*
149:*14* 150:*5, 9, 14*
152:*18* 156:*17* 160:*22*
161:*8* 162:*15* 163:*7, 19*
164:*10* 166:*12* 167:*6, 8*
168:*20* 169:*21, 21*
171:*20* 172:*7* 175:*5*
178:*14* 179:*10, 17*
181:*4, 8* 184:*7* 185:*11,*
*24* 186:*9, 13* 188:*3, 13,*
*16* 189:*20* 190:*1* 195:*7,*
*10, 17, 19* 196:*3, 9, 20, 23,*
*24* 197:*2, 4, 17, 23*
198:*2, 6, 8, 10, 14* 201:*7*
**Greenfield's** 70:*2*
**grew** 59:*9*
**grounds** 188:*2*
**group** 8:*23* 104:*10*
118:*6* 123:*18*
**guess** 13:*6* 23:*17* 25:*14,*
*23* 40:*7* 46:*20* 62:*8*
69:*8* 70:*5* 84:*4* 87:*21*
89:*10* 97:*5* 109:*18*
121:*22* 145:*22* 170:*4*
**guessing** 45:*6* 69:*7*
81:*11* 170:*18*
**GUI** 127:*13, 16, 17*
**guidance** 131:*4, 8* 140:*1*
**guy** 61:*2* 67:*3* 71:*19*
107:*7* 186:*5* 190:*4*
195:*18*
**guys** 111:*12* 112:*25*
134:*16, 21* 168:*12*
183:*13*
**guy's** 101:*10*

**< H >**
**half** 12:*6, 11* 13:*24*
19:*8* 20:*16* 45:*3* 59:*20*
81:*8* 166:*8*
**Hammernik** 38:*3, 6, 10*
39:*20* 40:*23* 93:*24*
103:*2, 6* 125:*25* 130:*7,*
*12, 19* 133:*18* 200:*12,*
*20* 204:*5, 11, 16, 18, 21*
**hand** 119:*16* 150:*23*
206:*18*
**hand-delivered** 144:*23*
146:*1*
**handed** 86:*22* 120:*19*
121:*12, 17*
**handled** 32:*6, 14* 118:*20,*
*25* 149:*18, 21, 23* 176:*11*

**handling** 80:*17, 18*
113:*15* 119:*1* 158:*23*
**handwritten** 75:*23* 99:*9*
191:*15*
**happen** 11:*11* 22:*23*
110:*2* 122:*1* 201:*17*
**happened** 8:*20* 13:*17,*
*18* 16:*17, 19* 18:*20*
23:*6, 12, 14, 15* 33:*17,*
*20* 34:*7, 16* 38:*19*
39:*20* 43:*13* 52:*3* 75:*5*
85:*23* 86:*4, 10, 14*
113:*16* 121:*14* 122:*11*
129:*10* 149:*6* 150:*16*
175:*14, 16* 189:*16, 24*
196:*18* 198:*6*
**happening** 151:*10*
154:*14, 25* 155:*5* 199:*14*
**happens** 11:*7* 121:*23*
195:*6*
**happenstance** 51:*10*
177:*8*
**happy** 46:*16* 136:*24*
**harassed** 25:*13* 104:*4*
**harassment** 183:*19*
**hard** 62:*15*
**harm's** 107:*21*
**hazard** 15:*9*
**Head** 4:*21* 25:*3* 61:*2*
67:*3* 71:*19* 186:*5*
**headed** 116:*8*
**headers** 162:*2*
**Health** 61:*20* 62:*21, 25*
89:*16, 19* 160:*23* 161:*2*
166:*24* 167:*4, 15, 21*
168:*15, 19, 23* 169:*9*
171:*3* 201:*10*
**healthcare** 85:*14, 22*
169:*25*
**hear** 112:*19* 195:*9*
**heard** 21:*12* 38:*17*
83:*14* 99:*17* 111:*22*
116:*12* 140:*13, 15*
154:*17* 155:*6* 197:*19*
**hearsay** 37:*20, 24*
111:*23*
**Heavy** 51:*3* 111:*25*
**He'd** 155:*7*
**HEITZER** 2:*12*
**held** 114:*3* 152:*7*
**Helen** 89:*17*
**help** 81:*19* 84:*11*
**HEOs** 80:*4*
**her,** 23:*6, 12*
**hereunto** 206:*17*
**heritage** 102:*1*
**Hernandez** 13:*21, 23*
14:*6, 8, 20* 15:*10* 17:*3,*
*12, 17, 21* 22:*19* 27:*8*
28:*4* 30:*13* 31:*23*
32:*23* 33:*3, 8* 36:*25*
37:*18* 38:*7, 9* 43:*13*
49:*18* 50:*18* 51:*4, 15,*

*19* 52:*4, 7, 14* 56:*16*
57:*12* 73:*1* 75:*22*
82:*16* 92:*7* 93:*5* 94:*14*
95:*11, 16, 21* 99:*22*
101:*16, 21* 108:*12, 16,*
*20* 109:*1, 22* 110:*8, 18*
111:*1, 2, 15* 113:*11, 14*
114:*13, 15, 18, 22*
115:*17* 116:*1* 118:*16,*
*20, 25* 120:*25* 121:*8, 18*
124:*22* 125:*19* 126:*9,*
*15* 128:*10* 130:*9, 23*
132:*7* 136:*10* 137:*14*
138:*18* 153:*7* 154:*9*
156:*5, 21* 175:*24*
176:*10, 20, 22, 23*
182:*22* 190:*17* 192:*7, 22*
**Hernandez,** 110:*20*
**Hernandez's** 18:*20*
27:*11* 30:*9* 32:*2* 92:*16,*
*24* 95:*4* 99:*18* 129:*2, 8*
182:*18*
**hesitant** 139:*23*
**hesitation** 120:*16*
**hey** 197:*18*
**high** 58:*1, 3*
**higher** 63:*12* 64:*12, 12*
65:*17* 79:*5*
**higher-ups** 133:*8*
**highest** 7:*5* 60:*22* 78:*17*
**hip** 144:*1*
**hire** 164:*17*
**hired** 58:*24* 59:*17*
60:*19* 64:*11* 74:*6* 85:*1*
**hiring** 186:*20, 24*
**Hispanic** 29:*16, 19*
92:*20, 21* 94:*19* 102:*1*
**Hohensee** 130:*3* 182:*20*
**H-O-H-E-N-S-E-E** 130:*4*
**hold** 44:*23*
**home** 12:*14, 15* 62:*8*
67:*25* 159:*19* 161:*16*
**homesick** 59:*9*
**Honduras** 104:*20* 105:*1,*
*3, 8, 10, 15* 126:*24*
127:*3* 136:*16*
**honest** 85:*9*
**honestly** 36:*20*
**hoped** 137:*19*
**hopeful** 65:*12*
**hospital** 151:*8*
**hour** 170:*20* 178:*10, 11*
**hourly** 170:*13* 177:*17*
**hours** 118:*13* 170:*8, 16,*
*17, 22, 23* 171:*23, 24, 24*
172:*2, 20, 24* 173:*4, 8*
177:*11, 16, 16*
**house** 151:*3*
**HR** 159:*1* 167:*1* 190:*2,*
*10*
**Hull** 195:*23* 196:*9*
**human** 24:*24* 159:*1*
**humiliate** 193:*12*

**humiliation** 193:*9*
194:*21* 197:*25* 198:*4*
**hung** 117:*13*
**hurt** 195:*14*
**husband** 150:*24*

**< I >**
**i.e** 186:*5*
**idea** 11:*19* 40:*23* 84:*12,*
*13*
**ideals** 141:*22*
**identification** 99:*12*
138:*5* 139:*16* 145:*4*
152:*24* 159:*20* 185:*2*
**IDENTIFIED** 3:*8* 47:*3,*
*10* 54:*12* 183:*13*
**identify** 160:*18*
**iii** 202:*5*
**illegal** 23:*9*
**imagine** 13:*1* 132:*22*
**immediate** 182:*18*
**immediately** 55:*19, 22*
74:*20*
**important** 84:*10*
**improper** 32:*9*
**improve** 192:*16*
**inactions** 110:*3* 119:*21*
200:*18*
**inappropriate** 100:*1*
**incidences** 13:*16, 18, 19*
25:*13* 54:*6*
**incident** 13:*21, 23* 14:*6,*
*8, 11, 20* 17:*12* 22:*9, 12*
25:*10* 27:*17, 20* 28:*4,*
*10* 33:*16* 37:*18* 38:*7*
40:*20* 49:*19* 51:*4, 19*
52:*4, 14* 53:*10* 57:*12,*
*15* 73:*2* 75:*23* 82:*17*
92:*7* 97:*15* 98:*9* 99:*18*
107:*6* 108:*13, 17, 21*
109:*23* 110:*21* 111:*15*
113:*11* 114:*13, 15, 23*
116:*1* 120:*1, 25* 121:*8,*
*18, 19* 124:*22* 125:*23*
128:*10* 130:*9* 132:*7*
136:*10* 138:*18* 139:*11*
149:*10, 16, 23* 153:*8*
154:*10* 156:*5* 175:*24*
176:*11* 190:*17* 192:*8*
**incidents** 22:*21* 23:*16*
25:*11* 26:*7, 17, 20* 27:*1*
53:*8, 12, 18* 108:*15*
121:*6*
**incidents,** 22:*17*
**include** 104:*7* 136:*19*
168:*10* 201:*6*
**included** 36:*3* 131:*10*
153:*22*
**including** 92:*2* 137:*21*
**Inclusive** 146:*12, 13*
**income** 67:*18* 69:*17*
**incorporate** 81:*19*
**incorrect** 122:*13*

**increase** 61:*1, 5* 64:*19*
65:*7* 67:*2, 5* 165:*6*
**increases** 67:*15*
**incrementally** 67:*16*
**indicate** 71:*16* 128:*23*
164:*9* 193:*11*
**indicated** 41:*18* 51:*21*
56:*5* 188:*7* 193:*10*
**indicates** 141:*17* 142:*10*
**indicating** 133:*22* 135:*1*
136:*18* 164:*13*
**indication** 39:*6* 117:*17*
118:*15* 130:*25* 139:*22*
175:*14*
**indirectly** 206:*15*
**individual** 96:*24* 111:*23*
177:*22* 188:*15* 189:*13*
200:*4, 7*
**individuals** 14:*4* 38:*1*
39:*10* 42:*5, 12* 43:*4*
57:*17* 100:*10, 14, 18*
116:*12* 120:*3* 121:*3*
137:*21* 149:*24* 151:*25*
171:*25* 172:*15*
**informally** 88:*14, 15*
**information** 22:*5* 34:*2*
37:*24* 42:*24* 63:*8* 75:*6*
91:*7, 12* 101:*17, 23*
119:*7, 12* 130:*15*
158:*12* 161:*6, 7* 166:*25*
178:*9* 195:*3* 197:*8, 11*
198:*18*
**informed** 100:*19* 105:*13*
109:*12, 14, 15* 200:*23*
201:*1*
**initial** 11:*3* 15:*10* 36:*4*
55:*24* 60:*18* 65:*19, 20*
80:*24* 160:*11* 190:*22*
201:*1* 202:*13*
**initially** 8:*8, 14, 15* 12:*4*
29:*15* 58:*24* 65:*8, 10,*
*12* 93:*1* 111:*2, 3, 15*
**injury** 148:*24* 150:*23*
**input** 158:*19*
**inquired** 9:*23* 189:*17*
**inside** 25:*21*
**inspired** 183:*25* 185:*6*
**instance** 2:*2* 23:*20*
124:*13* 197:*24*
**instances** 54:*1, 6* 117:*5*
124:*21*
**instruct** 124:*1* 130:*22*
**instructed** 99:*3* 118:*21*
124:*6*
**instructing** 98:*7*
**instruction** 119:*5*
**insurance** 6:*10* 61:*20,*
*25* 62:*22, 25* 63:*13*
160:*23* 161:*2* 166:*24*
167:*5, 15* 168:*19, 23*
169:*9* 171:*3* 201:*10*
**intended** 117:*7* 142:*17*

