UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF WISCONSIN

JAMES A. MOLLET,

      Plaintiff,

v.                                Case No.:  16-CV-01145

CITY OF GREENFIELD (Fire Department),

      Defendant.

## **DEFENDANT CITY OF GREENFIELD (FIRE DEPARTMENT)'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Defendant City of Greenfield (Fire Department), by its attorneys Crivello Carlson, S.C. and as and for its brief in support of its Motion for Summary Judgment, hereby submit the following.

## **INTRODUCTION/BACKGROUND**

Plaintiff James Mollet (hereafter "Mollet") originally filed a complaint with the State of Wisconsin Department of Workforce Development Equal Rights Division on June 4, 2013 in which he alleged that he was the subject of improper treatment because he opposed discriminatory behavior at the City Of Greenfield Fire Department.  (Doc. # 22 Ehrke Aff. Ex. 1, Complaint of Discrimination.)[1]

---

[1] Mollet also alleged age discrimination at the ERD, and followed that with a similar claim here, but has since dismissed that portion of his complaint voluntarily once faced with a Rule 12(b)(6) Motion to Dismiss. (Doc. #11, 4/4/17 Decision and Order,  p.9)

On December 18, 2015 the Wisconsin Equal Rights Decision issued its Initial Determination finding that there was no probable cause to believe that the City of Greenfield violated any laws by discriminating against Mollet because he opposed a discriminatory practice or by terminating or discharging Mollet because he opposed a discriminatory practice. (Doc. #22 Ehrke Affidavit, Ex. 2, ERD Initial Determination of No Probable Cause)

Mollet has now filed a complaint against his former employer, the City of Greenfield Fire Department, alleging that his employer violated Title VII of the Civil Rights Act. (Doc. No. 1, Complaint) He generally asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e, et seq. (Doc. No. 1, para. 2) The court has jurisdiction under 28 U.S. C. Secs. 1331, 1337, 1339 and 1343.

His suit focuses on one discrete February 17, 2012 incident in which a Hispanic firefighter's (Cesar Henandez) bedding was tied up, and a paper 8 1/2" x 11" Mexican flag was taped behind that on the wall after Hernandez had left his gear and bedding in the sleeping room after his shift. (Doc. #1, Complaint, hereafter "The Hernandez Incident.")

The undisputed facts show that the activity was not unusual for firefighters who forgot to stow their bedding, and that Hernandez was not offended by the behavior, never filed or reported any type of complaint, and took the Mexican flag off the wall and taped it to the outside of his own personal locker. The true undisputed facts will also show that, even without a complaint from the subject firefighter, the command staff at the fire department agreed with Mollet that such

behavior was inappropriate, and requested Mollet look into the incident, received his findings, finalized the investigation, and disciplined four different employees, including another battalion chief. The battalion chief lost a day of vacation which had a monetary value of around $720.00 to him. The three other firefighters received verbal reprimands which were noted in their personnel files.

Mollet alleges that he was "constructively terminated," resulting in his taking a battalion chief job with Menomonee Falls.[2]

Based primarily on Mollet's own testimony, there is nothing in the record that supports Mollet's claims. Mollet presents no causal link whatsoever between treatment he attributes to what he calls his "opposition to discriminatory behavior" and any alleged "treatment" about which he now complains. In fact, Mollet admits that his employment life and relationship with Chief Jon Cohn (to whom he attributes his "mistreatment") actually became "miserable" when Jon Cohn became interim chief in June of 2011- eight months before the Hernandez incident. He admits that "misery" continued in November of 2011 when Cohn was named as permanent chief-three months before the Hernandez incident. Most, if not all of the

---

[2] Mollet also alleges that he suffered a reduction in pay and benefits resulting in damages to him upon his switch to Menomonee Falls. However, he failed to timely provide any calculation of such damages, and as of this writing has still failed to provide or any supporting documents upon which such calculation might be based, as required by Fed. R. Civ. Pro. 26(a)(1). He attempted to present a "calculation" at his 2/7/18 deposition, but admitted that he cannot testify how any of his "calculations" have been made. He has named no experts to support proper calculations of any alleged losses. As of this filing, he still has failed to provide any such information. In addition, he became the highest ranking individual in the Menomonee Falls department eight months after his departure from Greenfield. The time for individual disclosures and naming experts has long passed, and discovery is now closed, so that this will be the subject of a separate motion to preclude or dismiss damage claims should the case survive summary judgment.

3

incidents of what Mollet calls "criticism" occurred before the Hernandez incident, and anything thereafter is consistent with the "misery" and criticism he experienced before. He admits that he never sought outside employment and only applied for a job with Menomonee Falls after he received an unsolicited blast email from the Wisconsin Chiefs' association. Mollet can show no proof of any link between his relationship with Cohn and Weber and the Hernandez incident. Nothing relating to his taking the Menomonee Falls job reflects in any fashion anything relating to Hernandez or the opposition to discriminatory conduct.

## FACTUAL BACKGROUND

The following undisputed facts, shown mostly by Mollet's own sworn testimony, provide the background for the case, and show that the case should be dismissed.

