# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JAMES A. MOLLET,**

        **Plaintiff,**

       v.                       **Case No. 16-CV-1145**

**CITY OF GREENFIELD,**

        **Defendant.**

## REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff James A. Mollet brought this action against defendant City of Greenfield, alleging retaliation for opposing discrimination in the workplace, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. (ECF No. 1.) The City of Greenfield moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). (ECF No. 17.) On July, 24, 2018, Judge Adelman, before whom the action is pending, referred the City of Greenfield's motion to this court for a report and recommendation. (ECF No. 41.)

# FACTS

## A. Greenfield Fire Department

Mollet began his employment with the Greenfield Fire Department in 1995 as a firefighter. (ECF No. 28, ¶ 1.) He rose through the ranks of the fire department and was ultimately promoted to Battalion Chief for the "B" shift in November 2009. (ECF No. 39, ¶¶ 1, 3.) As a Battalion Chief, Mollet was one of five members of the command staff; the other members of the command staff were Battalion Chief Shawn Hammernik for "A" shift, Battalion Chief Jeff Hohensee for "C" shift, Assistant Chief George Weber, and Chief John Cohn. (*Id.*, ¶ 4.)

Cohn was appointed Interim Chief of the department in June 2011 and was named permanent Chief in November 2011. (ECF No. 28, ¶ 4.) Once Cohn was appointed Chief, Mollet's employment with the City of Greenfield became miserable. (*Id.*, ¶ 6.) Prior to Cohn being appointed Chief, he and Mollet were friendly, but after he became Chief all text messages and phone calls between he and Mollet immediately stopped. (ECF No. 28, ¶ 7; ECF No. 39, ¶ 22.) Mollet and Cohn's relationship was further strained after Cohn was appointed Chief because Cohn was not behaving consistently with the vision for the fire department he had discussed with Mollet prior to his promotion. (*Id.*)

In August 2011, Cohn criticized Mollet for allowing his EMT certification to lapse. (ECF No. 39, ¶¶ 24-25.) Mollet explained that his EMT certification was not

lapsed and reported that there was some problem with the processing of his certification. (*Id.*, ¶ 24.) The EMT certification issue was eventually resolved. (ECF No. 29-3.)

Prior to being appointed to Assistant Chief in January 2012, Weber served as a Lieutenant under Mollet. (ECF No. 39, ¶ 7.) Weber started treating Mollet differently when Weber was being considered for the Assistant Chief position. (ECF No. 28, ¶ 67.)

**B. Hernandez Incident**

At the end of their shifts, firefighters are expected to stow or put away their gear or bedding. (ECF No. 28, ¶ 8.) When a firefighter either forgets or neglects to put away his or her gear or bedding, firefighters at the beginning of the next shift will sometimes ball it up or pull some other "prank" with it. (*Id.*)

After leaving the fire station on February 17, 2012, firefighter Cesar Hernandez forgot to stow away his bedding. (ECF No. 28, ¶ 9.) When he returned, Hernandez found his bedding rolled up and hung with caution tape from the ceiling supports. (*Id.*, ¶ 11.) On the wall next to where his bedding was hanging was a paper version of an 8 ½ x 11'' Mexican flag with the words "Border Patrol" printed below it. (*Id.*) Hernandez took down his bedding and taped the sign of the Mexican flag to the front of his locker at the station. (*Id.*, ¶ 12.) The incident apparently did not bother Hernandez, who did not feel as if he had been the victim of any type of discriminatory behavior. (*Id.*, ¶ 13.) Hernandez did not file any type of complaint related to the incident. (*Id.*, ¶ 14.)

Even though the incident did not bother Hernandez, it bothered other employees of the fire department. On February 19, 2012, firefighter Donna Perkins saw the sign with the Mexican flag and "Border Patrol" written underneath and reported it to her immediate superior officer, Lieutenant P. Sustachek, because she thought it was discriminatory. (ECF No. 39, ¶ 34.) Lieutenant Sustacheck and firefighter/paramedic Garett Cieczka then met with Mollet to report the incident. (*Id.*, ¶ 35.) Cieczka informed Mollet that Hammernik had shown him a photograph of the bedding incident on Hammernik's phone. (*Id.*, ¶ 37.)

That evening Mollet emailed Chief Cohn and Assistant Chief Weber to report the incident. (ECF No. 39, ¶ 38.) Assistant Chief Weber replied to Mollet's email, stating:

> Thank you for bringing this to our attention. I agree with you 100% that this crosses the line of firehouse hazing. Could you do some investigating into this incident and report any findings back to me. This type of behavior should not and will not be tolerated. Please let me know what you find out.