**intent** 55:*24* 105:*12*
111:*14* 145:*22*
**interest** 70:*14* 71:*21*
**interested** 156:*16*
184:*17* 188:*1* 201:*3*
202:*4, 11* 206:*15*
**interim** 27:*2* 72:*6*
74:*18* 75:*3* 77:*11*
109:*8* 153:*25* 199:*25*
203:*14, 16* 204:*8, 19*
**intern** 188:*13, 16, 21, 25*
189:*1, 2, 4, 7, 19*
**interns** 189:*14* 190:*12,*
*15*
**interplay** 81:*1* 189:*21*
**interpret** 148:*7*
**interpretation** 141:*4*
**interpreted** 119:*16*
146:*4*
**intervention** 133:*11, 16*
**interview** 57:*9* 60:*1*
98:*18* 99:*1* 130:*23*
149:*15* 156:*23, 24*
**interviewed** 150:*21*
186:*2*
**intimation** 117:*17*
**intravenous** 184:*23*
**intrigued** 9:*24*
**investigate** 27:*24* 28:*3*
33:*23* 57:*15* 96:*15* 98:*8*
**investigated** 26:*14*
31:*11* 57:*16* 75:*22*
151:*17* 182:*24* 183:*6*
**investigating** 27:*16*
97:*14*
**investigation** 24:*11, 15*
28:*10, 18, 20* 31:*16*
32:*5* 34:*10, 14* 35:*3*
36:*23* 37:*5* 41:*24*
49:*19* 50:*18* 57:*18*
96:*8, 25* 97:*9* 98:*1, 12,*
*15, 19* 99:*1, 3, 10, 23*
100:*17, 21* 103:*11*
110:*21* 114:*23* 116:*9*
118:*20, 25* 119:*14, 24*
120:*3, 14, 18* 121:*2*
125:*24* 128:*21* 130:*23*
131:*2, 7* 136:*10* 139:*13,*
*23* 151:*22* 157:*9, 15*
192:*8, 23*
**investigations** 26:*7*
**investigator** 156:*12, 15*
**invited** 21:*18* 131:*2*
**involved** 26:*6* 42:*6*
51:*7* 52:*19* 53:*13*
57:*17* 76:*23* 106:*12*
110:*6* 115:*15*
**involvement** 37:*3* 81:*1*
99:*25*
**involving** 148:*12, 23*
**ironic** 44:*25*
**issue** 37:*25* 95:*3*
108:*10* 110:*1, 5* 126:*24*

136:*23* 148:*20, 23*
149:*18, 21* 151:*6*
182:*22* 188:*19* 197:*22,*
*23*
**issued** 158:*7*
**issues** 48:*8* 77:*1* 85:*25,*
*25* 149:*1* 152:*2* 176:*22*
188:*23* 192:*12*
**its** 141:*2*
**IV** 184:*21, 22, 23, 25*

**< J >**
**JAMES** 1:*4, 12* 2:*1* 4:*2,*
*8* 155:*14*
**January** 9:*13* 59:*5*
73:*22* 113:*7, 7* 167:*22*
206:*22*
**Jayden** 191:*5, 6*
**Jeff** 182:*20*
**jeopardy** 110:*12*
**Jesse** 195:*11, 23* 196:*9*
197:*8, 15, 15*
**Joanne** 190:*2*
**job** 8:*19, 23* 9:*25* 10:*9*
55:*7* 58:*11, 16* 59:*12,*
*15* 63:*8, 11, 15* 64:*7, 8*
65:*25* 66:*21* 70:*16, 20*
110:*12* 134:*9* 144:*12*
165:*13* 174:*12, 21*
185:*7* 187:*22* 188:*1*
194:*5*
**jobs** 56:*13* 186:*11, 17,*
*23*
**Joe** 9:*18*
**join** 81:*10* 183:*24*
**joined** 81:*6, 7*
**Jon** 2:*20* 72:*17* 77:*21*
80:*17* 138:*13* 199:*3*
204:*15, 17*
**Judging** 102:*1, 2*
**July** 47:*21* 62:*10* 111:*6*
126:*24* 159:*11* 161:*10*
191:*12, 13* 192:*6* 202:*14*
**June** 72:*9* 75:*3, 8, 20*
77:*11, 20* 88:*25* 103:*14*
153:*25* 154:*15* 203:*16*
204:*22*
**jury** 6:*1* 68:*14, 18, 24*
69:*9, 23, 24* 122:*24*

**< K >**
**Kathy** 83:*7*
**keep** 84:*21* 85:*4*
106:*12* 109:*12, 14*
**Kevin** 45:*24* 54:*15*
77:*2* 80:*12* 154:*12, 18,*
*24*
**keyboard** 161:*14*
**kids** 106:*10, 12, 19*
**kind** 7:*9* 13:*6* 16:*20*
34:*23* 35:*1, 9, 19* 39:*7*
41:*11* 48:*14* 62:*16*
73:*14* 89:*3* 105:*16*

109:*20* 115:*16* 127:*14*
131:*11* 140:*7, 20*
147:*20* 161:*3* 167:*19*
174:*1* 182:*5, 15* 188:*12*
193:*5*
**kitchen** 140:*17*
**knew** 20:*11* 63:*21* 64:*2,*
*9* 66:*11* 103:*8* 105:*6*
111:*12* 147:*10* 149:*6,*
*10* 172:*22* 174:*23*
194:*5, 7, 11, 23* 196:*13*
197:*4, 5, 14* 202:*11*
**knot** 16:*25*
**know** 7:*23, 25* 11:*17, 21,*
*22* 12:*22, 23* 13:*1, 4*
17:*21* 18:*23, 25* 19:*1, 2,*
*24* 22:*3* 23:*17* 26:*3*
27:*9* 28:*22, 24* 31:*5, 13,*
*17* 32:*2, 13* 36:*3, 5, 19*
37:*2, 16* 38:*9, 13, 23, 24*
39:*19* 42:*5, 8, 10, 19, 23,*
*23* 43:*1* 44:*12* 45:*12,*
*14, 15, 17, 24* 47:*15*
48:*7, 9* 51:*15, 17, 18, 20*
52:*11* 60:*12* 61:*6, 22*
64:*6* 65:*14* 66:*16*
67:*17* 69:*6* 70:*3, 19*
74:*8, 10* 77:*8, 16* 79:*4*
82:*1* 83:*18, 20* 84:*3, 4,*
*4, 21, 21* 87:*10* 88:*10,*
*14* 94:*4, 6, 11, 13* 95:*9,*
*10, 11, 12, 14, 15, 17*
97:*17* 102:*24* 103:*6*
104:*25* 111:*19* 112:*4*
114:*18* 115:*15* 116:*25*
122:*3* 123:*8* 124:*4*
125:*2* 126:*16, 19*
129:*17, 22, 23* 131:*3*
134:*10, 20, 21, 24* 139:*4*
140:*18, 21* 143:*23*
145:*24* 146:*17* 147:*5*
148:*19* 157:*25* 158:*11*
161:*9* 163:*8* 169:*9, 10,*
*18* 170:*1* 173:*15, 17*
174:*11, 25* 177:*24, 25*
178:*11, 12, 14* 179:*1, 18,*
*19, 20* 181:*23* 186:*21*
189:*12* 190:*4, 21*
193:*22* 194:*1* 195:*12,*
*16* 196:*12* 197:*11, 13,*
*20* 200:*18* 201:*3* 202:*3*
**knowing** 35:*14* 63:*12*
70:*2* 84:*2* 125:*19*
129:*21* 135:*12* 149:*8*
183:*20* 185:*14* 197:*4*
**knowledge** 11:*14* 25:*24*
26:*2* 31:*22* 33:*7* 37:*21*
50:*17* 52:*3, 13* 88:*19*
116:*22* 147:*23* 183:*21*
190:*5* 196:*17*
**known** 8:*24* 16:*23* 34:*4*
40:*4* 48:*10* 129:*18*

**< L >**
lack 59:8 198:19
language 147:15
lapse 89:2, 6 90:14, 18
91:22, 24
lapsed 90:21, 24
lapsing 91:19
large 121:19, 20
larger 120:15
late 92:11 131:15
LAW 2:12
lawsuit 4:17 6:7 83:24,
25 85:17 87:2 195:10,
18 196:2, 23, 24 197:25
198:3, 8
lawyer 46:9 54:13
87:13 155:3
layperson's 118:3
Layton 106:16
lead 102:21 186:4
leader 200:8
leadership 54:23 77:17
78:3, 12 142:8 155:12
156:2 199:22 200:16
leapfrogged 73:15, 25
learned 37:20 189:11
leave 45:3 55:3 57:10
59:6 77:7 175:17
leaving 15:5 55:6
147:16 156:16 174:8
175:16 177:19 193:19
194:23
left 15:12 16:15, 18, 22
17:7, 18 21:4 55:17
56:8 59:1 61:17 63:19
64:3 94:7 101:5
116:23 164:11 171:20
172:6 173:20 185:11,
19 186:9, 12 194:25
195:14, 21 197:2
legal 196:8 202:12
legitimacy 160:6
lesbian 25:17
Letter 3:12, 13 10:24
59:21 60:10 133:22
134:25 135:5, 12, 13, 18
136:6, 9, 14 142:21, 23
143:14, 17 144:9, 19, 20
145:9, 15 146:4, 23
153:4, 8 175:9, 12
190:25
letters 106:18
level 184:20
Lewison 2:12 3:4
10:11 36:2, 7 96:3
117:1 125:10 137:2
181:19 198:22, 24
199:17 200:22 202:1
liaison 189:14 190:14
license 89:2, 14, 15, 21,
22 90:18 91:8, 19, 22

licensing 90:3
licensures 89:11
Liedtke 80:25 81:1
82:6, 23 84:24 85:10
L-I-E-D-T-K-E 80:25
Lieutenant 14:13 23:3
29:25 73:10, 11 78:8,
18 79:19 80:3 106:5
111:25 128:24 129:6
140:16 141:17
lieutenants 14:23
182:22 183:12
lieutenant's 14:17
life 74:4
lifestyle 25:22 180:7
ligament 143:25
Likewise 11:10 151:25
Lindsay 1:22 2:4 206:3,
22
line 21:7 80:3 171:5
lines 178:2 193:9
list 20:7, 10 47:13, 13,
18, 19, 20 54:21 59:15,
18, 23 86:21 191:8
listed 187:14 188:15
litigation 6:13 154:21
196:19 198:1, 8, 13
little 9:24 19:5 21:21
38:17 53:7 56:24
61:20 66:8 80:1 81:20
82:1 84:3 89:4 96:23
97:3, 4 115:5 144:3
148:21 150:25 153:15
166:8, 20 188:22
lived 45:10
living 45:9
local 147:19
locker 25:15, 21, 21
31:3, 4, 7 54:2 92:24
95:4, 18, 22 96:1
115:13 129:2, 8 144:25
145:1 193:14, 17, 25
194:10, 25
log 89:19 91:5
logged 91:9
long 20:15 21:20 45:18
47:20 48:1 49:14 59:3
66:16 82:9 191:19
192:25
longer 20:19 21:22
195:4
longevity 160:23 179:3,
5, 12, 22
look 9:16 35:19 36:13
56:13 63:3 67:13
68:12 77:17 97:3, 10,
12 139:24 145:7, 13
151:13 162:1, 21, 24
167:9, 13, 17 180:11
181:12 182:13
looked 8:17 10:5 39:24
61:11, 15 62:4 69:15