### Mollet Employment

James Mollet was an employee of the City of Greenfield and served as a battalion chief for the City of Greenfield Fire Department, having begun his employment there in 1995. (Doc. No. 1, Complaint ¶2) DPFF#1

From March 6, 1995 until March 23, 2013, Mollet was employed as a firefighter, paramedic and fire lieutenant with his last position being battalion chief. (Doc. No. 1, Complaint ¶ 7) DPFF#2

In the present lawsuit, Plaintiff Mollet originally included a claim for age discrimination but Plaintiff and his lawyer asked to have the age discrimination

Case 2:16-cv-01145-LA   Filed 03/30/18   Page 4 of 30   Document 24

case dismissed and it was dismissed.  (Doc. No. 20; Mollet Depo. p. 87, lines 10-17) DPFF#3

Mollet was a battalion chief when Chief Jon Cohn was appointed as the Interim Chief in June of 2011 and when Chief Cohn was named permanent Chief in November of 2011.  (Doc. No. 20; Mollet Depo. p. 72, lines 5-13) DPFF#4

As of February of 2012, the Greenfield Fire Department organizational structure consisted of a Chief, Asst. Chief and three Battalion Chiefs who reported to the Asst. Chief.  (Doc. No. 20; Mollet Dep. p. 15, line 24 – p. 16, line 3) DPFF#5

Since the promotion of Jon Cohn to the position of Chief in November of 2011, Mr. Mollet's employment experience with the Department had been, in a word, miserable.  (Doc. No. 20; Mollet Depo. p. 72, lines 16-23) DPFF#6.  Mollet's life actually became "miserable employment-wise when Chief Cohn took over because once he (Cohn) became the interim Chief in June of 2011," as text messages and phone calls between Cohn stopped or ceased immediately, and there were things that were mentioned in conversation that appeared to (Mollet) that were not in alliance or in congruity with what the two had previously talked about, and it confused Mollet.  Mollet's perception of the vision for the Department that he thought he shared with Battalion Chief Cohn changed as soon as Cohn was appointed interim Chief in June of 2011".  Doc. No. 20; Mollet Dep. p. 74, line 3, p. 75, line 5) DPFF#7

Mollet also classified his employment in Greenfield as "miserable" in November of 2011, at least three months before the Hernandez incident. (Doc. No. 20; Mollet Depo. p. 72, line 24 through p. 73, line 3).

*The Hernandez Incident*

In February, 2012, at the end of a shift, a firefighter would typically stow or put away their gear or bedding. In Station 1, the firefighters had a closet that had shelving units and they would stow it in that area. Some would put their bedding and gear in a duffel bag and maybe slide it on the floor. In circumstances where a firefighter would either forget or neglect to put away his gear or bedding at the end of the shift, firefighters at the beginning of the next shift would either ball it up or do something else with it. This is what happened to Cesar Hernandez's gear on February 17, 2012. (Doc. No. 20; Mollet Dep. p. 18, lines 1-22) DPFF#8

On February 17, 2012, Hernandez' left his shift and forgot to put away his bedding. Hernandez also confirms that at that time, if a firefighter left their bedding on the bed at the end of their shift and left the firehouse, it was not unusual for other firefighters to take the bedding and ball it up or do something with it in prank-like fashion. (Doc. No. 19, Hernandez Affidavit, para. 2) DPFF#9

After Hernandez left the fire station after his shift ended on February 17, he realized that he had not put away his bedding. Understanding that he could therefore be the victim of a prank involving the bedding, he returned as quickly as he could to the fire station. (Doc. No. 19, Hernandez Affidavit para. 3) DPFF#10

6

When he arrived at the fire station, he found his bedding rolled up and hung with police caution tape from the ceiling supports on the east side of the fire station. Behind and below that on the wall he saw a paper version of an 8 ½ x 11" Mexican flag with the words "Border Patrol" printed on it. (Doc. No. 19, Hernandez Aff. para. 4) DPFF#11

Understanding that this had been a prank, Hernandez took down his bedding and removed the papers from the wall. He then took the 8 ½ x 11" paper Mexican flag into the locker room and taped it on the front of his own personal locker. (Doc. No. 19, Hernandez Aff. para.5) DPFF#12

Hernandez never felt as though he had been discriminated against or had been the subject of any type of discriminatory behavior.(Doc. No. 19, Hernandez Aff. para. 6) DPFF#13

Hernandez never complained to anyone at the Fire Department or the City about the prank, and he never filed any type of report and/or complaint about any type of "discrimination" at any time with anyone as a result of the prank. He never filed a discrimination complaint with any administrative agency (Doc. No. 19, Hernandez Aff. para. 7); Doc. No. 20; Mollet Dep. p. 31, line 22 through p. 33, line 1; DPFF#14

Mollet believes he saw Cesar Hernandez's bedding tied up in the fire station on Friday, February 17 when he was a Battalion Chief. (Doc. No. 20; Mollet Dep. p. 15, lines 16-23) DPFF#16. However, while Mollet saw the bedding and the sign behind it on Friday, February 17, he did not report it or complain

7

about it to anyone in his role as a Battalion Chief. (Doc. No. 20; Mollet dep. p. 16, lines 8-11) DPFF#17

Mollet understood Cesar Hernandez to be the "subject" of what had occurred. (Doc. No. 20; Mollet Dep. p. 28, lines 13-16) DPFF#18

When Hernandez was informed that the Command Staff was going to investigate the matter after a fellow fire fighter complained about the flag he had placed on his own locker, Hernandez indicated to the command staff that he did not believe that any specific investigation was necessary, and that he did not feel anyone should be disciplined. (Doc. No. 19, Hernandez Aff. para. 8) DPFF#15

*Joint Opposition to Discrimination*

In the context of where Mollet alleges that his claims arise out of his opposition to discrimination (described by him as "not thinking the Hernandez incident was appropriate" (DPFF#20)), he did not, as a Batallion Chief, mention or report it for two days. (DPFF #16, #17) This raises an immediate cloud over whether Mollet really "opposed" such behavior in the first place. Asst. Chief Weber stated his opposition to that kind of behavior in an email to Mollet before Mollet started any investigation. Mollet was aware as of February of 2012 that Chief Cohn was in agreement that there was no place for this kind of behavior at the Department. Mollet, Asst. Chief Weber and Chief Cohn were thus "on the same page" with regard to knowing that they opposed that type of behavior, because there was no place for it. (Doc. No. 20; Mollet Dep. p. 35, lines 1-17) DPFF#19. This was

true even though the subject (Hernandez) was not offended and did not file any complaint.