(ECF No. 22-3 at 1.) Mollet responded:

> Thanks for your quick response. I'm glad you share the sentiments in the seriousness of this incident. With all due respect, I would rather not conduct an investigation as to alleviate inner quarrels amongst shifts and tension(s) between Shift Officers/Commanders.

(*Id.*) Chief Cohn then responded to Mollet's email:

> Although there is a perception that things are done 'by the seat of our pants' this is quite contrary to what actual[ly] occurs in the background. This was yet again the case for this incident. This item was decided upon for actual, thoughtful reasons.

> Handing this back over to [Battalion Chief](s) and Company Officer(s) under who's watch this incident may have occurred would be totally wrong. In an effort to get the facts while being impartial, this was assigned to you for those reasons by [Assistant Chief Weber].
>
> While this has the opportunity to become an issue amongst shifts it is completely in the handling that minimizes this potential. This should not be framed as individuals or a shift having issue but a departmental issue that cannot exist for numerous reasons and must cease.
>
> Being in a leadership role requires making what appears to be unpopular decisions but protects individuals and the integrity of the organization. While these actions can be perceived as unpopular and definitely have the opportunity to create quarrels and tensions; it is in the delivery and corrective actions in which members should understand the need for ceasing these behaviors. Ironically, when handled properly, these instances create respect and understanding for the difficult situations we deal with while trying to protect the organization. So if [you] are concerned about individual and shift over organization and you still 'would rather not' or choose not to; please advise immediately as this matter must be addressed and will be re-evaluated for assignment of fact finding.
>
> However, if you need assistance or guidance please advise [Assistant Chief Weber] (or me).

(ECF No. 22-4.)

Mollet agreed to undertake the investigation. (ECF No. 28, ¶ 26.) At some point during the investigation Hammernik took responsibility for the Hernandez incident because it happened on his watch. (*Id.*, ¶ 35.) Assistant Chief Weber thereafter told Mollet that he and Chief Cohn would take over the investigation and that Mollet should forward his findings to them. (ECF No. 22-5 at 2.) On February 23, Mollet emailed his findings from the investigation to Assistant Chief Weber. (ECF No. 22-5.) As a result of

the Hernandez incident, four individuals were disciplined: Hammernik lost a day of vacation (which amounted to about a loss of $720.00) and three other firefighters received verbal reprimands. (ECF No. 28, ¶¶ 40-41.)

**C. Criticism and Mistreatment**

On a number of occasions after the Hernandez incident Chief Cohn and Assistant Chief Weber made comments or decisions that Mollet argues constituted criticisms of his performance. In March 2012 Cohn and Weber were critical of Mollet's ability to check off probationary firefighters on certain tasks, something he had been doing successfully for years. (ECF No. 39, ¶ 50.) In April 2012 Weber told Mollet that Weber would take over the lead on Rapid Intervention Team training, which previously had been done by Mollet. (*Id.*, ¶ 55.) In May 2012 Mollet was removed from overseeing the firefighter internship program after Administrative Assistant Mary Read was told that one of Greenfield's interns had listed the Greenfield Fire Department as a former employer on a job application for another employer. (*Id.*, ¶ 56.)

On August 10, 2012, Chief Cohn told Mollet that he was upset about the press coverage of Mollet's mission trip to Honduras, and criticized Mollet's internal communications regarding the purpose of the trip. (ECF No. 39, ¶ 57.) Cohn also criticized Mollet for failing to engage in informal communication by way of text messaging. (*Id.*, ¶ 61.) During the August 10, 2012 meeting, Assistant Chief Weber criticized the manner in which Mollet was speaking with his crew of firefighters even

6

though Weber did not know the content of the conversation, effectively accusing Mollet of colluding with non-command staff against Weber and Cohn. (*Id.*, ¶ 62.)

Also in August 2012 Chief Cohn criticized Mollet for issuing a commendation letter to Department of Public Works employees (something Mollet had been doing for years) without letting him know. (ECF No. 39, ¶ 66.) In November 2012 Mollet's training of two EMTs on his shift was criticized, and he was also criticized for failing to tell Cohn that he was aware that one of the firefighters was having marital problems. (*Id.*, ¶ 67.)

During a meeting with Mollet on November 15, 2012, Chief Cohn criticized Mollet's leadership. (ECF No. 39, ¶¶ 68-69.) Cohn told Mollet that he could either change his leadership style or "get off the bus." (*Id.*, ¶ 70.) Cohn also told Mollet that Cohn thought it was too late for Mollet to change and suggested that there might be a reorganization of the department that would include Mollet's demotion or reassignment to a non-Battalion Chief position. (*Id.*, ¶ 71.) During that meeting Cohn told Mollet that he could not trust Mollet anymore because Mollet had spoken with Ben Granberg, the City's Human Resource Director, and had tried to speak with the Greenfield Mayor. (*Id.*, ¶ 72.)