94:19 107:24 187:5, 22
195:11 197:20 200:15
looking 8:10, 25 10:8
47:24 48:13 60:24
61:24 67:11, 16 69:3
120:13 121:22 138:11
143:21 178:8 181:1
182:5, 15
looks 102:19, 21
lose 185:23
loss 61:14 68:2
lot 4:25 13:5
loud 4:20
lower 73:11 139:19
171:16
luck 49:2
Luke's 151:5, 5
lunch 20:25 21:11, 13,
22 22:2 33:11 35:18
36:15 41:16 43:16, 22
luncheon 107:3

**< M >**
majority 121:20
makeup 8:12
making 74:3 91:21
106:9 112:13 174:15
manage 203:23
managed 204:2
management 87:19
88:2, 3 109:16, 21
111:18, 21, 22 141:22
manager 7:17, 18 64:21
67:14
manner 118:19 119:11
March 55:17 56:2, 8
59:5 60:4, 7, 11, 16
66:16 143:23 144:22,
22 145:2 152:9 153:3
162:20 175:13, 17
176:16 177:19
mark 138:8 140:16
141:9, 10, 24 190:20
marked 99:12, 14 138:5,
9 139:16, 18 145:4, 8
152:24 159:20, 24
160:17 185:2, 4 200:25
Marshal 128:4, 5
Mary 76:13 190:1, 1
material 202:8
mathematical 178:8
matter 5:25 11:25 27:7
29:18 32:6 49:21
94:11 126:21 143:6, 12
198:14
Mattila 76:11, 12 78:10
M-A-T-T-I-L-A 76:11
maximum 172:16
maximums 164:2, 4
mayor 24:25 173:19, 25
174:4, 18, 21 175:15
177:2
me, 111:22

mean 30:3, 16 33:21
115:23 117:2 122:9
129:14 168:24 178:17
180:17 199:7
Meaning 53:22 88:15
meant 120:12 129:16
142:14 148:5 199:13
mechanically 187:8
mechanism 187:8
media 104:21 105:1, 9,
23
medical 86:8 134:14
184:19
Medicare 169:1
meet 20:24 45:22 46:1
134:8 174:4, 9 193:15
meeting 30:8 93:2 94:7
123:13 125:2, 4, 6, 17
126:13 131:10, 13, 15,
19, 23 173:19 174:10,
18 177:6, 8 191:12, 15,
19 192:6, 10, 14, 22, 25
meetings 92:12 175:18
176:19
member 141:6 193:20
members 88:18 107:21
129:18 131:20, 24
150:4 194:23
memory 97:11 167:14
173:1
Menomonee 7:1, 4, 25
8:6, 15, 24 9:5 55:7, 15,
18 56:12, 18, 24 57:1,
10, 14 60:15, 19 61:3,
16 62:1 63:1, 5, 9, 11,
18, 25 64:4, 6 65:11, 20
66:1, 10, 13, 17, 21, 25
67:3 68:25 69:13
133:24 134:3, 6 143:5
144:8, 13 152:10, 14, 17
156:11, 13 157:4, 25
158:22 160:22 161:8
162:16, 19 164:21
165:9 166:6, 9, 11
167:4, 20 169:20
170:14 174:13, 22
177:5 179:13 181:5, 6,
7 183:24 184:1, 15, 17
185:7, 17, 25 186:2, 7
187:4, 22 188:1 194:6,
24 195:5, 20, 24 197:3,
14, 19, 22 198:10 204:2
mention 19:25 93:19
137:14 153:7 173:20
184:11 189:3 190:17
192:7
mentioned 9:21 12:16
23:20 25:18 48:24
55:22 74:21 89:25
108:12 124:22 125:18
126:15, 17, 17 142:14
143:3 188:20 198:9

**Gramann Reporting, Ltd.**      (800) 899-7222

mentioning 95:6
Merit 2:4 206:3
message 137:8 149:5, 8 189:8
messages 25:15, 20 74:19 88:15
met 90:2 173:25 174:6 191:11
meted 39:8 111:8
Mexican 21:1, 11 30:22 101:16, 22 102:5, 16, 18, 22
MF 162:12 170:7
MFFD 162:3, 10 167:12
mid-2016 81:14
military 93:6
Milwaukee 1:17 2:8, 13, 16 21:1 58:15 59:10 206:2, 10, 18
mind 59:24
mine 115:9
minister 85:1
minute 33:15 122:14 135:6, 19 190:6
minutes 20:17 21:21 45:20 49:16 53:6 82:10 97:21 139:8
mischaracterizes 199:9
miserable 72:20, 25 73:25 74:4 88:24 103:14
misquoted 112:4
missed 45:8
mission 105:16, 21 137:20 140:19
misstated 112:5
mistaken 126:19
mistreatment 114:16
misunderstanding 204:13
MM 162:9
MOLLET 1:4, 12 2:1 4:2, 8, 11 5:17 10:11 39:1 53:5 70:5 77:13 99:14 108:19 112:14, 15 114:5 115:5 122:9 132:9 138:7 139:18 145:6 148:11 152:9 153:2, 15 154:23 156:8 159:3, 22 169:18 170:19 173:3 185:4 188:5, 12 190:22 198:20 201:15 202:21 203:3
M-O-L-L-E-T 4:10
Mollet's 72:18 201:5
Monday 60:16 119:25 130:4 135:15, 16, 17 145:22, 23
money 171:21 181:11
month 82:14 113:10 167:8, 12 179:3 194:9
monthly 164:6 187:16, 18

months 66:24 73:1 82:15 92:6 108:16, 16 111:7 132:6 154:9, 13, 24 202:19
morals 78:4, 13
morning 14:12, 24 15:6 27:23 29:20 46:21 98:5 118:4 128:2 135:16
move 50:5 160:14 165:18, 21, 22 172:16
moved 151:23
movement 61:22
moving 23:11 58:14 89:7 165:4 166:23
Mukwonago 58:3
multiple 109:10 115:18
multiplied 170:12
municipal 165:24
municipality 164:17 165:17

< N >
name 4:7, 9 20:25 21:2 64:15 81:16 102:23 128:17 189:17 192:7 195:22
named 19:19 20:2, 12 52:11 72:10 73:4, 8, 14, 18 74:1 78:20 80:24 83:7, 9 86:18
National 21:1 117:15 120:23 122:10, 17, 21 123:1
nationality 117:15 120:23 122:10 123:2
nature 22:5 77:19 122:3 159:17
near 115:12
necessary 37:6 40:1
need 34:9 37:2, 13 97:2 126:16 140:1
needed 31:16 42:19, 19 89:21 106:12 109:12 131:4 152:12 186:24 190:11
needs 187:20 201:14
negative 49:9 95:25 114:11 128:13 189:23
neglect 18:15
negligent 91:20 92:3
negotiated 165:8
negotiations 167:3
Nehm 128:4
N-E-H-M 128:4
nervousness 44:10
net 107:18
never 9:4 11:13, 19 13:3, 14 20:1 26:11 27:8, 19 44:11 49:12 54:25 80:21 92:21 94:21 96:12 99:21 100:3 102:12 106:11

108:12 111:22 114:23 121:14 122:11 125:20 128:1 143:11 144:16 156:4, 19
New 9:12, 16, 18, 20 10:5, 8 56:14 89:16 152:13 180:21 181:7 194:5 196:16, 16 203:22
Nicholas 77:4, 9 80:13
night 29:9 48:24 49:14, 22 96:15 97:7 144:24
nine 89:18 91:1 168:23 169:11
Nonverbal 43:8 62:18 82:20 92:8
noon 132:13
Nora 89:24
normal 100:16
normally 100:17
North 1:16 2:7, 16 74:10 206:9
Notary 2:5 206:4, 22
note 100:25
noted 65:24 203:9, 12, 18
notes 75:23 86:6 99:9 115:9 191:15, 17, 20, 23 192:5, 19, 21 193:1
notice 15:7 56:12, 17 147:16, 17, 20, 23 148:2, 8, 9
noticed 23:18 27:20 129:2 150:4, 14, 20, 23
notices 106:8
notification 9:3 12:5 13:25 186:18
notifications 187:1
notified 14:1, 5, 7 59:13 89:14 97:22
notify 14:10 46:10 150:19
notifying 67:15
November 60:21 67:5 72:13, 18, 25 124:25 125:5, 14, 15, 18 148:15, 23 166:14 176:9, 10
NUMBER 3:8 6:21 22:17 25:13, 19 54:5 65:15 66:12 100:10, 13 141:23 163:3 164:11, 18, 22, 23 165:13, 18, 19 171:11 172:14 182:14 192:12
Numbers 3:14 6:20 61:23 159:5 160:1, 2, 7, 21 163:25 166:12 170:5 171:1, 15 178:23 182:4
numeral 184:22, 25
nurses 85:19, 20

< O >

oath 4:3
object 199:8
Objection 96:3
obligation 202:12
observation 94:16
observe 52:6 193:16, 24
observed 29:7, 12 92:15 194:2
obtain 96:9
obviously 164:22
occasion 84:19 106:14 176:3
occur 23:21 50:14 72:8 73:21 82:13 107:10
occurred 7:22, 23 8:2 13:10 19:2 26:17 28:14 34:17 38:7 50:17 51:16 53:10, 15 81:22 89:1 92:4 101:8 107:13 120:22 142:9 203:6 204:7, 16, 22
occurrence 16:17
October 72:14 148:13, 14, 16, 19
off-chance 174:7
offended 31:1, 15 38:11 39:4 51:8
offense 40:15, 18
offensive 32:20 95:24
offer 133:23 134:7 152:16 165:25 201:14
offered 66:6
offhand 21:3 23:22 42:2 67:12 82:8 84:18 108:8 127:19 141:5 167:10 169:10 171:9 178:7 196:11
OFFICE 2:12 14:17 140:15, 15, 18 193:17 195:8 206:18
officer 79:6 104:15, 23 106:3, 5 120:17 129:13, 17 149:7
officers 149:14 150:15
official 60:22 162:18
officially 144:20
offset 180:5
offtrack 19:5
oftentimes 74:12 107:17
Oh 54:3 94:21 128:21 162:21 175:14 176:13 183:13 204:13
Okay 4:3 5:15, 22 6:9 7:4, 22 8:5, 22 9:2 10:20 12:2 13:18 15:20 17:11 19:4 20:18, 24 26:10 28:8, 13 29:5 34:6 36:9 37:21 40:9, 15 41:18 43:2, 19 44:1 45:18 46:7 48:1, 20 50:8 52:10 53:2 54:3, 8 55:9 58:18 68:6 73:8