Mollet confirms that his only opposition to workplace discrimination in this case was "his expression that he did not think the behavior was appropriate," the same view expressed by both Chief Cohn and Asst. Chief Weber (Doc. No. 20; Mollet Dep. p. 115, line 20 through p. 116, line 18) DPFF#20.

*The Investigation*

Two days after he saw the bedding and signs, on February 19, 2012 at 9:32 p.m. Mollet emailed Chief Cohn and Asst. Chief Weber, stating:

> "I want to make you aware of an incident that occurred sometime this week and was noticed on Friday, February 17. The incident involved Cesar, he had forgotten his bedding in the dorm, members took his bedding and tied in barrier tape and suspended it from the pipes on the east wall of the apparatus floor. Furthermore, they put signs around the bedding – one was similar to the signs used to designate the branch of service and time served. The other was of a Hispanic flag with the words border patrol written beneath. Upon retrieving my gear from my floor locker at quick glance I saw the bedding but was not aware of the sign depicting the flag and inappropriate reference. This troubled several members and do believe it does cross the line of "hazing". With the addition of 17 new members within the last one and one-half years I would hope that we would want to develop and encourage diversity as well as behold key organizational and human values within the work place, behavior like this can undermine these values. I am unaware of who is responsible, but events like this can escalate and become harmful to not only individuals but also the Department."

(Doc. No. 22; Ehrke Aff. Ex. 3; GFD document production p. 000151 000152, Mollet 2/19/12 email to Cohn and Weber) DPFF#21

Upon report by Mollet to Asst. Chief Weber, within 30 minutes Weber responded:

> "I agree with you one hundred percent that this crosses the line of fire house hazing. Could you do some investigating into this incident and report any findings back to me. This type of behavior should not and will not be tolerated. Please let me know what you find out."

(Doc. No. 22; Ehrke Aff. Ex. 3; GFD Production p. 000151, 2/19/12 10:02 p.m. email) DPFF#22; See also (Doc. No. 20; Mollet Dep. p. 34, lines 21-25) DPFF#23

On February 19, 2012, at 10:44 p.m., Mollet replied in an email to Weber and Cohn and hedged on the request that he investigate, stating:

> "Thanks for your quick response. <u>I'm glad you share the sentiments in the seriousness of this incident</u>. With all due respect, I would rather not conduct an investigation as to alleviate inner quarrels among shifts and tensions between shift officers/commanders".

(Doc. No. 22; Ehrke Aff. Ex. 3, GFD Prod. P. 000151; 2/19/12 10:44 p.m. email) DPFF#24

On February 20, 2012 at 9:37 a.m., Cohn responded further to the Mollet email and gave Mollet the option to opt out of the investigation, stating:

> "Handing this over to BCs and company officers under whose watch this incident may have occurred would be totally wrong. In an effort to get the facts while being impartial, this was assigned to you for those reasons by the Asst. Chief. While this has the opportunity to become an issue among shifts, it is completely in the handling that minimizes this potential. This should not be framed as individuals or a shift having issue, but a departmental issue that cannot exist for numerous reasons and must cease. Being in a leadership role requires making what appears to be unpopular decisions but protects the individuals and the integrity of the organization. While these actions can be perceived as unpopular and definitely have the opportunity to create quarrels and tensions, it is in the delivery and corrective actions in which members should understand the need for ceasing these behaviors. Ironically, when handled properly, these instances

10

create respect and understanding for the difficult situations we deal with while trying to protect the organization. So if our (sic) concerned about individual and shift over organization and you still "would rather not" or choose not to, please advise immediately as this matter must be addressed and will be re-evaluated for assignment of fact findings. However, if you need assistance or guidance, please advise AC or me.

(Doc. No. 22; Ehrke Aff. Ex. 4; GFD Prod. P. 000153   2/20/12 9:37 a.m. email) DPFF#25.

At that point Mollet undertook the investigation instead of asking Cohn to have it reassigned. (Doc. No. 20; Mollet Dep. p. 97, line14 through p. 98, line 17) DPFF#26. Having been advised to let the Cohn or Weber know if he needed any assistance, Mollet never went back to them for any assistance or guidance in the investigation. (Doc. No. 20; Mollet Dep. p. 130, line 25 through p. 131, line 9) DPFF#27.

In his role as Battalion Chief investigating the incident, Mollet said he never spoke with Cesar Hernandez about the incident involving Hernandez's bedding or gear. (Doc. No. 20; Mollet Dep. p. 27, lines 11-15, p. 28, lines 9-12);   DPFF#28.