**D. Menomonee Falls**

In December 2012 Mollet received an email blast from the Wisconsin State Fire Chiefs Association informing him that a position with Menomonee Falls was available

7

as a Battalion Chief. (ECF No. 28, ¶ 43.) Mollet decided to apply for the position. (ECF No. 39, ¶ 85.) Mollet wrote in his application that he was motivated to apply for the position because he wanted an opportunity to face the unique challenges of a combination department such as Menomonee Falls where the Fire Department and Police Department operated under a singular Public Safety Director. (ECF No. 28, ¶ 47; *see* ECF No. 22-6.) Mollet was also interested in the position because Menomonee Falls was considering upgrading its emergency medical service from an EMT IV Technician to the Paramedic level. (*Id.*) Mollet submitted his application for the Menomonee Falls position on December 27, 2012. (ECF No. 28, ¶ 49.)

On February 4 or 5, 2013, Mollet received a conditional offer of employment from Menomonee Falls. (ECF No. 39, ¶ 86.) On February 14, Chief Cohn and Assistant Chief Weber told Mollet that he did not fit in with the Greenfield Fire Department and that he needed to leave. (*Id.*, ¶ 93.)

On February 19, 2013, Mollet told Weber that he was moving forward with the Menomonee Falls offer, contingent upon passing a physical and psychological exam. (ECF No. 39, ¶ 94.) On February 22, Mollet received an emailed letter from Chief Cohn indicating that he was accepting Mollet's resignation. (ECF No. 29-1 at 3.) On February 25, Mollet hand-delivered a letter to Cohn which stated that he was not resigning. (*Id.* at 4.) On February 28, Cohn responded to Mollet's letter, telling him that Mollet's

8

employment with the Greenfield Fire Department was over effective February 24, 2013. (*Id.* at 5.)

Mollet's attorney wrote a letter to the Greenfield City Attorney arguing that Chief Cohn had illegally discharged Mollet. (ECF No. 29 at 3-4.) Mollet was placed on paid leave pending the outcome of the Menomonee Falls job offer. (ECF No. 39, ¶ 100.) Mollet submitted his letter of resignation on March 23, 2013, and began his employment with Menomonee Falls on March 25, 2013. (*Id.*)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable finder of fact could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

**ANALYSIS**

Title VII of the Civil Rights Act of 1964 bars employers from retaliating against their employees for complaining about discrimination. 42 U.S.C. § 2000e-3(a). The incident that provides the basis for Mollet's retaliation claim is that relating to Hernandez and the posting of a picture of the Mexican flag with "Border Patrol" written across the bottom.  For his retaliation claim to survive summary judgment, Mollet must show that a reasonable jury could find that (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; and (3) the protected activity and the adverse action are causally connected. *Robinson v. Persales*, 894 F.3d 818, 830 (7th Cir. 2018).

**A. Protected Activity**

Protected activity is activity that identifies discrimination based on sex, race, national origin, or some other protected class. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  "It is not necessary that the conduct the plaintiff opposed actually violated Title VII; rather, the plaintiff's opposition is protected if he [had] an honest, good faith, and reasonable belief that the conduct he [] oppos[ed] is prohibited by Title VII." *Chapman v. Milwaukee County*, 151 F. Supp. 892, 897 (E.D. Wis. 2015) (citing *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011)).

The City of Greenfield does not dispute that Mollet engaged in protected activity when he complained that Hernandez, a Latino firefighter, was harassed on the basis of his ethnicity and/or national origin. (ECF No. 22-3 at 2.)

**B. Adverse Action**

An adverse employment action is "'a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (quoting *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)) (alterations in original). While "an adverse action need not be quantifiable in terms of pay or benefits[,] … 'not everything that makes an employee unhappy is an actionable adverse action.'" *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 466 (7th Cir. 2002) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).

The only adverse employment action advanced in Mollet's brief is constructive discharge. "An employee is constructively discharged when, from the standpoint of a reasonable employee, the working conditions become unbearable." *Wright v. Ill. Dep't of Children and Family Servs.*, 798 F.3d 513, 527 (7th Cir. 2015). "[T]o establish 'constructive discharge,' the plaintiff must … show that the abusive working environment became so intolerable that [his] resignation qualified as a fitting response." *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004). "A constructive discharge constitutes an adverse employment

11

action." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citing *Pa. State Police*, 542 U.S. at 147).