74:3 75:22 83:7 85:10, 14 87:7, 13 90:15, 15 92:2 101:13 104:13 106:2 108:15 109:7 110:7, 10 111:5 112:22 113:10 116:2, 19 117:14 118:3, 12 119:4 121:1, 11 123:5, 11, 24 124:4, 12, 24 128:21 132:17 135:9 136:9, 16 138:21 141:10 142:4, 19 143:11 145:18 147:3 148:1 154:18 155:23 157:2, 10 159:13 161:16 162:21 164:16 165:2, 15, 17, 23 168:10 172:20 174:20 175:14 176:22 177:8, 11 178:13 181:21 183:11, 13, 17 187:12, 19 189:21 194:4 200:13 202:2
**old** 169:3 191:6
**once** 37:3 74:18 91:8 109:11 118:21 123:20 137:6 151:20 181:4
**oncoming** 140:14
**one-page** 159:4, 24
**ones** 22:18
**online** 48:13
**open** 147:1 157:10, 21
**opening** 8:25 140:5
**operated** 141:2
**operating** 142:12 193:18, 23
**operator** 51:3 112:1
**opinion** 52:21
**opinions** 49:8
**opportunity** 59:10 96:13 152:15, 22 184:13
**oppose** 35:15
**opposed** 33:8 35:1, 5 39:7 55:6 57:6 108:22 115:21, 24 117:19 201:16
**opposing** 33:5 184:9 200:24
**opposition** 116:14 175:25 188:9
**opted** 66:22
**option** 169:13
**options** 143:7, 13 144:14
**order** 58:22 62:4 79:24 89:21 101:18, 24 160:15 177:5
**ordinance** 147:15, 20
**organization** 7:8 8:11 121:24 137:18 140:24 189:10 200:10, 16, 21
**organizational** 8:6 15:24
**origin** 117:15 120:23 122:10, 17, 21 123:2
**Original** 3:16, 16

**originally** 146:16 150:9, 19 164:22
**orthopaedic** 144:2
**ostensibly** 8:2
**outcome** 55:10
**outgoing** 193:24
**outset** 156:23
**outside** 43:4 50:3 100:18 155:11, 13 176:22 201:17
**oversees** 7:20
**overview** 7:10

**< P >**
**p.m** 2:9 99:4 115:3 138:12, 23 153:13, 13 205:1
**packaged** 151:4
**PAGE** 3:2, 8 35:14 129:3, 15 138:11, 15, 21
**pages** 138:10 161:22
**paid** 55:16, 20, 21 56:6 63:2 67:10 70:3 162:15 164:11 167:25 170:10 172:8 175:2 177:21, 22 182:9 185:20
**pants** 140:6, 11 141:2
**paper** 5:24 106:19 107:2
**paperless** 89:8
**papers** 35:19
**paperwork** 44:20, 24 127:12 181:12, 13, 15
**Paragraph** 101:15, 20 115:8, 11, 20 140:5
**paramedic** 10:7 14:15 76:7 77:5, 10 80:4 184:20 186:22
**paramedics** 118:7
**paranoia** 181:25
**paraphrasing** 98:8 149:7
**parents** 102:10
**part** 42:20 73:23 82:19 89:6 130:22 132:17 157:5, 16 161:22 204:10
**particular** 13:5, 14 14:2 15:6 83:25 90:7 100:12
**particularly** 41:19 62:21 128:22 160:7
**particulars** 9:24
**parties** 206:13
**partner** 12:15
**parts** 6:1
**part-time** 85:2 128:6, 8 186:21
**partway** 162:11
**party** 6:6 202:6
**pass** 134:14 143:19, 19
**passed** 34:12, 18 35:22 191:21
**passing** 134:23 144:4

**pastor** 81:2, 3, 7, 20 82:6, 23 83:9, 17, 22 84:6, 17 85:10
**pastoral** 81:21 82:3 84:2
**pastors** 84:10
**Patrick** 148:12, 17
**patrol** 29:16 92:20
**Paul** 14:14 30:1 71:8 76:20 79:17 93:2
**pay** 9:25 38:4 40:19, 20 61:7, 13, 15, 15 63:12 64:12 65:16, 18, 19, 21 67:8, 14, 15, 22 68:24, 25 69:4 146:8, 8 163:14 167:18 171:21 172:23, 24 174:13, 14 175:1 179:6 180:3 193:6 201:19
**paycheck** 167:17 172:23 173:3, 5 179:8
**paying** 63:4, 6 167:15
**payment** 179:22 181:6
**payments** 170:1 180:5
**payout** 173:21 185:10
**payroll** 173:6
**PD** 150:9
**penalty** 160:24 179:25 180:12, 21 181:3, 8 201:17
**pending** 204:25
**people** 5:1 10:17, 19 16:18 18:12 34:5 38:22, 25 39:2 43:2 51:8 52:19 59:17 70:24 106:8 112:16 127:5 149:15 164:21
**perceived** 23:8 32:18 114:11, 17 142:10, 16 189:23
**percent** 171:22 177:20, 22 178:18, 23
**percentage** 180:12
**perception** 24:14 74:25 77:24 140:10 141:1
**performance** 192:15
**performed** 24:10
**performing** 107:20
**period** 74:10 81:4, 5 82:13 105:10 201:18
**Perkins** 10:22 11:3, 24 12:4 13:9, 20 19:7, 12 20:16, 24 21:9 22:21 25:11 26:19 30:21 33:12 34:3, 16 35:18 36:12 37:14 41:16, 20 43:11, 23 45:15, 19, 22 46:4, 7 47:6 50:2 53:8 54:9 57:22 76:1 79:14 86:23 92:23 93:18 98:18, 25 129:2, 7
**permanent** 27:4 72:10

**person** 14:10 19:3 20:22, 23 24:16 39:12 44:13 50:14 86:21 195:14
**personal** 25:24 26:2 31:22 33:7 37:21 42:10 50:16 52:2, 5 156:24 183:21 193:25 206:7
**personality** 77:18 78:4, 13
**personally** 88:19 94:8 137:18 155:3 185:8
**personnel** 157:11, 19, 22 158:13, 17 197:4
**perspective** 78:25 79:5, 9, 10, 12, 24 80:9
**ph** 190:2
**phone** 12:19 19:12, 13 20:15, 21 21:6 22:13, 15 23:11, 13 44:13, 14, 22 45:18 48:17 49:17 50:14, 15 74:13, 19 93:25 94:9 103:3 130:19 154:2
**physical** 86:13 134:15, 18, 23 143:19 144:1, 4, 7
**physically** 146:21
**physician's** 85:19
**pick** 117:21
**picture** 30:17 93:24 94:8 103:2 122:25 130:19
**pictures** 103:7 122:2 123:15
**place** 11:6 12:3 31:23 35:9, 16 90:17 96:19 108:15
**placed** 49:20
**Plaintiff** 1:5 2:14 202:10, 12
**plan** 90:8 167:19 168:8, 8, 16, 19
**Plankinton** 1:16 2:7, 16 206:9
**plans** 45:21 46:1
**play** 196:7
**played** 157:5
**please** 4:7 17:20 32:7, 9 37:7, 9 41:1 42:13 50:19 64:1 70:8 75:11 97:17 101:19 122:6 139:4 140:1 143:5 194:16
**plenty** 66:20
**plural** 22:17 54:5
**plus** 182:7
**point** 5:19 32:6, 15 34:13 89:12 90:7 98:14 99:23 106:4 110:25 119:14 127:8 144:19, 22 149:13 152:12 154:7 159:3

**180:**15 **188:**12 **191:**17 **194:**4

**police** 7:16, 18, 20 71:1, 7, 13 148:25 149:6, 11, 14, 23 150:5, 14, 19 151:1, 7, 8

**policies** 151:24

**policy** 39:24 41:11 150:3, 7, 11 183:20

**Poppy** 59:22

**position** 7:5, 18 9:22 10:4, 6 39:18 56:5 60:18 63:18 70:11 72:5, 6, 17 73:15 78:20 84:25 134:3 143:4 153:18 164:17 174:16 175:3 184:18 189:3 196:16

**positions** 73:9

**possible** 71:5 72:14 90:24 94:23

**possibly** 19:1 24:25 175:22

**post** 165:18 186:24

**posted** 65:19 68:4 166:19

**poster** 30:23 93:8, 22 94:25 95:3, 13 115:14

**posters** 115:12 117:6 118:15 121:20 123:22, 25 124:10 130:20

**posting** 64:8 65:25 122:2 165:13

**postings** 103:2

**potential** 19:20 47:11, 17 54:19 57:20 81:16 96:17 149:25 152:1 176:25

**potentially** 131:1

**PR** 104:15 106:4 107:7, 14 108:2 110:5

**practice** 41:11 164:16

**practitioner** 85:22

**practitioners** 85:15

**prayer** 84:3

**praying** 84:22

**preceding** 206:6

**preclude** 143:3 144:4 146:21 160:15

**precluded** 144:12

**precluding** 198:18

**predecessor** 204:3

**premium** 63:4

**premiums** 62:22, 25 63:13 167:25 169:9

**PRESENT** 2:20 6:15 21:14 45:21 51:24 53:20

**presented** 24:16 41:21 161:23

**presently** 6:23

**president** 24:3 196:14

**pretty** 134:17

**previous** 101:10 200:8 203:25

**previously** 153:20

**primarily** 10:9

**prior** 7:24 9:2, 4, 7 16:12 17:4, 11 23:2 25:19 34:21 47:2 53:20, 23, 24 59:11 71:25, 25 77:20 101:6 144:1 147:8 148:9 199:25

**privacy** 43:6 148:20

**private** 14:16 42:11 156:24

**probable** 188:7

**probably** 13:15 21:21 39:24 50:11

**probation** 39:18

**probationary** 39:22, 23

**problem** 31:10 38:11 51:15 134:22 150:10 156:20

**problems** 40:24 86:13 131:16

**Procedure** 2:4 18:1, 5 41:11 193:18, 23

**proceed** 118:22

**proceeding** 100:17

**PROCEEDINGS** 4:1 196:8

**process** 4:15 5:17 24:19, 21 25:2, 7 45:13 46:16, 19 56:23 71:1, 12 91:6 97:5 132:18, 20, 23 156:10 190:18

**produced** 158:16, 20 160:10 202:16

**professional** 120:14

**program** 188:13

**Progressive** 40:14 132:23

**project** 167:2

**promoted** 113:7 166:14

**promotion** 72:17 165:4

**prompted** 9:16 84:7 86:6 93:14

**promptly** 182:24 183:6

**proof** 108:19, 24 109:19, 23 110:7, 17 114:11, 12 118:17

**proper** 24:14, 19, 21 150:3, 7

**protection** 58:21

**protective** 7:15, 19 8:13 64:10, 14 180:19

**protocols** 151:24

**provide** 60:10, 12 62:10 158:1 184:3 202:6, 14

**provided** 36:8, 11 43:19 47:12 63:7 86:19 119:12 148:18 181:14 199:1

**providing** 147:20

**psych** 144:7

**psychiatrists** 85:20

**psychological** 134:14, 17, 23

**psychologists** 85:20

**Public** 2:6 7:10 104:15, 23 106:2 198:14 206:5, 22

**pull** 101:5 190:12

**Pullen** 89:17

**pulling** 101:10

**punishment** 40:1

**purports** 190:23

**purpose** 105:2, 4

**pursuant** 2:3 105:17 203:23

**pursued** 58:8

**put** 15:12 17:8 18:2, 9, 12 27:13 31:4, 7 54:1, 20 91:6 93:5 95:18, 22 96:1 101:18, 24 104:3 106:19 107:2, 21 115:12 117:12 118:1 119:24 123:7, 9, 15, 25 127:21, 24 153:2 157:14 159:3, 11, 22 161:10, 13 168:22 174:15, 25 175:3 185:8 186:20 189:8, 9, 17, 19

**putting** 117:21 180:3, 25

**< Q >**

**qualities** 77:18 142:8

**quell** 122:4

**quelled** 121:18

**quelling** 121:12

**question** 5:14 28:6, 6, 24 32:8 46:17 68:22 79:7 80:5 90:10, 13 96:9 113:18, 25 114:10 122:5, 24 124:15 145:14 146:20 147:18 189:2, 12 190:3 194:13, 14 196:10 204:14