Mollet ultimately did tell Hernandez that he (Mollet) had "had to go forward" on the matter, and Hernandez indicated to Mollet that Hernandez had not been bothered or offended by the incident. (Doc. No. 19, Hernandez Aff. para. 9) DPFF#29.

Mollet never determined who actually put the sign and Mexican flag on Hernandez's locker. (Doc. No. 20; Mollet Dep. p. 31, lines 13-21) DPFF#30 Hernandez confirmed that he himself took the Mexican flag off the wall and put it on his own locker. (Doc. No. 19, Hernandez Aff. para. 5) DPFF#31. Ultimately,

11

Mollet admitted has no personal knowledge whether Cesar Hernandez opposed what was done in February of 2012. (Doc. No. 20; Mollet Dep. p. 33, lines 7-10) DPFF#32.

Mollet turned the findings from his investigation over to Asst. Chief Weber. (Doc. No. 20; Mollet Dep. p. 33, line 22 through p. 34, line 1, Ex. 1; Ehrke Aff. Ex. 5) DPFF#33.

Prior to the time that Mollet handed over the investigation to Weber, Weber had made it clear to him in an email that the Department would not tolerate the kind of behavior involved in the Hernandez incident. (Doc. No. 20; Mollet Dep. p. 34, lines 21-25) DPFF#34.

At some point during the investigation, Battalion Chief Shawn Hammernik came forward and took responsibility for what had occurred with regard to Cesar Hernandez because it happened on his (Hammernik's) watch. (Doc. No. 21; Hammernik Dep. p. 11, lines 19-22) DPFF#35.

Hernandez' statements to either the Chief or Asst. Chief that he (Hernandez) was not bothered by the incident at all and did not want an investigation dictated how the Chief and Asst. Chief handled the matter from that point forward. (Doc. No. 20; Mollet Dep. p. 32, lines 2-16) DPFF#36.

Mollet was instructed to do the investigation on February 19 at roughly 10:00 p.m. and he reported his findings to Asst. Chief Weber in the afternoon of February 23, four days later. (Doc. No. 20; Mollet Dep. p. 99, lines 3-8) DPFF#37.

12

Mollet has no reason to dispute that Cesar Hernandez took the flag and sign off of the wall at the fire house and put the flag on his own locker. (Doc. No. 20; Mollet Dep. p. 95, lines 21-23) DPFF#38.

*The Discipline*

Mollet does not have any personal knowledge as to the end result of any discipline relating to the Hernandez incident. (Doc. No. 20; Mollet Dep. p. 37, lines 16-23) DPFF#39. In fact, four different individuals were disciplined as a result of the Hernandez incident, with Batallion Chief Shawn Hammernik losing a day of vacation and three other firefighters receiving verbal reprimands. (Doc. No. 18; Cohn Aff. para. 12) DPFF# 40 The one day vacation loss discipline for Battalion Chief Shawn Hammernik, on whose shift the incident had occurred amounted in monetary terms to roughly $720.00. This was a lot of money to Hammernik. (Doc. No. 21; Hammernik Dep. p. 21, line 24 through p. 22, line 5;) DPFF#41.

Along with Battalion Chief Hammernik, three other firefighters received discipline in the form of verbal counseling related to the Cesar Hernandez incident. (Doc. No. 18; Cohn Aff. para. 12) DPFF#42.

With regard to the discipline that was rendered in the Hernandez incident, Mollet understood that such discipline would be consistent with Weber's February 19 email statement to him that this type of behavior should not and will not be tolerated. (Doc. No. 20; Mollet Dep. p. 100, line 23 through p. 101 line 3) DPFF#59

13

*Mollet's Resignation and the Menomonee Falls Job*

In December of 2012,Mollet was on an email blast site that went out to everyone listed on the Wisconsin State Fire Chiefs Association site, and actually became aware of the available Battalion Chief job opening at Menomonee Falls through a Wisconsin Fire Chiefs group sending out announcements regarding available jobs. (Doc. No. 20; Mollet Dep. p. 187 l8-15, DPFF#4; Doc. No. 20; Mollet Dep. p. 8, lines 22-25) DPFF#46.

Ten months after the Hernandez incident, on December 11, 2012, Mollet first looked at the Menomonee Falls Batallion Chief job application. (Doc. No. 20; Mollet Dep. p. 8, lines 14-21) DPFF#48.

Before he got the email regarding the Menomonee Falls job, he had not looked anywhere else for employment. (Doc. No. 20; Mollet Dep. p. 187, lines 12-24) DPFF#44. Had Mollet not received the email from the Wisconsin State Fire Chiefs Association site indicating a job was available in Menomonee Falls, he confirms that he would have stayed at the City of Greenfield. (Doc. No. 20; Mollet Dep. p. 187, line 13 through p. 188 line 4) DPFF#45. Clearly, then, as of this time Mollet's employment had not been any more "miserable" as it had been before the Hernandez incident.