The Court of Appeals for the Seventh Circuit has recognized two forms of constructive discharge, both of which require unendurable or intolerable working conditions. *Chapin*, 621 F.3d at 679. Although it's not clear, it appears Mollet contends he was the victim of both forms of constructive discharge. (ECF No. 26 at 20-23.)

The first form of constructive discharge occurs when "an employee resigns due to discriminatory harassment." *Chapin*, 621 F.3d at 679. "Such cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim[.]" *Id.* Mollet asserts that criticism from Chief Cohn and Assistant Chief Weber became more frequent and more intense after the Hernandez incident. Cohn and Weber allegedly criticized him with regard to his job duties (ECF No. 30, ¶¶ 26, 36, 39-40, 52), his leadership (*Id.*, ¶¶ 27, 42-43, 51), and his communication (*Id.*, ¶¶ 30, 33-35, 38, 46, 49-50). Mollet also claims that he was removed from his responsibilities of conducting Rapid Intervention Team training (*Id.*, ¶ 28) and overseeing the firefighter internship program (*Id.*, ¶ 29).

Although perhaps unpleasant and frustrating to Mollet, these events do not constitute the type of discriminatory harassment necessary to establish that Mollet was the victim of a constructive discharge. In cases finding a constructive discharge due to discriminatory harassment, or allowing a claim of constructive discharge claim to

12

advance, the plaintiffs suffered from much more severe and sustained harassment than the type of harassment Mollet alleges. *See, e.g., Pa. State Police*, 542 U.S. at 135-36; *Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789-90 (7th Cir.2007); *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1198-99 (7th Cir. 1992); *Snider v. Consolidation Coal Co.*, 973 F.2d 555, 558 (7th Cir. 1992).

The second form of constructive discharge occurs when "'an employer acts in a manner so as to have communicated to a reasonable employee that [he] will be terminated'[.]" *Chapin*, 621 F.3d at 679 (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)). The inquiry under this form of constructive discharge is "whether the employee's working conditions had become intolerable because the employer had conducted itself in a manner that made it objectively clear that the employee's discharge was imminent and inevitable." *Wright*, 798 F.3d at 528. "An employee's work environment thus becomes intolerable … when the employer's actions communicate to the employee that [he] immediately and unavoidably will be terminated." *Id.* at 528-29 (emphasis omitted).

Mollet claims that Chief Cohn and Assistant Chief Weber first made it clear that his job was in jeopardy in a meeting in August 2012. (ECF No. 24 at 21; ECF No. 30, ¶ 37.) And in November 2012 Cohn allegedly told Mollet that he could either "change or get off the bus," meaning he could either change his leadership style or quit. (ECF No. 24 at 21; ECF No. 30, ¶ 43.)

13

Mollet claims he received a conditional offer to be a Battalion Chief with Menomonee Falls on either February 4 or 5, 2013. (ECF No. 30, ¶ 59.) Chief Cohn and Assistant Chief Weber asked to meet with Mollet on February 8, and, at some point, Cohn or Weber allegedly asked, "What would it take for you to leave?" (*Id.*, ¶ 64.) On February 14, Cohn and Weber allegedly told Mollet that he did not fit in and needed to leave. (*Id.*, ¶ 66.) Cohn supposedly implied that, if Mollet did not leave voluntarily, he might be forced to leave. (*Id.*)

On February 22, 2013, Chief Cohn sent a letter to Mollet indicating that the City of Greenfield had accepted Mollet's resignation as Greenfield Battalion Chief. (ECF No. 29 at 5.) Mollet responded, "I will not be resigning until my requirements for the Menomonee Falls Fire Department have been met and I have received an unconditional offer of employment." (*Id.* at 6.) On February 28, Chief Cohn replied, "we stand by the resignation and separation date at the conclusion of payroll on Sunday February 24, 2013." (*Id.* at 7.)

When Mollet's attorney wrote the Greenfield City Attorney arguing that Mollet had been improperly discharged (ECF No. 29 at 3-4), Mollet was placed on paid leave pending the outcome of the conditional offer of employment from Menomonee Falls. (ECF No. 30, ¶ 75.) Mollet ultimately submitted his letter of resignation on March 23, 2013. (ECF No. 30, ¶ 76.)

Construing all of this evidence in favor of Mollet, a reasonable employee in Mollet's shoes could have believed that, had he not resigned, he would have been fired. *See Univ. of Chi. Hosp.*, 276 F.3d at 332. Accordingly, a reasonable jury could find that Mollet was constructively discharged—that is, that he suffered a materially adverse employment action.