**questioned** 24:9

**questions** 4:16, 20 5:3, 9 6:4, 5 11:12, 21 12:24 13:7 22:4, 8 28:22 33:24 198:25 203:3

**quick** 139:9

**quite** 11:18 12:25 28:3 56:3 177:6 199:19

**quote** 139:2

**quoted** 64:8 164:22

**< R >**

**race** 122:17 123:1

**racial** 117:14 120:23 122:9 124:14

**Racine** 77:6

**raise** 164:23

**raised** 65:16 136:23 182:22

**Raising** 138:18

**ranged** 186:19

**ranges** 58:5

**rank** 73:12 78:17 79:19 140:9

**ranking** 7:5 60:22 79:6

**rapid** 133:11, 15

**Rapids** 58:11, 15 59:4, 7, 12, 21

**rate** 64:12, 12 65:17, 18, 19, 21 170:13

**rationale** 157:18

**rattle** 121:25

**reach** 169:1 172:16

**reached** 107:24 164:18

**reaction** 52:23

**read** 32:8, 10 37:8, 10 41:2, 3 42:15 50:21 75:12, 13 76:13 80:5, 7 86:25 90:9, 11 101:20 105:1 113:19 122:5, 7 139:2 140:3 162:25 163:1 188:5 190:1, 1, 21 194:17

**reading** 6:1

**ready** 132:11

**realize** 49:23 200:23

**realized** 8:11 89:13 137:6 189:24 190:7

**really** 13:3 23:15 55:14 140:20 161:4 188:25 190:4

**realm** 61:8

**Realtime** 2:5 206:4

**reason** 4:13 5:12, 24 95:21 96:16, 20 104:6, 9 172:7

**reasons** 168:4

**reassign** 98:16

**reassignment** 98:12

**recall** 12:8 18:25 19:24 20:9 21:5 23:22 27:3, 6, 10 28:24 30:6 31:2, 5 33:4, 14 37:15 38:16 41:17 42:2 43:15 49:11 50:22 51:6, 14 52:23 58:17, 25 61:6 65:14, 23 66:18 67:12 68:3, 6 71:4, 5, 9, 18 80:20 82:8, 12, 14, 24, 25 83:1 84:1, 18, 23 85:6, 9, 12 86:5 87:10 90:22 92:11, 13 94:5, 6 99:2 102:17 107:15 108:8, 14 111:6 113:2 116:21 125:1, 22 126:7 127:19 133:14, 19, 21, 25 135:22 138:1 141:15, 16 142:3 148:14, 22 149:4, 17 154:16 155:13 157:1

**Gramann Reporting, Ltd.**        **(800) 899-7222**

161:*12* 164:*8* 171:*9*
172:*14* 178:*7, 15* 179:*6*
180:*13* 184:*2* 191:*22*
192:*17* 193:*2, 21* 196:*6,*
*11* 201:*5*
**recanted** 23:*16*
**receive** 45:*13* 61:*1*
67:*21* 185:*10* 187:*1*
**received** 12:*5, 17* 38:*2*
41:*8* 44:*20* 45:*4* 59:*15*
69:*1* 133:*23* 139:*20*
143:*14* 149:*5* 160:*4*
200:*24*
**receiving** 12:*18* 201:*3*
202:*4*
**recess** 53:*3* 115:*3*
138:*4* 153:*13*
**recognize** 106:*15*
**recollect** 24:*9*
**recollection** 9:*13* 15:*18*
47:*21* 60:*5* 65:*22* 66:*8*
72:*12* 155:*2* 171:*4*
192:*4*
**Record** 32:*10* 36:*10*
37:*10* 41:*3* 42:*15*
50:*21* 75:*13* 80:*7*
90:*11* 113:*19* 114:*3*
122:*7* 152:*6, 7* 159:*23*
160:*3* 194:*17* 198:*15*
200:*23* 201:*21*
**recorded** 149:*22*
**records** 36:*11* 67:*11, 13*
157:*3, 11, 21* 201:*12, 12*
**reduced** 206:*7*
**reduction** 193:*5*
**Reed** 76:*11*
**refer** 128:*19* 167:*11*
168:*23*
**reference** 115:*17*
123:*14* 125:*23* 127:*12*
129:*11* 130:*3* 163:*20*
177:*11* 178:*1* 179:*25*
182:*7*
**referenced** 193:*8*
**referencing** 143:*1*
145:*11* 176:*10*
**referred** 10:*17* 22:*18*
61:*12* 107:*18* 180:*20*
**referring** 87:*22* 116:*1*
118:*1*
**reflective** 128:*13*
**refrained** 112:*11*
**refresh** 155:*2* 167:*13*
**refresher** 90:*1* 91:*4*
**refused** 45:*12*
**regard** 7:*9* 27:*7* 35:*14*
37:*16, 25* 40:*24* 41:*20*
52:*3* 53:*8* 62:*21* 64:*17*
65:*3* 71:*17* 73:*15* 76:*3,*
*9, 19* 78:*10, 12* 80:*22*
81:*22* 83:*22* 89:*1*
94:*14* 98:*6* 100:*24*
104:*18* 107:*7, 13, 14*

111:*8, 21* 112:*5* 114:*8*
120:*22* 124:*18* 148:*20*
150:*10, 18* 157:*8* 158:*1,*
*16* 160:*13* 161:*2*
163:*24* 182:*21* 188:*21*
204:*15*
**regarding** 51:*19* 52:*14*
91:*18* 92:*12* 201:*7, 10*
**regardless** 108:*10*
**regards** 35:*21* 52:*4*
126:*20* 175:*20*
**regional** 186:*15*
**Registered** 2:*4* 206:*3*
**regular** 201:*18*
**regularly** 141:*18*
**reinstated** 55:*16* 91:*2*
**Reinstatement** 55:*21*
**relate** 4:*17*
**related** 14:*19* 85:*15*
110:*17* 112:*13* 114:*13*
121:*7* 156:*5*
**Relating** 36:*25* 152:*1*
156:*21* 176:*23, 24*
188:*25*
**relation** 43:*24* 75:*15*
85:*24* 111:*14* 119:*20,*
*23* 120:*25* 161:*7*
**relations** 104:*15, 23*
106:*3*
**relationship** 190:*16*
**relative** 206:*12, 14*
**relied** 159:*8*
**rely** 68:*1*
**remained** 56:*6*
**remark** 126:*3, 4* 140:*17*
**remedial** 151:*23*
**remember** 8:*1* 15:*16*
21:*3* 49:*13* 53:*19* 56:*1,*
*25* 80:*23* 81:*5* 82:*19*
89:*24* 97:*10* 107:*15*
127:*2* 135:*11* 140:*7*
148:*11, 16* 149:*1, 9*
167:*10* 187:*3, 3* 188:*23*
**removal** 193:*24*
**remove** 179:*18*
**removed** 143:*20* 146:*18*
193:*4*
**render** 40:*6*
**rendered** 38:*15* 42:*11*
52:*18* 100:*24* 120:*20*
121:*9*
**repeat** 17:*20* 32:*7* 37:*7*
41:*1* 42:*13* 50:*19*
60:*17* 70:*8* 75:*11*
118:*23* 147:*18* 194:*15*
**repeatedly** 156:*15*
**repetitive** 92:*14*
**rephrase** 5:*5*
**report** 16:*4, 9* 97:*15*
136:*7*
**Reported** 1:*22* 29:*8*
32:*19* 33:*18* 99:*5*

100:*8* 151:*17* 206:*6*
**reported,** 33:*20*
**Reporter** 2:*5, 5* 4:*21*
201:*20, 22* 206:*4, 4*
**reporter's** 5:*20*
**reporting** 16:*1* 28:*5*
33:*16* 119:*25* 127:*14*
**represent** 177:*15*
**representative** 25:*4*
**reprimands** 38:*2*
**request** 34:*1* 82:*6*
157:*11, 22* 158:*24* 197:*1*
**requested** 32:*10* 37:*10*
41:*3* 42:*15* 50:*21*
65:*10* 75:*13* 80:*7*
90:*11* 113:*19* 122:*7*
174:*9* 194:*17* 197:*6*
**requesting** 41:*23, 24*
**requests** 157:*2, 6*
**Require** 88:*7* 202:*16*
**required** 36:*4* 58:*22*
62:*10*
**requirement** 58:*25*
147:*19, 22, 24*
**requirements** 90:*3*
134:*8, 13*
**requires** 202:*5*
**rescheduling** 143:*24*
**rescue** 107:*16* 108:*4*
**rescues** 107:*19*
**reserve** 179:*17*
**reserving** 198:*17*
**residence** 21:*13* 45:*10*
**resign** 55:*23* 147:*21*
173:*14*
**resignation** 55:*12, 25*
60:*10* 135:*2, 3* 153:*4, 8*
**resigned** 63:*9* 64:*25*
66:*14* 135:*6, 19* 142:*21*
173:*11, 16*
**resigning** 55:*14* 144:*21*
145:*11* 175:*10*
**resolution** 163:*9, 10, 13,*
*25* 164:*1, 9, 12* 165:*24*
166:*4* 167:*6* 201:*6*
**resolve** 131:*15* 164:*18*
**resources** 24:*24* 159:*1*
**respective** 73:*9* 74:*7*
**respond** 42:*3* 98:*3*
201:*24*
**responded** 130:*25*
137:*17*
**responding** 157:*5*
**response** 43:*8* 62:*18*
82:*20* 92:*8* 97:*24*
137:*1, 2, 4* 138:*23*
139:*8, 10, 22* 184:*3, 6*
185:*8* 202:*2, 24* 203:*3*
**responsibility** 130:*8*
**restate** 68:*22* 113:*17*
131:*22*
**restated** 112:*8*

**restaurant** 21:*1, 11*
**restructuring** 8:*7*
**result** 37:*16, 19* 85:*15,*
*22* 86:*14* 115:*22*
**results** 28:*23* 34:*9, 12*
**retain** 155:*10*
**retaliated** 115:*22* 188:*8*
**retaliation** 153:*7* 156:*20*
184:*8*
**retire** 169:*5, 8* 173:*13*
**retired** 21:*24* 81:*2, 9, 14*
83:*17* 128:*7* 154:*13, 24*
155:*4, 8* 169:*2* 171:*22*
173:*11*
**retiree** 160:*22* 166:*24*
167:*4* 171:*3*
**retirement** 72:*1* 169:*1,*
*15* 170:*7*
**retirements** 177:*23*
**retiring** 169:*13*
**return** 159:*16*
**returns** 67:*18* 159:*14*
201:*8*
**revealed** 95:*7*
**review** 151:*14*
**right** 6:*12, 15, 23* 10:*11*
34:*15* 42:*10, 24* 44:*24*
47:*25* 52:*17* 54:*3, 4*
55:*18* 60:*25* 64:*4*
96:*10, 16* 100:*2* 106:*25*
107:*8* 113:*16* 118:*14*
119:*18* 120:*6* 121:*1, 1*
123:*18* 127:*16, 25*
130:*14* 133:*9* 137:*22,*
*25* 140:*3, 25* 144:*10*
154:*4, 5, 10, 14* 155:*17*
156:*25* 159:*15* 160:*12,*
*14* 161:*5, 9* 165:*2*
168:*2, 6* 170:*18* 179:*2,*
*17* 181:*14, 22* 183:*15*
190:*16* 191:*14* 194:*12*
197:*23, 23* 200:*22*
203:*23*
**right-hand** 139:*19*
**rights** 97:*2* 154:*22*
188:*7* 196:*4* 198:*18*
**RMR** 1:*22* 206:*22*
**rode** 89:*3*
**Roehsler** 76:*15* 79:*15*
**R-O-E-H-S-L-E-R** 76:*16*
**role** 16:*10* 104:*23*
107:*7* 158:*15*
**roll** 14:*13* 181:*5*
**Roman** 184:*22, 25*
**room** 64:*11* 65:*4*
115:*13, 13*
**rooms** 101:*14*
**Rottel** 112:*3* 195:*7, 17*
197:*5, 18*
**rough** 66:*19*
**roughly** 44:*1* 45:*20*
63:*23* 65:*23* 81:*13, 14*