As motivation for his application to Menomonee Falls, Mollet was seeking an opportunity to face the unique challenges of a combination department such as Menomonee Falls, where the Fire Department and Police Department operated under a singular Public Safety Director. Mollet was also interested in the job

14

because Menomonee Falls was considering upgrading its emergency medical service from an EMT IV Technician to the Paramedic level. He confirmed this motivation in his application materials to Menomonee Falls, including an essay responding to a question as to what had inspired him to apply to become a Battalion Chief in Menomonee Falls. (Doc. No. 20; Mollet Dep. p. 184, lines 13-24; Ehrke Aff. Ex. 6/ Mollet Dep. Ex. 7, Mollet essay response; DPFF#47

Over ten months after the Hernandez incident, investigation, and discipline, Mollet submitted his application for the Menomonee Falls job on December 27, 2012. (Doc. No. 20; Mollet Dep. p. 56, line 23 through p. 57 line 2) DPFF#49

Mollet never told anyone at Menomonee Falls that he wanted to leave Greenfield because of any treatment that he attributed to the Cesar Hernandez incident. (Doc. No. 20; Mollet dep. p. 57, lines 9-13) DPFF#50

During the application process with Menomonee Falls, he specifically spoke with an investigator who repeatedly asked him why he was interested in leaving the City of Greenfield. In response, Mollet never told him that there was any problem with retaliation or discrimination relating in any way to Hernandez. (Doc. No. 20; Mollet Dep. p. 152, lines 9-23; Mollet Dep. p. 156, lines 10-22) DPFF#51.

On February 19, 2013, Mollet informed Assistant Chief Weber that he had been offered a job with Menomonee Falls, contingent upon passing a physical and psychological exam, and would be moving forward with that. (Doc. No. 18, Cohn Aff. para. 3) DPFF#52.

15

Upon receiving the notice of the offer to Mollet from Menomonee Falls, Chief Cohn perceived this as a notice of resignation, and thus congratulated Mollet, and accepted the resignation in a letter dated February 22, 2013. (Doc. No. 18, Cohn Aff. para. 4) DPFF#53; Ehrke Aff. Ex. 9).

Upon receiving Chief Cohn's letter, Mollet delivered a letter on February 25, 2013 (which he had dated February 23) that notified the Chief that he was not yet resigning. Upon such notice, Chief Cohn responded to Mollet and indicated that Mollet would continue to receive full pay and benefits, and asked Mollet to advise if the Menomonee Falls offer fell through. Mollet received full pay and benefits until he formally resigned by letter on March 23, 2013. Mollet did not lose any pay or benefits between the time of his original verbal notification of the Menomonee Falls job and his formal resignation letter. (Doc. No. 18, Cohn Aff. para. 5) DPFF#54, Ehrke Aff. Ex. 9).

Mollet then followed up with a formal letter of resignation in March of 2013 and started his employment with Menomonee Falls on March 25, 2013. (Doc. No. 20; Mollet Dep. p. 60, lines 10-16) DPFF#55 (Ehrke Aff. Ex. 7). This March 23, 2013 resignation letter to Chief Cohn made no mention of, and did not refer in any way to any complaint of discrimination or retaliation, nor did it even mention anything relating to the Hernandez incident. (Doc. No. 20; Mollet Dep. p. 153, lines 1-10; Ehrke Aff. Ex. 7/Mollet Depo. Ex. 5, March 23, 2013 resignation letter); DPFF#56.

Mollet started at Menomonee Falls as a Battalion Chief in March of 2013, and became the highest ranking official in the Fire Department at Menomonee Falls in November of 2013. (Doc. No. 20; Mollet Dep. p. 60, lines 17-24) DPFF#57 *Criticism and "Treatment" Of Mollet.*

As one of the most significant undisputed facts in this case, (along with his confirmation that he would not have left Greenfield had the Menomonee Falls job not become known to him) Mollet himself admits that "Since the promotion of Jon Cohn to the position of chief in November of <u>2011</u>, Mr. Mollet's employment experience with the department had been, in a word, miserable." This was at least three months before the Cesar Hernandez incident. (Doc. 20, Mollet Dep. p. 72 l. 16-p. 73 l. 3).

As to criticism he now complains about, Mollet admits he was criticized in <u>2011</u> by Chief Cohn or Asst. Chief Weber for his failure to follow through with the State and make sure that his EMT license would not lapse. All of this criticism, including any allegations that he was negligent in that regard, occurred in 2011 which would have been at least three months before the Cesar Hernandez incident. (Doc. No. 20; Mollet Dep. p. 91, line 17 through p. 92, line 10) DPFF#58.

Criticism from Chief Cohn, Asst. Chief Weber, and other Battalion Chiefs, regarding Mollet's communication skills, along with comments regarding Mollet seeming disconnected and distant from the rest of the staff occurred in the period Mollet became miserable back in June of 2011. (Doc. No. 20; Mollet Dep. p. 103, line 13 through p. 104, line 2). These incidents and "treatment" again took place

17

months before as well as the months after the Hernandez incident, but Mollet admits that the Hernandez incident was never mentioned in any such communication or "criticism." (Doc. No. 20; Mollet Dep. p. 108, lines 9-18) DPFF#60.

While Mollet thought his actions or inactions were being scrutinized, whether it was because of a PR issue or something that was involved with his shift in general, he has no proof that any of the criticism he received had anything to do with the Hernandez incident. This includes any discussions regarding Mollet's job "being in jeopardy." Thus, Mollet admits he has no proof that any of this had anything to do with the Hernandez incident or his investigation thereof. (Doc. No. 20; Mollet Dep. p. 109, line 19 through p. 110, line 24) DPFF#61. As a result, the criticism and treatment cannot be shown to be related to Hernandez.