**C. Causation**

The last question in determining whether Mollet was retaliated against is whether a reasonable trier of fact could find that Mollet's constructive discharge was causally connected to his opposition to discrimination. "To prove causation, the plaintiff must show that 'the desire to retaliate was the but-for cause of the challenged employment action.'" *Robinson*, 894 F.3d at 830 (quoting *Gracia v. SigmaTron Int., Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016) (internal citation omitted)).

Mollet argues that conditions at Greenfield "rapidly deteriorated" after he complained about the Hernandez incident, ultimately leading to his constructive discharge. (ECF No. 26 at 27-28.) The City of Greenfield contends Mollet has failed to provide any evidence that "could be differentiated from his deteriorated relationship with [Chief Cohn] and [Assistant Chief Weber] and resultant 'miserable' work life that existed long before the Hernandez incident." (ECF No. 24 at 25.)

Even construing all of the evidence in Mollet's favor, no reasonable trier of fact could find that Mollet's opposition to discrimination was the but-for cause of the

15

constructive discharge. Mollet acknowledged at his deposition that his employment with the City of Greenfield became "miserable" once Cohn became Chief in November of 2011--at least three months *before* the Hernandez incident. (ECF No. 20 at 73-74.) Mollet testified that, once Cohn became interim chief, text messages and phone calls between he and Cohn "stopped or ceased immediately," and Cohn's leadership of the fire department was not consistent with what he and Cohn had previously discussed. (*Id.* at 75, 201.) Also, about a month before the Hernandez incident, Mollet was told by a few members of his shift that Assistant Chief Weber had told them that management was "watching" Mollet. (ECF No. 20 at 112-113; ECF No. 27 at 5.)

With regard to the Hernandez incident itself, both Chief Cohn and Assistant Chief Weber agreed with Mollet that the conduct of which he complained was unacceptable. Assistant Chief Weber wrote to Mollet,

> Thank you for bringing this to our attention. I agree with you 100% that this crosses the line of firehouse hazing. Could you do some investigating into this incident and report any findings back to me. This type of behavior should not and will not be tolerated. Please let me know what you find out.

(ECF No. 22-3 at 1; *see* ECF No. 20 at 35-36.) Chief Cohn and Assistant Chief Weber disciplined four different individuals in connection with the Hernandez incident. Because they agreed with Mollet that the hazing of Hernandez was unacceptable and that those involved needed to be disciplined, no basis exists for concluding that either

Chief Cohn or Assistant Chief Weber retaliated against Mollet for having reported the incident to them.

In response to the City pointing out that both Cohn and Weber agreed with Mollet about the need to deal with whoever was responsible for posting the "Border Patrol" sign, all Mollet offers is that "[w]hile it appeared that Mollet, Weber and Cohn were 'on the same page,' on Februrary 19, 2013, one has to wonder whether that was, in fact, the case." (ECF No. 26 at 28.) Wondering whether "that is the case" is not the same as presenting evidence that that was not the case. And to survive summary judgment Mollet has to do more than just wonder; he has to present evidence that Cohn and Weber were somehow unhappy with him for expressing his opinion that something needed to be done in response to the Hernandez incident and, as a result, retaliated against him.

But Mollet has put forth no evidence, other than what he characterizes as "suspicious timing," that any perceived negative treatment he received from either Chief Cohn or Assistant Chief Weber had anything to do with the Hernandez incident. Mollet admitted at his deposition that he didn't have any proof that Cohn's and Weber's criticisms were in any way related to the Hernandez incident. (ECF No. 20 at 110-11.) In an August 2012 meeting with Cohn and Weber in which they discussed Mollet's performance and how his communication could improve, Mollet made no reference to the Hernandez incident or any belief that he was being mistreated because he had

17

complained about the Hernandez hazing. (*Id.* at 193.) And Mollet's March 23, 2013, resignation letter to Chief Cohn made no complaint of discrimination or retaliation. (ECF No. 22-7; ECF No. 20 at 154.)

Indeed, even Mollet's allegation of "suspicious timing" is not supported by any facts. He concedes that he began having problems with Cohn and Weber months *before* the Hernandez incident. That the problems continued after he reported his concern over the Hernandez hazing does not render the subsequent problems he had with them "suspicious" at all.

As such, the court recommends granting the City of Greenfield's motion for summary judgment as to Mollet's retaliation claim under Title VII.

**IT IS THEREFORE RECOMMENDED** that the defendant's motion for summary judgment (ECF No. 17) be **granted**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Civ. P. 72(b)(2) whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of service of this recommendation. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 23rd day of August, 2018.

*William E. Duffin*
WILLIAM E. DUFFIN
U.S. Magistrate Judge