*99:4 165:14 178:19, 20
202:19*
**rounds** 15:5, *14*
**Rowan** 155:*14*
**Rule** 202:5
**Rules** 2:3 202:*16*
**rumors** 195:*13*
**run** 199:*20*
**Rural** 167:*21*
**rush** 5:*1, 2*
**Russ** 24:7 77:20 78:*19*
**Russell** 77:*15*
**Ruzinski** 64:*16*

**< S >**
**S.C** 1:*16* 2:7, *15* 206:9
**safety** 7:*10* 89:*17*
**salaries** 163:*11* 164:*5*
**salary** 61:*1, 5* 63:*17, 23*
64:*3, 6* 65:4, *14* 66:6,
*17* 67:2 68:6, *8, 11, 15*
69:6, *10, 19, 21* 163:*4,
18, 22* 164:7 166:*20*
167:*2* 170:*12, 21, 22*
178:*1, 2, 10, 15, 22*
180:*24*
**salarywise** 67:*10*
**Saturday** 145:*3*
**save** 161:*19*
**saw** 15:4, *16* 16:*4*
29:*15* 30:*12, 25* 93:4, *6*
94:*18, 21* 96:22 152:*13,
21* 187:*7*
**saying** 11:*20* 71:*9*
112:*11* 117:*25* 119:*6*
135:*5, 19* 137:*17*
145:*11* 203:*15*
**says** 20:*11* 101:*15*
115:*20* 117:22 123:*1*
143:*2, 18* 159:*25* 162:*3,
3, 6, 24* 170:*12* 171:*6*
172:*24* 178:*2, 3* 179:*3*
197:*21*
**scale** 174:*13*
**scam** 46:*24*
**scene** 106:*9* 150:*8*
**schedule** 5:*20* 146:*8, 17,
18*
**scheduled** 135:*21* 136:*2,
5* 146:*2, 15, 20, 22*
147:*11*
**scheduling** 127:*15*
**Schlecht** 71:*8*
**school** 58:*2, 3*
**scrutinized** 110:*4*
**se** 96:*25* 185:*21*
**seal** 206:*18*
**search** 187:*10*
**seat** 140:6, *11* 141:*2*
**second** 48:*20* 114:*6*
129:*15* 137:*6* 172:*17*
**security** 6:*21*

**see** 8:*20* 14:*25* 15:*9*
30:*8, 10, 11, 14* 31:*10*
48:*14* 49:*1* 74:*17* 79:*4*
85:*24* 87:*18* 93:*7*
94:*17, 20* 115:*8* 137:*19*
162:*4* 171:*7, 11* 173:*20*
177:*13* 178:*4* 191:*3*
**seeing** 47:*24* 69:*11*
136:*6*
**seek** 9:*8, 25* 56:*19*
66:*24* 70:*16* 83:*4*
**seen** 14:*19, 20, 21, 23*
15:*21* 17:*3* 28:*4* 85:*14,
21* 94:*8, 24* 164:*14*
165:*23*
**send** 8:*19* 71:*15* 106:*13*
109:*10* 144:*19*
**sending** 8:*23*
**sense** 39:*4* 119:*1* 200:*2*
204:*13*
**sent** 8:*18* 27:*21* 33:22
42:*7* 106:*5, 16* 135:*5*
136:*17* 137:*6, 10* 138:*13*
**sentence** 139:*25*
**sentiments** 139:*10*
**separate** 157:*19*
**September** 114:*22*
**sequences** 48:*4*
**serious** 120:*14*
**seriously** 97:*3* 182:*24*
183:*6*
**seriousness** 139:*11*
**served** 39:22 46:*11, 14*
47:*8, 14* 78:*20* 118:*8*
**server** 21:*13* 44:*23*
45:*2, 13* 46:*16, 19*
**serves** 97:*12* 173:*1*
**service** 45:*13, 16* 47:*3*
48:*18* 83:*16* 184:*19*
**services** 7:*15, 19* 8:*13*
64:*10, 14* 89:*20* 155:*10*
180:*19*
**session** 142:*15*
**set** 7:*8* 90:*5* 181:*17*
188:*2* 201:*23* 206:*17*
**sets** 163:*14*
**settle** 173:*25*
**settled** 58:*6*
**Settlement** 3:*14* 159:*5*
160:*1* 173:22 174:*5, 6*
**setup** 7:*4*
**seven** 202:*19*
**severe** 144:*3* 180:*3*
**shakes** 4:*22*
**share** 34:*9* 43:*3* 52:*17*
88:*21* 139:*10* 196:*3*
**shared** 34:*2, 7, 11* 75:*1*
148:*10*
**sharing** 195:*3*
**Shawn** 38:*3, 6, 10* 39:*20*
40:*23* 93:*24* 103:*6*
130:*7, 19* 133:*18*

**200:**12 204:*11, 16, 18, 21*
**shelving** 18:*10*
**shift** 14:*15* 16:*15, 22*
17:*19* 18:*2, 16, 17* 19:*1*
39:*13* 80:*3* 101:*6, 8, 10*
110:*6* 112:*1* 117:*8, 12,
21, 23, 24* 118:*2, 4, 6*
122:*3* 123:*17* 124:*1*
127:*4, 5* 131:*20* 132:*10,
10* 134:*1, 5, 16, 21*
140:*14, 16* 146:*7, 12*
147:*3* 151:*25* 184:*1*
194:*3, 4, 23*
**shift,** 122:*15*
**shifts** 74:*7* 124:*5*
131:*17, 25*
**Shore** 74:*10*
**short** 49:*23* 74:*10*
148:*8* 153:*22*
**show** 39:6 99:*14*
105:*13* 128:*1* 132:*11,
12* 139:*18* 145:*8*
159:*23* 185:*4*
**showed** 30:*2, 17* 173:*8*
**showing** 67:22 138:*8*
160:*16*
**shown** 112:*15*
**sic** 23:*16*
**sick** 160:*23* 170:*10, 11*
171:*16, 21* 172:*3, 9, 15,
24* 173:*4, 7, 21* 177:*16,
16*
**sign** 15:*9* 27:*12* 30:*11,
12, 15* 128:*24* 129:*7*
**significant** 87:*18* 121:*23*
**significantly** 168:*1*
**signs** 149:*25* 150:*4, 20*
**similar** 55:*10* 79:*3*
93:*5* 166:*4* 180:*19*
**simply** 11:*22*
**single** 168:*8*
**sisters** 17:*14*
**sit** 18:*23* 68:*13* 70:*9*
87:*7* 161:*14* 171:*13*
182:*2* 197:*12*
**site** 89:*20* 143:*19*
187:*13, 15*
**Sitting** 62:*24* 68:*19, 23*
117:*11*
**situation** 39:*14* 148:*11*
165:*23*
**skills** 103:*16* 104:*1, 5, 8*
**slash** 168:*22*
**slide** 18:*13*
**slip** 67:*15*
**smartphones** 88:*17*
**social** 6:*20* 89:*20*
**somebody** 40:*18* 51:*24*
93:*23* 101:*9* 117:*21*
140:*10* 165:*25* 193:*18*
**somebody's** 101:*5*
**someone's** 97:*2*

**somewhat** 11:*20* 22:*6*
25:*5* 74:*23* 75:*16*
81:*20* 105:22 106:*13*
111:*18* 119:22 121:*24*
129:*20* 200:*5, 9, 15*
**soon** 59:*13* 64:*3* 75:*2*
88:*24*
**sorry** 12:*10* 16:*8* 17:*20*
21:*2* 56:*3* 83:*3* 112:*12*
125:*10* 137:*9* 169:*1*
175:*12* 183:*1* 184:*22*
187:*6*
**sort** 109:*3*
**sought** 9:*4* 186:*8*
195:*21*
**sounds** 47:*25* 60:*25*
191:*14*
**southeastern** 186:*15*
**Southridge** 148:*24*
149:*11*
**Spahn** 24:7, *19* 53:*11*
71:*19* 77:15, *20* 78:*19*
80:*16* 87:*19* 88:*2, 12,
16, 18* 199:*20* 200:*8*
**Spanish** 92:22 94:*19*
**speak** 14:*16, 18* 28:*9*
78:*5, 14*
**speaking** 23:*5* 122:*19,
20*
**specific** 36:*11* 105:*15*
124:*20* 131:*14* 163:*15*
188:*22* 204:*10*
**specifically** 73:*21* 84:*6,
19, 20* 85:*7, 9* 104:*17*
131:*2* 142:*3* 152:*11*
154:*19* 156:*12* 176:*4*
**speculate** 70:*4* 170:*4*
179:*20*
**speculation** 13:*5* 96:*3*
109:*1, 24*
**speculative** 202:*23*
**spell** 4:*9*
**spelled** 128:*17*
**spent** 74:*12*
**spoke** 13:*23* 20:*20*
28:*20* 43:*23* 46:*3*
65:*12* 129:*23* 130:*4*
155:*15, 17, 20* 156:*12*
**spoken** 10:*13, 19, 21*
11:*24* 46:*8* 50:*4* 51:*21*
52:*10* 57:*21* 76:*3, 9, 15,
19, 22*
**sporadic** 187:*18*
**spread** 195:*13*
**SS** 206:*1*
**St** 151:*5, 5*
**staff** 80:*3* 88:7, *17* 89:*3,
7* 104:*10, 11* 112:*14*
119:22 132:*13* 137:*7*
140:*19* 141:6, *13, 18*
142:*12* 146:*24* 147:*2*
148:*10* 151:*5* 155:*16*

**stand** 175:18 184:7 193:20 200:5

**stand** 127:18

**standard** 78:13 193:18, 23

**standards** 78:4

**standing** 55:24

**standpoint** 118:3 151:22 156:2

**stark** 109:25

**starkly** 199:15

**start** 60:2, 14 65:5, 24 87:1 91:1 147:4 162:18 165:15 181:6

**started** 35:2 59:13 61:9 63:24 66:10, 11 77:24 83:15 153:18 154:21 165:10 183:23 195:5 196:8 198:1

**starting** 23:2 58:1 61:7, 15 63:18 66:12 75:7, 20 166:20

**starts** 118:4 138:12

**State** 2:6 4:7 8:19 26:19 41:10 64:1 89:17 91:21 169:14 180:23 187:14 206:1, 5, 22

**stated** 87:4 92:19 164:6

**statement** 32:13 55:4 72:16 104:24 112:17 121:16 126:22 153:16 202:25

**statements** 32:3

**STATES** 1:1 160:20

**State's** 89:6

**stating** 25:21 160:3 181:25

**Station** 15:4, 4, 13 18:9, 24 23:19 117:7, 13 135:17 136:13 146:22 147:11 149:12, 14 150:15 151:9 174:8 193:14

**status** 39:22, 23

**stay** 175:4

**stayed** 68:20 69:2 70:1 163:7 175:21 179:23 188:3

**step** 190:5

**stepped** 27:2

**steps** 37:5 39:6 132:24 135:2

**Steve** 91:11

**sticker** 139:19

**Stoflett** 89:24

**stopped** 12:14 74:19 147:6, 12 174:7 180:3, 25 181:2

**stopping** 106:8

**story** 26:4 105:8

**stow** 18:2, 9, 11

**stress** 81:17

**strike** 19:10 29:6 38:20 46:25 47:1 52:1 59:2 126:25 133:20 156:9 162:9 166:6 169:2 191:12

**structure** 8:9, 11 15:24 152:18 186:3

**strung** 14:21, 25 15:8 16:14 17:4 18:24

**stub** 167:18 172:23, 24

**stubs** 67:14 159:14 201:9

**style** 87:19 88:2, 3 109:16, 21 203:24, 25

**subject** 27:19 28:14 32:20 39:3 58:19 96:17 100:5 113:1 114:7, 22 198:17

**subjects** 142:7

**submit** 20:10

**submitted** 57:2, 3

**subpoena** 20:2, 13 158:7, 11

**subpoenaed** 19:16 158:4

**subsequent** 125:24 163:12 169:22

**subsequently** 107:2 135:5 151:9

**subtracted** 170:24 171:6

**suggested** 137:24

**suggesting** 158:19

**suit** 19:20 174:1

**Suite** 1:16 2:7, 13, 16 206:10

**summer** 90:23

**Sunday** 14:12, 24 16:5 29:20 83:16 92:18 93:12 135:23 136:1 146:2, 6, 9, 10, 25 147:4 183:15

**Sundays** 147:1

**superintendent** 106:17, 22

**superiors** 79:12

**supervisor** 24:22, 22, 23 182:18

**support** 54:23 81:21 82:3 84:2 181:13 182:5, 15

**supported** 140:19

**supporting** 49:4 160:8

**supposed** 62:13 100:5 132:10 147:4

**Sure** 4:24 5:4, 6, 10 6:3 12:25 36:10 39:19 46:17, 23 56:3 83:13 87:4 91:21 95:5 130:15 144:2 158:14 161:4, 21 168:4 177:6 178:25