As to Mollet's perception of "criticism" and statements allegedly made by Asst. Chief Weber that the staff was "watching" Mollet, (as referenced in his complaint) ultimately Asst. Chief Weber apologized to Mollet for that within a day or two of when it came to Mollet's attention. More importantly, this occurred during the first week of January, 2012, which was over a month before the Hernandez incident. As a result, Mollet admits that Asst. Chief Weber's criticism and treatment of Mollet could not have had anything to do with Hernandez, or Mollet's handling of the Hernandez incident, as it all occurred before that incident. (Doc. No. 20; Mollet Dep. p. 112 line 13 through p. 113, line 23) DPFF#62.

With regard to alleged criticism or treatment by Ben Granberg at the City of Greenfield referenced in the complaint, Mollet admits that Mr. Granberg was not aware of the Hernandez incident, and therefore Mollet confirms that Granberg's treatment or "mistreatment" of Mollet could not have had anything to do with the Hernandez incident, because he did not know about it. In fact, the Hernandez incident never came up in any discussions Mollet had with Granberg, even in August or September of 2012. (Doc. No. 20; Mollet Dep. p. 114, lines 8-25) DPFF#63.

As another independent source of criticism unrelated to Hernandez, before Mollet went to Honduras in August of 2012, he sent a widespread email out regarding collection of gear, but he failed to include the Battalion Chiefs, the Asst. Chief or the Chief (i.e. the entire command staff) on the email, and Chief Cohn was not happy with that. Mollet apologized. Mollet confirmed that this did <u>not</u> have anything to do with Cesar Hernandez, and the Hernandez matter was not mentioned by the Chief in these conversations. The Chief simply responded by indicating that he did not take it personally, and this was about the organization, and the Chief hoped that Mollet could see that this type of a mission could cause dissent among certain individuals, including Battalion Chiefs. Chief Cohn also suggested a different form of communication so as to avoid such problems. (Doc. No. 20; Mollet Dep. p. 136 line 16 through p. 138, line 1) DPFF#64. There was no mention of Hernandez in these communications.

As to any criticism perceived by Mr. Mollet, and as referenced in his complaint, most of that occurred before the Hernandez incident. As to any such criticism or treatment perceived by Mr. Mollet after the Hernandez incident, Chief Cohn confirms that none of that had anything to do with the Hernandez situation or the investigation thereof. (Doc. No. 18, Cohn Aff. para. 7) DPFF#65. Mollet's sworn testimony and admissions confirm that he cannot dispute that fact.

As Mollet, Cohn and Weber all felt the same with regard to, and opposed discrimination in the workplace, none of the treatment or criticism perceived by Mr. Mollet could have been based on his separate "opposition to discriminatory behavior," as that opposition was identical to that of the chief and assistant chief. Mollet and Chief Cohn agreed that there was no place for such behavior in the department. (Doc. No. 18, Cohn Aff. para. 8) DPFF#66.

With regard to communications between Weber, Cohn and Mollet, Mollet admits that Asst. Chief Weber started treating Mollet differently when Weber was being considered for the Asst. Chief position and this included short and disinterested conversations, as well as the cessation of texts and phone calls from Chief Cohn to Mollet as well as Chief Cohn "distancing himself" from Mollet. This all occurred in June of 2011, eight months before the Hernandez incident. (Doc. No. 20; Mollet Dep. p. 153, line 15 through p. 154, line 11) DPFF#67.

Any disagreements between Mr. Mollet and Chief Cohn, from the time Cohn became chief, were simply because the two of them had different views of the direction the department should take and differences of opinion regarding

management styles. (Doc. No. 18, Cohn Aff. para. 9) DPFF#68.  Mollet has no proof to dispute this.

With regard to discussions relating to alleged potential demotion or termination between February 13, 2013 and March 23 referenced in Mollet's complaint, nothing in any of those discussions related to or mentioned the Hernandez incident.  In those discussions, to the limited extent that they may have occurred and mentioned "demotion," other issues independent of, outside of, and unrelated to  Hernandez were discussed.  (Doc. No. 20; Mollet Dep. p. 176 line 15 through p. 177 line 1; Doc. No. 18, Cohn Aff. para. 10)) DPFF#69

As to meetings with HR manager Ben Granberg, Mollet confirmed that in his notes from a July, 2012 with HR Manager Ben Granberg that he (Mollet) never even mentioned the Hernandez name or the investigation or incident.  In addition, in a meeting with Chief Cohn and Asst. Chief Weber in August of 2012, there was a discussion relating to performance and communications improvement, and Mollet typed up notes from that meeting, also.  Mollet confirms that none of the notes from the July 2012 meeting with Granberg or the notes from the August 2012 meeting with Cohn and  Weber mention in any way the Hernandez incident or the Hernandez investigation.  (Doc. No. 20; Mollet Dep. p. 192, lines 5-24) DPFF#70 Thus, there was no complaint upon which might be perceived as "opposition" to discrimination by Mollet.

## **ARGUMENT**

Summary Judgment Standard

In Federal Court, the Federal Rules of Civil Procedure govern procedural matters in civil actions. *Musser v. Gentiva Health Services,* 356 F. 3d 751, 754-755 (7th Cir. 2004)

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

If the moving party has a properly supported motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial. *Cincinnati Life Ins. Co. v. Beyrer,* 722 F. 3d 939, 951 (7th Cir. 2013)

The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 248. A "material fact" is one that is outcome determinative of an issue in the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) The mere existence of some *alleged* factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 242. A mere

scintilla of evidence in support of a non-movant's position is insufficient to defeat summary judgment. *Anderson,* 477 U.S. at 248. Speculation, hearsay or conclusory allegations, which are all that Mollet can present here, will not suffice to defeat summary judgment.  *Gobitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see also Mills v. First Federal Savings & Loan*, 83 F.3d 833, 840 (7th Cir. 1996).