**surprised** 105:23

**Sustachek** 14:14 30:1 76:20 79:17 93:2 94:13 128:24 129:6

**S-U-S-T-A-C-H-E-K** 76:20

**sustain** 193:5

**switching** 39:18

**sworn** 4:3

**system** 89:8, 9 90:4, 5 127:13, 20 169:15

**< T >**

**take** 4:25 5:11, 13 29:3 40:19 52:25 53:1 58:15 59:15 63:15 66:7, 20 75:8, 23 84:24 105:7 106:19 113:25 114:2 117:19, 20 130:8 134:9 137:17 138:2 144:5 148:8 153:11 166:1 167:17 174:12 190:14 191:15

**taken** 2:2 16:24 30:2 37:5 39:6 53:3 59:11 99:24 115:3 134:15 138:4 153:13 164:1 182:23 183:5, 18 206:9

**takes** 169:11

**talk** 13:9 21:20 27:13 28:17 45:21 52:6, 7, 7 56:23 82:2, 5, 7 84:11 106:20 108:25 115:9 118:6 141:21 143:9 170:7 186:18 194:21

**talked** 12:22 27:19 33:2 48:3 53:9 54:15 64:13 74:23 75:16 76:1, 2 84:17 86:17 87:23 88:23 99:21 100:3 116:8 118:15 119:8 124:20 126:25 127:1 138:7 142:5 154:18 156:8 159:7 176:8, 13 177:2 183:4 199:2, 16 204:6

**talking** 11:11 26:18 33:11 34:16 44:9, 10 53:6 56:15 75:25 79:20 81:4 93:10 105:2 110:20 119:4 128:16, 25 143:11 148:5 150:15 171:18 176:8, 13 181:3 194:20 200:11

**talks** 140:6

**tape** 15:9

**target** 28:14

**tasked** 27:16

**tax** 67:18 159:14, 16 201:8

**taxes** 69:17

**technical** 58:4, 8, 9, 9, 13

**technician** 58:21 184:20, 21

**tell** 4:14 5:3 7:8 9:11 10:18 11:2 12:2, 19 16:20 19:19, 23 20:5, 8 22:1 23:13, 15 30:18, 25 31:10 45:1 47:7, 12, 17 50:16 51:13 57:9, 14 62:24 64:17 65:3 68:14, 18, 24 69:8, 19, 23, 24 71:6 80:25 81:22 83:8 84:16, 19 85:3, 7 88:1 92:15 93:23 102:5, 8, 10 104:19 105:9 107:5 108:7 109:19 112:24 126:18 127:8 129:12 134:2, 5 135:25 141:5 143:22 154:12 160:19 165:12 171:5, 12 175:4 182:3 190:23 202:22

**telling** 10:23, 24 26:4 47:8, 10, 14 98:15 105:5 112:24 129:11 140:20 154:16 195:4

**ten** 49:16

**tendency** 112:15

**tension** 131:19, 23

**tenure** 163:15

**term** 33:5 55:8 84:8 148:4 199:10

**terminated** 54:25 55:2, 6 173:17 175:22 194:12

**terminated,** 55:8

**termination** 176:18

**terms** 159:7 173:22 199:18

**test** 134:23 143:20 144:7

**testified** 4:4 70:22 125:19 154:1 159:10 160:8

**testifies** 31:18

**testify** 31:6 77:15 79:10 86:13

**testifying** 68:14, 24 69:9

**testimony** 78:11 199:9 201:6

**Tew** 76:23 79:18 112:3

**T-E-W** 76:23

**text** 74:19 88:15, 20, 20 149:5

**texting** 74:12

**texts** 154:2

**Thank** 53:2 106:7

**thanked** 97:24

**Thanks** 139:9 204:25

**theories** 141:22

**therapists** 85:21

**thereto** 156:6

**thing** 44:12 62:17 87:10 121:13 129:25 161:3 181:6

**things** 4:*14* 11:*12* 16:*20, 23* 22:*22* 23:*12* 25:*14, 20* 48:*14* 54:*1, 24* 62:*16* 74:*3, 20* 77:*19* 80:*17, 18* 84:*22* 88:*25* 122:*3* 140:*11* 142:*4, 9* 155:*24* 159:*16* 193:*25* 195:*12, 13* 199:*5*

**think** 11:*16, 17, 21* 22:*7, 8* 31:*14, 16* 41:*18* 42:*9* 47:*25* 53:*9, 14* 68:*3* 70:*12* 76:*25* 79:*3* 87:*8* 97:*11, 12* 100:*7* 102:*21* 105:*5* 116:*3, 16* 125:*22* 126:*15* 127:*13* 174:*25* 194:*7* 198:*20* 199:*9, 10*

**third** 28:*24* 43:*22* 44:*18* 49:*14*

**thought** 10:*8* 13:*11* 25:*5* 29:*13* 31:*6* 38:*10* 44:*24* 46:*24* 59:*14* 65:*8, 10* 75:*1* 81:*18* 84:*9* 87:*23* 95:*19* 125:*11* 192:*15*

**three** 12:*1* 15:*25* 28:*25* 38:*25* 39:*2* 49:*17* 59:*17* 66:*18* 73:*1* 79:*19* 92:*6* 108:*22* 125:*17* 132:*6* 168:*13, 19* 178:*2*

**throw** 112:*16*

**Thursday** 44:*3* 83:*19*

**tied** 16:*25*

**tight** 16:*24* 17:*18*

**tighten** 17:*18*

**tightening** 17:*11*

**time** 4:*25* 5:*11, 12, 16* 9:*15, 17* 10:*5* 11:*5* 14:*2* 15:*6, 14, 22, 24* 19:*15* 24:*3, 6* 28:*1, 19* 29:*1* 33:*2* 34:*18* 35:*5* 39:*17* 40:*1* 42:*9* 43:*22* 44:*18, 25* 45:*10* 49:*10* 53:*13* 56:*14* 59:*1, 18, 22* 61:*24* 63:*4* 66:*20* 69:*15* 70:*13* 71:*11* 74:*11* 75:*2* 81:*7* 82:*13* 91:*9, 11, 23* 95:*3* 100:*12* 101:*4* 103:*14* 105:*10, 16* 106:*11* 107:*23* 115:*1* 116:*23* 118:*4* 124:*17* 128:*13* 129:*16* 130:*18* 131:*11* 134:*10* 138:*19* 141:*10* 147:*3* 150:*3* 153:*17* 161:*6, 12* 163:*5* 169:*15* 170:*11* 171:*17, 17, 19* 172:*3, 9, 12, 15, 25* 173:*4, 8, 21* 174:*17* 177:*16* 178:*14* 179:*3, 18* 185:*16, 21* 188:*15* 191:*21, 22* 196:*14*

197:*5* 200:*19* 202:*17*

**timeframe-wise** 196:*12*

**times** 5:*1* 11:*24* 48:*3, 16* 82:*5, 8* 83:*22* 84:*16* 89:*19* 91:*10* 109:*10* 179:*4*

**timewise** 196:*7*

**title** 7:*2*

**today** 5:*7, 19, 24* 10:*12, 16* 11:*4* 18:*23* 43:*24* 49:*24* 62:*24* 68:*13, 14, 19, 23* 69:*9, 24* 70:*9* 87:*7* 148:*1* 171:*13* 182:*2, 15* 197:*12* 198:*19* 202:*22*

**today's** 138:*9* 153:*3*

**told** 20:*1, 6* 25:*25* 27:*23, 24* 31:*13* 33:*23* 37:*19* 38:*9, 14, 16* 44:*23* 46:*14, 22* 47:*1, 2, 6* 48:*11, 13* 49:*23, 24* 51:*11* 52:*15* 53:*8* 55:*3, 23* 63:*17* 65:*6, 8, 18* 70:*24* 71:*11* 76:*25* 81:*25* 86:*8* 91:*20* 92:*22* 93:*1* 94:*2* 96:*14* 97:*6, 25* 98:*22* 103:*1, 10* 104:*11* 106:*11* 107:*21* 109:*11, 13* 110:*11* 111:*17, 23* 112:*5, 9* 113:*4* 119:*2, 13* 120:*21* 123:*20* 129:*1, 25* 130:*10, 18* 134:*7* 140:*18* 151:*3, 5* 156:*19, 23* 161:*1* 175:*6* 189:*18* 197:*15*

**tolerate** 34:*23* 129:*19*

**tolerated** 97:*17* 101:*2* 129:*24* 139:*4*

**tomorrow** 185:*19*

**top** 139:*7* 159:*4, 25* 162:*2*

**torn** 143:*25*

**total** 171:*23, 24, 24, 25* 180:*11*

**tote** 18:*8*

**touch** 115:*6*

**traditional** 7:*13*

**training** 133:*12, 16* 151:*23*

**traits** 77:*18* 78:*3, 12*

**transcript** 3:*16, 16* 4:*1, 23* 5:*21, 23*

**translate** 4:*22*

**treated** 153:*19*

**treating** 153:*19*

**treatment** 23:*9* 27:*1* 57:*11* 83:*4* 113:*13* 114:*12, 16*

**treatments** 111:*16*

**tremendous** 180:*24*

**trial** 6:*2* 181:*17, 19*

182:*1*

**tried** 141:*5*

**trip** 105:*2, 21, 24* 126:*25*

**trucks** 128:*19*

**true** 62:*21* 79:*14, 17* 80:*12* 169:*25* 195:*15*

**try** 60:*17* 61:*12* 170:*4* 173:*25* 201:*13*

**trying** 36:*23* 97:*5* 177:*3*

**turn** 98:*10, 22* 169:*15* 190:*2* 196:*13*

**turned** 33:*24* 119:*7, 14* 120:*3*

**two** 12:*12* 13:*22* 21:*20* 22:*1, 16* 29:*12* 35:*18* 51:*23, 25* 59:*20, 25* 66:*18* 79:*19* 82:*15* 107:*9, 12* 112:*4* 113:*4* 117:*8, 10* 122:*16* 124:*5* 138:*10* 140:*25* 151:*15, 24* 154:*3, 13, 24* 168:*13, 15* 172:*15* 182:*22* 183:*3, 13* 197:*7* 199:*15*

**type** 8:*9* 35:*5, 15* 44:*12* 97:*16* 101:*1* 110:*1* 121:*2, 7* 123:*11* 129:*19* 137:*19* 139:*3* 161:*14* 184:*8* 185:*10* 186:*17* 191:*17, 23* 192:*19, 25* 197:*6*