The application of these legal standards makes it clear that the complaint should now be dismissed.

Constructive Termination Based on Discrimination:
Plaintiff Must Show That The Employer Acted Illegally <u>And</u>
That Such Actions Created An Intolerable Work Environment

The constructive discharge doctrine contemplates a situation in which 1) an employer discriminates against an employee (which does not exist here) to the point such that 2) his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.  *Green v. Brennan*, 542 U.S. 141, 136 S.Ct. 1769 (2016). An employee can only be constructively discharged if the underlying working conditions were themselves unlawful or discriminatory in some fashion.  *Gawley v. Ind. Univ.* 276 F. 3d 301, 315 (7th Cir. 2001); *Simpson v. Borg-Warner Automotive*, 196 F. 3d 873 (7th Cir. 1999) Lacking such proof, or a question of fact on that issue, as is the case here, the analysis ends and the case must be dismissed.  Here Mollet bases his claim of illegal discrimination on the sole concept of his "opposition to discrimination." His "opposition" was limited to his expression that he "did not think the Hernandez

23

incident was appropriate." (DPFF#20), the same opposition expressed by Chief Cohn and Assistant Chief Weber. He submits nothing to tie his "opposition" to the alleged mistreatment by the command staff or his resignation.

> There Was No Illegal Discrimination Based on
> Opposition When Mollet, The Chief and The
> Assistant Chief Were Unified In Their Opposition

In order to even reach a question of constructive termination, a Plaintiff must first show that their employer illegally discriminated against them. (*Simpson*) Mollet admits at the outset that he and his superiors—an Assistant Fire Chief and the Fire Chief--shared the same opposition to the alleged discriminatory behavior in this case. (DPFF# 19, 20) He admits that, in spite of the fact that Cesar Hernandez made no complaint nor sought any investigation, Chief Cohn, Asst. Chief Weber, and Mollet were all "on the same page" in their opposition to such behavior (DPFF# 19), leading to the request to Mollet to investigate. They asked him to investigate, and report his findings to the Assistant Chief. He did that. They took his findings, along with the admissions of another battalion chief, and delivered quick discipline, showing the identical opposition to the behavior. Here, as in *Simpson,* Mollet has shown no direct evidence of discrimination based on his "opposition" to the Hernandez situation. (DPFF#19, 20). It makes no sense that the chief and assistant chief would confirm their opposition, use Mollet's findings in part, punish those involved, and then criticize or mistreat him for his identical "opposition." There is no remaining question of fact to show anything other than identical opposition among them. For any treatment he theoretically perceives as negative after the

24

Hernandez incident, he admits he is unable to show any causal link of such "treatment" to anything that occurred with regard to Hernandez. (DPFF# 60, 61, 62, 63, 64, 65, 68, 69, 70) As such a link is required in the law (see *Rabinovitz v. Pena*, 89 F. 3d 482, 489), this is another natural stopping point for the analysis, and the case should be dismissed.

There is no remaining question beyond speculation and unsupported conclusory allegations to show that the chief or assistant chief discriminated against Mollet. This, again, by itself justifies dismissal of the complaint.

Even if Mollet could survive summary judgment on these initial required elements, the law on constructive termination shows additional independent grounds for dismissal.

> There Is No Basis For A Claim Of Objectively Intolerable
> Conditions On Any Ground, Discriminatory Or Otherwise So
> The Complaint Should Be Dismissed On This Independent Ground

In addition to the lack of proof regarding discrimination, Mollet fails to provide any proof of or claim for damages that would have arisen in the year he worked after the Hernandez incident, or which could be differentiated from his deteriorated relationship with the chief and assistant chief and resultant "miserable" work life that existed long before the Hernandez incident. The second required element of the constructive discharge doctrine requires proof a Plaintiff's "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign. *Green v. Brennan*, 542 U.S. 141, 136 S.Ct. 1769 (2016) To establish the second element of constructive termination, a Title VII plaintiff must show not only that what he perceives as negative work conditions are the result of illegal

25

discrimination, (one cannot complain about a constructive discharge unless there is a causal relation between the discrimination and the discharge (*Rabinovitz v. Pena*, 89 F. 3d 482, 489) but also that his working conditions were objectively **so** intolerable that a reasonable person would have been compelled to resign. *Simpson v. Borg-Warner Automotive*, 196 F. 3d 873 (7th Cir. 1999) Mollet's willingness to work for a year after the Hernandez investigation, until he got an unsolicited email about the Menomonee Falls job belies any such conclusion. For constructive termination, the working conditions for constructive discharge must be "even more egregious than the high standard for hostile work environment," and the job conditions must be "unbearable." *Drake v. Minnesota Mining & Manufacturing Co*., 134 F. 3d 878, 886 (7th Cir. 1998); *Robinson v. Sappington*, 351 F. 3d 317, 336, (7thCir. 2003), *Tutman v. WBBM-TV*, 209 F. 3d 1044, 1050 (7th Cir. 2000).