**types** 11:*21* 12:*23* 22:*5* 54:*24* 84:*22* 142:*9*

**typically** 18:*8* 163:*22*

**typing** 191:*20*

**< U >**

**Uh-uh** 56:*20*

**ultimate** 37:*16* 38:*14* 52:*18* 156:*11*

**ultimately** 14:*19* 24:*4* 38:*19* 66:*5* 93:*23* 100:*10, 23* 116:*11* 165:*15*

**Um-hum** 36:*16* 113:*12*

**um-hums** 4:*22*

**unaware** 173:*12*

**uncomfortable** 57:*5* 131:*1*

**uncommon** 16:*13*

**underlying** 201:*4*

**underneath** 29:*17*

**understand** 4:*15* 5:*2* 6:*5, 13* 7:*9* 19:*10* 21:*24* 28:*13* 38:*3* 41:*8* 46:*17* 48:*25* 73:*11* 102:*13* 110:*23* 119:*5* 120:*2* 144:*6* 148:*4* 157:*17* 168:*18* 181:*16, 21* 200:*7*

**understanding** 5:*8* 9:*15* 27:*11* 40:*22* 42:*17* 54:*18, 20* 57:*25* 62:*9, 12* 63:*22* 77:*14, 14*

78:*2, 11* 96:*22* 134:*17* 136:*7* 183:*20, 22*

**understood** 5:*9* 6:*4* 40:*9*

**undertook** 98:*14*

**unexpected** 44:*11*

**unfortunate** 51:*9*

**unhappiness** 137:*4*

**unhappy** 57:*5* 71:*10, 16* 124:*19* 184:*7*

**union** 24:*2* 25:*3, 4* 129:*13, 17, 18* 196:*14*

**unique** 184:*13*

**UNITED** 1:*1*

**UnitedHealthcare** 167:*23*

**units** 18:*10*

**unknown** 48:*4*

**unpaid** 189:*4, 7, 19*

**untie** 17:*1*

**unused** 172:*8*

**upgrading** 184:*18*

**upset** 46:*18* 82:*1*

**use** 33:*5* 40:*13* 46:*21* 108:*4* 168:*22* 172:*21* 185:*22*

**usual** 44:*9*

**Utilizing** 55:*8*

**< V >**

**vacation** 105:*10, 15* 127:*22* 185:*12, 16*

**vague** 120:*4*

**valid** 89:*15*

**validity** 160:*6*

**Valley** 6:*16* 58:*12*

**values** 54:*24* 77:*18*

**varied** 16:*19* 172:*2*

**various** 58:*4, 5*

**vary** 167:*25*

**venue** 88:*21*

**verbal** 40:*16*

**verbally** 71:*20* 91:*14*

**verbatim** 191:*25*

**verbiage** 97:*10* 113:*2* 121:*20*

**verify** 69:*11*

**vested** 180:*14*

**victim** 28:*15* 32:*20* 96:*17* 100:*5*

**videos** 48:*14*

**Village** 7:*1, 16, 17, 18* 64:*21, 21* 67:*14* 157:*4, 18, 25* 158:*22, 24* 190:*9*

**violated** 183:*19*

**violation** 41:*10* 43:*6* 97:*1*

**vis-à-vis** 203:*19*

**vision** 74:*25* 79:*5* 87:*24*

**visitation** 149:*13*

**volunteer** 137:*9*

**vs** 1:*6*

**< W >**

**W-2** 67:*21* 69:*12* 159:*15, 16* 201:*7*
**wage** 64:*8* 160:*21* 164:*6* 166:*12* 177:*17* 201:*7*
**wages** 164:*5* 174:*24* 201:*7*
**Wages,** 162:*2, 21*
**wait** 4:*19* 29:*12* 55:*14* 122:*14* 135:*6, 19* 190:*6*
**waive** 147:*17, 22, 25* 148:*2*
**waiving** 160:*12, 14*
**walk** 133:*11, 17*
**walked** 140:*17* 145:*16*
**walking** 94:*7, 24*
**wall** 15:*1* 29:*21* 30:*4* 92:*22* 115:*12*
**want** 4:*25* 5:*11, 13* 6:*2* 31:*11* 32:*5* 69:*8* 79:*2* 88:*20* 91:*13* 95:*5* 98:*9* 109:*15* 120:*9* 122:*15* 138:*3* 159:*22* 165:*19* 166:*19* 174:*15* 200:*17* 201:*21*
**wanted** 57:*10* 59:*23* 144:*5* 175:*6* 184:*13*
**wanting** 122:*2*
**warnings** 40:*16*
**warranted** 24:*24*
**was,** 30:*3*
**watched** 112:*25* 126:*23*
**watching** 111:*18, 21* 112:*14*
**Wate** 190:*2*
**Waukesha** 6:*16* 58:*7*
**way** 31:*8* 38:*12* 50:*6* 51:*7* 76:*19* 80:*17* 86:*3* 94:*14* 95:*25* 96:*22* 102:*19* 103:*5* 107:*21* 110:*17* 114:*13* 116:*9* 118:*19, 24* 142:*16, 17* 146:*13* 149:*18, 21* 153:*15* 156:*21* 170:*19* 176:*23* 177:*2* 187:*8* 199:*19* 200:*17* 204:*7, 16*
**WCA** 167:*21*
**WCTC** 58:*7*
**wears** 7:*17*
**Weber** 13:*12, 15* 26:*22* 28:*21* 29:*9* 33:*25* 34:*13, 19, 21* 35:*13* 49:*10* 53:*16, 22* 72:*2* 73:*4* 80:*18, 22* 91:*18* 93:*15* 97:*6* 98:*22* 99:*5* 100:*8* 103:*13, 16, 19, 25* 104:*4* 107:*3* 108:*11* 110:*11* 112:*8, 20* 116:*5, 20* 119:*15, 17* 123:*14* 125:*7* 129:*25* 130:*11, 16* 131:*3* 136:*15* 138:*14, 24* 144:*24* 148:*17* 151:*18* 153:*17*

**155:**20 175:*19* 190:*14* 192:*11*
**Weber's** 100:*25*
**Wednesday** 1:*13* 44:*3*
**week** 12:*6, 7, 9, 11* 13:*24* 19:*8* 20:*16, 21* 21:*12* 36:*8* 43:*25* 45:*2, 3, 19* 46:*3* 48:*25* 64:*24* 69:*16* 113:*6* 158:*5* 160:*4* 170:*17* 201:*14*
**weeks** 59:*25* 66:*19*
**weird** 44:*25*
**welcome** 137:*9*
**well** 4:*22* 10:*15* 11:*23* 13:*8* 14:*5* 16:*12* 19:*10* 20:*6* 29:*5* 30:*12* 38:*20, 25* 45:*9* 50:*5, 13* 52:*1* 69:*21* 71:*5* 74:*8* 83:*1* 88:*14* 90:*17* 93:*1, 4* 102:*14* 103:*21* 104:*3, 13* 107:*10* 109:*6* 112:*19* 133:*4* 141:*16* 142:*4* 151:*13* 167:*6* 177:*8* 178:*10* 188:*23* 193:*22* 194:*11* 196:*8* 198:*17*
**well-being** 134:*18, 18*
**went** 7:*13* 15:*13* 24:*2* 25:*2* 33:*13* 39:*21* 58:*4* 64:*4, 9* 67:*17* 110:*25* 111:*4* 112:*7* 114:*21* 130:*14, 16* 136:*13, 16* 166:*9* 187:*13*
**Wentlandt** 71:*1, 7*
**we're** 4:*14* 5:*19, 20* 6:*3* 122:*20, 22* 160:*16* 201:*21* 202:*18*
**West** 2:*13*
**we've** 57:*20* 76:*1, 1* 99:*14* 159:*23*
**whatnot** 121:*21*
**whatsoever** 109:*4*
**whereof** 206:*17*
**whoa** 190:*6*
**wide** 186:*22*
**widespread** 136:*17*
**wife** 10:*14* 50:*7* 51:*22* 52:*2* 54:*10* 57:*23* 59:*8* 81:*18, 25* 84:*9* 174:*8* 191:*1*
**wife's** 82:*6* 84:*13*
**wiggle** 64:*11* 65:*4*
**William** 2:*15*
**Windler** 10:*22* 11:*10* 20:*1* 46:*10* 47:*7* 48:*2* 49:*8* 50:*2, 9* 51:*18* 54:*9* 57:*22* 76:*2* 79:*18*
**WISCONSIN** 1:*2, 17* 2:*6, 8, 13, 13, 16* 6:*16* 8:*19, 22* 9:*3* 56:*11* 58:*11, 14, 15* 59:*4, 7, 12, 21* 154:*22* 169:*6, 14*

**186:**15, 17 187:*14* 188:*6* 206:*1, 5, 10, 19, 22*
**Wisniewski** 45:*24* 54:*15* 77:*2* 80:*12* 154:*12, 18, 24* 155:*4*
**withdraw** 180:*4, 10* 181:*7, 10*
**withdrawal** 160:*24* 180:*1, 8* 181:*3* 201:*11*
**withdrawn** 193:*4*
**witness** 2:*1* 4:*2* 19:*20* 20:*6, 10, 12* 32:*11* 37:*11* 41:*4* 42:*16* 47:*4, 11, 12, 13, 18* 49:*3* 50:*19, 22* 52:*24* 53:*2* 54:*19, 20* 75:*14* 81:*16* 83:*10* 86:*21* 113:*17, 20, 24* 125:*14* 194:*15, 18* 195:*25* 199:*12* 206:*17*
**witnessed** 93:*3* 99:*17*
**witnesses** 52:*7, 10, 11* 54:*12* 57:*21* 75:*25* 78:*20* 86:*17, 18* 191:*8*
**woman** 189:*24*
**wondering** 21:*5*
**word** 46:*20* 59:*9* 72:*20* 175:*23* 176:*1, 2* 181:*1*
**words** 82:*2* 120:*8*
**work** 9:*4, 16* 21:*23* 22:*25* 50:*25* 58:*11, 22* 59:*3* 78:*3, 12* 80:*2* 85:*2* 91:*15* 127:*23* 128:*8* 135:*21, 23, 25* 136:*2, 4, 8* 143:*15* 146:*2, 15* 155:*11* 170:*16* 171:*21*
**worked** 134:*19* 170:*23* 179:*21* 195:*4*
**working** 5:*8* 8:*3* 24:*10* 29:*25* 38:*1* 39:*10, 11* 49:*10* 59:*13* 77:*6* 128:*9* 146:*5* 152:*21* 167:*2* 171:*14*
**workplace** 108:*23* 115:*21, 25* 116:*14*
**wrapped** 16:*24*
**write** 191:*25* 192:*2*
**write-ups** 40:*16*
**writing** 206:*7*
**written** 29:*17* 38:*2* 184:*3, 5* 185:*7*
**wrong** 29:*13* 96:*18* 164:*25*
**wrote** 125:*13* 133:*21* 190:*25*

**< Y >**
**Yeah** 34:*4* 53:*23* 90:*25*
**year** 47:*22* 59:*19* 67:*22* 81:*8, 8, 12* 113:*8* 128:*9* 164:*24* 166:*6, 8* 167:*7, 11, 25* 169:*22* 170:*16* 171:*24* 172:*3, 3* 185:*22*

**yearly** 164:*5, 7* 170:*21, 22*
**years** 59:*20* 69:*1* 109:*3* 163:*12, 19* 168:*23, 25* 169:*11* 179:*4, 21*
**YouTube** 48:*13*

**< Z >**
**ZIP** 6:*17*