Mollet offers only after the fact conclusory allegations about his reason for leaving Greenfield in a failed attempt to tie that to the Hernandez situation. Unsupported assertions of criticism of his communication skills and abilities as a public relations officer (Comp. paras. 17, 25), removal from certain (yet undefined) roles in the department without any allegation of loss of pay or benefits (Comp. para. 18), vague "routine" or "weekly" (yet undefined) insulting comments and actions (Comp. para. 19), generalized comments (without detail as to date, time, place or participants) about Mollet's job, (Comp. para. 20), suggestions that he change (Comp. para. 34) or undetailed "discussions" regarding the command staff distrust of him (Comp. para. 35) fail to reach the intolerable/unbearable level

required under the law, even if they could somehow be tied to illegal discrimination here. Any assertion of an intolerable environment is directly contradicted by his contemporaneous actions when he first heard from the Chiefs Association regarding the Menomonee Falls job. For nine months after Hernandez, he continued to work at Greenfield without complaint, without departure, and without even looking for a job. His own admissions and common sense confirm that circumstances relating to Hernandez at Greenfield had nothing to do with his learning of, applying for, and ultimately receiving the new job at Menomonee Falls. He can hardly argue that his working conditions were so objectively intolerable, and "unbearable" to cause him to quit, when he admitted that had not looked for and was not looking for any jobs prior to hearing about Menomonee Falls (DPFF# 44) and that he would have stayed at Greenfield had he not received the initial blast email about the Menomonee Falls battalion chief job in December of 2012. (DPFF#45) Combine that with his expressed reason for seeking the Menomonee Falls Job (desire to face the challenges of a combination department that was upgrading its EMS services—DFPP#47), and the fact that in repeated conversations he never told the Menomonee Falls investigator that he was leaving Greenfield for any Hernandez related reasoning (DPFF# 51), and there remains no question as to the fact that his conditions at Greenfield were anything but "unbearable" or intolerable. There are no <u>reasonable</u> inferences to the contrary. It was only after he started with Menomonee Falls that he came up with the constructive termination theory, albeit without any legitimate proof to support same.

27

The "treatment" he now complains about existed before and after Hernandez. He sustained no loss of pay or benefits in that time frame. There was no demotion. Compared with the constructive termination case law where there was discrimination involving physical assault, sexual assault, repeated sexual comments, death threats, threats of violence, and repeated racial comments and threats where employment actually became intolerable and unbearable, simple criticism of one's performance or communications, and expressions of lack of trust or doubt about one's job, about which Mollet now complains, are inadequate to constitute an objectively intolerable and unbearable  work environment. Mere reassignment or withdrawal of duties, without a loss of pay or benefits, does not meet the threshold requirement to constitute an adverse employment action. Even in a light most favorable to Mollet, the environment and treatment about which he now complains existed before Hernandez and, at best, simply continued after the incident.  There remain no questions of material fact on these issues.

The 7th Circuit court of Appeals has found that a range of unpleasant and even embarrassing employer actions are in fact tolerable and therefore insufficient to effect a constructive discharge. These include arbitrary reprimands, exclusion from office activities, and lack of supervisor support. The same is true for a series of work restrictions including limited secretarial access, denial of a flex time request, a bar on speaking to colleagues about non work matters, and truncated breaks.  Even an environment where coworkers husband and wife were shunned, received harassing calls, had their papers in work lockers gone through and were told their

28

safety may be in jeopardy were found "unpleasant, but not intolerable. *Simpson*, 196 F. 3d 873, 877. Citing *Harriston v. Chicago Tribune Co*, 992 F. 2d 697 (7th Cir. 1993), *Rabinovitz v. Pena,* 89 F. 3d 482, 489, and *Drake v. Minnesota Mining & Manufacturing*, 134 F. 3d 878, 886 (7th Cir. 1998). All of these are more serious than Mollet's complaints, yet fail to reach the required threshold. As in *Simpson*, then, Mollet presents no facts to show that a sufficiently intolerable and unbearable environment existed for him in Greenfield. He has submitted no proof that his work environment in the ten months after the Hernandez incident was significantly different than that before Hernandez, or so severe, pervasive, intolerable and unbearable so as to reach the threshold level required by *Robinson v. Sappington*, 351 F. 3d 317, 336, (7thCir. 2003) and *Tutman v. WBBM-TV*, 209 F. 3d 1044, 1050 (7th Cir. 2000).

Finally, the passage of a year between the conclusion of the Hernandez investigation and Mollet's actual resignation to take the Menomonee Falls job, without any complaints about mistreatment or a hostile work environment to the command staff or HR in interim July and August 2012 meetings (recall he testified these were not discussed-DPFF# 63, 70) makes it clear that there are no questions of fact that would allow Mollet to avoid the dismissal of his constructive termination claim.

## CONCLUSION

Based on the undisputed facts in this case, based primarily on Plaintiff's own admissions and testimony, and under the Summary Judgment, Discrimination, and

Constructive Termination legal standards, this matter is in proper position for dismissal. There remain no questions of material fact on any of the multiple and independent elements necessary for his suit to survive. Even aking all of these undisputed facts in a light most favorable to him, and drawing all _reasonable_ inferences in his favor, there is no genuine issue of material fact requiring a trial. The City of Greenfield Fire Department is entitled to judgment of dismissal as a matter of law.

Dated this 30th day of March, 2018.

CRIVELLO CARLSON, S.C.
Attorneys for Defendant
City of Greenfield (Fire Department)


By:    s/    _William W. Ehrke_
              WILLIAM W. EHRKE
              State Bar No.: 1005619

PO ADDRESS:
710 North Plankinton Avenue
Suite 500
Milwaukee, WI 53203
Phone: 414-290-7570
Fax: 414-271-4438
Email: wehrke@crivellocarlson.com